John M. Desmarais (SBN 320875)
jdesmarais@desmaraisllp.com
DESMARAIS LLP
101 California Street
San Francisco, CA 94111
(415) 573-1900

Tamir Packin (SBN 317249)
tpackin@desmaraisllp.com
Carson Olsheski (*admitted pro hac vice*)
colsheski@desmaraisllp.com
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
(212) 351-3400

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND

| | |
|---|---|
| CISCO SYSTEMS, INC., a California Corporation, CISCO TECHNOLOGY, INC., a California Corporation<br><br>Plaintiffs,<br><br>v.<br><br>WILSON CHUNG, JAMES HE, JEDD WILLIAMS, and THOMAS PUORRO, individuals, and PLANTRONICS, INC. dba POLY, a Delaware Corporation<br><br>Defendants. | Case No. 4:19-CV-07562<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT PLANTRONICS, INC.'S MOTION TO DISMISS**<br><br>Date:   March 18, 2020<br>Time:   9:00am<br>Judge:  Hon. Phyllis J. Hamilton<br>Dept.:   Courtroom 3 |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................... 1

OVERVIEW OF ALLEGATIONS ................................................................................. 2

I.   Poly ......................................................................................................... 2

II.  Dr. Chung ................................................................................................ 2

III. Mr. He .................................................................................................... 4

IV.  Messrs. Williams & Puorro ..................................................................... 4

LEGAL STANDARD ..................................................................................................... 5

POLY'S MOTION TO DISMISS SHOULD BE DENIED ............................................. 5

I.   The Detailed Factual Recitations In The First Amended Complaint Plausibly Allege That Poly Misappropriated Cisco's Trade Secrets. ...................................... 5

     A.   Cisco Has Described The Subject Matter Of The Trade Secrets With Sufficient Particularity At This Early Stage Of The Case. ................................... 6

     B.   Cisco Has Sufficiently Pled Independent Economic Value Of The Trade Secrets At Issue. ................................................................................ 12

     C.   Poly Is Liable For The Actions Of Its Employees Under Multiple Theories Alleged In The First Amended Complaint ............................................ 14

          1.   Poly is vicariously liable for the actions of Dr. Chung and Mr. He performed within the scope of their employment. ................................ 14

          2.   Poly is vicariously liable for the actions of Mr. Puorro performed within the scope of his employment. ........................................... 16

          3.   Poly is directly liable for trade secret misappropriation at least because it ratified Dr. Chung's and Mr. Williams' conduct. .................... 16

II.  Cisco's Intentional Interference With Contract Claim Does Not Arise From The Same Nucleus Of Facts As Its Trade Secret Misappropriation Claims And Is Not Preempted. ........................................................................ 19

III. Poly's Efforts To Join Dr. Chung and Mr. Williams' Motions Must Fail ........................ 20

CONCLUSION ............................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Acrisure of California, LLC v. SoCal Commercial Ins. Servs., Inc.*,
2019 WL 4137618 (C.D. Cal. Mar. 27, 2019)...................................................................... 14

*Alta Devices, Inc. v. LG Elecs., Inc.*,
343 F. Supp. 3d 868 (N.D. Cal. 2018) ............................................................................ 5, 10

*AlterG, Inc v. Boost Treadmills LLC*,
2019 WL 4221599 (N.D. Cal. Sept. 5, 2019) ................................................................... 9, 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................................ 5

*Autodesk, Inc. v. ZWCAD Software Co.*,
2015 WL 2265479 (N.D. Cal. May 13, 2015)........................................................................ 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................................ 5

*Bladeroom Grp. Ltd. v. Facebook, Inc.*,
2015 WL 8028294 (N.D. Cal. Dec. 7, 2015)....................................................................... 11

*C.R. v. Tenet Healthcare Corp.*,
169 Cal. App. 4th 1094 (2009) ............................................................................................ 17

*Calendar Research LLC v. StubHub, Inc.*,
2017 WL 10378336 (C.D. Cal. Aug. 16, 2017)............................................................... 12, 14

*Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*,
2019 WL 2177262 (C.D. Cal. May 20, 2019) ....................................................................... 9

*Citcon USA, LLC v. RiverPay Inc.*,
2019 WL 917056 (N.D. Cal. Feb. 25, 2019) ............................................................. 14, 15, 16

*Competitive Techs. v. Fujitsu Ltd.*,
286 F. Supp. 2d 1118 (N.D. Cal. 2003) ............................................................................... 16

*Contemporary Servs. Corp. v. Landmark Event Staffing Servs., Inc.*,
677 F. App'x 314 (9th Cir. 2017) ........................................................................................ 17

*Courtesy Temp. Serv., Inc. v. Camacho*,
222 Cal. App. 3d 1278 (Ct. App. 1990)............................................................................... 14

*Emazing Lights LLC v. De Oca*,
2016 WL 3658945 (C.D. Cal. Jan. 7, 2016) ........................................................................ 11

*Epicor Software Corp. v. Alt. Tech Sols., Inc.*,
2015 WL 12724073 (C.D. Cal. 2015).................................................................................. 20

*Farhang v. Indian Inst. of Tech., Kharagpur*,

2010 WL 2228936 (N.D. Cal. June 1, 2010) ........................................................................ 11

*Fortinet Inc. v. FireEye Inc.*,
  2014 WL 4955087 (N.D. Cal. Sept. 30, 2014) ...................................................................... 9

*Fuhu, Inc. v. Toys "R" US, Inc.*,
  2013 WL 12097569 (S.D. Cal. Mar. 1, 2013) ...................................................................... 13

*Gabriel Techs. Corp. v. Qualcomm, Inc.*,
  2011 WL 6152240 (S.D. Cal. Dec. 12, 2011) ...................................................................... 11

*Garcia ex rel. Marin v. Clovis Unified Sch. Dist.*,
  627 F. Supp. 2d 1187 (E.D. Cal. 2009) ........................................................................ 17, 18

*Henry Schein, Inc. v. Cook*,
  191 F. Supp. 3d 1072 (N.D. Cal. 2016) .............................................................................. 10

*Henry Schein, Inc. v. Cook*,
  2017 WL 783617 (N.D. Cal. Mar. 1, 2017) .................................................................... 19, 20

*Imax Corp. v. Cinema Techs., Inc.*,
  152 F.3d 1161 (9th Cir. 1998) ........................................................................................... 11

*Jobscience, Inc. v. CVPartners, Inc.*,
  2014 WL 1724763 (N.D. Cal. May 1, 2014) ....................................................................... 11

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ............................................................................................... 5

*Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*,
  944 F. Supp. 2d 775 (N.D. Cal. 2013) ................................................................................ 14

*Loop AI Labs Inc. v. Gatti*,
  195 F. Supp. 3d 1107 (N.D. Cal. 2016) ................................................................................ 6

*Meggitt San Juan Capistrano, Inc. v. Yongzhong*,
  575 F. App'x 801 (9th Cir. 2014) ......................................................................................... 6

*Pellerin v. Honeywell Int'l, Inc.*,
  877 F. Supp. 2d 983 (S.D. Cal. 2012) ........................................................................... 10, 11

*Poynt Corp. v. Innowi, Inc.*,
  2019 WL 935499 (N.D. Cal. Feb. 26, 2019) ........................................................................ 6

*Ramos v. Los Rios Cmty. Coll. Dist.*,
  2018 WL 626381 (E.D. Cal. Jan. 29, 2018) ......................................................................... 18

*ReadyLink Healthcare v. Cotton*,
  126 Cal. App. 4th 1006, 24 Cal. Rptr. 3d 720 (2005) .......................................................... 10

*Sandoval v. S. Cal. Enterprises*,
  98 Cal. App. 2d 240 (1950) ................................................................................................ 18

*SolarCity Corp. v. Pure Solar Co.*,
  2016 WL 11019989 (C.D. Cal. Dec. 27, 2016) .................................................................... 14

*Space Data Corp. v. X*,
  2017 WL 3007078 (N.D. Cal. July 14, 2017).................................................................. 6, 10

*SunPower Corp. v. SolarCity Corp.*,
  2012 WL 6160472 (N.D. Cal. Dec. 11, 2012).................................................................. 20

*TMX Funding, Inc. v. Impero Techs., Inc.*,
  2010 WL 2509979 (N.D. Cal. June 17, 2010).................................................................. 9

*Top Agent Network, Inc. v. Zillow, Inc.*,
  2015 WL 7709655 (N.D. Cal. Apr. 13, 2015).................................................................. 10

*United States v. Cerna*,
  2011 WL 500229 (N.D. Cal. Feb. 9, 2011) ..................................................................... 20

*VasoNova Inc. v. Grunwald*,
  2012 WL 4119970 (N.D. Cal. Sept. 18, 2012) ................................................................ 9

*Zoom Imaging Sols., Inc. v. Roe*,
  2019 WL 5862594 (E.D. Cal. Nov. 8, 2019)..................................................................... 19

**STATUTES**

18 U.S.C. § 1839............................................................................................................... 12

18 U.S.C. § 1839(5)(A)..................................................................................................... 15

18 U.S.C. § 1839(5)(B)..................................................................................................... 15

Cal. Civ. Code § 3426.1(d) .............................................................................................. 12

Cal. Civ. Code § 3426.7(b) .............................................................................................. 19

Cal. Civ. Proc. Code § 2019.210 .................................................................................... 5, 6

*** All emphasis added unless otherwise noted ***

**<u>INTRODUCTION</u>**

Cisco's First Amended Complaint ("FAC") provides comprehensive details of a months-long investigation into four former employees who intentionally stole Cisco's trade secrets to use them at Plantronics, Inc. ("Poly"), with Poly's apparent endorsement.  Having been caught, rather than deny the allegations, Poly casts aspersions on Cisco and its motivations for pursuing relief in the courts.  But Poly's legally irrelevant attempted misdirection cannot mask the fact that on its watch and with its encouragement, four Poly employees stole Cisco's trade secrets.  Almost as an afterthought, Poly advances four theories on why Cisco's FAC fails to state a plausible claim for relief, but none have merit.

First, the FAC describes the subject matter of the trade secrets at issue in this case with sufficient particularity.  For each Defendant, Cisco identified categories of information misappropriated, and then described the subject matter of the trade secrets within those categories. Poly complains that Cisco has not disclosed in full the trade secrets themselves in its pleading. But in doing so, Poly has conflated the requirements of a pleading (which give notice of the bounds of the case and permit the Court to craft limits on discovery) with a state statutory requirement to disclose trade secrets under a protective order as discovery begins.

Second, the FAC sufficiently alleges that the trade secrets at issue here have independent economic value.  Far from making merely conclusory allegations about the value of its secrets, Cisco explained that its engineers and global sales force rely on the precise trade secrets at issue in this case to develop innovative collaboration products and routes-to-market in a highly competitive sector.  Poly complains about the sufficiency of Cisco's allegations, but rather than address them head on, Poly ignores the specific factual allegations in the FAC that support Cisco's claim of independent economic value.

Third, the FAC explains why Poly is liable for the actions of its employees under two well-pled agency theories—respondeat superior and ratification.  Poly's Motion says nothing at all to the former, and merely raises a factual dispute as to the latter.  Indeed, Poly is vicariously liable for the actions of its employees performed within the scope of their employment, and the FAC pleads facts showing that Dr. Chung, Mr. He, Mr. Puorro, and Mr. Williams misappropriated trade

secrets from Cisco, and at least Dr. Chung and Mr. He used those trade secrets in their work for Poly. And Poly is directly liable for Dr. Chung and Mr. Williams' misappropriation because it failed to take appropriate action when it learned of their conduct.

Finally, the FAC pleads facts showing that Cisco's Intentional Interference with Contract claim arises from a different nucleus of facts than its trade secret allegations. Accordingly, Poly's Motion should be denied in its entirety.

## OVERVIEW OF ALLEGATIONS

### I.    Poly

Poly is vicariously liable for torts committed by its employees within the scope of their employment. This includes trade secret misappropriation, even if Poly itself did not authorize the conduct, so long as there is a causal nexus between the activity and the employee's work. Poly directly competes with Cisco in the collaboration business. *Id.* ¶ 12. The misappropriation was foreseeable, given Poly's lax approach to pre-employment confidentiality measures. *Id.* ¶¶ 180-181 (explaining that prior to finalizing his hiring, Poly accepted Mr. Williams' 'certification' that he had returned all Cisco property to Cisco, which was patently false, given that Mr. Williams was still a Cisco employee and Poly either knew or was willfully blind to this fact). And, as outlined herein, Poly employees, including at least Dr. Chung, Mr. He, and Mr. Puorro acquired or used Cisco's trade secrets within the course and scope of their employment. FAC ¶¶ 189, 195, 196. Poly is directly liable at least for Dr. Chung and Mr. Williams' conduct, because it ratified their conduct by failing to take appropriate remedial measures when it learned of their theft and Dr. Chung's intentional destruction of relevant evidence in an effort to hide his illegal activity. *Id.* ¶ 190. Poly has chosen to stand behind Dr. Chung and Mr. Williams, and is, therefore, directly liable for their tortious conduct.

### II.    Dr. Chung

Dr. Chung was a Principal Engineer in Cisco's Unified Communications Technology Group ("UCTG") who, immediately prior to joining Poly, deliberately and methodically copied thousands of technical documents to personal portable hard drives that he retained following his departure from Cisco. The documents he exfiltrated include design specifications of a pre-release

video conferencing display prototype, such as artwork prototypes, user experience research, and schematics, as well as design specifications for Cisco's sound bar products, a collaboration "Road Map" document, and a document detailing component selection and differentiators for Cisco's entire collaboration product line.  FAC ¶¶ 26, 42, 45, 47, 48, 51, 64, 67, 73, 74, 77, 80.  Dr. Chung then used these documents at Poly for his own benefit and for the benefit of Poly by, for example, uploading the document detailing component selection for Cisco's unreleased collaboration products to Poly's internal "Sharepoint" site, and accessing documents related to *Cisco's* collaboration product roadmap while he was working at Poly.  *Id.* ¶¶ 73-74, 85.  While working in a directly competitive business at Poly, Dr. Chung also retained the Cisco-issued laptop he used while he worked for Cisco as a Principal Engineer, refused to return the laptop to Cisco notwithstanding its multiple demands that he do so, and then wiped the laptop prior to turning it over for a forensic analysis even though he was advised of his obligations not to destroy potentially relevant evidence.  *Id.* ¶¶ 31-35, 41, 77, 82-84, 90-91.  Dr. Chung also retained while working at Poly external drives containing trade secrets taken from Cisco (such as the video conferencing display prototype documents) and attempted to delete evidence from these devices before turning them over.  *Id.* ¶¶ 42, 47, 67, 90-91.  Further still, Dr. Chung uploaded source code for debugging a user interface and design details for Cisco's sound bar products to a cloud account prior to leaving Cisco and had continued access to these.  *Id.* ¶¶ 41, 45.

Even more disturbing, Dr. Chung began employment at Poly before terminating his employment at Cisco, and used this dual access to his and Poly's advantage by bringing Cisco's materials to Poly.  *See id.* ¶¶ 4, 68-78, 95.  The materials Dr. Chung took included Cisco's trade secrets.  *Id.* ¶¶ 26, 36, 41, 42, 51, 64, 65, 73, 74, 78-80, 199.  And, because the collaboration field is highly competitive and characterized by rapid innovation, these trade secrets have independent economic value.  *Id.* ¶ 12.  Cisco invests significant resources in research and development to build its collaboration products, including, for example, by designing and testing prototypes, and the results of these efforts are valuable *because* competitors do not have access to them and because Cisco undertakes significant effort to keep its confidential materials secure.  *Id.* ¶¶ 2, 42, 74, 92, 215.

### III.    Mr. He

Like his colleague Dr. Chung, Mr. He spent his last weeks as an engineer in Cisco's UCTG copying thousands of Cisco's files over to his personal hard drive before leaving for Poly. *Id.* ¶¶ 4, 103, 109, 111-115. These documents included Cisco's trade secrets, such as architectural design documents for an unreleased headset concept, and a full engineering specification for a next-generation conference room collaboration device. *Id.* ¶¶ 103, 105, 109, 120. Mr. He worked at Poly from on or around June 24, 2019 to August 2019, and during that time accessed Cisco's trade secrets from his personal hard drive, including the full engineering specification for a next-generation conference room collaboration device developed by Cisco, for his own benefit and for the benefit of his work at Poly. *Id.* ¶¶ 117-121, 124. The trade secrets Mr. He misappropriated are valuable, and the loss thereof threatens to deprive Cisco of the opportunity to obtain a first-mover advantage in product development and go-to-market strategies. *Id.* ¶ 9.

### IV.    Messrs. Williams & Puorro

Mr. Williams revealed confidential details about Cisco's collaboration business to senior executives at Poly in the hopes of securing employment. *Id.* ¶ 130. Mr. Puorro induced Mr. Williams to reveal Cisco's confidential information to himself and other senior executives at Poly in exchange for advocating for Mr. Williams' employment. *Id.* ¶¶ 136-144, 158, 164, 165, 169. The Cisco confidential information that Mr. Williams delivered to Mr. Puorro and other Poly executives contained trade secrets, including for example, non-publicly reported financial "bookings" data, which broke down Cisco's bookings revenue in the collaboration business by geographic category and segment, and also explained why Cisco's sales to various segments were increasing or decreasing. *Id.* ¶¶ 131, 153. Additional trade secrets include sales strategies developed by and for Cisco, named "Project X" and "Project Liberator," and non-public information about Cisco's future plans for a specific current product. *Id.* ¶¶ 141, 162, 164, 169. Under the inducement of Mr. Puorro, Mr. Williams communicated Cisco's trade secrets to Mr. Puorro and other Poly executives in order to show Cisco that Poly can "inflict pain." *Id.* ¶ 167. Mr. Williams also retained a "time machine" backup of his Cisco laptop, containing detailed information about Cisco's sales forecasts and opportunities, including customer names,

commitments, and upsides. *Id.* ¶ 187. Mr. Williams is still employed by Poly and has not returned this backup. *Id.*

## LEGAL STANDARD

Federal Rule of Civil Procedure 8 requires that a pleading contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Twombly*, 550 U.S. at 572. In general, "district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

## POLY'S MOTION TO DISMISS SHOULD BE DENIED

I.  **The Detailed Factual Recitations In The First Amended Complaint Plausibly Allege That Poly Misappropriated Cisco's Trade Secrets.**

In general, under both the DTSA and CUTSA, a plaintiff must allege that (1) it is the owner of a trade secret; (2) the defendant misappropriated that trade secret; and (3) it was damaged. "Trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets." *Autodesk, Inc. v. ZWCAD Software Co.*, 2015 WL 2265479, at *6 (N.D. Cal. May 13, 2015). Accordingly, at the pleading stage, a plaintiff need not spell out the details of the trade secret," but "must *describe the subject matter of the trade secret* with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 881 (N.D. Cal. 2018). By contrast, Cisco must *disclose its trade secrets* with reasonable particularity "before commencing discovery"—with an appropriate protective order—but not at the pleading stage. *See* Cal. Civ. Proc. Code § 2019.210; *Alta Devices, Inc.*, 343 F. Supp. 3d at 882 ("Federal Rule of Civil

Procedure 9's heightened pleading standard does not apply to trade secret cases . . . Rule 8 does not have a particularity requirement . . . California Civil Procedure Code § 2019.210 has no place at the pleading stage"). Under the Rule 8 standard, courts in this district look for enough detail to "permit [defendants] to prepare a defense and for the court to craft limits on discovery." *Space Data Corp. v. X*, 2017 WL 3007078, at *3 (N.D. Cal. July 14, 2017).

**A.    Cisco Has Described The Subject Matter Of The Trade Secrets With Sufficient Particularity At This Early Stage Of The Case.**

Poly's Motion conflates disclosure of trade secrets—required for CUTSA claims under Cal. Civ. Proc. Code ("CCP") § 2019.210 before commencing discovery but after issuance of a protective order—with describing the subject matter of the trade secrets. *See Alta Devices, Inc.*, 343 F. Supp. 3d at 882 ("California Civil Procedure Code § 2019.210 has no place at the pleading stage."); *Meggitt San Juan Capistrano, Inc. v. Yongzhong*, 575 F. App'x 801, 803 (9th Cir. 2014) (finding no authority to suggest that a party is required to disclose a trade secret with reasonable particularity at the pleading stage). Indeed, Cisco cannot disclose its trade secrets in a public complaint because doing so would result in public disclosure of the trade secrets. *Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1112 (N.D. Cal. 2016) ("As a preliminary matter, the fact that Plaintiff publicly filed its trade secret disclosure belies the proposition that it contains information specific enough to be considered 'confidential' trade secrets."). Even if Cisco's proffer at the pleading stage were deficient—which it is not—the CCP § 2019.210 process will add additional clarity before discovery begins. *Poynt Corp. v. Innowi, Inc.*, 2019 WL 935499, at *3 (N.D. Cal. Feb. 26, 2019) ("Plaintiff's trade secret claims may be deficient as pled, but . . . the discovery process will provide sufficient notice as to these allegations. . . . As required by state law, the party alleging the misappropriation shall identify the trade secrets with reasonable particularity before commencing discovery.").

At the pleading stage, Cisco needs only to describe the subject matter of the trade secrets at issue in this case to allow Poly to assert a defense and allow the Court to craft limits on discovery. Cisco has done so. For each defendant, the FAC identifies categories of information misappropriated. Dr. Chung, for example, misappropriated "source code, schematics, design

details and specifications, user feedback, design documentation, and features relating to Cisco's existing and future products, as well as Cisco business information such as marketing strategy, cost and pricing information, and payment information" that he had access to as Principal Engineer in Cisco's Unified Communications Technology Group ("UCTG"). FAC ¶¶ 26, 199. The UCTG builds products, including "video endpoints, telepresence units, all-in-one video collaboration systems, integrated room systems, VoIP and video phones, microphones, cameras, speakers, and headsets." *Id.* ¶ 2. The numerous categories of information alleged reflects Dr. Chung's organized and methodical efforts to exfiltrate thousands of documents from Cisco in the weeks preceding his departure. *See id.* ¶¶ 36–76. Beyond categories of information, Cisco alleges with particularity the technical subject matter of specific trade secrets within those categories that Dr. Chung took, including, for example, Cisco's market opportunities in 5G (*id.* ¶ 36), design specifications of a pre-release video conferencing display prototype (*id.* ¶ 36), source code for debugging a user interface (*id.* ¶ 41), artwork prototypes, user experience design documentation, user interview feedback, and schematics for the above-mentioned pre-release video conferencing display prototype (*id.* ¶ 42), design details and specifications for Cisco's sound bar products (*id.* ¶45), and the "EA document" describing component specifications and competitive differentiators for Cisco's current and not yet released hardware products. *See id.* ¶¶ 30, 51, 64, 65, 74, 86.

The FAC also identifies categories of information misappropriated by Mr. He, including, for example, design and architectural documents, hardware diagrams, schematics, source code stacks, and engineering specifications relating to existing and future Cisco products, and non-public financial information. *Id.* ¶¶ 97, 229. Mr. He had access to these categories of information from his role as an engineer within Cisco's UCTG. *Id.* ¶ 97. Like Dr. Chung, the large number of categories reflect Mr. He's organized and methodical efforts to exfiltrate thousands of documents from Cisco in the weeks before his departure. *See* FAC ¶¶ 101-115. Within those categories of information, Cisco alleges with particularity the technical subject matter of specific trade secrets that Mr. He took, including, for example, architectural design documents for an unreleased Cisco headset concept (*id.*¶ 103), a hardware diagram for a Cisco headset prototype (*id.* ¶ 105), design and configuration documents for Cisco's headset prototypes (*id.* ¶ 109), a schematic for an

unreleased IP telephone project (*id.* ¶118), and a full engineering specification for a next-generation conference room collaboration device (*id.* ¶ 120). *See also id.* ¶¶ 102, 106, 111, 112, 114.

With respect to Mr. Williams and Mr. Puorro, the FAC identifies categories of information that Mr. Puorro induced Mr. Williams to misappropriate, including, for example, market and strategy data (*id.* ¶ 154), product strategy (*id.* ¶ 157), financial data (*id.*), information about Cisco's Limited Restructurings (*id.* ¶159), Cisco's investments in emerging technologies (*id.* ¶ 177), sales opportunities and customer lists, product pipelines, partner margins, and future plans for current products (*id.* ¶ 258) (collectively, "Business Opportunity Data"). Within those categories of information, Cisco alleges with particularity the subject matter of specific trade secrets that Mr. Puorro induced Mr. Williams to take. In particular, the FAC includes a redacted document, which describes, among other things, a breakdown of non-public financial information, including bookings data from Cisco's global collaboration business, the growth rate of Cisco's collaboration business, the geographic breakdown of Cisco's global collaboration business, the growth rate of each geographic constituent of Cisco's global collaboration business, the largest geographic category by segment and country, corresponding growth rates for each segment/country, an explanation of why Cisco's sales to various market segments were increasing or decreasing, and the strategies Cisco employed to secure this growth. *Id.* ¶¶ 131, 153. The document further described a Cisco sales strategy named "Project Liberator." *Id.* ¶ 153. Additionally, the FAC alleges that Mr. Puorro induced Mr. Williams to misappropriate information about organizational changes at Cisco before they were made public so that Poly, among other things, could use such information as a recruiting tactic for individuals not impacted by upcoming restructurings (*id.* ¶¶ 141, 158), a discussion guide including Cisco's product strategy and other financial data (*id.* ¶ 156), details of a Cisco sales program named "Project X" that Mr. Williams helped develop at Cisco (*id.* ¶ 164), and Cisco's future plans for particular collaboration products (*id.* ¶ 169). The FAC also alleges that Mr. Williams retained a "Time Machine backup" of his Cisco laptop after his termination, which included sales forecasts, customer names, commitments, and upsides,

which Mr. Williams retained in his possession and continues to retain while employed at Poly. *Id.* ¶ 187.

Courts in the Ninth Circuit routinely find trade secrets of the type alleged here sufficiently alleged at the pleading stage. With respect to Dr. Chung and Mr. He, Cisco alleges far more than "five allegedly misappropriated documents or information that it apparently deems important." *See* Dkt. 40 at 15. Cisco alleges that Dr. Chung and Mr. He misappropriated materials that go to the heart of the operation and functionality of its collaboration products. *See VasoNova Inc. v. Grunwald*, 2012 WL 4119970, at \*3 (N.D. Cal. Sept. 18, 2012) ("the software and operation of the [Plaintiff's] product and implementation information such as the devices, algorithms, and processes useful for catheter guidance . . . identifies the misappropriated trade secrets with enough particularity to put [defendant] on notice of [plaintiff's] claims at this initial pleading stage"); *TMX Funding, Inc. v. Impero Techs., Inc.*, 2010 WL 2509979, at \*3-4 (N.D. Cal. June 17, 2010) (finding allegations the defendants misappropriated "software, source codes, data, formulas, and other technical information developed as proprietary and confidential products and services . . . sufficient to permit [d]efendants to at least ascertain the boundaries within which the secrets lie"). The FAC alleges just these types of trade secrets. *See, e.g.*, FAC ¶¶ 36, 42, 51, 64, 74, 78, 80, 102, 103, 106, 109, 112 (data and other technical information developed as proprietary and confidential products and services); *id.* ¶¶ 41, 123 (software, source code).

As to the "Business Opportunity Data," the FAC alleges Messrs. Williams and Puorro misappropriated, Cisco's proffer at this stage is plainly sufficient. *See, e.g.*, *Fortinet Inc. v. FireEye Inc.*, 2014 WL 4955087, at \*7 (N.D. Cal. Sept. 30, 2014) (finding alleged trade secrets including customer names, purchasing forecast, sales channel information, non-public marketing and sales information, sales forecasts, plans, techniques, methods, and non-public employee-specific information adequately pled); *AlterG, Inc. v. Boost Treadmills LLC*, 2019 WL 4221599, at \*6 (N.D. Cal. Sept. 5, 2019) ("Pricing and marketing strategy, by contrast, are less technical, and their description does not demand the same level of specificity that applies to technical matters. Pricing and marketing strategies tied to specific products are typical trade secrets."); *Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*, 2019 WL 2177262, at \*6 n.9 (C.D. Cal. May 20, 2019)

("information about Plaintiff's employees within the CRM and MOS databases are also protectable"); *ReadyLink Healthcare v. Cotton*, 126 Cal. App. 4th 1006, 1018, 24 Cal. Rptr. 3d 720, 728 (2005) (employee information, including lists of employees, employment preferences, and contact information protectable as trade secret); *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) ("Customer information such as sales history and customer needs and preferences constitute trade secrets."). The FAC alleges just these type of trade secrets. *See* FAC ¶ 187 (customer names, forecasts); *id.* ¶¶ 131, 153 (channel strategy, non-public sales information (i.e., bookings data)); *id.* ¶ 164 (sales techniques and methods); *id.* ¶ 141 (non-public employee-specific information); *id.* ¶ 169 (marketing strategy tied to specific product). Moreover, the FAC provides more than enough detail to "permit [Defendants] to prepare a defense and for the court to craft limits on discovery." *See Space Data Corp.*, 2017 WL 3007078, at *3. Indeed, Cisco has identified, among other things, a specific document containing Cisco's trade secrets and how that document was shared (FAC ¶¶ 131, 153), a specific conversation between Mr. Williams and Mr. Puorro where Cisco's trade secrets were shared (*id.* ¶ 169), the specific names of projects (*id.* ¶¶ 162, 164), and specific financial information stored on Mr. Williams' "Time Machine" backup. *Id.* ¶ 187.

The cases Poly cites to support dismissal are readily distinguishable. Cisco's detailed allegations contain far more detail than those at issue in *Pellerin*, which concerned conclusory allegations that a party "had access to and acquired Honeywell's trade secret information, which had independent economic value because it was not generally known or readily ascertainable by persons outside of Sperian or Honeywell." *See Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988–89 (S.D. Cal. 2012); *Cf. Top Agent Network, Inc. v. Zillow, Inc.*, 2015 WL 7709655, at *4 n.3 (N.D. Cal. Apr. 13, 2015) (finding trade secrets, including "unique features, its membership model, and its business strategy" not pled with sufficient specificity). *Top Agent* is also distinguishable because it referenced the plaintiff's failure to "itemize" trade secrets as required by CCP § 2019.210, but, as explained above, this has no role at pleading stage. *Compare Top Agent*, 2015 WL 7709655, at *4, *with Alta Devices*, 343 F. Supp. 3d at 882 ("California Civil Procedure Code § 2019.210 has no place at the pleading stage."). The *Imax* case is irrelevant

because it concerned identification of trade secrets at the summary judgment stage. *See Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1165-1166 (9th Cir. 1998). *Emazing* is similarly inapplicable, because there, the Plaintiffs identified as trade secrets "any . . . information not publically and widely known," which did not permit meaningful limits for discovery. *See Emazing Lights LLC v. De Oca*, 2016 WL 3658945, at *2 (C.D. Cal. Jan. 7, 2016). *Fahrang* similarly dismissed one of two pled secrets—it's "business models and implementations"—because it did not describe the subject matter of the trade secret with sufficient particularity. *Farhang v. Indian Inst. of Tech., Kharagpur*, 2010 WL 2228936, at *14 (N.D. Cal. June 1, 2010). Cisco's FAC, by contrast, describes categories of information, and identifies the specific subject matter of trade secrets within those categories. *Compare* FAC ¶ 26 ("design specifications"), *with id.* ¶ 42 ("pre-release video conferencing display" documents including "user experience design documentation, user interview feedback, artwork prototypes, and schematics").

*Bladeroom Group* is irrelevant because it involves a filing under seal, in which "Plaintiffs should be able to more clearly specify the information they consider to be a trade secret." *Bladeroom Grp. Ltd. v. Facebook, Inc.*, 2015 WL 8028294, at *3 (N.D. Cal. Dec. 7, 2015). *Jobscience* and *Gabriel Techs.* are similarly inapplicable because they involved a CCP § 2019.210 proffer, which is not required at the pleading stage. *Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 1724763, at *2 (N.D. Cal. May 1, 2014); *Gabriel Techs. Corp. v. Qualcomm, Inc.*, 2011 WL 6152240, at *2 (S.D. Cal. Dec. 12, 2011). With respect to *AlterG*, Poly has misrepresented that holding. In that case, the court dismissed the "Second Trade Secret" because it was in the public domain, but denied the motion to dismiss as to the "Eighth Trade Secret" because ***"Pricing and marketing strategies tied to specific products are typical trade secrets***." *AlterG*, 2019 WL 4221599, at *6. In fact, *AlterG* instructs this Court to deny Poly's motion to dismiss.

Poly also argues in a footnote that "Plaintiff must allege facts to support legal conclusion that defendant ***misused*** plaintiff's trade secrets," and cites *Pellerin* for that proposition. Dkt. 40 at n.7. But *Pellerin* does not so hold. *Pellerin*, 877 F. Supp. 2d at 989-90 ("the standard on a motion to dismiss is "whether [the plaintiff] has pled enough facts raising a plausible claim that [the

defendant] *misappropriated* those trade secrets"); *see* 18 U.S.C. § 1839 (defining misappropriation as acquisition by improper means, disclosure, or use of a trade secret).

### B. Cisco Has Sufficiently Pled Independent Economic Value Of The Trade Secrets At Issue.

Under both the DTSA and CUTSA, trade secrets "derive independent economic value" from their secrecy. 18 U.S.C. § 1839; Cal. Civ. Code § 3426.1(d). "To have independent economic value, a trade secret must be sufficiently valuable and secret to afford an actual or potential economic advantage over others." *Calendar Research LLC v. StubHub, Inc.*, 2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017). "The standard to show that trade secrets derive economic value is not a high standard" and can be shown by "circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access." *Id.* at *4.

The FAC alleges that "Cisco has invested significant resources to design, build, and sell its robust collaboration platform, which includes unified communications and video conferencing software and collaboration endpoints." FAC ¶ 2 (further explaining that this field is "highly competitive and characterized by rapid innovation"). Cisco's engineers rely upon source code, schematics, design details and specification, user feedback, design documentation, and feature documentation to create collaboration products (such as video endpoints, phones, and headsets) for this competitive marketplace. *Id.* (further noting that this information is valuable because it is not known by others who can obtain economic value from the disclosure or use of this information). Cisco also makes substantial investments in developing its routes to market for its collaboration products and services, and its sales force relies upon, among other things, non-public financial reporting, customer lists, pricing models, forecasting, sales, resourcing, and competitive strategies and plans to market and sell Cisco's collaboration products. *Id.* ¶ 3. To protect this information from disclosure to competitors who could leverage it for their economic advantage, Cisco required Dr. Chung, Mr. He, Mr. Williams, and Mr. Puorro to sign a Proprietary Information and Inventions Agreement ("PIIA"), which prohibits, during and continuing after employment,

disclosure of Cisco's confidential and proprietary documents outside of Cisco except as required to do so in connection with performing duties of employment. *Id.* ¶¶ 93, 126, 267, 309.

The FAC also alleges circumstantial evidence of the willingness of others to pay for access to this secret information. With respect to Dr. Chung, he risked his future at Poly by maintaining simultaneous employment at Cisco for three days so that he would not lose access to Cisco's trade secrets. *Id.* ¶¶ 4, 68-78. Dr. Chung further risked his future at Poly by accessing Cisco's trade secrets while he worked at Poly. *E.g.*, *id.* ¶¶ 80, 85, 87. The FAC alleges that Dr. Chung's actions were not innocent or accidental—indeed, he performed data wiping procedures on his devices so that his actions would not be detected. *Id.* ¶ 96. With respect to Mr. He, he also risked his future with Poly by accessing Cisco's trade secrets while employed there. *Id.* ¶¶ 117-120. And, with respect to Messrs. Williams and Puorro, both recognized that Cisco's own trade secrets could be leveraged to "inflict pain" upon Cisco. *Id.* ¶¶ 1, 131, 167. Mr. Williams shared Cisco's trade secrets with Poly's highest ranking executives to show "How I drive the [Routes To Market] each and every day through our channel partners." *Id.* ¶¶ 23, 153 (describing non-public financial data that Mr. Williams shared with Poly, which explained why Cisco's sales to various market segments were increasing or decreasing, and the strategies Cisco employed to secure growth). Part of this information included partner margins. *See, e.g.*, *id.* ¶¶ 6, 258, 285, 316. The FAC also alleges a quid-pro-quo between Messrs. Williams and Puorro, wherein Mr. Williams would reveal Cisco's trade secrets in exchange for Mr. Puorro's advocacy, showing that both Messrs. Williams and Puorro recognized the inherent value of the information being shared. *E.g.*, *id.* ¶¶ 137–146. The FAC also alleges that Messrs. Williams and Puorro took measures to keep their conversations live, in order to prevent creating a digital record, further demonstrating circumstantial evidence that Messrs. Williams and Puorro knew the inherent economic value of the information. *E.g.*, *id.* ¶¶ 165, 169.

Cisco's proffer at this stage of the case is plainly sufficient. *See, e.g.*, *Fuhu, Inc. v. Toys "R" US, Inc.*, 2013 WL 12097569, at *8 (S.D. Cal. Mar. 1, 2013) (finding the assertion "Fuhu owns trade secret information relating to NABI that has actual or potential independent economic value because it was secret" was sufficient to survive a motion to dismiss); *Calendar Research*,

2017 WL 10378336, at *4 (sufficient to allege that trade secrets "enable the creation of economically successful applications for use on the mobile phones and the Web"). Furthermore, many of Cisco's trade secrets at issue in this case are inherently valuable—its margins and customer lists are "irrefutably" of commercial value. *Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*, 944 F. Supp. 2d 775, 785 (N.D. Cal. 2013) ("Customer lists presumably therefore have inherent commercial value and thus are appropriate for trade secret protection under the CUTSA."); *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1288 (Ct. App. 1990). Poly's reliance on *Acrisure* is misguided, because there, the plaintiff pled no facts whatsoever in support of economic value, and also failed to plead that the purported trade secrets were not generally known. *Acrisure of California, LLC v. SoCal Commercial Ins. Servs., Inc.*, 2019 WL 4137618, at *4 (C.D. Cal. Mar. 27, 2019).

### C.   Poly Is Liable For The Actions Of Its Employees Under Multiple Theories Alleged In The First Amended Complaint.

The FAC plausibly alleges multiple agency theories for Poly's liability. *E.g.*, FAC ¶¶ 317–322. Poly attacks the sufficiency of these allegations without reference to agency law, and instead relies on legally irrelevant characterizations of "facts" from outside the pleadings.

#### 1.   Poly is vicariously liable for the actions of Dr. Chung and Mr. He performed within the scope of their employment.

"Employers are liable for torts committed by their employees within the scope of their employment." *Citcon USA, LLC v. RiverPay Inc.*, 2019 WL 917056, at *5 (N.D. Cal. Feb. 25, 2019); *SolarCity Corp. v. Pure Solar Co.*, 2016 WL 11019989, at *5 (C.D. Cal. Dec. 27, 2016). "This includes intentional torts, even if the employer has not authorized the employee to perform the tortious activity, so long as there is a "causal nexus" between the activity and the employee's work." *SolarCity,* 2016 WL 11019989, at *5; *see Language Line*, 944 F. Supp. 2d at 783 ("UTSA does not preempt the respondeat superior doctrine. . . . Accordingly, LSA cannot prevail at summary judgment merely by arguing that it was not aware of the acts of its employees, and summary judgment, therefore, cannot be awarded on that basis.").

The FAC alleges that Mr. He and Dr. Chung misappropriated Cisco's trade secrets not only by "acquisition by improper means," but also by "use of a trade secret of another without express or implied consent." *Compare* 18 U.S.C. § 1839(5)(B), *with* 18 U.S.C. § 1839(5)(A). Cisco has alleged that Mr. He acquired Cisco's trade secrets through improper means. *E.g.*, FAC ¶¶ 98–115, 230. Cisco further alleged that after leaving Cisco, Mr. He used these trade secrets in his work at Poly, having used improper means to acquire those same trade secrets. In particular, Mr. He joined Poly on or around June 24, 2019 (*id.* ¶ 117), and over the next 3 weeks—while he was employed at Poly—accessed: (1) a schematic for an unreleased IP telephone project; (2) a full engineering specification for a next-generation conference room collaboration device; and (3) a vendor roadmap update created for Cisco. *Id.* ¶¶ 117–120. With respect to Dr. Chung, the FAC alleges in detail how he too acquired Cisco's trade secrets through improper means. *See id.* ¶¶ 36–78. Moreover, it alleges his use of these trade secrets at Poly. In particular, after beginning employment at Poly, Dr. Chung: (1) uploaded the EA document to Poly's Sharepoint site; (2) forwarded Cisco's vendor contract details to his personal email account; (3) sent Cisco documents from his personal email account to his Poly email account; and (4) accessed at least the EA Document, Webex Vision Document, and a Cisco collaboration roadmap. *Id.* ¶¶ 73, 75, 78, 79, 80, 85. Further, the FAC alleges, among other things, that Dr. Chung and Mr. He accessed Cisco's trade secrets while employed at Poly for their own benefit, ***and for the benefit of Poly***. *Id.* ¶¶ 88, 121.

That Poly may not have authorized these actions, or that Dr. Chung and Mr. He may not have further distributed these documents is irrelevant and not required under the law. Because Poly's business is directly competitive with Cisco's collaboration business, there is a causal nexus between Dr. Chung and Mr. He's use of Cisco's trade secrets at Poly, and Poly's business. *Id.* ¶ 12, 153, 319; *Citcon*, 2019 WL 917056, at *6:

> "The tort had a causal nexus to Hua's employment at RiverPay, because the companies are competitors in the same field and create similar products targeting similar customers. That an employee might misappropriate trade secrets of a former employee and competitor to commit tortious acts against that competitor is a generally foreseeable consequence of RiverPay's business."

Accordingly, the FAC sufficiently alleges that Poly is vicariously liable for the actions of Dr. Chung and Mr. He.

### 2. Poly is vicariously liable for the actions of Mr. Puorro performed within the scope of his employment.

As described above, "[e]mployers are liable for torts committed by their employees within the scope of their employment." *Citcon*, 2019 WL 917056, at *5.

The FAC alleges that Mr. Puorro misappropriated Cisco's trade secrets at least because he acquired the trade secrets through improper means, and disclosed those trade secrets to others at Poly without authorization. FAC ¶ 286. In particular, Mr. Puorro initiated a scheme to induce Mr. Williams to reveal Cisco's trade secrets to himself and other Poly executives. *E.g.*, *id.* ¶¶ 130, 131, 136, 141, 144, 146, 150, 153–159, 165–167. Mr. Williams in fact revealed Cisco's trade secrets to Mr. Puorro. *Id.* Moreover, Mr. Puorro knew that the trade secrets were acquired through improper means. *Id.* ¶ 309 ("Mr. Puorro was aware of the Williams PIIA. For example, Mr. Puorro himself signed a Proprietary Information and Invention Agreement (The "Puorro PIIA") which similarly prohibited the use and disclosure of Cisco's proprietary information, including trade secrets.").

As with Dr. Chung and Mr. He, because Poly's business is directly competitive with Cisco's collaboration business, there is a causal nexus between Mr. Puorro's use of Cisco's trade secrets at Poly, and Poly's business. *Id.* ¶¶ 12, 153, 319, 322; *Citcon*, 2019 WL 917056, at *6. Accordingly, the FAC sufficiently alleges that Poly is vicariously liable for the actions of Mr. Puorro.

### 3. Poly is directly liable for trade secret misappropriation at least because it ratified Dr. Chung's and Mr. Williams' conduct.

A principal may be directly liable for the acts of its agents that it authorizes or ratifies. *Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1144-1145 (N.D. Cal. 2003). Ratification is not necessary for respondeat superior liability, instead, it is an independent basis of direct liability. *Id.* at 1145. "The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort." *Garcia*

*ex rel. Marin v. Clovis Unified Sch. Dist.*, 627 F. Supp. 2d 1187, 1202 (E.D. Cal. 2009).  In the context of trade secrets, a failure to disavow an employee's conduct after having reason to know of the employee's misappropriation raises a triable issue of unlawful ratification.  *Contemporary Servs. Corp. v. Landmark Event Staffing Servs., Inc.*, 677 F. App'x 314, 315 (9th Cir. 2017).

Poly ratified Dr. Chung's misconduct by affirmatively bringing him back to work after learning of his illegal activities, including his attempted spoliation of evidence in violation of both his and Poly's preservation obligations, continuing to allow him to work at Poly and failing to terminate him; thus, it is directly liable for trade secret misappropriation.  With respect to Dr. Chung, the FAC alleges that: (1) Poly was aware of Dr. Chung's misconduct; (2) Poly was aware of Dr. Chung's dishonesty; (3) Poly was aware that Dr. Chung attempted to destroy evidence; (4) Poly was aware that Dr. Chung accessed Cisco Confidential Materials after he began work at Poly; (5) Poly was aware that Dr. Chung did not have a credible explanation for the **current location** of the First or Second Seagate Drives—which possessed large amounts of Cisco Confidential Materials; and (6) Poly welcomed Dr. Chung back to work despite this knowledge.  FAC ¶¶ 190-194.

Poly is also liable for Mr. Williams' acts of misappropriation because it ratified his conduct, after having reason to know of his misappropriation.  *Id.* ¶ 321.  As alleged in the FAC, Poly's executives were aware of Mr. Williams' misappropriation of Cisco's trade secrets; and, instead of declining to hire Mr. Williams and notifying Cisco of the problem, Poly hired Mr. Williams.  *Id.* ¶¶ 130, 131, 132, 156, 158, 162, 164, 172, 196.  Poly further ratified Mr. Williams' conduct through the actions of its executives, who carried on business conversations with Mr. Williams over their own personal email addresses to avoid detection.  *Id.* ¶¶ 132, 156.

Poly's principal defense to the ratification allegations is that it cooperated in Cisco's investigation of Dr. Chung's activities.  But, Poly is aware and Cisco has made clear, Cisco's investigation into Dr. Chung's activities was not completed when they brought Dr. Chung back to work.  *Id.* ¶ 190 (noting that the whereabouts of the Seagate Drives were, and are, unknown).  Indeed, "ratification may occur when an employer learns of misconduct and fails to discharge an agent or employee."  *C.R. v. Tenet Healthcare Corp.*, 169 Cal. App. 4th 1094, 1111 (2009).

Moreover, that Poly cooperated is irrelevant when the allegations outlined above concern Poly's failure to take adverse action against Dr. Chung when the investigation was complete. Cisco also disputes the extent of Poly's "cooperation." *See* FAC ¶ 96 ("On the evening of November 13, after learning the alarming results of forensic investigation, Poly informed Cisco that it inexplicably intended to return Dr. Chung to his position at Poly the next day."). Poly's ratification of Dr. Chung's conduct is premised on more than the mere failure to terminate Dr. Chung. *Cf. Ramos v. Los Rios Cmty. Coll. Dist.*, 2018 WL 626381, at *2 (E.D. Cal. Jan. 29, 2018) (rejecting ratification theory when "There are no facts alleged regarding the [defendant's] supervision or investigation of [tortfeasor]."). Here, Poly investigated Cisco's allegations, learned that Dr. Chung had misappropriated Cisco's trade secrets, lied about key elements and facts, and attempted to destroy evidence, and, despite learning all of that, still returned Dr. Chung to work. FAC ¶ 190. And, by stating that Dr. Chung would return to work the next morning, Poly did not give Cisco the opportunity to meaningfully consider Dr. Chung's imminent return. Furthermore, Poly endorsed Dr. Chung's conduct even in its Motion here, when it looked outside the pleadings to claim—"Here, there was no wrongful conduct by Dr. Chung, merely the retention of a handful of documents that, based on Cisco's own descriptions, do not rise to the level of a trade secret and some of which were obviously publicly available." Dkt. 40 at 19. Moreover, the 1917 case relied on by Poly has not been followed by other courts. *See, e.g.*, *Garcia ex rel. Marin*, 627 F. Supp. 2d at 1202 ("Retention of an employee after knowledge of the employee's conduct or an adequate opportunity to learn of the conduct may support an inference of ratification."); *Sandoval v. S. Cal. Enterprises*, 98 Cal. App. 2d 240, 250 (1950) (same). With respect to Mr. Williams, Poly apparently took no adverse action whatsoever with his employment at Poly.[1]

---

[1] Instead of taking adverse action, shortly after learning about Mr. Williams' disclosure, Poly actually **hired** as "Chief Revenue Officer" the recipient of Cisco's non-public bookings data that Mr. Williams disclosed. *Id.* ¶ 131; http://investor.poly.com/file/Index?KeyFile=402362911 .

II.    **Cisco's Intentional Interference With Contract Claim Does Not Arise From The Same Nucleus Of Facts As Its Trade Secret Misappropriation Claims And Is Not Preempted.**

As an initial matter, Poly's Motion is a full page over the 25 page limit.  Given its extensive use of single-spaced footnotes, and joinder to the motions of others Defendants (Dkt. 47), Cisco requests that Poly's page limit be strictly enforced, and its preemption arguments ignored. Nevertheless, Poly's motion to dismiss the intentional interference with contract claim should be denied because Cisco's intentional interference claims do not arise from the same nucleus of facts as its trade secrets claims.  A state tort claim is not preempted when the claims show "more than a restatement of the same operative facts supporting trade secret misappropriation." *Henry Schein, Inc. v. Cook*, 2017 WL 783617, at *2 (N.D. Cal. Mar. 1, 2017); *Zoom Imaging Sols., Inc. v. Roe*, 2019 WL 5862594, at *7 (E.D. Cal. Nov. 8, 2019).   The CUTSA explicitly carves out from preemption: "other civil remedies that are not based upon misappropriation of a trade secret."  Cal. Civ. Code § 3426.7(b).  Cisco alleges specific conduct by Mr. Williams that breached his PIIA, at the behest of Mr. Puorro, and this induced breach stands irrespective of the trade secret misappropriation.

Cisco has alleged that Mr. Puorro engaged in a scheme to have Mr. Williams deliver information about Cisco's restructurings and provide information about Cisco employees.  FAC ¶¶ 6, 130.  Beyond delivery of information about which valuable Cisco employees were good recruitment candidates even though they were not impacted by restructurings, Mr. Puorro used Mr. Williams as an agent for Poly within Cisco to recruit Cisco employees not impacted by restructurings, and to take business from Cisco, thereby causing Mr. Williams to violate his own PIIA.  *See, e.g.*, *id.* ¶ 168 ("looking at [customer] from the Cisco lens.  I could easily change that lens though"); *id.* ¶ 130 ("if you want him – I think you can get him – but it can't be like me – you have to do it quickly."); *id.* ¶ 137; *id.* ¶ 141 ("Time is now to recruit."); *id.* ¶ 148 ("I think we have a leak in our India team.  Anyway you can find out?"); ¶¶ 309-310.  Mr. Puorro was aware of Mr. Williams' PIIA, having been reminded of his own obligations under his own PIIA as recently as February 2019.  *Id.* ¶ 309.

These allegations are separate, distinct, and tied to the interference and the breach of the PIIA document as opposed to the misappropriation of trade secrets. The cases Poly cites to support preemption, by contrast, involve claims indistinguishable from trade secret claims. *See Epicor Software Corp. v. Alt. Tech Sols., Inc.*, 2015 WL 12724073, at \*2 (C.D. Cal. Apr. 2, 2015) (with "no material distinction between the wrongdoing"); *SunPower Corp. v. SolarCity Corp.*, 2012 WL 6160472, at \*16 (N.D. Cal. Dec. 11, 2012) (bringing, among others, conversion and trespass to chattels claims). In *Henry Schein*, this Court held that allegations of "breach of fiduciary duty and duty of loyalty claim[s] ***do not merely restate*** the same facts as the CUTSA claim" when the breach does not necessarily rely on trade secrets. 2017 WL 783617, at \*3. The conduct amounting to the interference with the Williams PIIA claims do not rise or fall based upon the misappropriation of trade secrets. Thus, Poly's preemption arguments fail.

**III.   Poly's Efforts To Join Dr. Chung and Mr. Williams' Motions Must Fail**

Poly's half-hearted attempt to piggyback on the arguments of its codefendants in order to end-around page limits cannot be enough to deprive Cisco of its right to pursue its claims against Poly in court:

> "The motion is woefully inadequate in that it offers no explanation as to how the [relevant] motions sought to be joined apply to him. The undersigned cannot make arguments for counsel and determine which arguments contained in the wide array of severance motions filed apply to [Defendant's] particular situation. The joinder motion is Denied."

*United States v. Cerna*, 2011 WL 500229, at \*11 (N.D. Cal. Feb. 9, 2011) (further noting that claiming to join "to the extent there are common issues" is "not enough"). Accordingly, Poly's joinder to these motions must be denied.

## CONCLUSION

Cisco respectfully requests that Poly's motion to dismiss be DENIED in its entirety.

Respectfully submitted,

Dated: February 10, 2020                DESMARAIS LLP

By: /s/ John M. Desmarais

John M. Desmarais (SBN 320875)
jdesmarais@desmaraisllp.com
DESMARAIS LLP
101 California Street
San Francisco, CA 94111
(415) 573-1900

Tamir Packin (SBN 317249)
tpackin@desmaraisllp.com
Carson Olsheski (*admitted pro hac vice*)
colsheski@desmaraisllp.com
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
(212) 351-3400

*Attorneys for Plaintiffs*