UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CISCO SYSTEMS, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WILSON CHUNG, et al.,<br><br>Defendants. | Case No.  19-cv-07562-PJH<br><br>**ORDER RE MOTIONS TO COMPEL ARBITRATION, STAY THE CASE, AND DISMISS**<br><br>Re: Dkt. Nos. 40, 41, 43, 45, 47, 54, 57, 80 |

Before the court are defendant Jedd Williams' ("Williams") motion to compel arbitration and stay the case or, in the alternative, motion to dismiss (Dkt. 41), defendant Wilson Chung Ph.D.'s ("Chung") motion to dismiss and joinder to Williams' motions (Dkt. 43), defendant Plantronic Inc.'s ("Plantronics" or "Poly") motion to dismiss (Dkt. 40) and joinder to Williams' and Chung's motions (Dkt. 47), defendant Thomas Puorro's ("Puorro") motion to dismiss and joinder to his co-defendants' respective motions (Dkt. 45), and defendant James He's ("He") motion to dismiss and joinder to Williams' motion to compel arbitration (Dkt. 54) (collectively, "defendants").

Having read the parties' papers and carefully considered their argument and the relevant legal authority, and good cause appearing, the court hereby **GRANTS** Williams' motion to compel arbitration and stay the instant litigation with respect to the claims against him, **TERMINATES** his alternative motion to dismiss, and **DENIES** his motion to stay with respect to the claims against the remaining defendants.  Additionally, the court **GRANTS** Chung's and He's motions to dismiss and **GRANTS IN PART** and **DENIES IN PART** Puorro's and Plantronic's motions to dismiss.

## BACKGROUND

This action concerns the alleged misappropriation of Cisco Systems, Inc.'s and

United States District Court
Northern District of California

Cisco Technology, Inc.'s (collectively, "plaintiff" or "Cisco") purported trade secrets.  At core, plaintiff alleges that its former employees schemed with a competitor, Plantronics, to improperly reveal a range of its purported trade secrets.

**A.    The Underlying Claims**

Plaintiff filed its initial complaint on November 18, 2019.  Dkt. 1.  On December 17, 2019, plaintiff filed the operative pleading in this action, its First Amended Complaint ("FAC").  Dkt. 25.  In it, plaintiff alleges claims for the following:

- Misappropriation of trade secrets under both federal (Title 18 U.S.C. § 1836) and California state law (Cal. Civ. Code § 3426) against Chung.  FAC ¶¶ 197-226.

- Misappropriation of trade secrets under both federal and California state law against He.  Id. ¶¶ 227-55.

- Misappropriation of trade secrets under both federal and California state law against Williams.  Id. ¶¶ 256-82.

- Misappropriation of trade secrets under both federal and California state law against Puorro.  Id. ¶¶ 283-306.

- Intentional interference with a contractual relationship under California state law against Puorro.  Id. ¶¶ 307-313.

- Misappropriation of trade secrets under both federal and California state law against Plantronics.  Id. ¶¶ 314-41.

- Intentional interference with a contractual relationship under California state law against Plantronics.  Id. ¶¶ 342-44.

Except Chung, plaintiff seeks both monetary and injunctive relief against all defendants.  FAC, Prayer for Relief.  Plaintiff seeks only injunctive relief against Chung. Id. ¶¶ 220, 226.

**B.      Factual Background[1]**

      **1.      The Parties and an Overview of Defendants' Alleged Misconduct**

          **a.      Plaintiff**

Plaintiff is a California corporation that designs, engineers, manufactures, and sells software, hardware, and other electronic devices.  FAC ¶ 2.

          **b.      Plantronics**

Plantronics is a Delaware corporation with its principal place of business in Santa Cruz, California.  Id. ¶ 12.  Plantronics is "in the IP telephone, headset, video, and collaboration space" and is a market competitor to plaintiff.  Id.

          **c.      Chung**

Chung served as a Principal Engineer in plaintiff's Unified Communications Technology Group ("UCTG").  Id. ¶ 26.  Chung's responsibilities included developing plaintiff's collaboration products, including "IP telephony solutions and audio headsets." Id.  Incidental to his role, Chung had access to "some of Cisco's most confidential trade secrets used within the UCTG, including design specifications, schematics, source code, product market analyses, and vendor contract details."  Id.

Chung formally departed plaintiff's employment on February 28, 2019, id. ¶ 62, but began working for Plantronics on February 26, 2019, id. ¶ 69.  As part of his employment with plaintiff, Chung received two laptops, a Lenovo and a MacBook.  Chung returned his Lenovo laptop on February 27, 2019, id. ¶ 77, but, at least as of September 27, 2019, did not return his MacBook laptop, id. ¶ 95.

Plaintiff alleges a series of instances between February 3, 2019 and at least March 8, 2019 in which Chung downloaded, copied, or emailed various plaintiff's documents and files concerning certain technological and business subject matter to multiple external devices not owned by plaintiff.  Id. ¶¶ 36-80.  Such subject matter includes "Cisco's contribution to 5G technology . . . and design specification of a pre-release video

---

[1] For purpose of this motion, the court recounts plaintiff's well-pled allegations as true. The court will specify any FAC paragraph cited that is alleged on "information and belief."

conferencing display prototype," id. ¶ 36, source code for debugging a user interface, id. ¶ 41, pre-release video conferencing display prototypes, id. ¶ 42, design details and specifications related to plaintiff's sound bar products, id. ¶ 45 (alleged on information and belief), over 100 webinar presentations relating to plaintiff's communications product portfolio, id. ¶ 65 (alleged on information and belief), a presentation detailing strategy and costs for a pre-release video conferencing display product, id. ¶ 51 (alleged on information and belief), plaintiff's marketing position in the collaboration space, id. ¶ 64, and "component specifications and competitive differentiators" for plaintiff's current and unreleased hardware products, id. ¶ 74.

Chung used at least six different external devices to improperly download or transfer the subject information. Id. ¶ 37 (First Seagate Drive), ¶ 42 (Second Seagate Drive), ¶ 44 (SanDisk Drive), ¶ 39 (Samsung Drive), Chung's personal email account, id. ¶¶ 64, 80, and his corporate email account at Plantronics, id. ¶ 80. At the time of his departure from plaintiff's employment, Chung did not provide plaintiff the four external drives. Id. ¶ 77. Chung accessed at least three specific documents (the "EA Document," the "Webex Vision Document," and the "Cisco collaboration roadmap document") during his employment at Plantronics. Id. ¶ 86.

As a condition of his employment, Chung signed a Proprietary Information and Inventions Agreement ("PIIA"), which, among other things, prohibited him from maintaining simultaneous employment with any industry competitor, barred him from removing any plaintiff information except as necessary to perform his employment duties, and required that he return all plaintiff information upon termination of his employment. Id. ¶ 93. Revealed in the parties' briefing, Chung maintained an arbitration agreement ("Chung Arbitration Agreement") with plaintiff. Dkt. 50-3 at 2-5.

### d. He

He served as an engineer. Id. ¶ 97. Incidental to his role, He had access to "some of Cisco's most confidential trade secrets used within Cisco's UCTG, including design specifications, schematics, source code, product market analyses, and vendor

1   contract details." Id.  As early as March 2019, Chung began to recruit He to join

2   Plantronics. Id. ¶ 99-100.  In June 2019, He departed plaintiff's employment, id. ¶ 114,

3   and joined Plantronics on June 24, 2019.  Id. ¶ 117 (alleged on information and belief).

4       Plaintiff alleges a series of instances between May 13, 2019 and June 20, 2019 in

5   which He took photographs of or downloaded plaintiff's diagrams and documents

6   concerning various technological and business subject matter to his iPhone and an

7   external drive (the "LaCie drive").  Id. ¶¶ 102-114.  Such subject matter includes an

8   unreleased headset concept and like prototypes, FAC ¶¶ 103, 105, 109, "vendor

9   roadmaps for Cisco's products," id. ¶ 109, "an unreleased IP telephone project," id. ¶¶

10  112, 118, "full engineering specifications for a next-generation conference room

11  collaboration device," id. ¶ 120, emerging business opportunities in the collaboration

12  space, id. ¶ 106, and "Cisco's strategic product development decisions," id. ¶ 111.

13      At the time of his departure, He did not return the LaCie Drive.  Id.¶ 115.  He

14  accessed at least three specific documents (an unreleased IP telephone project

15  schematic, a vendor roadmap update, and specification for a next-generation conference

16  room collaboration device) during his employment at Plantronics.  Id. ¶¶ 118-120.

17      He signed his own PIIA, which similarly barred him from removing certain plaintiff's

18  information except as necessary to perform his employment duties and required that he

19  return all such information upon termination of his employment.  Id. ¶ 126.  He did not

20  maintain an arbitration agreement with plaintiff.

21          **e.   Puorro and Williams**

22      Puorro is the Executive Vice President and General Manager of Products at

23  Plantronics.  Id. ¶ 128.  Before joining Plantronics in early 2019, Puorro served as

24  plaintiff's Vice President of its Unified Communications Technology Group between

25  October 2014 and December 2018.  Id.

26      Williams served as a Regional Sales Director and Director in Global Collaboration

27  Sales prior to his termination from plaintiff's employment in October 2019.  Id. ¶ 127.  In

28  the latter role, Williams was responsible for developing strategies to bring plaintiff's set of

collaboration products to market.  Id.

Shortly after Puorro's departure, Williams began to pursue employment at Plantronics.  Id. ¶ 129.  To do so, he reached out to Puorro, who initiated a "scheme" in which Puorro would exchange professional coaching and advocacy for his employment at Plantronics in exchange for Williams' provision of "confidential details about Cisco's competitive business."  Id. ¶ 130.  Williams received an offer to join Plantronics on September 26, 2019.  Id. ¶ 176.  Between February 2019 and receipt of that offer, Williams underwent multiple interviews with various Plantronics executives.  Id. ¶ 134 (March 3-4, 2019 interviews with unidentified "First Poly Executive"); ¶ 147 (April 30, 2019 interviews with other unspecified executives); ¶¶ 152, 155 (June 12, 2019 interview with other executive); ¶ 158 (June 28, 2019 interviews scheduled with other unspecified executives).  Williams began his employment at Plantronics on October 14, 2019.  Id. ¶ 179.

Plaintiff alleges a series of communications between Williams, Puorro, and unidentified Plantronic executives during the February 2019 to September 2019 period to substantiate the alleged scheme.  While the court will detail those communications in its analysis, Williams allegedly shared information concerning plaintiff's collaboration business, id. ¶¶ 131, 153, a sales strategy named "Project Liberator," id. ¶ 153, unannounced organizational changes (i.e., layoffs), id. ¶¶ 141, 158, plaintiff's product strategy, id. ¶ 156, a sales strategy named "Project x," id. ¶ 164, and some particular product, id. ¶ 169 (actual name redacted in the FAC).

Williams signed his own PIIA, which required that, absent plaintiff's consent, he maintain the confidentiality of any information concerning plaintiff's business (actual or anticipated) and return all plaintiff information upon termination of his employment.  Id. ¶¶ 265-67.[2]  Williams maintained an arbitration agreement ("Williams Arbitration

---

[2] Plaintiff alleges that Williams used a so-called "Time Machine back-up" of his corporate laptop and, at the time of his termination, failed to return that device.  Id. ¶ 187.  For reasons noted below, the court need not consider any information contained within that back-up device to reach its decisions on the various motions to dismiss at issue.

United States District Court
Northern District of California

1    Agreement") with plaintiff.  Dkt. 41.

2        **2.     Pre-Complaint Events**

3        By September 2019, plaintiff notified both He and Chung of their purported

4    misconduct.  Id. ¶¶ 89, 122.  After receiving notice of their preservation obligations, both

5    defendants attempted to conceal the information they purportedly misappropriated by, for

6    example, performing Internet searches on how to delete information from certain devices

7    without detection, id. ¶ 91 (Chung), and deleting files, id. ¶ 123 (He).

8        Plantronics conducted its own investigation into the allegations against both

9    Chung and He.  Following each investigation, Plantronics terminated He's employment,

10   id. ¶ 124, and placed Chung on administrative leave, id. ¶¶ 95-96.  Plantronics reinstated

11   Chung on November 14, 2019.  Id. ¶ 96.  Plaintiff filed this action four days later.  Dkt. 1.

12   **C.    The Instant Motions**

13       Plantronics, Puorro, Chung, and Williams respectively filed their motions on

14   January 27, 2020.  He filed his motion on February 10, 2020.  All defendants request

15   dismissal under Rule 12(b)(6).

16       As noted above, Williams' motion includes a primary request to compel arbitration

17   of the claims against him and stay the instant litigation against both him and all

18   defendants.  After Williams filed his motion, the remaining defendants either filed a

19   supplementary notice of joinder to Williams' compulsion and stay requests with respect to

20   the claims respectively against them or indicated such joinder in their briefing.  Except

21   Chung, who himself maintained an arbitration agreement with plaintiff, all of the non-

22   Williams defendants rely upon the Williams Arbitration Agreement in support of their

23   joinder requests.  The court will analyze the various requests to compel arbitration, stay

24   the instant litigation, and dismiss in that order.

                                **DISCUSSION**

25

26   **A.    Legal Standards**

27       **1.     Motion to Compel Arbitration**

28       Any party bound to an arbitration agreement that falls within the scope of the

                                      7

Federal Arbitration Act ("FAA"), Title 9 U.S.C. §§ 1, *et. seq.*, may bring a motion to compel arbitration and stay the proceeding pending resolution of the arbitration. 9 U.S.C. §§ 3-4; Lifescan, Inc. v. Premier Diabetic Servs., Inc., 363 F.3d 1010, 1012 (9th Cir. 2004). The FAA requires the court to compel arbitration of issues covered by the arbitration agreement. Dean Witter Reynolds, Inc., v. Byrd, 470 U.S. 213, 218 (1985).

In ruling on a motion to compel arbitration under the FAA, the district court's role is typically limited to determining whether (i) an agreement exists between the parties to arbitrate; (ii) the claims at issue fall within the scope of the agreement; and (iii) the agreement is valid and enforceable. Lifescan, 363 F.3d at 1012; Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000). If the answers are yes, the court must enforce the agreement. Lifescan, 363 F.3d at 1012.

Regarding whether an agreement exists to arbitrate, the "first principle" that underscores the U.S. Supreme Court's arbitration decisions is that "[a]rbitration is strictly a matter of consent, and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration." Granite Rock Co. v. Int'l B'hd of Teamsters, 561 U.S. 287, 299 (2010); First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995). Thus, "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." Granite Rock, 561 U.S. at 297 (emphasis in the original).

Regarding the validity of the agreement, the FAA provides that arbitration clauses "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Thus, state contract defenses may be applied to invalidate arbitration clauses if those defenses apply to contracts generally. Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996); Circuit City Stores, Inc. v. Adams, 279 F.3d 889, 892 (9th Cir. 2002).

Regarding the scope of the agreement, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983). Nevertheless, a motion to compel

arbitration should be denied if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." AT&T Techs., Inc. v. Commc'n Workers, 475 U.S. 643, 650 (1986).

### 2.    Motion to Stay

Title 9 U.S.C. § 3 provides that a federal court must stay its proceedings against a party bound to an arbitration agreement subject to the FAA.  9 U.S.C. § 3.

Distinct from Title 9 U.S.C. § 3's statutorily mandated stay, a district court maintains authority to enter a stay of litigation as part of its inherent authority to manage its own docket.   Landis v. N. Am. Co., 299 U.S. 248, 254-55 (1936).  The United States Supreme Court has recognized that such entry may be advisable in litigation involving mixed arbitrable and non-arbitrable claims but has reiterated that "[t]hat decision is one left to the district court . . . as a matter of its discretion to control its docket." Moses H. Cone Mem'l Hosp, 460 U.S. at 21 n.23.

### 3.    Rule 12(b)(6) Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Rule 8 requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), dismissal "is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).  While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 558-59 (2007).

As a general matter, the court should limit its Rule 12(b)(6) analysis to the contents of the complaint, although it may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not

United States District Court
Northern District of California

physically attached to the plaintiff's pleading." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005); Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007) ("a court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document"). The court may also consider matters that are properly the subject of judicial notice, Lee v. City of L.A., 250 F.3d 668, 688–89 (9th Cir. 2001), exhibits attached to the complaint, Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and documents referenced extensively in the complaint and documents that form the basis of the plaintiff's claims, No. 84 Emp'r-Teamster Jt. Counsel Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

**B.      Analysis**

> **1.      Defendants' Requests to Compel Arbitration**

>> **a.      Williams' Motion to Compel Arbitration**

In support of his motion to compel arbitration, Williams cites the Williams Arbitration Agreement.  Dkt. 41-2 at 2-3.  Plaintiff does not dispute that it and Williams entered the Williams Arbitration Agreement and that that agreement remains enforceable. In relevant part, the Williams Agreement provides:

> "The Company and I agree to resolve exclusively through binding arbitration all claims . . . ("claims"), past, present or future, whether or not arising out of my employment (or its termination), that the Company may have against me or that I may have against any of the following: (1) the Company . . . Examples of claims that we both agree to submit to arbitration include claims of discrimination, harassment, retaliation, wrongful termination, unpaid wages, breach of contract, defamation, and all other claims related to the employment relationship (or its termination), regardless of whether the claim is brought by me or the Company."  Dkt. 41-2 at 2.

Plaintiff consented to Williams' alternative motion to compel arbitration under this agreement.  Dkt. 53 at 6.  Therefore, the court grants Williams' motion to compel arbitration with respect to the claims against him.

>> **b.      Chung's Request to Compel Arbitration**

In his opening brief, Chung joins in Williams' motion to compel arbitration.  Dkt. 43

at 12-14.  In support of that request, Chung initially argued that the claims against him are also subject to the Williams' Arbitration Agreement because those claims are "intimately founded in and intertwined with" that agreement.  Id. at 14.  In its opposition, plaintiff proffered evidence of an arbitration agreement between it and Chung signed January 29, 2007 (the Chung Arbitration Agreement referenced above).  Dkt. 50-3 at 2-5. That agreement includes the following provisions:

> "We agree to arbitrate before a neutral arbitrator any and all disputes or claims arising from or relating to Employee's recruitment to or employment with Cisco, or the termination of that employment, including claims against any current or former agent or employee of Cisco, whether the disputes or claims arise in tort, contract, or pursuant to a statute, regulation, or ordinance now in existence or which may in the future be enacted . . . including, but not limited to  . . claims for fraud . . . or breach of contract . . . [and various other employment related claims]." Dkt. 50-3 at 3 (*i.e.,* "general arbitration agreement provision").
>
> . . .
>
> "We understand and agree that nothing in this Agreement shall prevent either party from seeking from a court the remedy of an injunction for a claimed misappropriation of a trade secret, patent right, copyright, trademark, or any other intellectual or confidential property." Id. at 4 (*i.e.,* the "intellectual property injunctive relief carveout").
>
> . . .
>
> "We understand and agree that if any term or portion of this Agreement shall, for any reason, be held to be invalid . . . or to be contrary to public policy. . . then the remainder of this Agreement shall not be affected by such invalidity . . . but shall remain in full force and effect, as if the invalid . . . term or portion thereof had not existed within this Agreement." Id. (*i.e.,* the "severability provision").

In his reply, Chung contested that this agreement provides a second independent basis for this court to compel arbitration of the claims against him.  Dkt. 56 at 6-7.  The court analyzes each of Chung's arguments below.

### i.      The Chung Arbitration Agreement Does Not Require Arbitration of the Claims Against Him

In his reply, Chung argues that the intellectual property injunctive relief carveout is

United States District Court
Northern District of California

United States District Court
Northern District of California

1   unenforceable because, when considered in light of the general arbitration agreement

2   provision, the Chung Arbitration Agreement is ambiguous.  Dkt. 56 at 6.  In support of

3   that argument, Chung cites Comedy Club, Inc. v. Improv West Associates, 555 F.3d 1227

4   (9th Circ. 2009) for the proposition that the Ninth Circuit has considered and held

5   ambiguous an arbitration provision including a similar carveout for equitable relief.  Dkt.

6   56 at 6-7.

7       Chung overstates the relevance of Comedy Club, Inc. here.  The arbitration

8   provision at issue in Comedy Club, Inc. generally provided the following:

9       "All disputes relating to or arising under this Agreement or the
        Asset Purchase Agreement shall be resolved by arbitration in

10      Los Angeles, California . . ." Id. at 1281.

11  The provision then added that:

12      "Notwithstanding this agreement to arbitrate, the parties, *in
        addition to arbitration*, shall be entitled to pursue equitable

13      remedies and agree that the state and federal courts shall have
        exclusive jurisdiction for such purpose and for the purpose of

14      compelling arbitration and/or enforcing any arbitration award."
        Id.

15

16      On appeal, the parties in Comedy Club, Inc. disputed whether this provision

17  allowed *the arbitrator* authority to adjudicate equitable claims.  Id. at 1284.  The parties

18  advanced two competing interpretations of this provision on that issue: (1) the carveout

19  "is explicit that only state and federal courts, and not an arbitrator, have jurisdiction over

20  equitable claims"; and (2) that clause "only carved out equitable claims 'in aid of

21  arbitration' to maintain the status quo between the parties pending arbitration" and it "did

22  not supplant the arbitrator's authority to decide all disputes under the Trademark

23  Agreement."  Id. The Ninth Circuit found that a "natural reading of [the carveout] lends

24  plausibility" to the second interpretation.  Id. at 1285.  It reasoned that "[t]he language 'in

25  addition to arbitration' . . . suggests that arbitration still applies to all disputes, but that in

26  addition, the parties are 'entitled to pursue equitable remedies' before courts. . . .

27  Because the parties included this language, it is plausible and a permissible contract

28  interpretation that the equitable claims exception . . . was intended to apply only to claims

designed to maintain the status quo between the parties." Id.  Giving the benefit of the doubt to the "federal presumption in favor of arbitration," the Ninth Circuit held that the agreement "should be interpreted as granting arbitration coverage over 'all disputes' arising from the [underlying agreement at issue]." Id. at 1286.

The Ninth Circuit's conclusion in Comedy Club, Inc. does not control this court's interpretation of the intellectual property injunctive relief carveout.  The ambiguity issue in Comedy Club, Inc. concerned the arbitrator's authority to adjudicate equitable claims. The issue here is whether any such authority conferred to an arbitrator under the general arbitration agreement provision deprives plaintiff of its **option** to have such claims adjudicated in this court pursuant to the intellectual property injunctive relief carveout. Stated differently, there is no question here about the arbitrator's authority to litigate equitable claims; rather, the question is whether that authority (contractually allowed under the arbitration agreement) creates an ambiguity about this court's concurrent authority to adjudicate the equitable claims contemplated under the intellectual property injunctive relief carveout.  Based on a plain reading of the relevant provisions in the Chung Arbitration Agreement, the answer is no.

The intellectual property injunctive relief carveout states that "***nothing in this Agreement*** shall prevent either party from seeking from a court the remedy of an injunction . . .," id. (emphasis added), and—unlike the oddly inserted "in addition to arbitration" phrase generating the confusion in Comedy Club, Inc.—is contained in a separate paragraph directly below the general arbitration agreement provision.  Dkt. 50-2 at 3.  Like its construction of most contracts containing general provision, exceptions, and limitations, the court reasonably construes the Chung Arbitration Agreement to generally require the parties to arbitrate any and all claims (general arbitration agreement provision), except those seeking an injunction for allegedly misappropriated intellectual property (intellectual property injunctive relief carveout).  For that latter set of claims, either party may (general arbitration agreement) but need not (intellectual property injunctive relief carveout) pursue such claims in arbitration.

1      In this case, plaintiff chose to limit the relief sought for the trade secret

2   misappropriation claims against Chung to a permanent injunction.  Consistent with the

3   Chung Arbitration Agreement's recognition that "nothing in this Agreement shall prevent

4   either party from seeking from a court the remedy of an injunction" for such claims," Dkt.

5   50-2 at 3, plaintiff chose to bring such claims in this court.  As a result, the court rejects

6   Chung's attempt to compel arbitration on the basis of the intellectual property injunctive

7   relief carveout's purported ambiguity.

8      In a passing paragraph, Chung asserts that the court should invoke the Chung

9   Arbitration Agreement's severability provision to strike the intellectual property injunctive

10  relief carveout because "[t]ime and again, California Courts have determined that one-

11  sided arbitration provisions that reserve the claims employers are likely to pursue  (e.g.,

12  trade secret claims for equitable relief) for court and push employee-based claims . . . to

13  arbitration are substantively unconscionable." Dkt. 56 at 7.  Chung fails to explain how or

14  why the carveout here—which states that "nothing in this Agreement shall prevent ***either***

15  ***party*** from seeking from a court  . . .". Dkt. 50-2 at 3 (emphasis added)— qualifies as

16  "one-sided."  Plainly that provision allows either party to it to seek the subject equitable

17  relief outside of arbitration.  In any event, Chung further fails to explain why this provision

18  is also procedurally unconscionable.  Accordingly, the court rejects Chung's attempt to

19  compel arbitration on the basis of the intellectual property injunctive relief carveout's

20  purported unenforceability.  Given the above, Chung's first argument in support of his

21  request for arbitration fails.[3]

22

23  ───────────────

24  [3] In his reply brief, Chung footnotes his intention "to file a separate motion to compel arbitration so that the Court can either compel arbitration of his claims pursuant to Mr. Williams' motion or pursuant to a standalone motion brought pursuant to the specific

25  Cisco-Chung Arbitration Agreement."  Dkt. 56 at 8 n.2.  Chung already "joined" in Williams' motion to compel arbitration, Dkt. 43 at 12, so he has no basis to bring a

26  separate motion to compel arbitration on that ground.  Chung has also had over two and a half months to bring a separate motion to compel on grounds of his arbitration

27  agreement and, significantly, has already briefed whether arbitration is proper on grounds of that agreement.  Given these circumstances, the court cautions Chung that he should

28  not file a motion to compel arbitration unless he can identify a substantial ground provided in the Chung Arbitration agreement not previously briefed.

ii.     **The Claims Against Chung Are Not Sufficiently Related to the Williams Arbitration Agreement**

California courts recognize that "a non-signatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes of action against the non-signatory are 'intimately founded in and intertwined' with the underlying contract obligations." Boucher v. Alliance Title Co., 127 Cal. App. 4th 262, 271 (2005). According to California courts, the basis for such compulsion arises out of equitable estoppel, id. at 272, which may require compelling arbitration for claims against a non-signatory "when a party has signed an agreement to arbitrate but attempts to avoid arbitration by suing non-signatory defendants for claims that are 'based on the same facts and are inherently inseparable' from arbitrable claims against signatory defendants." Turtle Ridge Media Grp., Inc. v. Pac. Bell Directory, 140 Cal. App. 4th 828 (2006), as modified (July 20, 2006).

To determine whether compelling arbitration on this basis is proper, courts must analyze the relationship between the claims against a non-signatory defendant and the contract including the subject arbitration agreement. Turtle Ridge Media Grp., Inc., 140 Cal. App. 4th at 835 ("Regardless of whether equitable estoppel may require detrimental reliance in other contexts, the test for applying equitable estoppel to an arbitration agreement is whether the causes of action are intertwined with the contract containing the agreement."). Construing California decisional law, the Ninth Circuit in Kramer v. Toyota Motor Corp., 705 F.3d 1122 (9th Cir. 2013) acknowledged that compelling the arbitration for claims against a non-signatory is proper under the following two circumstances:

> "(1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are 'intimately founded in and intertwined with' the underlying contract;" and
>
> "(2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and 'the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of

the underlying agreement.'   Id. at 1128-29 citing Goldman v. KPMG LLP, 173 Cal.App.4th 209, 221 (2009)

Here, the claims against Chung are not sufficiently related to the Williams Arbitration Agreement.  To substantiate his argument on this issue, Chung cites plaintiff's allegations that defendants collectively engaged in a "scheme" to misappropriate its trade secrets, Dkt. 43 at 14, and a recent decision by the Central District of California in Chartwell Staffing Services, Inc., v. Atlantic Solutions Group, Inc., 2020 WL 620294 (C.D. Cal. Jan. 9, 2020) purportedly compelling arbitration for trade secret misappropriation claims against non-signatories on the basis of similar allegations of conspiracy, Dkt. 56 at 5.

Again, Chung overstates his cited authority.  The court in Chartwell considered a single motion to compel arbitration collectively filed by nine defendants in an alleged scheme to misappropriate plaintiff's trade secrets.  Id. at *1.  Eight of those defendants were former employees, only four of whom had employment agreements with plaintiff that contained arbitration provisions.  Id.  While repeatedly citing its respective employment agreements with the former employee defendants in support of its trade secret misappropriation claims, id. at *6, plaintiff opposed arbitration with even those four former employee defendants who entered arbitration agreements as a condition of their employment, id. at *3.  The court found in favor of the defendant non-signatories on both grounds stated in Kramer and compelled arbitration on the claims against them.  Id. at *8.

With respect to its decision on the first ground, the court stated that plaintiff's repeated reference to the various employment agreements in a prior ex parte application "were not mere inconsequential mentions of the agreements" but instead calculated attempts by plaintiff to show that "(1) certain of its information constitutes protected trade secrets; (2) each individual Defendant, as a former Chartwell employee, was put on notice by the Employment Agreements of the nature of that information; and, (3) each individual Defendant, as a former Chartwell employee, has agreed that they are prohibited from engaging in unauthorized use of those trade secrets."  Id. at *6. On the basis of those calculated references, the court decided that plaintiff's "claims against the

16

United States District Court
Northern District of California

1  non-signatory [defendants] are founded in and inextricably bound up with the obligations

2  imposed by the agreement containing the arbitration clause." Id. at *7.  The court further

3  observed that the subject "trade secret information would not have been provided to

4  defendants but for the contracts they entered into with [plaintiff]." Id.

5         With respect to its decision on the second ground, the court cited its decision on

6  the first ground as largely dispositive and then went on to address plaintiff's "allegations

7  of a concerted and collusive effort by Defendants to misappropriate and use Chartwell

8  trade secrets to siphon off Chartwell customers and employees for the benefit of

9  [corporate defendant]." Id.  The court characterized these allegations as "center[ing]

10  around the rights and obligations created by the Employment Agreements" (without

11  specifying which employment agreements) and, on the basis of that characterization,

12  concluded that plaintiff's claims against the non-signatory defendants "are based on the

13  same facts and are inherently inseparable from arbitrable claims against signatory

14  [defendants]." Id.

15         For multiple reasons, the court rejects the argument that Chartwell controls this

16  instant case.  First, unlike the plaintiff in Chartwell, plaintiff here expressly consented to

17  Williams' motion to compel arbitration.  Plainly, then, plaintiff is not trying to avoid certain

18  terms of its employment arrangement with Williams but nonetheless selectively assert

19  others.  Given that, compelling the non-signatory claims to arbitration would not advance

20  the rationale underlying the subject equitable doctrine.

21         Second, unlike the broader employment contracts in Chartwell that included

22  certain "prohibitions and restrictive covenants," id. at * 6, the Williams Arbitration

23  Agreement is a standalone two-page document that says nothing about Williams'

24  substantive employment obligations with respect to plaintiff's trade secrets, Dkt. 41-2 at

25  2-3.  The Williams Arbitration Agreement itself does not support any of the various

26  showings that the court in Chartwell identified as supporting plaintiff's trade secret claims

27  against the non-signatory defendants.  Id. at *7.

28         In any event, even without these distinctions, the court finds Chartwell's reasoning

on the non-signatory compulsion issue unpersuasive. Significantly, with respect to the first ground set forth in <u>Kramer</u>, the court in <u>Chartwell</u> failed to explain why the signatory employment contracts were necessary to plaintiff's claims against the non-signatory. While the court in <u>Chartwell</u> identified three aspects of the underlying claims that the subject agreements supported, <u>id.</u> at *6, helping to substantiate a required element is different than being necessary to substantiate such an element. Similarly, with respect to the second ground set forth in <u>Kramer</u>, the court in <u>Chartwell</u> based its decision upon its characterization of the allegations of the defendants' collective misconduct. Aside from the cursory "but for" observation supporting its first decision, the court did not clarify how the alleged collective misconduct by defendants generally arises out of the signatory employees' employment contracts.

Instead, the court concludes that the claims against Chung do not depend upon the Williams Arbitration Agreement. The claims against Chung are for misappropriation of trade secrets under federal and California state law. As a general matter, a plaintiff need not identify an agreement to state a trade secrets misappropriation claim and Chung fails to explain why plaintiff's theory of his liability for such claims depend upon the Williams Arbitration Agreement. While Chung accurately points out plaintiff's allegations that defendants conspired in a collective scheme to misappropriate its trade secrets, such allegations do not establish that the claims against Chung necessarily rely upon or are intimately connected with the Williams Arbitration Agreement.

Chung's remaining argument—i.e., that the court should order arbitration to avoid duplicative litigation in parallel proceedings, Dkt. 56 at 6—is a policy oriented critique that Chung fails to support with any citation to controlling California law, and, in any event, has already been characterized by the United States Supreme Court as an acceptable byproduct of litigation.[4] As a result, the court denies Chung's request to compel

---

[4] <u>Moses H. Cone Mem'l Hosp.</u>, 460 U.S. at 19-20 ("The Hospital points out that it has two substantive disputes here—one with Mercury . . . and the other with the Architect . . . The latter dispute cannot be sent to arbitration without the Architect's consent, since there is no arbitration agreement between the Hospital and the Architect. It is true, therefore, that

United States District Court
Northern District of California

1    arbitration of the claims against him.

2           c.      **The Remaining Defendants' Requests to Compel Arbitration**

3           The remaining non-signatory defendants base their request for arbitration on a

4    materially similar theory of intertwinement to that proffered by Chung.  In his opening

5    brief, He asserts that "[p]lainly, each Defendant's defense is inextricably intertwined,"

6    explaining only that "[e]ach defendant will require the testimony of the others to rebut

7    Cisco's allegations" and "the outcome of one may affect the others."  Dkt. 54 at 9-10.  In

8    his reply, He literally copies and pastes (without formatting) Chung's argument

9    concerning <u>Chartwell</u>'s applicability.  Plantronics similarly takes a page out of Chung's

10   briefing, both joining in it, Dkt. 47, and citing <u>Chartwell</u> for the vague proposition that

11   "[o]ther courts have ordered non-signatories to arbitration in trade secret cases, for

12   example, when the trade secret claims asserted against signatory and non-signatory

13   defendants were intertwined claims for misappropriation and the trade secret claim

14   against the signatory was encompassed within the sweeping language of the arbitration

15   clause at issue," Dkt. 59 at 16.  Puorro does largely the same when joining Chung's

16   motion in his opening brief.  Dkt. 45 at 12-14.

17          Here, the court denies the remaining non-signatory defendants' requests to

18   compel arbitration of the claims against them for the same reasons noted above with

19   respect to Chung.  Significantly, these defendants' theory of intertwinement fails to

20   establish how or why the various claims against them necessarily rely upon or are

21   intimately connected with the Williams Arbitration Agreement.  Similarly, just as the court

22   rejected Chung's summary assertion that compelling arbitration would advance the

23   court's interest in judicial efficiency, it does the same with respect to that argument by

24   Puorro.  Dkt. 60 at 5.  While consolidating all litigation related to a dispute in a single

25

26   ────────────────

27   if Mercury obtains an arbitration order for its dispute, the Hospital will be forced to resolve
     these related disputes in different forums. That misfortune, however, is not the result of
     any choice between the federal and state courts; **it occurs because the relevant**
28   **federal law *requires* piecemeal resolution when necessary to give effect to an**
     **arbitration agreement**.") (italics in the original) (bold added).

forum is desired policy, its efficiency gains do not overcome plaintiff's right to litigate against the non-signatory defendants in this forum.  Accordingly, the court denies the remaining non-signatory defendants request to compel arbitration of the claims against them.

### 2. Motion to Stay

#### a. The Court Stays the Instant Litigation Against Williams

A court must stay judicial proceedings against a party bound to an arbitration agreement that falls within the scope of the FAA.  9 U.S.C. § 3. As detailed above, plaintiff consented to Williams' alternative motion to compel arbitration, which Williams brought pursuant to Title 9 U.S.C. § 4, Dkt. 41 at 2.  Given that, the court grants Williams' request for a stay of the proceedings against him.

#### b. The Court Allows the Instant Litigation Against the Non-Signatory Defendants to Proceed

To determine whether staying litigation under its inherent authority is proper, a district court should weigh the following competing interests:

1. The possible damage that may result from granting a stay.

2. The hardship or inequity that a party may suffer if required to litigate.

3. How a stay would affect the "orderly course of justice," including whether it would simplify or complicate factual and legal issues in the pending litigation. Lockyer v. Mirant Corp., 398 F.3d 1098, 1110 (9th Cir. 2005).

In Clinton v. Jones, the United States Supreme Court has acknowledged that "[t]he proponent of a stay bears the burden of establishing its need." 520 U.S. 681, 708 (1997). Citing Landis, the Ninth Circuit in Lockyer further clarified that "if there is even a fair possibility that the stay . . . will work damage to someone else, the party seeking the stay must make out a clear case of hardship or inequity." Lockyer, 398 F.3d at 1112.

Here, as a general matter, each of the non-signatory defendants only joined in Williams' briefing to support their respective requests.  Dkt. 47; Dkt. 45 at 12-13; Dkt. 43 at 13; Dkt. 54 at 2. Except as specified below, none of the non-signatory defendants

1   advanced any argument different than that proffered by Williams.  Given that, the court

2   will generally refer to only Williams' briefing when addressing the propriety of a stay of the

3   proceedings against them.

### i.      Inequity Resulting from Denying the Stay

5         In his opening brief, Williams failed to offer any showing of inequity that would

6   befall him or the non-signatory defendants in the event the court denied the requested

7   stay of proceedings against the non-signatory defendants.  In his reply, Williams posits

8   only that "[a]llowing Cisco to pursue identical claims against Mr. Puorro and Poly in this

9   Court while concurrently arbitrating those claims against Mr. Williams could very likely

10  result in 'inconsistent and adverse rulings' harmful to Mr. Williams."  Dkt. 58 at 9.  Other

11  than that summary assertion, Williams failed to explain what those hypothetical rulings

12  might actually be, their likelihood, or why they would be unfairly harmful to his litigation

13  position.  Absent such explanations, Williams' cannot establish the "clear case of

14  hardship or inequity" necessary for this court to enter a stay.  Lockyer, 398 F.3d at 1112.

15  As a result, the court concludes that this factor cuts against granting the requested stay.

### ii.     Possible Damage Resulting from Grant of Stay

17        Williams similarly fails to show the absence of any damage that would befall

18  plaintiff in the event the court were to grant his requested stay of proceedings against the

19  non-signatory defendants.  Instead, Williams turns the applicable burden on its head,

20  neglecting any argument on this issue in his opening brief and mistakenly dedicating a

21  section of his reply to the argument that "**Cisco** has not demonstrated that it will be

22  prejudiced by a stay pending arbitration." Dkt. 58 at 9-10 (emphasis added).  Williams'

23  reply on this point only critiqued the purported harms that plaintiff argues in its opposition

24  it would suffer in the event of a stay.  Id. at 9 ("Cisco also attempts to argue that it will be

25  'damaged' and 'unduly prejudiced' by a stay.  These arguments fail for several reasons.").

26  Perhaps a fine distinction, such criticisms themselves fail to affirmatively show that

27  plaintiff would not suffer damage from a stay.

28        In any event, even if Williams had proffered any arguments supporting an

United States District Court
Northern District of California

United States District Court
Northern District of California

affirmative showing, the court finds that the purported harms identified by plaintiff in its opposition would tend to undermine any such showing.  Significantly, plaintiff argues that a stay would create a material risk of spoliation. Dkt. 53 at 17-18.  While the court understands Williams' critique that plaintiff failed to offer any evidence substantiating actual spoliation and, even if such spoliation did occur, plaintiff could seek sanctions, Dkt. 58 at 9-10, the court recognizes the reality that sanctions do not always adequately compensate an aggrieved party.  Such recognition is particularly well-placed in a situation where, like here, the full extent of some alleged wrongdoing cannot be known.  Additionally, while not evidence, plaintiff proffers various ***non***-information and belief allegations supporting its claimed risk of spoliation.  FAC ¶ 91 (Chung performed online searches for "how to permanently delete icloud backup" and "how to see what is [sic] the thumb drive without detection"), id. ¶ 123 (He deleted from his LaCie drive thousands of plaintiff's files, some of which contained confidential information, as well as certain source code stacks), id. ¶ 132 (Williams, Puorro, and unspecified Plantronics' executives used their personal emails and phone calls to communicate).  These allegations, which appear substantiated by pre-complaint investigations, support plaintiff's claimed risk of spoliation in the event of a stay.  Accordingly, the court concludes that this consideration cuts against granting the requested stay.

### iii.       Effect of a Stay on the Orderly Course of Justice

In his opening brief, Williams asserts that the claims against the non-signatory defendants (especially those against Puorro) "raise numerous questions of fact and law that are common to each Defendant." Dkt. 41 at 15-16.  On that basis, Williams argues that that the court should stay the action against the non-signatory defendants to avoid needless litigation and minimize the risk of inconsistent rulings.  Id.

In its opposition, plaintiff argues that the claims against each non-signatory defendant, as well as their supporting allegations, "stand alone" and that there are numerous factual and legal questions implicated in the claims against the non-signatory defendants that the arbitration against Williams will not resolve.  Dkt. 53 at 19.  Plaintiff

also asserts that there is no risk of inconsistent rulings because any ruling by the arbitrator would not bind this court.  Dkt. 53 at 19-20.

In his reply, Williams points out numerous paragraphs in the FAC alleging a collective scheme by the defendants to misappropriate plaintiff's purported trade secrets. Dkt. 58 at 8.  Williams also points out that some allegations supporting both the claims against him, Puorro, and Plantronics are identical and that, on the basis of such allegations, the liability of the latter two defendants "is entirely derivative of Mr. Williams' own liability and thus the arbitration will have preclusive effect on those claims should the arbitrator find Mr. Williams did not misappropriate Cisco's trade secrets."  Id.  Relying upon these two sets of allegations relating to both him and the other non-signatory defendants, Williams argues that "a stay will assist in simplifying issues of proof and evidence relating to overlapping factual issues."  Id.  Williams further adds that whether the purportedly misappropriated information itself qualifies as a trade secret poses numerous other common questions.  Id. at 7.  Lastly, Williams responds to plaintiff's final assertion by clarifying that just because an arbitrator's ruling may not preclude a finding in this litigation does not prevent the possibility that a ruling from this court would be inconsistent with that of the arbitrator.  Id. at 9.

Here, the court concludes that a stay would advance the orderly course of justice. As an initial matter, the court agrees that various allegations proffered to support the claims against Williams are similarly used to support the claims against Puorro, FAC 127-177, 285-86, 300-01, and Plantronics, id. ¶¶ 317-18, 321 (alleging vicarious and direct liability on the basis of Puorro's and Williams' alleged misconduct).  Plaintiff's allegations of a collective "scheme," which included Williams, further show factual questions common to all defendants.  FAC ¶ 8, 317-22.  Aside from the defendants' purported conduct, Williams is also correct that a core issue in this litigation—whether the information purportedly misappropriated by defendants qualifies as trade secrets—poses numerous threshold issues that must be decided both by Williams' arbitrator and this court.  Given the nature of those issues (i.e., mixed questions of legal fact), the court acknowledges

the possibility of inconsistent rulings.

That said, Williams' fails to explain how the court's abstention in this action would simplify those questions.  Plaintiff posits that the Williams arbitration would have no preclusive effect on the claims against the non-signatory defendants.  Dkt. 53 at 19-20.  Except as provided by the doctrine of nonmutual collateral estoppel, Dkt. 58 at 8 n.3, Williams does not disagree, Dkt. 58 at 8-9.  The court understands that there is a scenario that the non-signatory defendants may invoke that doctrine on certain issues in this litigation (i.e., in the event Williams were to prevail on them at arbitration) and that— in the event the court determined such invocation were proper—granting the requested stay would then simplify the issues presented.  However, given that this scenario rests on at least two contingencies, the court assigns it only little weight when assessing Lockyer's third interest.  In any event, such limited weight fails to offset Williams' other shortcomings under Lockyer.

Separate from Williams' briefing, Plantronics and Chung raise two other distinct arguments in support of the requested stay of the proceedings against them.  In its reply, Plantronics suggests that, absent a stay, litigation in this action would "undermine" Williams' arbitration proceeding and "thwart the federal policy in favor of arbitration."  Dkt. 58 at 16-17.  Aside from reciting the existence of overlapping questions of fact between the two proceedings (already addressed above), Plantronics fails to explain that suggestion.

Chung summarily asserts that this court "must" stay the instant proceeding pending the Williams arbitration because the two proceedings involve the same substantive allegations of wrongdoing.  Dkt. 56 at 8.  In support of it, he cites Rent-A-Center West, Inc. v. Jackson, 561 U.S. 63, 78 n.2 (2010) and Ziober v. BLB Resources, Inc., 839 F.3d 814, 817 (9th Cir. 2016).  Chung's citation to Rent-A-Center is unsupportable, as that citation corresponds to the dissent and, in any event, the footnote is entirely off topic.  Chung's citation to Ziober fares no better, as that portion of the Ninth Circuit's opinion interpreted Title 9 U.S.C. § 3, which, as noted above, requires a stay of

24

United States District Court
Northern District of California

1  federal court litigation against a signatory defendant pending arbitration. By his adoption

2  of Williams' briefing on this issue, Chung has already ceded that a stay of proceedings

3  against non-signatory defendants is discretionary.  Dkt. 41 at 15 (citing district court case

4  law for the proposition that a court "may" stay an entire action pending arbitration).  Given

5  the above, any distinct arguments on the stay issue contributed by the non-signatory

6  defendants are immaterial.

7      In short, defendants failed to carry their burden under <u>Lockyer</u>.  As a result, the

8  court denies the motion to stay the proceedings against the non-signatory defendants.

9      **4.    Motions to Dismiss[5]**

10      Given the relationship between the claims alleged against the various defendants,

11  the court analyzes their motions to dismiss on a claim-by-claim (rather than motion-by-

12  motion) basis.

13          **a.    Trade Secret Misappropriation Claims**

14      "To state a claim for trade secret misappropriation under the [Title 18 U.S.C. §

15  1836] and [California Civil Code § 3426], a plaintiff must allege that: (1) the plaintiff

16  owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the

17  defendant's actions damaged the plaintiff."  <u>Alta Devices, Inc. v. LG Elecs., Inc.</u>, 343 F.

18  Supp. 3d 868, 877 (N.D. Cal. 2018).

19          **i.    Whether Plaintiff Adequately Alleged Ownership of Trade**

20              **Secrets in the Purportedly Misappropriated Information**

21      Title 18 U.S.C. § 1839(3) defines a trade secret to mean the following:

22          "all forms and types of financial, business, scientific, technical,
23          economic,  or  engineering  information,  including  patterns,
            plans,  compilations,  program  devices,  formulas,  designs,

24

25  [5] Because the court has ordered that plaintiff litigate its claims against Williams in
    arbitration, the court **TERMINATES** without decision Williams' alternative motion to
26  dismiss.  At this time, the court does not make any decision on the preclusive effect of
    this section of its order on the Williams arbitration.  Relatedly, the court will not consider
27  the arguments made by Williams in support of his now-terminated alternative motion to
    dismiss in its analysis of the remaining defendants' respective motions to dismiss.
28  Whatever the scope of their joinders, those defendants had a full and fair opportunity to
    brief their own arguments in support of their motions to dismiss.

prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3)(A)-(B).

California Civil Code § 3426.1(d) similarly defines a trade secret to mean "information . . . that (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d)(1)-(2).

California courts have explained that "[i]nformation has a broad meaning" and "[t]he definition of trade secret is . . . unlimited as to any particular class or kind of matter and may be contrasted with matter eligible for patent or copyright protection, which must fall into statutorily defined categories . . . A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Altavion, Inc. v. Konica Minolta Sys. Lab., Inc., 226 Cal. App. 4th 26, 53 (2014).

Here, defendants proffer the following two grounds to support their argument that plaintiff failed to allege its ownership of trade secrets in the misappropriated information at issue: (1) plaintiff failed to allege such secrets with sufficient particularity and (2) plaintiff failed to show that the purportedly misappropriated information has independent economic value.  The court analyzes each ground in turn.

### A.    Description of the Purportedly Misappropriated Information

"[C]ourts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a

requirement would result in public disclosure of the purported trade secrets." Autodesk,
Inc. v. ZWCAD Software Co., 2015 WL 2265479, at *6 (N.D. Cal. May 13, 2015). Given
that, "a plaintiff need not spell out the details of the trade secret," but it must "describe the
subject matter of the trade secret with sufficient particularity to separate it from matters of
general knowledge in the trade or of special persons who are skilled in the trade, and to
permit the defendant to ascertain at least the boundaries within which the secret lies."
Alta Devices, 343 F. Supp. 3d at 881-82; accord Autodesk, 2015 WL 2265479, at *5;
Vendavo, Inc. v. Price f(x) AG, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018);
MedioStream, Inc. v. Microsoft Corp., 869 F. Supp. 2d 1095, 1113 (N.D. Cal. 2012) ("The
complaint need not 'spell out the details of the trade secret' but must identify the trade
secret with sufficient particularity to give defendants 'reasonable notice of the issues
which must be met at the time of trial and to provide reasonable guidance in ascertaining
the scope of appropriate discovery.'").[6]

     As this court has recently noted, "allegations that set out purported trade secrets in
broad, categorical terms that are merely descriptive of the types of information that
generally *may* qualify as protectable trade secrets' are insufficient to state a claim. Five
Star Gourmet Foods, Inc. v. Fresh Express, Inc., 2020 WL 513287, at *7 (N.D. Cal. Jan.
31, 2020) (emphasis in the original). For example, courts reject the following sorts of
descriptions as insufficiently specific to allege a trade secret:

- Allegations of "source code, customer lists and customer related information,
  pricing information, vendor lists and related information, marketing plans and

---

[6] In its reply, Plantronics cites Top Agent Network, Inc. v. Zillow, Inc., 2015 WL 7709655,
at *4 (N.D. Cal. Apr. 13, 2015) for the proposition that a pleading must offer "enough
detail to allow the Court to make the required ***'item-by-item determination'*** of what is
and is not protectable under [California Civil Code § 3426]." Dkt. 59 at 10 (emphasis in
the original). The court in Top Agent did not cite any Ninth Circuit authority directly
supporting such an onerous requirement. Rather, the court in Top Agent merely cited
another district court opinion and provided a parenthetical to a Ninth Circuit decision
holding that "while a particular customer database qualified as a trade secret, the
generalized assertion of trade secrets in diagnostic software and operating systems did
not provide sufficient specificity." Id. at * 4. That holding falls short of a general rule
requiring an "itemized" identification of protected information.

United States District Court
Northern District of California

United States District Court
Northern District of California

strategic business development initiatives, 'negative knowhow' learned through the course of research and development, and other information related to the development of its price-optimization software, including ideas and plans for product enhancements." <u>Vendavo</u>, 2018 WL 1456697, at *3-4.

- Allegations of "data on the environment in the stratosphere" and "data on the propagation of radio signals from stratospheric balloon-based transceivers." <u>Space Data Corp. v. X</u>, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017).

- Allegations of "marketing strategy, product composition, packaging and manufacturing logistics," <u>Five Star Gourmet Foods</u>, 2020 WL 513287, at *7.

For analytical purposes, the court separately addresses each portion of the allegedly misappropriated trade secret information per each defendant below.

### 1.    The Information Allegedly Misappropriated by Williams

Plaintiff argues that the FAC adequately alleges that Puorro induced Williams to take the following categories of information: "market and strategy data, product strategy, financial data, information about Cisco's Limited Restructurings, Cisco's investments in emerging technologies, sales opportunities and customer lists, product pipelines, partner margins, and future plans for current products."  Dkt. 51 at 13; Dkt. 52 at 10-11.[7]  Plaintiff further argues that "[w]ithin those categories of information, Cisco alleges with particularity the subject matter of specific trade secrets that Mr. Puorro induced Mr. Williams to take," including "a redacted document" containing a range of "non-public

---

[7] Plaintiff also notes its allegation that Williams retained a "Time Machine back-up" of his company laptop that included "sales forecasts, customer names, commitments, and upsides." <u>Id.</u> at 13-14.  Unlike the information listed above, plaintiff alleges misappropriation of that device's information only in its claim against Williams. <u>Compare</u> FAC ¶ 259 ("Mr. Williams misappropriated Cisco's trade secrets by acquisition by improper means (including . . . *by retaining possession of Cisco Confidential Materials after the termination of his employment*) (emphasis added) <u>with</u> <u>id.</u> ¶¶ 286, 317 (omitting retention of that device as a basis for misappropriation in its claims against Puorro and Plantronics).  Accordingly, the court need not consider whether plaintiff identified that information with sufficient particularity in its analysis of the claims against Plantronics and Puorro.

United States District Court
Northern District of California

1   financial information" and a sales strategy named "Project Liberator,"  Dkt. 51 at 13; Dkt.

2   52 at 11, as well as "information about organizational changes at Cisco before they were

3   made public, a discussion guide including Cisco product strategy and other financial data,

4   details of a Cisco program named 'Project X' [and] Cisco's future plans for particular

5   collaboration products," Dkt. 51 at 13; Dkt. 52 at 11.

6        In its reply, Plantronics argues that plaintiff's proffered descriptions of this

7   information are potentially applicable to "millions of documents in a technology company

8   like Cisco and hardly provide Poly with notice of what specific information is at issue here

9   or whether it is protectable." Dkt. 59 at 11.  With respect to the particular subject matter

10  identified by plaintiff,  Plantronics addresses only two documents supposedly referenced

11  in the allegations noted immediately above—"the document described in paragraphs

12  156-7 . . . that Mr. Williams assembled for an interview with Poly []" and "the document

13  described in paragraph 164 . . . an email describing Cisco's sales strategy, Project X []."

14  Dkt. 59 at 12.  Plantronics contends that the FAC alleges only that the information

15  referenced in these documents is "non-public or confidential," id., and, as a result, does

16  not merit trade secret status.  Relatedly, Puorro adds that plaintiff "only identifies

17  information that is the very type of publicly available market share and financial

18  information that is available for any publicly traded company like Cisco" and "cannot

19  therefore be trade secrets." Dkt. 60 at 3.

20       Here, the court concludes that plaintiff described the trade secret information

21  purportedly misappropriated by Williams with sufficient particularity.  As an initial matter,

22  the court agrees with Plantronics that—if left unqualified—some of the descriptions of the

23  categories of information purportedly misappropriated by Williams would serve as the

24  exact sort of allegations that a consensus of courts in this district have held insufficiently

25  particularized.  FAC ¶ 154 ("market and strategy data"); ¶ 157 ("product strategies and

26  other financial data"); ¶ 159 ("business information").  However, plaintiff narrowed the

27  scope of information at issue in such categories to particular subjects mentioned in

28  certain documents or communications alleged in the FAC.  Such subject matter includes

plaintiff's collaboration business, id. ¶ 131, the "Project Liberator" sales strategy, id. ¶ 153, plaintiff's impending layoffs (including the identities of employees who would be affected), id. ¶¶ 141, certain marketing opportunities, id. ¶ 156, the "Project x" sales strategy, id. ¶ 164, and the status of a particular but unidentified product, id. ¶ 169.

The court understands Plantronic's criticism in its reply that the FAC itself alleges that the above noted documents and communications contain only "non-public and confidential" information. Dkt. 59 at 12. However, Plantronics fails to cite any controlling authority for the proposition that plaintiff must, at the pleading stage, show that the specific information contained in the above referenced documents itself qualifies as a trade secret to satisfy the particularity requirement. Such proposition is not the test. Rather, the test is whether the complaint's "level of detail . . . is sufficient to ascertain at least the boundaries within which the secrets lie and the scope of appropriate discovery." Five Star Gourmet Foods, 2020 WL 513287, at *7. When limiting the categories of the information allegedly misappropriated by Williams to the particular subjects referenced in the above noted documents, the FAC passes that test.

Puorro's added criticism does not alter this conclusion. In his single paragraph reply on this issue, he failed to explain how the specifics of the subject matter noted above were publicly known, particularly at the time of their alleged disclosure. On a related point, the divisive declaration proffered by Williams in support of his reply (Dkt. 58-1) also does not alter this conclusion. In that declaration, Williams purports to attach the documents referenced at FAC paragraph 156 ("Exhibit A") and paragraph 164 ("Exhibit B"), which, as cited above, serve as two of the allegations referencing documents that detail two aspects of the subject matter allegedly misappropriated by Williams. Dkt. 58-1 ¶¶ 2-3. Plantronics footnotes that the court should consider each of these documents because "plaintiff's response briefs rely extensively [upon them] as central to its trade secret claims." Dkt. 59 at 12 n.4. While Plantronics fails to close the loop on the relevance of such consideration, it appears to suggest that the court's incorporation by reference of the contents of these materials would undermine any

United States District Court
Northern District of California

1   argument that they reference matters subject to trade secret protection.  Plaintiff objects

2   to this request on grounds of authenticity of the materials attached.  Dkt. 65 at 4-5.

3        The court sustains that objection.  The document referenced at FAC paragraph

4   164 is an August 22, 2019 email.  FAC ¶ 164.  The document attached as Exhibit B is an

5   email dated September 19, 2019.  Dkt. 57-1 at 15.  Plainly, they are not the same email.

6   While FAC paragraph 156 references more than one "version" of the "discussion guide"

7   PowerPoint presentation, id. ¶ 156, Exhibit A does **not** include the "Poly has to be on Par

8   with Cisco" statement allegedly included in the first referenced version and does **not**

9   include any parent document showing that it was the version "later emailed" to a

10  Plantronics executive's personal address.  Dkt. 57-2.  Given that, whichever "version" of

11  the PowerPoint discussion guide Exhibit A might be, it is neither of those referenced at

12  FAC paragraph 156.  Accordingly, the court will not consider Exhibit A or Exhibit B in its

13  decision.[8]  As a result, plaintiff described the trade secret information purportedly shared

14  by Williams with Puorro and Plantronics with sufficient particularity.

15              **2.**     **The Information Allegedly Misappropriated**

16                        **by Chung**

17       Plaintiff argues that the FAC adequately alleges that Chung took the following

18  categories of information: "source code, schematics, design details and specifications,

19  user feedback, design documentation, and features relating to Cisco's existing and future

20  products, as well as Cisco business information such as marketing strategy, cost and

21  pricing information, and payment information."  Dkt. 51 at 11-12; Dkt. 50 at 9.  Plaintiff

22  further argues that, "beyond categories of information, Cisco alleges with particularity the

23  technical subject matter of specific trade secrets within those categories that Dr. Chung

24  took, including, for example, Cisco's marking opportunities in 5G, design specifications of

25  a pre-release video conferencing display prototype, source code for debugging a user

26

27  [8] Given this decision, the court need not consider Williams' underlying administrative
    motion to seal those materials (Dkt. 57) or plaintiff's declaration in support of that motion
28  (Dkt. 64).  Accordingly, the court **TERMINATES** that motion (Dkt. 57) as moot.  Unless
    withdrawn by Williams, the materials filed with it shall remain restricted.

interface, artwork prototypes, user experience design documentation, user interview feedback, and schematics for the above-mentioned pre-release video conferencing display prototype, design details and specifications for Cisco's sound bar products, and the 'EA document' describing component specifications and competitive differentiators for Cisco's current and not yet released products."  Dkt. 51 at 11-12; Dkt. 50 at 9.

In its reply, Plantronics similarly characterizes these descriptions as potentially applicable to "millions of documents" and incapable of providing it "with notice of what specific information is at issue here or whether it is protectable."  Dkt. 59 at 11. Plantronics fails to address the effect that plaintiff's identification of the above referenced subjects would have upon such notice.  Chung, however, does go one step further.  He argues that, even though plaintiff identified various subject matter of information purportedly misappropriated by him, plaintiff fails to allege that such information contains trade secrets.  Dkt. 56 at 9-10.  In Chung's words, if plaintiff's position were accepted, "everything mentioned in the complaint is a trade secret."  Id. at 10.

Here, the court concludes that plaintiff described the trade secret information purportedly misappropriated by Chung with sufficient particularity.  Again, while the court agrees with defendants that the categories of misappropriated information alleged at FAC paragraphs 26 and 199 are themselves insufficiently particularized, plaintiff qualifies the breadth of such information by reference to their subject matter in other allegations.  As argued by plaintiff, such subject matter includes "Cisco's contribution to 5G technology . . . and design specification of a pre-release video conferencing display prototype," FAC ¶ 36, source code for debugging a user interface, id. ¶ 41, pre-release video conferencing display prototypes, id. ¶ 42, design details and specification related to plaintiff's sound bar products, id. ¶ 45 (alleged on information and belief), over 100 webinar presentations relating to plaintiff's communications product portfolio, id. ¶ 65 (alleged on information and belief), a presentation detailing strategy and costs for a pre-release video conferencing display product, id. ¶ 51 (alleged on information and belief), plaintiff's marketing position in the collaboration space, id. ¶ 64, and "component specifications and

competitive differentiators" for plaintiff's current and unreleased hardware products, id. ¶ 74.  These subject matter qualifications again allow defendants a "level of detail . . . [that] is sufficient to ascertain at least the boundaries within which the secrets lie and the scope of appropriate discovery."  Five Star Gourmet Foods, Inc., 2020 WL 513287, at *7.  Accordingly, plaintiff described the trade secret information purportedly misappropriated by Chung with sufficient particularity.

### 3. The Information Allegedly Misappropriated by He

Plaintiff argues that the FAC adequately alleges that He took the following categories of information: "design and architectural documents, hardware diagrams, schematics, source code stacks, and engineering specifications relating to existing and future Cisco products, and non-public financial information."  Dkt. 51 at 12; Dkt. 66 at 9.  Plaintiff further argues that, "within those categories of information, Cisco alleges with particularity the technical subject matter of specific trade secrets that Mr. He took, including for example, architectural design documents for an unreleased Cisco headset concept, a hardware diagram for a Cisco headset prototype, design and configuration documents for Cisco's headset prototypes, a schematic for an unreleased IP telephone project, and a full engineering specification for a next-generation conference room collaboration device." Dkt. 51 at 12; Dkt. 66 at 9-10.

In its reply, Plantronics repeats its prior arguments on this issue, Dkt. 59 at 11, and again fails to address the effect that plaintiff's identification of the above referenced subjects would have upon the sort of notice required to understand the scope of information at issue.  In his reply, He adopts a materially similar rebuttal to that proffered by Chung on this issue.  Namely, He contends that, despite the various subject matter purportedly identified by plaintiff, plaintiff fails to allege that the documents serving as the basis for describing such subject matter themselves contain trade secrets.  Dkt. 71 at 4.

Here, the court concludes that plaintiff described th trade secret information purportedly misappropriated by He with sufficient particularity.  Plaintiff qualifies the

33

United States District Court
Northern District of California

1   breadth of the categories of information allegedly misappropriated by He with reference

2   to their subject matter.  Such subject matter includes an unreleased headset concept and

3   like prototypes, FAC ¶¶ 103, 105, 109, "vendor roadmaps for Cisco's products," id. ¶ 109,

4   "an unreleased IP telephone project," id. ¶ 118, and "full engineering specifications for a

5   next-generation conference room collaboration device," id. ¶ 120.  These subject matter

6   qualifications provide defendants sufficient detail to understand the boundaries within

7   which the alleged trade secrets lie and the scope of appropriate discovery.  Therefore,

8   plaintiff described the trade secret information purportedly misappropriated by He with

9   sufficient particularity.[9]

10            **B.**     **Independent Economic Value of the Allegedly**

11                  **Misappropriated Information**

12      "To have independent economic value, a trade secret must be sufficiently valuable

13   and secret to afford an actual or potential economic advantage over others."  Calendar

14   Research LLC v. StubHub, Inc., 2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017).   A

15   plaintiff may show independent economic value "by circumstantial evidence of the

16   resources invested in producing the information, the precautions taken to protect its

17   secrecy, and the willingness of others to pay for its access."  Id.  Although "the standard

18   to show that trade secrets derive [independent] economic value is not a high standard,"

19   id. at * 4, courts recognize that merely reciting this element in a pleading is insufficient to

20   state a claim for trade secret misappropriation, Acrisure of Ca. v. So. Cal. Commc'l Ins.

21   Servs., Inc., 2019 WL 4137618, at *4 (C.D. Cal. Mar. 27, 2019) (dismissing plaintiff's

22   trade secret claim where complaint offered "mere recitation of California Civil Code §

23   3426.1's [independent economic value] legal element").

24

25

26   [9] On April 24, 2020, plaintiff filed an administrative motion for leave to file a supplemental
opposition.  Dkt. 80.  In it, plaintiff repeats its argument that, in the event the court found

27   that it failed to allege the misappropriated trade secrets with the requisite specificity, its
disclosure statement would remedy that shortcoming. Dkt. 80-1 at 5.  Because plaintiff

28   alleged the trade secret information purportedly misappropriated by Williams, Chung, and
He with sufficient particularity, the court **DENIES** as moot plaintiff's administrative motion.

1

**1.     Value of the Information Misappropriated by**

2

**Chung and He**

3          In its opposition, plaintiff advances three grounds to support its position that the

4   information misappropriated by Chung and He is economically valuable.  The court

5   analyzes each in turn.

6          First, plaintiff points to its allegations at FAC paragraph 2 and paragraph 3, Dkt. 51

7   at 17; Dkt. 66 at 12-13, which provide the following in relevant part:

8                "Cisco has invested significant resources to design, build, and
               sell its robust collaboration platform, which includes unified
9               communications and video conferencing software and
               collaboration endpoints. . . . Cisco's engineers rely upon
10              tangible and intangible financial, business, scientific,
               technical, economic, and engineering information, such as
11              source code, schematics, design details and specifications,
               user feedback, design documentation, and feature
12              documentation relating to Cisco's existing and future products,
               as well as Cisco business information such as operations,
13              marketing, and resource strategies and plans, supplier
               information, cost and pricing information, and payment
14              information to develop Cisco's products. Cisco takes
               reasonable measures to keep this information secret, and this
15              information derives independent economic value from not
               being generally known to, and not being readily ascertainable
16              through proper means by, others who can obtain economic
               value from the disclosure or use of the information." FAC ¶ 2.

17

                . . .
18
                "Cisco also has made substantial and significant investments
19              in developing its routes to market for its collaboration products
               and services, through extensive engagement of partner,
20              customer, and industry connections by its global sales force.
               Cisco's global sales force relies upon tangible and intangible
21              financial, business, and economic information, such as non-
               public financial reporting, customer lists, pricing models,
22              forecasting, sales, resourcing, and competitive strategies and
               plans, and product refresh strategies to develop Cisco's go-to-
23              market and business development plans and to market and sell
               Cisco products. Cisco takes reasonable measures to keep this
24              information secret, and this information derives independent
               economic value from not being generally known to, and not
25              being readily ascertainable through proper means by, others
               who can obtain economic value from the disclosure or use of
26              the information." Id. ¶ 3.

27          The above allegations only generally relate to plaintiff's collaboration platform.

28   They say nothing about the economic value of the categories of information purportedly

1    misappropriated by Chung or He that concern the handful of subject matter that plaintiff

2    alleged with sufficient particularity.  While that subject matter may serve as constituent

3    parts falling under the umbrella of plaintiff's "collaboration platform," that relationship does

4    not compel a reasonable inference that any information about such particular subject

5    matter is itself economically valuable.

6           Second, plaintiff relies upon allegations that Chung and He signed a PIIA and

7    those agreements generally prohibited them from disclosing its confidential and

8    proprietary information.  Dkt. 51 at 17.  While the existence of these agreements supports

9    the inference that information reviewed by Chung and He in the course of their

10   employment is valuable, it says nothing about the economic value of the particular

11   information at issue.

12          Third, plaintiff relies upon Chung's and He's decisions to "risk [their] futures" at

13   Plantronics by "maintaining simultaneous employment at Cisco" and "accessing Cisco's

14   trade secrets while employed there."  Dkt. 51 at 18; Dkt. 66 at 14.  While plaintiff cites this

15   alleged conduct as "circumstantial evidence of the willingness of others to pay for access

16   to [the] secret information" misappropriated by these defendants, Dkt. 51 at 18, plaintiff

17   fails to provide any coherent nexus linking such risks to the subject information.[10]  As a

18   result, the court concludes that plaintiff failed to adequately allege that the information

19   purportedly misappropriated by Chung and He maintained independent economic value.

20                          **2.      Value of the Information Misappropriated by**

21                                  **Williams**

22          In its opposition to Plantronic's motion, plaintiff advances three grounds to support

23   its position on this issue with respect to Williams.  The first two grounds are materially

24   similar to those considered and rejected above with respect to Chung and He.  Dkt. 51 at

25   17.  Given that, these grounds do not provide a basis to conclude that the information

26   _____

27   [10] In its opposition to He's motion, plaintiff argues that He's "use" of its trade secrets
     "while at Poly—combined with his efforts to conceal that use—is circumstantial evidence
28   of economic value."  Dkt. 66 at 14.  Plaintiff fails to cite any allegation supporting that
     argument.

purportedly misappropriated by Williams maintained independent economic value.

As its third ground, plaintiff points to the alleged quid pro quo between Williams and Puorro.  Dkt. 51 at 18.  As alleged, Williams provided Puorro certain information pertaining to the subject matter identified above in exchange for employment at Plantronics.  FAC ¶¶ 137-146.  Employment comes with certain monetary and other compensatory benefits, which, plainly, are economically valuable.  Given that, the court may fairly infer that the information Puorro allegedly traded such employment for, too, was economically valuable.  Otherwise, Puorro would not have engaged in the alleged quid pro quo.  Accordingly, plaintiff has adequately alleged that the information purportedly misappropriated by Williams has independent economic value.

### ii.    Alleged Misappropriation by Puorro and Plantronics

Under California Civil Code § 3426.1, "misappropriation" extends to "Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Cal. Civ. Code § 3426.1(b)(1).  Under that same section, "improper means" is defined to include "breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Cal. Civ. Code § 3426.1(a).[11]  Only Puorro and Plantronics challenge the trade secrets misappropriation claims against them on the basis of plaintiff's failure to adequately allege misappropriation.  The court analyzes each challenge in turn.

### A.    Misappropriation by Puorro

In his opening brief, Puorro summarily argues that "[n]owhere does plaintiff plead any 'reasonable basis' to infer that Mr. Puorro improperly misappropriated Cisco's alleged trade secrets . . . Cisco has pled no facts describing how Mr. Puorro misappropriated these alleged trade secrets."  Dkt. 45 at 11-12.  In response, plaintiff argues that the FAC adequately alleges that Puorro misappropriated the subject information under an

---

[11] Title 18 U.S.C. § 1839(5) and § 1839(6) adopt materially identical definitions of "misappropriation" and "improper means."  Given that, the court will not state them.

United States District Court
Northern District of California

improper acquisition theory.  Dkt. 52 at 15.  "In particular," plaintiff argues, "Mr. Puorro initiated a scheme to induce Mr. Williams to reveal Cisco's trade secrets to himself and other executives for the benefit of Poly."  Id..  In reply, Puorro argues that plaintiff's theory fails to show that Puorro actually "received or acquired" the subject information or that he "actually knew or had reason to know he had acquired a trade secret."  Dkt. 60 at 4.

Here, the court concludes that plaintiff adequately alleged misappropriation by Puorro.  Plaintiff alleges a series of communications between February 2019 and September 2019 that show "a scheme whereby [Puorro] would exchange coaching and advocacy on Mr. Williams' behalf for confidential details about Cisco's competitive business."  FAC ¶ 130.  Allegations showing that scheme—none of which are based on the "information and belief" condition that defendants contest in their briefing on this issue and many of which are substantiated by text messages—include the following:

- On March 6, 2019, Puorro "asked Mr. Williams if 'org changes' had happened at Cisco.  Mr. Williams provided a detailed response." Id. ¶ 137.

- On March 8, 2019, "Mr. Williams provided information to Mr. Puorro about organizational changes at Cisco.  Mr. Puorro requested further details . . ." Id. ¶ 140.

- On March 11, 2019, Puorro texts Williams asking him "talk?" and, within a minute, Williams responds "Yes sir."  Three hours later, Williams texts Puorro stating "[t]ime is now to recruit.  Let's execute a project x like we did with [another company] . . . I have a list." Id. ¶ 141.

- On March 22, 2019, four days following an in-person meeting with Puorro, Williams "communicated highly confidential details about a matter at Cisco, including [its] legal strategy, to Mr. Puorro." Id. ¶¶ 142, 143.

- On May 9, 2019, after learning that an unknown plaintiff employee knows something about his role at Plantronics, Puorro tells Williams "I think we have a leak in our India team.  Anyway you can find out?"  In less than an hour, Williams, responds: "Ok . . . Have info . . . call me when it works."  Puorro and

38

Williams then talk over the phone.  Id. ¶ 148.

- On May 22, 2019, after Puorro introduced Williams to an unidentified third-party consultant (later hired as a Plantronics employee), Williams texts Puorro stating: "I'm having dinner with [consultant] tonight . . . Let me know if you want me to pass on anything."  Id. ¶150.

- On May 25, 2019, Williams texts Puorro stating: "I have something you probably want to know . . . .Just ring me when you can sneak away – don't want to put this one in writing."  Id.¶ 151.

- On June 28, 2019, shortly before Williams' interview with executives for a position at Plantronics, Puorro contacts Williams stating: "I heard more LR in the BU's . . . Wonder if [particular employee] is safe or not . . . Dig for me?"  Id. ¶ 158.

- On July 1, 2019, Puorro asked Williams if plaintiff had executed its planned "LR" (i.e., "limited restructuring" or layoffs).  Williams responded.  Id. ¶ 160.

- On August 19, 2019, Williams provides Puorro with the names of various employees affected by the layoffs and who could be recruited to Plantronics.  Id. ¶ 163.

- On August 27, 2019, Puorro texts Williams about an internal meeting among plaintiff's personnel, stating "How was UC break out yesterday?" Williams responds suggesting a phone call and then stating "ping me later – don't want to put anything on Text [sic] that I don't want Cisco to have!" Id. ¶ 165.

- On August 28, 2019, Williams sends pictures from the subject internal meeting to Puorro.  Such pictures include screenshots of presentations and images of a new headset.  Puorro asks "[d]oes it work with Zoom?" On that same day, Williams provided Puorro with details from a presentation at that same meeting concerning plaintiff's competitive focus.  Id. ¶ 167.

- On September 3, 2019, Williams contacts Puorro informing Puorro that he is meeting with an unidentified customer and suggesting that he could redirect

United States District Court
Northern District of California

that customer's business away from plaintiff.  Id. ¶ 168.

- On September 7, 2019, Puorro texts Williams asking about some product. Williams responds "Talk? . . . Just in case big brother is watching…"  Puorro responds "Calling." Id. ¶ 169.

- On September 12, 2019, Williams contacted Puorro providing him with details about plaintiff's upcoming layoffs and an employee to recruit.  Id. ¶ 170.

- On September 13, 2019, Williams contacts Puorro stating that he heard "interesting rumors" about plaintiff's collaboration platform and wanted to speak with Puorro live.  Puorro called Williams shortly after.  Id. ¶ 171.

- On September 16, 2019, Williams contacted Puorro (and an unidentified Plantronics executive) to provide information about Project x.  Id. ¶ 172.

- On September 18, 2019, Williams contacted Puorro with information concerning plaintiff's upcoming layoffs, the status of a particular business unit, and the name of a potential employee to recruit.  Id. ¶ 174.

The court concludes that the above allegations show that Puorro received the information relating to the various subject matter that Williams purportedly misappropriated.  The sensitive nature of the information shared is shown by the multiple suggestions by Puorro and Williams that they take their communications off texting and to a phone call.  Their attempts at secrecy support a reasonable inference that Puorro knew or should have known that the allegedly shared information was being passed along by Williams in violation of his PIIA.  Given Puorro's status as a former plaintiff employee subject to a PIIA, FAC ¶ 309, the court may also reasonably infer that Puorro should have known that Williams maintained a like agreement.   Accordingly, plaintiff adequately alleged that Puorro misappropriated information concerning the various subjects purportedly shared by Williams.

## B.    Misappropriation by Plantronics

Plaintiff premises its trade secrets misappropriation claims against Plantronics

upon the alleged conduct of each individual defendant.  FAC ¶¶ 314-22, 335.[12]  To support such claim premised upon Puorro's alleged conduct, plaintiff advances theories of both vicarious liability and direct liability.  Id. ¶¶ 317-318.  With respect to Williams' alleged conduct, plaintiff advances only a theory of direct liability by ratification.  Id. ¶ 321.  The court analyzes each theory in turn.

### 1.    Vicarious Liability for Puorro's Conduct

"Under the doctrine of respondeat superior, an employer is vicariously liable for the torts of its employees committed within the scope of [their] employment." SolarCity Corp. v. Pure Solar Co., 2016 WL 11019989, at *5 (C.D. Cal. Dec. 27, 2016).  Such liability extends to "intentional torts, even if the employer has not authorized the employee to perform the tortious activity, so long as there is a 'causal nexus' between the activity and the employee's work."  Id.  Courts consider conduct "within the scope of employment when it is performed, at least in part, to benefit the employer, though the employer may forbid it."  Id.

Here, plaintiff adequately alleged that Puorro acted within the scope of his employment at Plantronics when he misappropriated the information purportedly taken by Williams.  Significantly, as noted above, the subject information concerned, among other things, the status of particular internal meetings, FAC ¶ 165, the status of particular products, id. ¶¶ 167, 169, 171, and the names of employees affected by plaintiff's layoffs that Plantronics may recruit, id. ¶¶ 137, 140, 141, 158, 160, 163, 172.  Given that Plantronics and plaintiff operate in the same industry, the court may reasonably infer that Puorro acquired the information purportedly taken by Williams to benefit Plantronics.  As a result, plaintiff adequately alleged that Plantronics misappropriated the information purportedly taken by Williams under a theory of vicarious liability.

---

[12] The court has concluded that plaintiff failed to adequately allege that the information purportedly misappropriated by Chung and He maintained independent economic value.  As a result, to the extent plaintiff bases its trade secrets misappropriation claims against Plantronics on the information allegedly misappropriated by either defendant, such claims fail.  Given that, the court need not analyze whether plaintiff adequately alleged that Plantronics is vicariously or directly liable for the alleged conduct of Chung or He.

United States District Court
Northern District of California

1

2

**2.**      **Direct Liability for Ratifying Puorro's and**

**Williams' Conduct**

3

4

5

6

7

8

"As an alternate theory to *respondeat superior,* an employer may be liable for an employee's act where the employer either authorized the tortious act or subsequently ratified an originally unauthorized tort." Garcia ex rel. Marin v. Clovis Unified Sch. Dist., 627 F. Supp. 2d 1187, 1201 (E.D. Cal. 2009).  "The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort."  Id.

9

10

11

12

13

14

Here, plaintiff alleges multiple instances where, over the course of interviewing for a position at Plantronics, Williams communicated the subject information to various unidentified Plantronics executives.  Despite such communications, those executives did not reprimand Williams for (or otherwise caution him against) making such disclosures. In some instances, those executives instead requested additional related information. Allegations reflecting the above conduct by Plantronics' executives include the following:

15

16

17

18

19

20

- "In preparation for the June 28 interviews, Mr. Williams prepared a 'discussion guide' PowerPoint presentation.  This presentation contained Mr. Williams' plans for accelerating sales at Poly, which included Cisco's product strategy and other financial data . . . Mr. Williams later emailed a version of this presentation to Second Poly Executive at the executive's personal email address as opposed to the executive's Poly email."  FAC ¶ 156.

21

22

23

24

25

- "On July 31, 2019, Mr. Williams sent a message to Second Poly Executive in which Mr. Williams proposed that it was '[t]ime to execute Project Liberator while Cisco is further distracted, grow sales and gain marketshare.'   Project Liberator is an ongoing Cisco sales strategy that Mr. Williams was involved with developing and executing while at Cisco."  Id. ¶ 162.

26

27

28

- "On August 22, 2019, Mr. Williams sent an email to Second Poly Executive's personal gmail account describing his vision for executing 'Project x' at Poly. Project x is a Cisco sales strategy that Mr. Williams was involved with

42

developing and executing while at Cisco. . . . Mr. Williams discussed Project x

with Second Poly Executive.  The Second Poly Executive asked Mr. Williams

to connect with Mr. Puorro and yet another Poly executive ('Third Poly

Executive') to 'figure out next steps to execute the concept . . . .'  Mr. Williams

subsequently shared the details of Project x with Mr. Puorro and Third Poly

Executive." Id. ¶ 164.

- On September 16, 2019, "Mr. Williams communicated with Mr. Puorro and

  Third Poly Executive about Project x.  Mr. Williams conveyed to Second Poly

  Executive that these were 'Great conversations' and asked Second Poly

  Executive if anything further was required."  Subsequently, "Second Poly

  Executive said that he would get the HR people 'in gear today.'  Second Poly

  Executive asked Poly's human resources department to move fast." Id. ¶¶

  172-173.

Plaintiff flagged each of these allegations in support of its position on this issue in

its opposition.  Dkt. 51 at 22.  In its reply, Plantronics failed to explain how or why any of

them fall short of ratification.[13]  Instead, Plantronics argues that the FAC's

acknowledgement that  "Mr. Williams certified to Poly [on October 12, 2019, FAC ¶ 181]

that he did *not* possess any Cisco confidential information when he was hired by Poly"

undermines any assertion that its executives had knowledge of Williams' alleged conduct.

Dkt. 59 at 9.  That argument is deflective.  Whatever the certification's contents, it does

not alter the executives' alleged participation in, or knowledge of, the communications

bulleted above.  Accordingly, plaintiff has adequately alleged that Plantronics

misappropriated the information purportedly taken by Williams under a theory of direct

liability by ratification as well.

---

[13] Plantronic's opening brief similarly neglects any such explanation.  In it, Plantronics
summarily asserts that "plaintiff alleges nothing more than Mr. Williams sought
employment at Poly, and that Mr. Williams had conversations regarding his recruitment
with Mr. Puorro."  Dkt. 40 at 25

### b.    Interference with Contract Claims

California Civil Code § 3426.7(b) "preempts common law claims that are based on the same nucleus of facts as the misappropriation of trade secrets claim for relief."  K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc., 171 Cal. App. 4th 939, 958 (2009).

In its oppositions, plaintiff argues that its intentional interference claims do not arise from the same nucleus of facts as its trade secrets claims because Puorro induced Williams to breach his PIIA and that inducement "stands irrespective of the trade secret misappropriation."   Dkt. 51 at 24; Dkt. 52 at 16.  To substantiate that assertion, plaintiff explains that "Mr. Puorro engaged in a scheme to have Mr. Williams deliver information about Cisco's restructurings and provide information about Cisco employees," id. (citing FAC ¶¶ 6, 130), and also used Williams "as an agent for Poly within Cisco to recruit Cisco employees not impacted by restructurings, and to take business from Cisco, thereby causing Mr. Williams to violate his own PIIA," id. (citing FAC ¶¶ 130, 137, 141, 148, 168, 309-10).  Plaintiff then summarily asserts that "[t]hese allegations are separate, distinct, and tied to the interference and the breach of the PIIA document as opposed to the misappropriation of trade secrets."  Dkt. 51 at 25; Dkt. 52 at 16.

Here, the court concludes that plaintiff failed to allege an intentional interference with contract claim that arises out of a set of operative facts distinct from those relied upon to support its trade secret misappropriation claims.  By its own argument in support of these claims, plaintiff cites the same "scheme" by Puorro that it proffered to support its trade secret misappropriation claims.  Compare Dkt. 51 at 24 (citing FAC ¶ 130) with Dkt. 51 at 21 (citing FAC ¶ 130).  While plaintiff cites certain communications by Williams concerning potential employees available for recruitment, Dkt. 51 at 24 (citing FAC ¶¶ 130, 137, 141), upcoming layoffs, id. (citing FAC ¶ 6), and existing clients potentially available for poaching, id. (citing FAC ¶ 168), specifically in support of its intentional interference claim, plaintiff relies upon the exact same sort of communications just a few

pages earlier in its opposition to substantiate its trade secrets misappropriation claims.[14]

Plaintiff may not have it both ways.

With respect to the remaining allegation cited by plaintiff in support of its claims—namely that Puorro asked Williams to run-down some leak in Plantronic's India team, FAC ¶ 148—plaintiff fails to explain how or why it maintained a property right in identifying which members of Plantronics were "telling everyone [Puorro is] now the guys at Poly." Bus. Sols., LLC v. Ganatra, 2019 WL 926351, at *6 (C.D. Cal. Jan. 7, 2019) ("common law claims premised on the wrongful taking of information which does not qualify as a trade secret are also superseded, unless the plaintiff identifies some law which confers the plaintiff with property rights in the information." ).

In any event, the very agreement that plaintiff bases its intentional interference claims upon (Williams' PIIA agreement), Dkt. 51 at 24, serves as the sole basis for alleging the acquisition by "improper means" aspect of its trade secrets misappropriation claims against both Puorro and Plantronics, Dkt. 52 at 15 ("Mr. Puorro knew that the trade secrets were acquired through improper means, as having Mr. Williams disclose the trade secrets would violate his duty to maintain confidentiality established in Mr. Williams' PIIA.  [FAC] ¶ 309"); Dkt. 51 at 21 (same argument).  Because plaintiff relies heavily upon the breach of that agreement to substantiate the misappropriation element of its trade secrets claims against Puorro and Plantronics, that agreement may not also serve as the object of its intentional interference claim absent a clear explanation of how its breach arises from a different set of facts.  Plaintiffs fails to provide such explanation. Given the above, the court concludes that plaintiff has failed to allege an intentional interference with contract claim against both Puorro and Plantronics.

---

[14] Id. at 13 ("With respect to Mr. Williams and Mr. Puorro, the FAC identifies categories of information that Mr. Puorro induced Mr. Williams to misappropriate, including, for example . . . information about **Cisco's Limited Restructurings** (citing FAC  ¶159) . . . sales opportunities and customer lists . . . (citing FAC ¶ 258) . . .  Within those categories of information, Cisco alleges with particularity the subject matter of specific trade secrets that Mr. Puorro induced Mr. Williams to take.") (emphasis added); id. at 15 ("The FAC alleges just these type of trade secrets. . . . [FAC]  ¶ 141 (**non-public employee-specific information**) . . .") (emphasis added).

1

####      c.      Leave to Amend the Dismissed Claims

2     A district court "should grant the plaintiff leave to amend if the complaint can

3 possibly be cured by additional factual allegations," however, dismissal without such

4 leave "is proper if it is clear that the complaint could not be saved by amendment."

5 <u>Somers</u>, 729 F.3d at 960.

6     Here, the court will allow plaintiff leave to amend its trade secret misappropriation

7 claims against Chung and He only to allege the independent economic value of the

8 purportedly misappropriated trade secret information with the requisite specificity.

9 Plantronics and Puorro failed to advance any argument establishing that plaintiff cannot

10 allege a basis for its intentional interference with contract claims that is legally distinct

11 from that proffered in support of its trade secrets misappropriation claims.  Given that, the

12 court cannot conclude that plaintiff's intentional interference with contract claims cannot

13 be saved by amendment and will allow plaintiff one opportunity to do so.  Absent leave of

14 court or consent of defendants, plaintiff may not otherwise amend its pleadings.  That

15 prohibition extends to any attempt by plaintiff to expand its allegations to information that

16 falls outside the subject matter previously found to have satisfied the sufficient

17 particularity pleading requirement.

18                                         **CONCLUSION**

19     For the above reasons, the court rules as follows:

20 •     Williams' unopposed motion to compel arbitration and stay the instant litigation

21        with respect to the claims against him is **GRANTED**, his motion to stay the

22        instant litigation with respect to the claims against all other defendants is

23        **DENIED**, and his alternative motion to dismiss is **TERMINATED**.

24 •     Chung's and He's respective motions to dismiss are **GRANTED** with leave to

25        amend as specified above.

26 •     Plantronics' and Puorro's respective motions to dismiss are **DENIED IN PART**

27        and **GRANTED IN PART** with leave to amend as specified above.

28     The court allows plaintiff **28 days** from the date of this order to file an amended

United States District Court
Northern District of California

complaint accounting for the deficiencies in the dismissed claims.  Failure to do so will result in dismissal of the subject claims with prejudice.  Upon the filing of any amended complaint, plaintiff must also file a redline version clearly demarcating its changes from the FAC.

**IT IS SO ORDERED**

Dated: May 26, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge