# Exhibit A

John M. Desmarais (SBN 320875)
DESMARAIS LLP
101 California Street
San Francisco, CA 94111
(415) 573-1900

Justin P.D. Wilcox (admitted *pro hac vice*)
jwilcox@desmaraisllp.com
Tamir Packin (SBN 317249)
tpackin@desmaraisllp.com
Steven M. Balcof (admitted *pro hac vice*)
sbalcof@desmaraisllp.com
Carson Olsheski (admitted *pro hac vice* ~~pending~~)
colsheski@desmaraisllp.com
David A. Frey (admitted *pro hac vice*)
dfrey@desmaraisllp.com
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
212-351-3400

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND**

| | |
|---|---|
| CISCO SYSTEMS, INC., a California Corporation, CISCO TECHNOLOGY, INC., a California Corporation<br><br>Plaintiffs,<br><br>v.<br><br>PLANTRONICS, INC., a Delaware Corporation, WILSON CHUNG, JAMES HE, JEDD WILLIAMS, AND THOMAS PUORRO individuals<br><br>Defendants. | Case No.: ~~3~~4:19-cv-07562-PJH<br><br>**JURY TRIAL DEMANDED** |

**~~FIRST~~SECOND AMENDED COMPLAINT FOR TRADE SECRET MISAPPROPRIATION**

Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc. (collectively "Cisco"), for their

Complaint against Defendants Plantronics, Inc. ("Poly"), Wilson Chung ("Dr. Chung"), James He

("Mr. He"), Jedd Williams ("Mr. Williams"), and Thomas Puorro ("Mr. Puorro") hereby allege as follows:

**Introduction**

1.      This is an action for trade secret misappropriation by Poly and the named parties, all of whom are former Cisco employees and are current or former Poly employees.  Mr. Puorro, a former Cisco executive and the current Executive Vice President, General Manager, Products at Poly responsible for Poly's audio and video collaboration solutions, orchestrated a scheme on behalf of Poly to induce Cisco employees to reveal trade secrets to him and others at Poly in an effort to unfairly compete against Cisco and to "inflict pain" upon Cisco.  This scheme was endorsed by Poly's most senior executives, who had knowledge of, and acquiesced to, Mr. Puorro's tactics.  Even after Cisco brought the egregious misconduct to the attention of Poly, Poly refused to disavow the theft of Cisco's trade secrets and continues to shield its employees and executives.  Cisco brings this suit against Poly because of Poly's continued endorsement of the scheme and its failure to take corrective action, even when presented with overwhelming evidence of misconduct.

2.      Cisco has invested significant resources to design, build, and sell its robust collaboration platform, which includes unified communications and video conferencing software and collaboration endpoints.  Cisco's endpoint hardware includes video endpoints, telepresence units, all-in-one video collaboration systems, integrated collaboration room systems, VoIP and video phones, microphones, cameras, speakers, and headsets.  The collaboration field is highly competitive and characterized by rapid innovation.  Cisco's engineers rely upon tangible and intangible financial, business, scientific, technical, economic, and engineering information, such as source code, schematics, design details and specifications, user feedback, design documentation, and feature documentation relating to Cisco's existing and future products, as well as Cisco business information such as operations, marketing, and resource strategies and plans, supplier information, cost and pricing information, and payment information to develop Cisco's products.  Cisco takes reasonable measures to keep this information secret, and this information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others who can obtain economic value from the disclosure or use of the information.

3.    Cisco also has made substantial and significant investments in developing its routes to market for its collaboration products and services, through extensive engagement of partner, customer, and industry connections by its global sales force.  Cisco's global sales force relies upon tangible and intangible financial, business, and economic information, such as non-public financial reporting, customer lists, pricing models, forecasting, sales, resourcing, and competitive strategies and plans, and product refresh strategies to develop Cisco's go-to-market and business development plans and to market and sell Cisco products.  Cisco takes reasonable measures to keep this information secret, and this information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others who can obtain economic value from the disclosure or use of the information.

4.    Cisco has uncovered evidence that Dr. Chung and Mr. He, two former high-level engineers in Cisco's Unified Communications Technology Group, downloaded thousands of documents containing Cisco's highly confidential and proprietary business information ("Cisco Confidential Materials") relating to the design, manufacture, pricing, and market opportunities for both current and unreleased products.  Dr. Chung undertook efforts over a period of weeks preceding his departure, and after he had accepted employment with Poly and while he was, unbeknownst to Cisco, simultaneously employed by both Cisco and Poly, to exfiltrate Cisco Confidential Materials to removable hard drives, personal email, cloud storage, and to Poly's internal intranet, and then used Cisco Confidential Materials while at Poly.  When confronted with evidence of his misappropriation, Dr. Chung destroyed evidence to conceal his actions.

5.    Mr. He joined Poly after being recruited by Dr. Chung.  Prior to his departure, and after accepting his employment offer from Poly, Mr. He copied thousands of files containing Cisco Confidential Materials to an external hard drive.  These documents also related to the design, manufacture, pricing, and market opportunities for both current and unreleased products.  Cisco has recovered Mr. He's hard drive, and learned that Mr. He accessed a number of these documents while at Poly, and, when the misappropriation was uncovered, deleted the files to avoid detection.

6.    Cisco also has uncovered evidence that Mr. Williams misappropriated Cisco Confidential Materials relating to Cisco's financial information and sales, business development,

resourcing and competitive strategies and plans, including Cisco's market data and strategies, partner margins, potential organizational restructurings, information concerning Cisco's emerging technologies, competitive focus, sales opportunities and customer lists, product pipelines, and future plans for current products.  On information and belief, Mr. Williams disclosed Cisco Confidential Materials to senior executives at Poly during the recruiting and interview process and exfiltrated these materials from Cisco, including by storing an unauthorized backup of his Cisco laptop on a home server and maintaining Cisco Confidential Materials on that server after leaving Cisco and starting work at Poly.  Cisco also has uncovered evidence suggesting that Mr. Williams was offered employment at Poly after proposing and disclosing to Poly Cisco Confidential Materials, including a non-public go-to-market strategy he dubbed "Project x," which had been developed and refined at Cisco and was therefore Cisco's proprietary information, and which he disclosed while employed by Cisco to both Mr. Puorro and at least two other very high ranking Poly executives.

7.      Cisco has also uncovered evidence that Mr. Puorro, a former Cisco executive, and Executive Vice President at Poly, induced Mr. Williams to reveal Cisco's trade secrets to him and to other senior executives at Poly.  As a former Cisco executive, Mr. Puorro was, or should have been, familiar with Cisco's confidentiality policies, and knew, or should have known, that the information he requested from Mr. Williams contained Cisco trade secrets and that his request for and receipt of such information interfered with Mr. Williams' obligations to Cisco.

8.      In sum, Dr. Chung, Mr. He, Mr. Williams, and Mr. Puorro engaged in a scheme that on information and belief was endorsed by senior Poly executives and was designed to give Poly access to Cisco's trade secrets and allow Poly to unfairly compete with Cisco.

9.      Defendants' conduct threatens to cause Cisco irreparable harm, potentially depriving Cisco of the opportunity to obtain a first-mover advantage in product development and go-to-market strategies, and depriving Cisco of business opportunities.  There is also the threat that Cisco Confidential Materials will be further disclosed by Defendants, which will damage Cisco's trade secret technology and business processes.

10.     Cisco has implemented multiple security measures to protect its trade secrets; these measures constitute reasonable measures to protect and maintain its trade secrets pursuant to 18 U.S.C.

4

1  §1839(3)(A).  The security measures taken by Cisco include, but are not limited to, confidentiality

2  certifications and employee codes of conduct, electronic and computer-based data security, and

3  physical barriers.  The following is a more detailed description of each category of Cisco's reasonable

4  trade secret protective measures:

5       • **Confidentiality Certifications and Employee Codes of Conduct** – Cisco's measures

6       to maintain secrecy include requirements for its employees and third-party contractors.  For

7       example, Cisco employees sign Proprietary Information and Invention Assignment

8       Agreements (PIIAs), in which they agree to keep confidential Cisco's proprietary information

9       and to assign all inventions made in the course of their employment to Cisco.  By way of further

10      example, Cisco employees also agree to return all company documents and materials to Cisco

11      at the end of their employment.  Cisco's vendors, contractors, consultants, and partners sign a

12      Cisco Confidential Information Agreement, in which they agree, among other things, to keep

13      in confidence and trust, and not use or disclose, any Cisco trade secret to anyone outside of

14      Cisco without the prior written consent of an authorized Cisco representative.  As another

15      example, Cisco employees also certify annually that they will comply with Cisco's Code of

16      Business Conduct, which prohibits, among other things, the use of Cisco assets for non-

17      company purposes.  Further, Cisco conducts background checks on its employees and any

18      third-party contractors before granting them access to Cisco's data repositories.  To prevent

19      the inadvertent disclosure of Cisco's trade secrets in connection with collaborations with its

20      vendors and partners, Cisco requires vendors to agree to confidentiality provisions and/or non-

21      disclosure agreements.

22      • **Electronic and Computer-Based Data Security** – Cisco has a Security & Trust

23      Organization tasked with managing user and administrative access to data and systems

24      (devices, applications, and services) by establishing proper controls for authentication,

25      authorization, and auditing.  Cisco restricts access to certain documents on its secured

26      repositories based upon different levels of data classification to prevent disclosure, and

27      therefore, protect the secrecy of those documents.  Cisco defines levels of data classifications

28      (public, confidential, highly confidential, and Cisco Restricted), which allow Cisco to

differentiate the sensitivity of data and restrict access based on the sensitivity.  For access to Cisco's internal network, Cisco requires dual-factor authentication.  Cisco monitors its employees' network activities, and maintains logs of, among other things, cloud uploads, USB downloads, and file transfers to and from Cisco's data repositories.  Cisco's Computer Security Incident Response Team ("CSIRT") and Data Protection and Privacy Team ("DPP") form part of the investigative branches of the Cisco Security and Trust Organization, and provides proactive threat analysis, incident detection, and coordinated incident response by, in part, investigating incidents that involve the access and potential misuse of Cisco information by Cisco employees and vendors.

9.• **Physical Boundaries** – Cisco physically restricts access to its offices, network, systems, and data at least by restricting access to its facilities to only those employees or contractors with badge access.

## The Parties

10.11.  Plaintiff Cisco Systems, Inc., is a company duly organized and existing under the laws of California, having its principal place of business at 170 West Tasman Drive, San Jose, California 95134.

11.12.  Plaintiff Cisco Technology, Inc. is a wholly owned subsidiary of Cisco Systems, Inc., and is a company duly organized and existing under the laws of California, having its principal place of business at 170 West Tasman Drive, San Jose, California 95134.

12.13.  Defendant Poly is a Delaware corporation, with its principal place of business at 345 Encinal Street, Santa Cruz, California 95060.  Poly may be served with process by serving its registered agent, CT Corporation System, 818 W. Seventh Street, Ste. 930, Los Angeles, CA 90017.  Poly is in the IP telephony, headset, video, and collaboration space, and is a competitor to Cisco.

13.14.  Dr. Chung is an individual residing in this jurisdiction.

14.15.  Mr. He in an individual residing in this jurisdiction.

15.16.  Mr. Williams is an individual residing outside this jurisdiction.

16.17.  Mr. Puorro is an individual residing outside this jurisdiction.

### Nature Of The Action

17.18.  This is a civil action for violation of the Defend Trade Secrets Act ("DTSA") under 18 U.S.C. § 1836 *et seq.*, violation of Cal. Civ. Code § 3426 *et seq.*, and Intentional Interference with a Contractual Relationship.

### Jurisdiction And Venue

18.19.  This Court has subject matter jurisdiction over Cisco's claims for violation of the Defend Trade Secrets Act ("DTSA") pursuant to 28 U.S.C. §§ 1331 because they present a Federal Question.

19.20.  This Court has supplemental subject matter jurisdiction of the pendent state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the DTSA claims that they form part of the same case or controversy.

20.21.  This Court has personal jurisdiction over Poly because its principal place of business is in this district.

21.22.  This Court has personal jurisdiction over Dr. Chung because he resides in this district.

22.23.  This Court has personal jurisdiction over Mr. He because he resides in this district.

23.24.  This Court has personal jurisdiction over Mr. Williams at least because he has purposefully directed his activities to this forum by committing intentional acts within California causing harm to Cisco (a California corporation).   Mr. Williams also purposefully directed his activities to this forum and residents thereof, by disclosing Cisco's trade secrets to Poly and its officers, including those at Poly's California headquarters, so that Mr. Williams could obtain a job at Poly.  Mr. Williams also purposefully directed his activities to this forum through his repeated travels to California to interview with Poly, and by beginning employment with Poly in California, and by agreeing that his confidentiality obligations to Cisco shall be interpreted and enforced in accordance with the laws of the State of California.  Mr. Williams also carried on a continuous course of communications with Poly's executives in California, including communications giving rise to the claims at issue in this case.  Moreover, the claims arise out of Mr. Williams' activities within the forum.  For example, as outlined in the detailed factual allegations below, Mr. Williams revealed Cisco's trade secrets to Poly while in California, including on or around April 1, 2019, April 30, 2019,

and June 28, 2019. Mr. Williams also created the contacts giving rise to the claims at issue in this case with the forum himself, at least through his frequent and voluntary travels to Poly's headquarters in California while seeking employment. Furthermore, Mr. Williams certified to Poly on October 12 that he did not then possess any Cisco Confidential Materials or property. Both Mr. Williams and Poly knew that Mr. Williams' certification was false since, among other things, they knew Mr. Williams was still employed at Cisco and Mr. Williams had access to Cisco Confidential Materials. Indeed, the falsity of Mr. Williams' certification is evidenced by, among other things, the fact that he uploaded Cisco Confidential Materials to a Cisco cloud storage site while he was in California after executing the certification, he personally returned his Cisco laptop to Cisco in California after executing the certification, and never returned the backup of his Cisco laptop that he created. The false certification instigated from Poly's California office—which Poly either knew, or should have known, was meaningless—evidences that neither Mr. Williams nor Poly undertook reasonable protection of Cisco Confidential Materials.

24.25.  This Court has personal jurisdiction over Mr. Puorro at least because Mr. Puorro purposefully directed his activities to this forum, by misappropriating Cisco's trade secrets for the benefit of Poly, a corporation with its principal place of business in California. In particular, Mr. Puorro carried on a continuous course of direct communications with Poly's executives in California, including the communications giving rise to the claims at issue in this case, such as his advocacy for Mr. Williams' hiring to Poly's senior executives in California. As outlined in the detailed factual allegations below, Mr. Puorro was also the guiding spirit behind Poly's wrongful conduct at issue in this case. Moreover, the claim arises out of Mr. Puorro's activities within the forum. For example, as outlined in the detailed factual allegations below, Messrs. Puorro and Williams were together in California from April 2-5, 2019, and met in person to discuss Mr. Williams' potential employment at Poly, and Cisco's collaboration product portfolio. These April meetings occurred after Mr. Williams began relaying confidential details of Cisco's business to Mr. Puorro in exchange for Mr. Puorro promoting Mr. Williams' employment candidacy. On information and belief, this course of conduct continued during the April meetings between Messrs. Puorro and Williams in California. Moreover,

1    Mr. Puorro traveled to Santa Cruz during the week of July 1st.  In that week, Mr. Puorro solicited

2    confidential information about Cisco from Mr. Williams.

3        25.26.  Venue is proper within this District under 28 U.S.C. § 1391(b) because a substantial

4    part of the events or omissions giving rise to these claims occurred within this District.

5                                              **FACTUAL ALLEGATIONS**

6        **A.    Dr. Chung**

7        26.27.  Dr. Chung was employed at Cisco as Principal Engineer in Cisco's Unified

8    Communications Technology Group ("UCTG").  Dr. Chung was involved in developing Cisco's

9    collaboration products, including IP telephony solutions and audio headsets.  Incumbent with this role

10   was access to some of Cisco's most confidential trade secrets used within the UCTG, including design

11   specifications, schematics, source code, product market analyses, and vendor contract details.  On

12   information and belief, after joining Poly, Mr. Puorro recruited Dr. Chung, and as a result of these

13   efforts, Dr. Chung left Cisco in February 2019 to join Poly.  Before doing so, Dr. Chung willfully and

14   maliciously misappropriated Cisco Confidential Materials to use for his own benefit, and for the

15   benefit of Poly, to the detriment of Cisco.  Almost immediately after starting at Poly, Dr. Chung carried

16   out Poly and Mr. Puorro's efforts to entice Cisco's collaboration engineers to join Poly by recruiting

17   his former colleague, James He.

18       27.28.  Dr. Chung began working for Cisco as a Technical Leader in March 2007.

19       28.29.  On May 7, 2012, Dr. Chung became Principal Engineer of Cisco's UCTG.

20       29.30.  Dr. Chung claims that his personal and Cisco laptops were stolen around Thanksgiving

21   2018.

22       30.31.  Subsequent to the alleged theft, Dr. Chung used a Lenovo ThinkPad X1 with serial

23   number PF0Z3DLE ("Lenovo laptop") issued by Cisco as his primary work computer.

24       31.32.  On November 14, 2018, Cisco also leased a MacBook Pro from IBM Global Finance

25   which was assigned to Dr. Chung to use as a secondary work computer.  Dr. Chung's department

26   incurred the cost for this MacBook Pro.  This MacBook Pro (serial number C02W186W186HV2M)

27   ("MacBook") was shipped to Cisco and later delivered to Dr. Chung.

28       32.33.  Dr. Chung does not own, and has never owned, the MacBook.

1    33.34.  Dr. Chung is not the lessee, and has never been the lessee, of the MacBook.

2    34.35.  Cisco did not authorize Dr. Chung's retention of the MacBook when his employment

3    with Cisco ended.

4    35.36.  Dr. Chung has no right to possess the MacBook after his employment with Cisco

5    terminated, and also had no right to possess the MacBook when he began to work at Poly.

6    36.37.  On February 3, 2019, Dr. Chung downloaded over 3,000 files from Cisco's internal

7    document repositories.  These documents are Cisco Confidential Materials and relate to, among other

8    things, Cisco's contributions to 5G technology (such as its market opportunities), and design

9    specifications of a pre-release video conferencing display prototype.

10    37.38.  On February 3, 2019, Dr. Chung connected a Seagate Expansion Drive with serial

11    number NAA77962 ("First Seagate Drive") to his Lenovo Laptop.

12    38.39.  Dr. Chung has not made the First Seagate Drive available for inspection by either Cisco

13    or, according to Poly's General Counsel, to Poly.

14    39.40.  On February 3, 2019, Dr. Chung connected a Samsung Flash Drive with serial number

15    374718110032913 ("Samsung Drive") to his Lenovo laptop five times.

16    40.41.  Dr. Chung copied Cisco Confidential Materials to the Samsung Drive.

17    41.42.  On February 3, 2019, Dr. Chung uploaded files from the MacBook to his personal

18    iCloud account, including Cisco's source code for debugging a user interface.

19    42.43.  On February 6, 2019, Dr. Chung copied 129 files containing Cisco Confidential

20    Materials that relate to vendor product roadmaps and a pre-release video conferencing display

21    prototype to a Seagate Expansion SCSI Disk Device with serial number 26977AAN ("Second Seagate

22    Drive").  The pre-release video conferencing display prototype documents included user experience

23    design documentation, user interview feedback, artwork prototypes, and schematics.

24    43.44.  On February 6, 2019, Dr. Chung connected the Samsung Drive to the Lenovo laptop

25    four times.

26    44.45.  On February 6, 2019, Dr. Chung connected a Sandisk UltraFit storage drive with serial

27    number 4C50001291121118332 ("Sandisk Drive") to his Lenovo laptop two times.

28

1      45.46.  On information and belief, on February 6, 2019, Dr. Chung uploaded a folder entitled

2  "Toyshop" from his Lenovo laptop to cloud storage.  This folder included Cisco Confidential Materials

3  such as design details and specifications relating to Cisco's collaboration endpoints, including Cisco's

4  sound bar products.

5      46.47.  Dr. Chung's misappropriation of Cisco Confidential Materials was organized,

6  premeditated, and intentional.

7      47.48.  On February 6, 2019, Dr. Chung created various folders on the Samsung Drive named

8  after an internal Cisco project codename.

9      48.49.  On February 6, 7, and 8, 2019, Dr. Chung created various folders on the Second Seagate

10  Drive named after numerous additional Cisco project codenames.

11      49.50.  On February 7, 2019, Dr. Chung connected the Second Seagate Drive to the Lenovo

12  laptop.

13      50.51.  On February 8, 2019, Dr. Chung connected the Second Seagate Drive to the Lenovo

14  laptop twice.

15      51.52.  On information and belief, on February 8, 2019, Dr. Chung uploaded Cisco

16  Confidential Materials to cloud storage, including a presentation detailing go-to-market strategy,

17  design details, cost modeling, and pricing information for a pre-release video conferencing display

18  product.

19      52.53.  On February 9, 2019, Dr. Chung connected the Second Seagate Drive to the Lenovo

20  laptop twice.

21      53.54.  On February 10, 2019, Dr. Chung connected the Second Seagate Drive to the Lenovo

22  laptop.

23      54.55.  On February 11, 2019, Dr. Chung connected the Second Seagate Drive to the Lenovo

24  laptop twice.

25      55.56.  On February 12, 2019, Dr. Chung connected the Second Seagate Drive to the Lenovo

26  laptop five times.

27      56.57.  On February 13, 2019, Dr. Chung connected the Second Seagate Drive to the Lenovo

28  laptop twice.

57.58.   On February 13, 2019, the MacBook was physically connected to Cisco's corporate network.

58.59.   On February 13, 2019, Dr. Chung informed his manager that he was leaving Cisco.

59.60.   During that February 13, 2019 conversation between Dr. Chung and his manager, Dr. Chung told his manager that he was not sure where he would be working, but that he was considering joining Apple.

60.61.   On February 14, 2019, Dr. Chung connected the Second Seagate Drive to the Lenovo laptop four times.

61.62.   Dr. Chung told Poly that his last day at Cisco was February 22, 2019.

62.63.   Dr. Chung's last day at Cisco was, in fact, February 28, 2019.

63.64.   Dr. Chung's exfiltration of Cisco Confidential Materials was outside the scope of his employment at Cisco.

64.65.   On February 24, 2019, Dr. Chung forwarded an email and attachment entitled "Cisco UCaaS Market Position" from his Cisco email account to his personal Gmail account.  The attached document, clearly marked "Internal only" and "Cisco Confidential," related to Cisco's prospective market positioning in the collaboration space.

65.66.   On February 25, 2019, Dr. Chung downloaded more than 100 recordings of Webex presentations to his Lenovo laptop.  On information and belief, these recordings related to the design, manufacture, pricing, and market opportunities for Cisco's Unified Communications product portfolio.

66.67.   On February 25, 2019, Dr. Chung connected the Second Seagate Drive to his Lenovo laptop six times.

67.68.   On February 25, 2019, Dr. Chung created a folder entitled "Webex_Recordings" on the Second Seagate Drive.

68.69.   From February 26, 2019 through February 28, 2019, Dr. Chung was an employee of both Cisco and Poly.

69.70.   On February 26, 2019, Dr. Chung began work at Poly.

70.71.   On February 26, 2019, Dr. Chung logged into the MacBook.

12

71.72.  On February 26, 2019, Dr. Chung emailed vendor representatives from his Cisco email account to inform them that his last day at Cisco would be February 28, 2019.

72.73.  On February 26, 2019, Dr. Chung forwarded an email from his Cisco email account to his personal Gmail account.  This email thread included "minutes" from a Cisco meeting.

73.74.  On February 26, 2019, Dr. Chung logged into Poly's "Sharepoint" site from the Lenovo laptop.  Dr. Chung uploaded to Poly's Sharepoint, among other things, a spreadsheet entitled Endpoints and Accessories ("EA Document").

74.75.  The EA Document contains Cisco Confidential Materials, including component specifications and competitive differentiators for Cisco's current and not yet released hardware products.

75.76.  On February 27, 2019, Dr. Chung forwarded an email from his Cisco email account to his personal Gmail account with details about a vendor contract, which also included a payment terms.

76.77.  On February 27, 2019, Dr. Chung accessed his Google drive from the Lenovo laptop.

77.78.  On February 27, 2019, Dr. Chung went to Cisco's office and returned his badge and the Lenovo laptop to Cisco.  Dr. Chung arrived at approximately 3:00pm, had coffee with a Cisco colleague, and posed for a group photo with members of Cisco's UCTG.  Dr. Chung did not turn in the MacBook, First Seagate Drive, Second Seagate Drive, SanDisk Drive, or Samsung Drive.

78.79.  On February 28, 2019, Dr. Chung forwarded an email from his Cisco email account to his personal Gmail account with details about sensor requirements for Cisco products.

79.80.  On March 8, 2019, Dr. Chung emailed the EA Document from his personal Gmail account to his Poly email account.

80.81.  On March 8, 2019, Dr. Chung emailed a file marked as Cisco Confidential and entitled "Webex Workplace Vision and Strategy – Compete" ("Webex Vision Document") from his personal Gmail account to his Poly email account.

81.82.  By March 9, 2019, Dr. Chung began recruiting James He to join Poly.

82.83.  As of March 28, 2019, the MacBook had not been returned to Cisco.  Cisco contacted Dr. Chung to secure return of the MacBook.

1    83.84.  On March 29, 2019, Cisco contacted Dr. Chung and requested return of the MacBook.

2    Dr. Chung insisted that he owned the MacBook and asked Cisco to check with Cisco's IT department.

3    84.85.  On April 9, 2019, after checking with Cisco's IT department, Cisco notified Dr. Chung

4    that the MacBook was Cisco property and must be returned.  Dr. Chung subsequently confirmed that

5    he possessed the MacBook.  Cisco followed up with Dr. Chung on April 10, April 11, April 14, April

6    15, and April 18, but Dr. Chung refused to return the MacBook.

7    85.86.  Dr. Chung accessed Cisco Confidential Materials while employed at Poly, including at

8    least the EA Document, Webex Vision Document, and a Cisco collaboration roadmap document.

9    86.87.  After being notified of Cisco's concerns that Dr. Chung had misappropriated Cisco's

10   trade secrets, on September 26, 2019, Poly informed Cisco that it had found five documents on Dr.

11   Chung's devices that he used at Poly, including the EA Document that Dr. Chung had previously

12   uploaded to Poly's Sharepoint.

13   87.88.  Dr. Chung downloaded the EA Document from Poly's Sharepoint to his new work

14   computer issued by Poly.

15   88.89.  On information and belief, Dr. Chung accessed this file, and other documents

16   containing Cisco trade secret information, for his own benefit, and for the benefit of Poly, to Cisco's

17   detriment.

18   89.90.  On September 19, 2019, counsel for Cisco wrote Dr. Chung a letter putting Dr. Chung

19   on notice to preserve all documents and things related to the potential misappropriation of Cisco

20   Confidential Materials.

21   90.91.  After receiving this preservation notice, Dr. Chung took steps to conceal his

22   misappropriation, including destroying evidence of his unlawful conduct.  For example, after receiving

23   the preservation notice, Dr. Chung:

24       a.   deleted iCloud backups;

25       b.   deleted Cisco Confidential Materials from the MacBook;

26       c.   deleted Cisco Confidential Materials from the Sandisk Drive;

27       d.   deleted Cisco Confidential Materials from the Samsung Drive; and

28

e.   propounded a demonstrably false explanation for failing to return the Second Seagate Drive to Cisco.

91.92.   After receiving this preservation notice, and before delivering the MacBook, Sandisk Drive, his personal iPad, and Samsung Drive to his attorney to eventually return to Cisco, Dr. Chung performed internet searches such as "how to permanently delete icloud backup," and "how to see what is [sic] the thumb drive without detection."

92.93.   Dr. Chung understood that his employment by Cisco created a relationship of confidence and trust with respect to confidential and proprietary information, including Cisco Confidential Materials.  In order to protect Cisco Confidential Materials from use by a competitor, Dr. Chung's Proprietary Information and Inventions Agreement ("Chung PIIA") prohibited Dr. Chung during his employment with Cisco from becoming an employee of any other firm engaged in a business in any way competitive with Cisco or involved in the design, development, marketing, sale, or distribution of any networking or software products without first informing Cisco and obtaining its consent.

93.94.   By the terms of the Chung PIIA, Dr. Chung agreed that he would "not remove any [Cisco] Documents and Materials from the business premises of [Cisco] or deliver any [Cisco] Documents and Materials to any person or entity outside of [Cisco], except as [] required to do in connection with performing the duties of [his] employment."  Dr. Chung also agreed that "immediately upon the termination of [his] employment," he would "return all [Cisco] Documents and Materials, apparatus, equipment and other physical property, or any reproductions of such property . . . ."

94.95.   Throughout its investigation into Dr. Chung's unlawful conduct, Cisco kept Poly informed of the results of its ongoing investigation so that Poly could take necessary actions to remedy the violations.  With full knowledge of Dr. Chung's illegal activities, Poly inexplicably brought Dr. Chung back to work on November 14, 2019, leaving Cisco no choice but to file this action to protect its trade secrets.  Indeed, as far back as September 9, 2019, Cisco first apprised Poly's General Counsel of the results of Cisco's initial investigation into Dr. Chung's unlawful conduct.  *See* Exhibit A.  Cisco followed up with Poly's General Counsel on September 19, 2019 to request a status of Poly's review

of the matter and further information regarding Dr. Chung's activities and employment at Poly.  *See* Exhibit B.

95.96.  On or about September 27, 2019, Poly's General Counsel represented to Cisco that (a) Poly had conducted an investigation into Dr. Chung's conduct, (b) Poly found that Dr. Chung had indeed brought Cisco Confidential Materials with him to Poly, and (c) Dr. Chung told Poly that he did not possess any Cisco equipment (even though he still had the MacBook Pro in his possession) and proffered a demonstrably false explanation regarding his download activities on the Second Seagate Drive and the whereabouts of the Second Seagate Drive.  *See* Exhibit C.  Cisco thereafter continued its investigation into Dr. Chung's activities and his purported story to Poly.  On October 9, 2019, Cisco provided Poly with further details of Dr. Chung's illegal conduct, including that Dr. Chung was still employed by Cisco when he accessed Cisco's systems and sent himself Cisco Confidential Materials *while unbeknownst to Cisco* he also was employed at Poly, and requested that Poly take immediate action to protect Cisco's intellectual property exfiltrated by Dr. Chung.  *See* Exhibit D.

97.  On October 10, 2019, Poly's General Counsel confirmed that Poly had placed Dr. Chung on administrative leave.  A subsequent forensic investigation by a neutral third-party of Dr. Chung's devices and cloud accounts revealed that Dr. Chung accessed additional Cisco Confidential Materials while employed at Poly, that he emailed Cisco Confidential Materials from his personal email address to his Poly email address, and that apparent data wiping procedures were performed on his devices.  On the evening of November 13, after learning the alarming results of forensic investigation, Poly informed Cisco that it inexplicably intended to return Dr. Chung to his position at Poly the next day, precipitating the filing of the original Complaint on November 18, 2019.

98.  The trade secrets misappropriated by Dr. Chung have independent economic value.

99.  First, Cisco has invested significant resources in the creation of these particular trade secrets:

- **Design specifications and schematics for Cisco's pre-release video conferencing prototype** – These specifications are the end result of Cisco's carefully orchestrated and labor-intensive design process.  The pre-release video conferencing prototype is complex: it requires a completed industrial design, an advanced processor system to coordinate and synchronize

16

the functions of other hardware components, a printed circuit board for electrically connecting various components, video components, acoustic components, and an advanced thermal design.  The design process of these products is iterative.  For example, a change to the thermal design requires corresponding changes to dependent components such as acoustic and video systems, as well as changes to the printed circuit board.  As another example, if a designer chooses a particular set of speakers for use in the endpoint, that decision will constrain the industrial design, because acoustic performance depends on various geometric parameters, such as volume, reverberation, and sound absorption.  Accordingly, the component selection and layout, which is reflected in Cisco's design specifications for the pre-release video conferencing prototype, must be carefully orchestrated in the design process.  These development efforts require the coordinated efforts of a team of engineers for many months.  The end result of the design process includes design specifications, which allow production of the system at scale without requiring the manufacturer to repeat Cisco's iterative design process.  Thus, design specifications and schematics for Cisco's pre-release video conferencing prototype are valuable at least because they allow Cisco to manufacture these products for resale at scale at a competitive cost.  Cisco's financial investment in these design specifications and schematics for Cisco's pre-release video conferencing prototype includes engineers' compensation, raw materials, off-the-shelf components, and third-party vendors, among other things.

- **Design details and specifications for Cisco's sound bar products** – Cisco's sound bar products follow the iterative process outlined above for Cisco's video conferencing prototype, except that stand-alone sound bar products do not include an integrated video component.  Thus, design details and specifications for Cisco's sound bar products are valuable at least because they allow Cisco to manufacture these products for resale at scale at a competitive cost.  Cisco's financial investment in these design details and specifications for Cisco's sound bar products also includes engineers' compensation, raw materials, off-the-shelf components, and third-party vendors, among other things.

- **Artwork prototypes, user experience design documentation, and user interview feedback** – This information reflects Cisco's investment in the user experience, and the coordinated efforts of its product design team and user experience professionals.  In particular, Cisco evaluates consumer preferences when designing a product, which informs what the product will look like, what features will be offered, and how much it costs.  The results of this research are Cisco's artwork prototypes and user feedback, which are used by Cisco's design teams in the iterative design process.  Thus, artwork prototypes, user experience design documentation, and user interview feedback are valuable to Cisco at least because they provide consumer insights, thus allowing Cisco to meet market demands in its commercial products. Cisco's financial investment in these artwork prototypes, user experience design documentation, and user interview feedback includes engineers' compensation, and third-party vendors, among other things.

- **Source code** – The misappropriated source code reflects engineer development time, which includes but is not limited to problem identification, solution conception, flow charting, pseudo-code authorship, code authorship, testing and debugging, and quality assurance.  In addition to its engineers' development efforts, Cisco's source code also reflects the collective expertise of its engineers and product development teams.  Cisco's financial investment in this source code includes software engineers' compensation, and third-party vendors, among other things.

- **The EA Document** – The EA document misappropriated by Dr. Chung identifies more than two dozen Cisco collaboration products by code name.  For each product, it identifies critical component selection choices made by Cisco's design team in the course of product development, and reflects thousands of hours of engineers' labor in making these decisions. As an example, Cisco's engineers devote considerable time to evaluating various CPU components for its collaboration products, including those that have not been commercially released, and makes these investments to determine which chips provide the optimal combination of cost and performance.  The EA document summarizes the end-result of Cisco's engineering efforts, and thus is valuable to Cisco at least because it summarizes the competitive

differentiators and product development plans, which, if known to competitors, would provide insights into Cisco's product development roadmap and deprive Cisco of a first-mover advantage. Cisco's financial investment in the information summarized in the EA Document includes engineer's compensation, raw materials, off-the-shelf components, and third-party vendors, among other things.

100. Second, Cisco took precautions to protect the secrecy of the trade secrets stolen by Dr. Chung. Dr. Chung's PIIA required him to keep the materials he misappropriated secret. In particular, it required that he protect "Proprietary Information," which includes trade secrets, source code, designs, product development plans, and research and development. Each of the trade secrets Dr. Chung misappropriated constitutes Proprietary Information under Dr. Chung's PIIA. Thus, Dr. Chung understood and agreed that his employment created a relationship of confidence and trust with respect to the information he misappropriated. Additionally, pursuant to his PIIA, Dr. Chung was prohibited from removing Proprietary Information from the business premises of Cisco or delivering it to any person or entity outside of Cisco, except as required in connection with performing the duties of his employment. Also, by signing the PIIA, Dr. Chung agreed that immediately upon the termination of his employment, he would return all Proprietary Information to Cisco. Cisco also protected the Proprietary Information that Dr. Chung could access as a high-ranking Cisco engineer, including the trade secrets at issue in this case, by requiring that he annually certify that he would not use Cisco assets for non-company purposes. Cisco also protected the trade secrets at issue here with electronic and computer-based data security. For example, Cisco monitored Dr. Chung's network activity, and thus was able to identify the time, date, and file name of the documents that he copied from Cisco's network to his personal storage drives. With those electronic and computer-based data security precautions, Cisco was able to ascertain the date, manner, scope, and other details pertaining to Dr. Chung's exfiltration of thousands of Cisco documents. Those details are reflected in the factual allegations in this pleading. Cisco also restricts access to its offices and data systems to current employees, a precaution that Dr. Chung overcame through deception, by failing to inform Cisco that he became a Poly employee on February 26, 2019 while still employed by Cisco.

101.   Third, others were willing to pay for access to the trade secrets stolen by Dr. Chung. In particular, Dr. Chung used the trade secrets in the course and scope of his employment at Poly, for which he was paid a salary.  As one example, with respect to the EA Document, Dr. Chung emailed that document to his Poly business email address and uploaded it to Poly's internal "Sharepoint" document sharing site.  As another example, Dr. Chung has retained and refuses to return the Second Seagate Drive, which, on information and belief, presently contains design specifications and schematics for Cisco's pre-release video conferencing prototype, design details and specifications for Cisco's sound bar products, Cisco's artwork prototypes, Cisco's user experience design documentation, Cisco's user interview feedback, and Cisco's source code.  On information and belief, Dr. Chung refuses to return these materials, at least in part because he uses them in the course and scope of his employment at Poly.

96.102.     Fourth, in addition to Cisco's development efforts, the trade secrets stolen by Dr. Chung also reflect the collective expertise of Cisco's engineers and product development teams. If these trade secrets were to become public, competitors could exploit them to shorten their own development timelines, by using them to guide internal development efforts or to outright copy Cisco's proprietary designs.  For example, Poly designs and manufactures collaboration devices such as sound bars, headsets, telephones, and video endpoints and could use Cisco's design specifications as development shortcuts.  In addition, even if Poly did not copy or mimic Cisco's design specifications, knowledge of Cisco's designs, product development strategies, and roadmaps, particularly when they pertain to unreleased products, enables Poly to tailor its own solutions to anticipate Cisco's product roadmap before that information is publicly available.  That advance notice gives Poly an economic advantage and deprives Cisco of a first-mover advantage.

**B.      Mr. He**

97.103.      Mr. He was an engineer with Cisco, who played an integral role in developing many of Cisco's successful products.  Incumbent with Mr. He's responsibilities was access to some of Cisco's most confidential trade secrets used within Cisco's UCTG, including design specifications,

20

1  schematics, source code, product market analyses, and vendor contract details.  Mr. He left Cisco in

2  June 2019 to join Poly.

3  98.104.        Before leaving Cisco, Mr. He, without authorization, willfully and maliciously

4  misappropriated Cisco's confidential and proprietary business information to use for his own benefit,

5  and for the benefit of Poly, to the detriment of Cisco.

6  99.105.        On March 1, 2019, Dr. Chung communicated details of his new position at Poly

7  to Mr. He.

8  100.106.        On March 9, 2019, Dr. Chung told Mr. He that Poly was interested in having

9  Mr. He work there.

10  101.107.        Mr. He regularly took photographs of Cisco Confidential Materials on his

11  iPhone Max.

12  102.108.        For example, on May 13, 2019, Mr. He took a photograph of a financial

13  presentation containing Cisco Confidential Materials, which included Cisco's Q3 financial highlights,

14  largest deals, and comparative revenue by category.

15  103.109.        On May 30, 2019, Mr. He copied Cisco Confidential Materials, including

16  architectural design documents relating to Cisco's unreleased headset concepts to a LaCie external

17  hard drive with serial number 0000NL37HDBX ("LaCie Drive").

18  104.110.        On June 1, 2019, Mr. He traveled from his home in China to California.  Mr.

19  He told his manager that this was a personal trip.  Mr. He remained in California until June 9, 2019.

20  105.111.        On June 3, 2019, Mr. He took a photo from his iPhone Max of a hardware

21  diagram for a Cisco headset prototype.

22  106.112.        On June 5, 2019, Mr. He took photographs from his iPhone Max of Cisco

23  Confidential Materials that discussed Cisco's emerging business opportunities in the collaboration

24  space.  On this date, Mr. He also downloaded a headset test report containing Cisco Confidential

25  Materials.

26  107.113.        On June 6, 2019, Mr. He informed his manager that he was resigning from

27  Cisco.

28

108.114.     On June 6, 2019, Mr. He connected to Cisco's Virtual Private Network from a Comcast IP address in the United States.

109.115.     While on Cisco's VPN in the United States on June 6, 2019, Mr. He copied over 100 documents to the LaCie Drive.  These documents included Cisco Confidential Materials, such as design and configuration documents relating to Cisco's unreleased headset prototypes.  Also included in these files was information relating to vendor roadmaps for Cisco's products.

110.116.     On June 10, 2019, Mr. He had an in-person meeting with his manager in China. In this meeting, Mr. He discussed his resignation with his manager.  Mr. He stated that he was not going to Poly, but that he was moving to Guangzhou for family reasons.

111.117.     On June 11, 2019, Mr. He copied an email archive from his Cisco email account to the LaCie Drive.  On June 14, 2019, Mr. He copied two additional archives from his Cisco email account to the LaCie Drive.  These archives contain Cisco Confidential Materials.  Discussions over email contained in the archive reflect Cisco's strategic product development decisions.  The email archives also include, as email attachments, technical design documents and presentations containing Cisco's trade secrets.

112.118.     On June 17, 2019, Mr. He copied approximately 200 emails from his Cisco email trash folder to the LaCie Drive.  These emails contain Cisco Confidential Materials and relate to design details for a then unreleased IP telephone project.

113.119.     On June 18, 2019, Mr. He copied approximately 1500 files to the LaCie Drive. These files contain Cisco Confidential Materials and include internal emails, architectural documents, marketing plans, and cost information.

114.120.     On June 20, 2019, Mr. He copied approximately 90 files to the LaCie Drive. These files contain Cisco Confidential Materials and relate to Cisco's headset projects.

115.121.     On June 21, 2019, Mr. He left Cisco.  Mr. He retained the LaCie Drive.

116.122.     Mr. He's exfiltration of Cisco Confidential Materials was outside the scope of his employment at Cisco.

117.123.     On information and belief, Mr. He joined Poly on or around June 24, 2019.

118.124.     On June 27, 2019, Mr. He accessed Cisco Confidential Materials stored on the LaCie Drive, including a schematic for an unreleased IP telephone project.  Mr. He again accessed this file on July 3, 2019.

119.125.     On July 1, 2019, Mr. He accessed Cisco Confidential Materials stored on the LaCie Drive, including a vendor's roadmap update created for Cisco.

120.126.     On July 15, 2019, Mr. He accessed Cisco Confidential Materials stored on the LaCie Drive, including a full engineering specification for a next-generation conference room collaboration device.  Mr. He had previously copied this file to the LaCie Drive on May 30, 2019.

121.127.     On information and belief, Mr. He accessed these Cisco Confidential Materials for his own benefit, and for the benefit of Poly, to Cisco's detriment.

122.128.     On August 2, 2019, counsel for Cisco put Mr. He on notice to preserve all documents and things related to the potential misappropriation of Cisco's confidential and proprietary business information.

123.129.     On August 5, 2019, after receiving the preservation notice, Mr. He took steps to conceal his misappropriation, including destroying evidence of his unlawful conduct.  By way of example, on August 5, Mr. He deleted thousands of Cisco files containing Cisco Confidential Materials from the LaCie Drive.  On information and belief, Mr. He deleted these files because Poly had commenced an internal investigation into the misappropriation, and Mr. He was requested to turn the LaCie Drive to Poly's investigators.  In addition to the aforementioned files and file types, Mr. He deleted various source code library stacks from the LaCie Drive.

124.130.     On August 2, 2019, Cisco notified Poly that Mr. He had misappropriated Cisco Confidential Materials.  Poly investigated Cisco's allegations and terminated Mr. He's employment with Poly shortly thereafter.

125.131.     Mr. He understood that his employment by Cisco created a relationship of confidence and trust with respect to confidential and proprietary information.

126.132.     By the terms of Mr. He's Proprietary Information and Inventions Agreement ("He PIIA"), Mr. He agreed that he would "not remove any [Cisco] Documents and Materials from the business premises of [Cisco] or deliver any [Cisco] Documents and Materials to any person or

23

entity outside [Cisco], except as [] required to do in connection with performing the duties of [his] employment."  Mr. He also agreed that "immediately upon the termination of [his] employment," he would "return all [Cisco] Documents and Materials, apparatus, equipment and other physical property, or any reproductions of such property . . . ."

133.    The trade secrets misappropriated by Mr. He have independent economic value.

134.    First, Cisco has invested significant resources in the creation of these particular trade secrets:

- **Architectural design documents and hardware diagrams for headset prototypes** – These specifications are the end result of Cisco's orchestrated and labor-intensive design process.  The headset prototype is complex: its design requires a completed industrial design, audio processing equipment, microphone, speakers, System on a Chip (SOC), and a printed circuit board (PCB).  Additionally, it required advanced acoustic design, including, for example, acoustic echo cancellation and the effects of foam pad variation on RMS.  Changes to particular components also necessitate alterations to other, dependent components.  For example, component modifications may require alterations to the products industrial design.  As another example, if a designer chooses a particular set of speakers for use in the headset, that decision will constrain the industrial design, because acoustic performance depends on various geometric parameters, such as volume, reverberation, and sound absorption.  Accordingly, the component selection and layout, which are reflected in Cisco's design specifications for its headset prototypes, must be carefully orchestrated in the design process.  These development efforts require the coordinated efforts of a team of engineers for many months.  The end result of the design process are design specifications, including architectural design documents and hardware diagrams, which allow production of the system at scale without requiring the manufacturer to repeat Cisco's iterative design process.  Thus, architectural design documents and hardware diagrams for headset prototypes are valuable at least because they allow Cisco to manufacture these products for resale at scale at a competitive cost.  Cisco's financial investment in these Architectural design documents and hardware

diagrams for headset prototypes includes engineers' compensation, raw materials, off-the-shelf components, and third-party vendors, among other things.

- **Design details and schematics for unreleased IP telephone project** – As with Cisco's headset prototypes, Cisco invests heavily in its IP telephone projects, even including those that do not become commercially available.  As with commercially available products, Cisco's unreleased products require thousands of hours of engineering time, raw materials, shelf components, and third-party vendors, among other things.  In addition to being valuable as potential future products, unreleased products reflect negative know-how, and inform Cisco's future design decisions on what not to do.  Thus, design details and schematics for the unreleased IP telephone project are valuable at least because they embody know-how that is part of the corpus of engineering knowledge that Cisco uses to develop its cutting-edge collaboration product portfolio.

- **Cisco's emerging business opportunities in the collaboration space** – In addition to investing in product development, Cisco also invests in market research to identify sales and partnership opportunities as a way to introduce its products into the marketplace.  Through direct customer engagement, Cisco's sales and marketing teams identify existing deals and deal pipelines to focus the efforts of its sales representatives.  Cisco builds long-term relationships with its customers and its partners.  These coveted relationships result in long term deals and deal pipelines, which Cisco values both as a source of revenue and as a means to predict revenue and identify roadblocks in the sales process.  Information about these emerging business opportunities in the collaboration space is valuable to Cisco at least because it identifies customers and targeted deals, allowing Cisco's sales force to target previously identified commercial opportunities to maximize efficiencies.  Cisco's financial investment in these emerging business opportunities in the collaboration space includes sales and marketing compensation, travel, product demos, customer support, office space, and third-party vendors, among other things.

- **Vendor product roadmaps** – Cisco's investments in its vendors, including its significant buying power and substantial purchase history, encourage vendors to keep Cisco

apprised of their own product development efforts in order to promote future sales.  Because of Cisco's buying power and substantial purchase history, vendors tailor their offerings to Cisco's needs, and provide information about their own product pipelines before that information becomes publicly available.  Cisco values this information because it facilitates product development planning.  For example, if Cisco knows when a vendor will have a SoC with particular capabilities commercially available, Cisco can plan its own product roadmap accordingly.  Cisco's financial investment in these vendor product roadmaps includes its extensive purchasing history with these vendors, among other things.

- **Full engineering specifications** – When a product design is complete, the design parameters are embodied in engineering specifications.  Full engineering specifications reflect the materials that Cisco sends to its manufacturing partners to enable them to physically make the products without duplicating Cisco's iterative design process.  These specifications are the end result of Cisco's design process, and access to full specifications would enable a competitor simply to bypass product design, or the efforts involved in reverse engineering, and take Cisco's specifications to a contract manufacturer.  Thus, full engineering specifications are valuable to Cisco at least because they allow Cisco to manufacture products for resale at scale at a competitive cost.  Accordingly, Cisco's financial investment in these full engineering specifications includes engineers' compensation, raw materials, off-the-shelf components, and third-party vendors, among other things.

135.    Second, Cisco took precautions to protect the secrecy of the trade secrets stolen by Mr. He.  Mr. He's PIIA required him to keep the materials he misappropriated secret.  In particular, it required that he protect "Proprietary Information," which includes secrets, source code, designs, business development plans, product development plans, research, and development.  Each of the trade secrets Mr. He misappropriated constitutes Proprietary Information under Mr. He's PIIA.  Thus, Mr. He understood and agreed that his employment created a relationship of confidence and trust with respect to the information he misappropriated.  Additionally, pursuant to his PIIA, Mr. He was prohibited from removing Proprietary Information from the business premises of Cisco or delivering it to any person or entity outside of Cisco, except as required to do in connection with performing the

26

1  duties of his employment.  Also, by signing the PIIA, Mr. He agreed that immediately upon the

2  termination of his employment, he would return all Proprietary Information to Cisco.  Cisco also

3  protected the Proprietary Information that Mr. He could access as a high-ranking Cisco engineer,

4  including the trade secrets at issue in this case, by requiring that he annually certify that he would not

5  use Cisco assets for non-company purposes.  Cisco also protected the trade secrets at issue here with

6  electronic and computer-based data security.  For example, Cisco monitored Mr. He's network

7  activity, and thus was able to identify the time, date, and file name of the documents that he copied

8  from Cisco's network to his personal storage drives.  With those electronic and computer-based data

9  security precautions, Cisco was able to ascertain the date, manner, scope, and other details pertaining

10  to Mr. He's exfiltration of thousands of Cisco documents.  Those details are reflected in the factual

11  allegations in this pleading.  Cisco also restricts access to its offices and data systems to current

12  employees.

13       136.  Third, others were willing to pay for access to the trade secrets stolen by Mr. He.  In

14  particular, Mr. He used the trade secrets in the course and scope of his employment at Poly, for which

15  he was paid a salary.  For example, while employed and paid by Poly, Mr. He accessed at least the

16  schematic for an unreleased IP telephone project, the vendor roadmap update, and the full engineering

17  specification for a next-generation conference room device.

18       137.  Fourth, in addition to Cisco's development efforts, the trade secrets stolen by Mr. He

19  also reflect the collective expertise of Cisco's engineers and product development teams.  If these trade

20  secrets were to become public, competitors could exploit them to shorten their own development

21  timelines, by using them to guide internal development efforts or to outright copy Cisco's proprietary

22  designs.  For example, Poly designs and manufactures collaboration devices such as sound bars,

23  headsets, telephones, and video endpoints and could use Cisco's design specifications as development

24  shortcuts.  In addition, even if Poly did not copy or mimic Cisco's design specifications, knowledge

25  of Cisco's designs, Cisco's product development strategies, and Cisco's roadmaps, particularly when

26  they pertain to unreleased products, enables Poly to tailor its own solutions to anticipate Cisco's

27  product roadmap before that information is publicly available.  That advance notice gives Poly an

28  economic advantage and deprives Cisco of a first-mover advantage.

## C.   Messrs. Williams & Puorro

~~127.~~138.      Mr. Williams was a Regional Sales Director in ASP Architectures when he terminated his employment at Cisco in October 2019.  Prior to that, he was a Director in Global Collaboration Sales, in which he had global responsibility for developing sales and marketing strategies for bringing Cisco's suite of collaboration products to market.  Mr. Williams started at Cisco in 1998 as a Systems Engineer II.

~~128.~~139.      Mr. Puorro is the Executive Vice President and General Manager of Products at Poly.  On information and belief, Mr. Puorro is the Poly executive officer chiefly responsible for its product development efforts.  Mr. Puorro was a Cisco employee from October 2009 until December 2018.  Mr. Puorro served as Vice President of Cisco's Unified Communications Technology Group from October 2014 until December 2018.  Mr. Puorro left Cisco in December 2018, and, on information and belief, Mr. Puorro joined Poly in January 2019.

~~129.~~140.      Mr. Williams stored his iPhone messages in his iCloud account.  While employed at Cisco, Mr. Williams synced his iPhone messages from iCloud account to his Cisco laptop, which saved a local copy of his iPhone messages on his Cisco laptop.

~~130.~~141.      Beginning in February 2019, Mr. Williams began aggressively pursuing employment with Poly.  Mr. Williams sought out and received the assistance of Mr. Puorro and other third-parties to advocate for his candidacy at Poly.  Mr. Puorro initiated a scheme whereby he would exchange coaching and advocacy on Mr. Williams' behalf for confidential details about Cisco's competitive business.  As part of this scheme, Mr. Williams shared with Mr. Puorro and other Poly executives information about upcoming organizational restructurings at Cisco before they were announced to enable Poly's recruitment of Cisco employees identified by Mr. Williams and Mr. Puorro, essentially acting as an agent for Poly within Cisco and while being employed and compensated by Cisco.

> 9/11/2019 3:01:17 PM; Mr. Williams:   I'm a huge [Cisco Employee] fan - I've seen him work miracles over the last 15 years.  [REDACTED] - that guy is a sales machine
>
> 9/11/2019 3:04:03 PM; Poly Executive:  Been talking to [Consultant]?
>
> 9/11/2019 3:05:20 PM; Mr. Williams:   No - but I gave [Cisco Employee] the heads-up about 30 days ago that there was an external job that may be opening up that he should consider if he gets a call.   He connected the dots.

9/11/2019 3:06:28 PM; Poly Executive:  Got it

\*       \*       \*

9/12/2019 2:14:12 PM; Mr. Williams:    We are going to execute another LR in two weeks

9/12/2019 6:09:57 PM; Mr. Puorro:    Nice

9/12/2019 6:10:12 PM; Mr. Williams:    [Cisco Employee] and I had another conversation

9/12/2019 6:10:55 PM; Mr. Williams:    if you want him - I think you can get him - but it can't be like me - you have to do it quickly.   He's got two very real other jobs he's looking at

131.142.        As Mr. Williams grew more desperate for employment with Poly, Mr. Williams shared with Mr. Puorro and other third parties increasingly sensitive Cisco Confidential Materials. For example, in preparation for an interview with Poly, Mr. Williams shared highly confidential and non-public financial information relating to bookings for Cisco's collaboration business with a third-party consultant who, at the time, Mr. Puorro was trying to bring into Poly, and who shortly thereafter began work at Poly.  Further still, Mr. Williams eventually revealed details of various Cisco sales and marketing strategies to Poly's highest ranking executives in order to secure employment.  In so doing, Mr. Puorro solicited, and Mr. Williams willfully and maliciously shared, Cisco's trade secrets to "inflict pain" upon Cisco.  For example, Mr. Williams, while preparing for an interview with Poly, shared a detailed presentation outline that Mr. Williams' intended to deliver to Poly with the third-party consultant, who would later become employed by Poly himself, containing Cisco's sensitive and non-public financial information.  On information and belief, Mr. Williams shared this information with Poly's highest ranking executives while interviewing with Poly.  Excerpts from this document are seen below:

Good morning!

I'm remain super excited about the opportunity to come work for you ███████████
████████████████████

How are things going for you?

How's the sales meeting?

Based upon our last conversation I thought I'd share with you a couple of additional items:
1. The Mix of our business across Public Sector, Enterprise, Commercial.
2. How I drive the RTM each and every day with though our channel partners:
   a) **Working with Channels at Cisco** ████████████████████████████
   ███████████████████████ **Everything we do** ████████████████
   ████████████████████████████████
   **I may not have emphasized this during our conversations,  and that may be due to**
   **the fact that** ██████████████████████████████
3. Some aggressive thoughts on how to take advantage of the market transition and
   opportunity happening now.
4. References for Jedd

**The Mix of the Business:**
I thought it would be good to share with you the mix of my business and where I spend the majority of my time when it comes to Collaboration.

**Globally:** ████████████████████
- ████████████████████████
- ██████████████████████
- ██████████████████

**Americas:** ████████████ in revenue broke down across these segments/countries:
- ██████████████████
- ██████████████████
- ██████████████████
- ████████████████████████
- ████████████████████████
- ██████████████████████

132.143.       Collectively, Mr. Williams, Mr. Puorro, and other senior Poly executives knew that their conduct was unlawful.  Indeed, they took steps to conceal their illegal conduct by communicating through their personal email addresses (and not their Poly email, which on information and belief, they use for Poly business) and reverting to live discussions so that the details of their communications would not be discovered, because they did not, in their words, "want to put anything on [t]ext that [they] don't want Cisco to have."

133.144.      In February 2019, shortly after Mr. Puorro left Cisco for Poly, Mr. Williams contacted Mr. Puorro to ask about employment opportunities at Poly.  Mr. Williams was eager to move on from Cisco, and sought out Mr. Puorro's assistance with the job search.

134.145.      Mr. Puorro advocated for Mr. Williams' candidacy at Poly.  For example, as soon as Mr. Williams expressed interest in joining Poly, Mr. Puorro spoke favorably of Mr. Williams to a Poly sales executive ("First Poly Executive").  Mr. Puorro's advocacy was effective—the First Poly Executive reached out to Mr. Williams days later and arranged for an in-person interview.  Mr. Puorro also secured expedited consideration for Mr. Williams.  For example, when he learned that Mr. Williams' interview with the sales executive would not occur until the following week, Mr. Puorro arranged for a high ranking Poly executive ("Second Poly Executive") to contact Mr. Williams personally the next day.

135.146.      On March 3-4, 2019, Mr. Williams interviewed with executives at Poly.  After the interviews, Mr. Williams immediately reached out to Mr. Puorro to discuss the interviews.  Mr. Williams indicated that his total target compensation threw the First Poly Executive "a curve ball" and that Mr. Williams received a "let's stay in touch" message.  As he would throughout Mr. Williams' interview process, Mr. Puorro counseled Mr. Williams on how to navigate these interviews and interact with Poly's executives.  For example, Mr. Puorro communicated to Mr. Williams that compensation is just a decision point, and that he should follow up with the Second Poly Executive in a couple of days.  Mr. Puorro maintained regular contact and ensured that Mr. Williams was following his guidance.

136.147.      On information and belief, Mr. Puorro provided guidance to Mr. Williams and advocacy for his candidacy within Poly to secure Mr. Williams as a source within Cisco for Cisco Confidential Materials.  Mr. Puorro regularly requested confidential details of Cisco's business from Mr. Williams.  These requests escalated in sensitivity, and frequently coincided with times when Mr. Puorro's advocacy would be most beneficial to Mr. Williams.  On information and belief, Mr. Puorro traded upon Mr. Williams' desperation for a senior position at Poly and his own apparent ability to expedite consideration to induce Mr. Williams to reveal Cisco's trade secrets.  Early on in the recruitment process, Mr. Puorro tested Mr. Williams' willingness to reveal sensitive information.

137.148.      On March 6, 2019, while Mr. Williams was in San Diego, California, Mr. Puorro asked Mr. Williams if "org changes" had happened at Cisco.  Mr. Williams provided a detailed response.  After Mr. Williams provided these details, he explained that he was ready to move on from Cisco.  Mr. Puorro reassured him that the Second Poly Executive would promptly respond to Mr. Williams' requests for employment.

138.149.      Mr. Puorro would use Poly's protracted recruitment procedures to his advantage in inducing Mr. Williams to reveal Cisco Confidential Materials.  On information and belief, Mr. Puorro would present delays as opportunities to advocate on Mr. Williams' behalf, with the understanding that Mr. Williams would provide sensitive details about Cisco's business in return.

139.150.      For example, on March 7, 2019, Mr. Puorro informed Mr. Williams that another individual already had the position Mr. Williams was seeking at Poly.  Mr. Puorro asked Mr. Williams for some time to work with the Second Poly Executive to bring Mr. Williams to Poly.

140.151.      Apparently in response, and desperate to prove his usefulness to Poly, on the following day, March 8, 2019, Mr. Williams provided information to Mr. Puorro about organizational changes at Cisco.  Mr. Puorro requested further details, and on information and belief, Mr. Williams provided such details.

141.152.      On March 13, 2019, less than a week after Mr. Puorro told Mr. Williams that he would work to bring him into Poly and knowing that Mr. Puorro was interested in learning about "organization changes" at Cisco before they were made public, Mr. Williams communicated to Mr. Puorro that he had access to, and was willing to share, the names of individuals who would be impacted by upcoming organizational changes and encouraged Mr. Puorro that now was the time to act to disrupt Cisco (dubbed "Project x"):

> 3/11/2019 2:35:32 PM; Mr. Puorro: talk?
>
> 3/11/2019 2:36:12 PM; Mr. Williams: Yes sir
>
> 3/13/2019 5:35:31 PM; Mr. Williams: Time is now to recruit.  Let's execute a project x like we did with [another company.]
>
> 3/13/2019 5:35:42 PM; Mr. Williams: I have a list

142.153.      On March 18, 2019, Mr. Puorro informed Mr. Williams that he had spoken to the Second Poly Executive about Mr. Williams, and Mr. Puorro asked to meet with Mr. Williams.  Mr.

Puorro and Mr. Williams met in person the next day to discuss Mr. Williams' potential employment at Poly.

143.154.      On March 22, 2019, Mr. Williams communicated highly confidential details about a matter at Cisco, including Cisco's legal strategy, to Mr. Puorro.

144.155.      Mr. Puorro, in addition to advocating for Mr. Williams' candidacy, counseling him on how to interact with Poly's other senior executives, and sharing how his candidacy was being perceived at Poly, also conveyed his own importance in the recruitment process to Mr. Williams.  For example, Mr. Puorro communicated that it was he and the Second Poly Executive who would get Mr. Williams to Poly, and Mr. Puorro made key introductions for Mr. Williams.

145.156.      On April 1, 2019, Mr. Puorro traveled to California for Poly business.  On April 2, 2019, Mr. Williams traveled to San Jose, California to meet with Mr. Puorro and other Poly employees to further discuss Mr. Williams' potential employment at Poly and, on information and belief, Cisco's collaboration business.  Both Mr. Williams and Mr. Puorro stayed in California until April 5, 2019.

146.157.      On information and belief, Mr. Puorro offered his assistance in exchange for Mr. Williams revealing increasingly sensitive Cisco Confidential Materials.  When Mr. Williams did not offer these materials, Mr. Puorro's advice was terse, insubstantial, or non-existent.

147.158.      On April 30, 2019, Mr. Williams was in Santa Cruz, California for interviews with Poly senior executives.

148.159.      On May 9, 2019, Mr. Williams relayed details from Cisco's Global Collaboration Quarterly Business Review meeting to Mr. Puorro, and suggested that he could provide information about Cisco in exchange for an offer with Poly:

> 5/9/2019 6:36:00 PM; Mr. Williams: [Cisco Employee] telling everyone you are now the guy at Poly
>
> 5/9/2019 6:36:09 PM; Mr. Williams: He covered it off at the Global Collab QBR
>
> 5/9/2019 7:21:47 PM; Mr. Puorro: We need to find out how [Cisco Employee] knew that.
>
> 5/9/2019 7:21:58 PM; Mr. Puorro: I think we have a leak in our India team. Anyway you can find out?
>
> 5/9/2019 7:24:00 PM; Mr. Williams: Will do
>
> 5/9/2019 7:24:08 PM; Mr. Williams: Can you get me an offer letter

5/9/2019 7:24:14 PM; Mr. Williams: kidding

5/9/2019 8:19:42 PM; Mr. Williams: Ok

5/9/2019 8:19:45 PM; Mr. Williams: Have info

5/9/2019 8:20:09 PM; Mr. Williams: I'm open the rest of the day in 11 mins - call me when it works

5/9/2019 9:22:01 PM; Mr. Puorro: Free?

5/9/2019 9:22:09 PM; Mr. Williams: yes sir

149.160.      On information and belief, Mr. Williams shared Cisco Confidential Materials with Mr. Puorro over the phone on May 9, 2019.

150.161.      Throughout Mr. Williams' interview process with Poly, Mr. Williams consulted with an individual, who was formerly a Cisco Senior Vice President whom Poly was interested in hiring as a consultant ("Consultant") for interview coaching and job transition strategies.  Mr. Puorro introduced Consultant to Poly, where he was indeed later employed as a consultant.  On information and belief, Mr. Puorro used Mr. Williams' relationship with Consultant as means to bring Cisco Confidential Materials to Poly.   On information and belief, Consultant began working for Poly part time on or around July 29, 2019.

5/22/2019 10:59:19 PM; Mr. Williams: I'm having dinner with [CONSULTANT] tonight

5/22/2019 10:59:51 PM; Mr. Williams: Let me know if you want me to pass on anything

151.162.      On May 25, 2019, on information and belief, Mr. Williams shared Cisco Confidential Materials with Mr. Puorro. "I have something you probably want to know." Mr. Williams said "Just ring me when you can sneak away - don't want to put this one in writing."

152.163.      Mr. Williams had an interview scheduled with a Poly executive on June 12, 2019.

153.164.      In preparation for the June 12 interview, Mr. Williams prepared a document containing talking points and a job transition strategy.  This document indicated that Mr. Williams intended to share with Poly highly confidential and non-public financial data related to Cisco's collaboration business that is directly competitive with Poly.  Specifically, the document included a breakdown of bookings data from Cisco's global collaboration business and the growth rate of Cisco's collaboration business.  Moreover, the document provided a geographic breakdown of Cisco's global

1 collaboration business, and identified the growth rate of each geographic constituent.  The document

2 also further broke down the largest geographic category by segment and country, and provided

3 corresponding growth rates for each segment/country.  The document also explained why Cisco's sales

4 to various market segments were increasing or decreasing, and the strategies Cisco employed to secure

5 this growth.  The document further described a Cisco sales strategy named "Project Liberator."  On

6 June 11, 2019, Mr. Williams emailed this market and strategy data outside of Cisco to Consultant,

7 who Mr. Williams knew was not authorized by Cisco to have access to Cisco Confidential Materials.

8 ~~154.~~165.       The market and strategy data that Mr. Williams sent to Consultant is a

9 compilation of Cisco's confidential financial and business information that is not publicly available,

10 that Cisco has taken reasonable measures to keep secret, and that derives independent economic value

11 from not being generally known to, and not being readily ascertainable through proper means by,

12 another person who can obtain economic value from the disclosure or use of the information.

13 ~~155.~~166.       On information and belief, Mr. Williams shared Cisco's market and strategy

14 data with Poly at the June 12 interview.  During or immediately after the June 12 interview, Poly

15 invited Mr. Williams to an additional round of executive interviews in California on June 28, 2019.

16 Mr. Williams accepted the invitation, and flew to San Francisco, California on June 28, 2019.

17 ~~156.~~167.       In preparation for the June 28 interviews, Mr. Williams prepared a "discussion

18 guide" PowerPoint presentation.  This presentation contained Mr. Williams' plans for accelerating

19 sales at Poly, which included Cisco's product strategy and other financial data, with the admonition

20 that "Poly has to be on Par with Cisco."  Mr. Williams later emailed a version of this presentation to

21 Second Poly Executive at the executive's personal email address as opposed to the executive's Poly

22 email.

23 ~~157.~~168.       Information concerning Cisco's product strategies and other financial data are

24 forms of business information that are not publicly available, that Cisco has taken reasonable measures

25 to keep secret, and that derive independent economic value from not being generally known to, and

26 not being readily ascertainable through proper means by, another person who can obtain economic

27 value from the disclosure or use of the information.

28

158.169.     On June 28, 2019, before Mr. Williams was to interview with Poly executives, Mr. Puorro contacted Mr. Williams to inquire about a potential Limited Restructuring ("LR"), including layoffs, in Cisco's Collaboration Business Unit ("BU").  Mr. Puorro stated "I heard more LR in the BU's . . . . Wonder if [Cisco Employee] is safe or not."  Mr. Puorro asked Mr. Williams to "Dig for me?"  On information and belief, Mr. Williams investigated on behalf of Mr. Puorro and provided details on the magnitude of the potential LR.

159.170.     Information concerning Cisco's potential LR's is a form of business information that is not publicly available, that Cisco has taken reasonable measures to keep secret, and that derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

160.171.     On July 1, 2019, Mr. Puorro asked Mr. Williams if Cisco had performed the potential LR yet.  Mr. Williams provided a detailed response.

161.172.     Between July 1 and August 19, Mr. Williams contacted Mr. Puorro more than 20 times concerning the potential employment opportunity at Poly.  Mr. Puorro provided only terse responses suggesting that he was too busy to discuss the potential employment opportunity for Mr. Williams at Poly.

162.173.     On July 31, 2019, Mr. Williams sent a message to Second Poly Executive in which Mr. Williams proposed that it was "[t]ime to execute Project Liberator while Cisco is further distracted, grow sales and gain marketshare."  Project Liberator is an ongoing Cisco sales strategy that Mr. Williams was involved with developing and executing while at Cisco.  The specific details and tactics of Project Liberator are Cisco Confidential Materials.

163.174.     On August 19, 2019, Mr. Williams told Mr. Puorro about two individuals who had just left Cisco.  Mr. Williams gave Mr. Puorro the names of additional people that Mr. Williams believed Mr. Puorro could recruit to Poly.

164.175.     On August 22, 2019, Mr. Williams sent an email to Second Poly Executive's personal gmail account describing his vision for executing "Project x" at Poly.  Project x is a Cisco sales strategy that Mr. Williams was involved with developing and executing while at Cisco.  The

specific details and tactics of Project x are Cisco Confidential Materials.  Mr. Williams discussed Project x with Second Poly Executive.  The Second Poly Executive asked Mr. Williams to connect with Mr. Puorro and yet another Poly executive ("Third Poly Executive") to "figure out next steps to execute the concept . . . ."  Mr. Williams subsequently shared the details of Project x with Mr. Puorro and Third Poly Executive.

165.176.        On August 27, 2019, Mr. Williams informed Mr. Puorro about Cisco's investment in an emerging technology.  Mr. Puorro then asked Mr. Williams about an internal Cisco meeting:

> 8/27/2019 6:58:32 PM; Mr. Puorro: How was UC break out yesterday?
>
> 8/27/2019 7:05:20 PM; Mr. Williams: Just got to my room if you want to chat
>
> 8/27/2019 7:05:32 PM; Mr. Puorro: Getting on plane..
>
> 8/27/2019 7:06:09 PM; Mr. Williams: Sounds good  - ping me later - don't want to put anything on Text that I don't want Cisco to have!

166.177.        Upon information and belief, Mr. Williams later orally provided Cisco Confidential Materials about the internal Cisco meeting to Mr. Puorro.

167.178.        On August 28, 2019, Mr. Williams shared pictures from this internal meeting with Mr. Puorro.  These pictures contained Cisco's screenshots of presentations and an image of a new Cisco headset.  Mr. Williams communicated to Mr. Puorro that he was "so ready to show [Cisco] that Poly can inflict pain."  Mr. Williams referred to Cisco's upcoming products by stating "They've got some good [expletive] coming."  Mr. Puorro asked "[d]oes it work with Zoom."  On information and belief, Mr. Williams' response reflected Cisco Confidential Information shared at the internal meeting.  Mr. Williams also provided Mr. Puorro with details from a presentation at this Cisco internal meeting, explaining Cisco's competitive focus.

168.179.        On September 3, 2019, Mr. Puorro intentionally interfered with Mr. Williams' duty of loyalty to Cisco, by inducing Mr. Williams to divert a partnership opportunity from Cisco to Poly.  Mr. Williams informed Mr. Puorro that he was meeting with a Cisco customer (whom he partner named), RoomReady (also known as "Zeller Digital," or "ZDI"), and stated said that he was "Looking at them from the Cisco lens.  I could easily change that lens though."  Mr. Williams further stated that

1  he was "[e]xcited to get going and help [Poly] scale this."  On information and belief, and as

2  substantiated by the subsequent events detailed below, Mr. Williams and Mr. Puorro agreed that Mr.

3  Williams would pursue the RoomReady opportunity on Poly's behalf despite the fact that Mr.

4  Williams was still employed by Cisco.

5        180.    Mr. Williams then met with Aaron McArdle, President and CEO of RoomReady on

6  September 3, 2019. Mr. Williams spent this visit with RoomReady and Mr. McArdle advancing Poly's

7  interests in a potential partnership, rather than Cisco's interests in its existing partnership.  The day of

8  the meeting with Mr. McArdle, Mr. Williams told Mr. Puorro "***I've been talking about you guys all***

9  ***day*** – These room ready guys have some really good stuff" and "*[y]our ears should be burning.*"  Mr.

10  Williams then introduced Mr. McArdle to Consultant (who is now Poly's Chief Revenue Officer) to

11  facilitate further discussion of a Poly/RoomReady partnership.

12        181.    Internally at Cisco, Mr. Williams described his one night trip as a "Partner meeting

13  with ZDI – Collaboration Partner" and he billed the $916.19 cost of his hotel, rental car, and flights

14  and $875.62 in other expenses to Cisco.  Cisco approved these expenses believing Mr. Williams was

15  using his meetings with RoomReady and Mr. McArdle to advance Cisco's business interests.  Instead,

16  Mr. Williams used the trip to broker a relationship between Poly and RoomReady.

17        182.    Through Mr. Williams' connection, Mr. McArdle and Consultant held high level

18  discussions about market strategy, RoomReady's growth, and Poly.  For example, on or around

19  September 13, 2019, Mr. McArdle and Consultant held a discussion in which they discussed

20  RoomReady's goals, industry direction, and, on information and belief, partnership opportunities with

21  Poly.  Mr. McArdle and Consultant scheduled an in-person meeting for October 2, 2019 in Normal,

22  Illinois.  Consultant then traveled to Normal for this meeting and, on information and belief, advanced

23  Poly's business interests in a potential partnership with RoomReady at this meeting

24        183.    As part of his PIIA, Mr. Williams agreed to "not provide consulting services to or

25  become an employee of, any other firm or person engaged in a business in any way competitive with

26  [Cisco] . . . without first informing [Cisco] . . . and obtaining prior written consent."  Mr. Puorro (an

27  individual formerly subject to the same requirements as a former Cisco employee with his own PIIA)

28

1   and Poly intentionally interfered with this contractual relationship by encouraging Mr. Williams to

2   divert the partnership opportunity with RoomReady from Cisco to Poly.

3       169.184.      Upon information and belief, on September 7, 2019, Mr. Puorro solicited Cisco

4   Confidential Materials from Mr. Williams.  Mr. Puorro and Mr. Williams had a conversation during

5   which Mr. Williams communicated Cisco Confidential Materials to Mr. Puorro.

6           9/7/2019 2:42:47 PM; Mr. Puorro: I'm curious how is my old [REDACTED] product doing?

7           9/7/2019 2:43:31 PM; Mr. Williams: I asked that very question earlier this week

8           9/7/2019 2:43:41 PM; Mr. Williams: REDACTED

9           9/7/2019 2:44:51 PM; Mr. Puorro: I think [REDACTED] tries to kill it

10          9/7/2019 2:45:07 PM; Mr. Williams: Talk ?

11          9/7/2019 2:46:04 PM; Mr. Williams: Just in case big brother is watching...

12          9/7/2019 2:46:42 PM; Mr. Puorro: Calling

13

14      170.185.      On September 12, 2019, Mr. Williams notified Mr. Puorro that he had turned

15  down a job offer from another company, and that he hoped to hear something from Poly that day.  He

16  then revealed details about a prospective Cisco LR, and identified a Cisco employee for Poly to recruit.

17      171.186.      On September 13, 2019, Mr. Williams told Mr. Puorro that he had heard Poly

18  was "having hell with Cisco legal,"  apparently a reference to Cisco's communication with Poly's

19  General Counsel regarding Dr. Chung and Mr. He.  Mr. Puorro stated "we are past that I believe."  Mr.

20  Williams said "They aren't going to give two [expletive] about me with where I'm at now."  Mr.

21  Williams then told Mr. Puorro that he had "interesting rumors" about Cisco and Collaboration and

22  wished to speak with Mr. Puorro live.  Mr. Puorro called Mr. Williams minutes later.

23      172.187.      Also, on September 16, 2019, Mr. Williams communicated with Mr. Puorro

24  and Third Poly Executive about Project x.  Mr. Williams conveyed to Second Poly Executive that

25  these were "Great conversations" and asked Second Poly Executive if anything further was required.

26      173.188.      On September 17, Second Poly Executive said that he would get the HR people

27  "in gear today."  Second Poly Executive asked Poly's human resources department to move fast.

28

174.189.     On September 18, 2019, Mr. Williams notified Mr. Puorro of a prospective LR at Cisco.  Mr. Williams also provided details concerning the status of a Cisco business unit, and identified an employee potentially impacted by the LR who he believed could be recruited by Poly.

175.190.     On information and belief, on September 19, 2019, Mr. Williams was informed an employment offer at Poly would be forthcoming.

176.191.     Mr. Williams received a formal employment offer to join Poly on September 26, 2019.

177.192.     Information concerning Cisco's investments in emerging technologies, Cisco's competitive focus, Cisco's sales opportunities and customer lists, Cisco's new products, and Cisco's future plans for its current products are forms of business information that are not publicly available, that Cisco has taken reasonable measures to keep secret, and that derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

178.193.     On October 10, 2019, Mr. Williams received his Poly network credentials.

179.194.     On October 11, 2019, Mr. Williams received from Poly his first week schedule, with a planned start date of October 14, 2019.

180.195.     On October 12, 2019, Mr. Williams signed a Poly form certifying that he had not downloaded onto any device any of Cisco's confidential information.  Mr. Williams also certified that Cisco had reviewed and/or deleted, or that he had deleted, any of Cisco's confidential information.  Mr. Williams also certified that he had returned all of Cisco's equipment and property to Cisco.

181.196.     Mr. Williams October 12, 2019 certification was false.  On information and belief, Poly knew, or was willfully blind to the fact, that Mr. Williams was still employed at Cisco at the time of the certification and had access to and possession of Cisco Confidential Materials and equipment.  For example, Mr. Williams indicated to Poly's human resources department that he would like to begin regular work activities on October 15, because of issues with Cisco's human resources department.

182.197.     Mr. Williams traveled to Santa Clara, California on October 13, 2019.

183.198.     After receiving and accepting Poly's offer of employment, Mr. Williams requested a monetary separation package from Cisco. Even though he was directly asked during these discussions about his plans after leaving Cisco, Mr. Williams claimed that he was going to work at his church and focus on personal issues.  In light of these circumstances and to help Mr. Williams with his family, Cisco offered Mr. Williams two months sales pay, in addition to a lump sum payment to cover two months COBRA health care premiums.  At the time, Mr. Williams of course already had accepted an offer with Poly, which included health benefits.

184.199.     Mr. Williams returned his laptop to Cisco's San Jose office in person.  Mr. Williams was obligated by Cisco to return all other Cisco Confidential Materials he possessed at that time.

185.200.     Mr. Williams' employment with Cisco terminated on October 15, 2019.

186.201.     Mr. Williams' disclosures of Cisco Confidential Information to Mr. Puorro were outside the scope of his employment at Cisco.

187.202.     During the course of his employment at Cisco, Mr. Williams ran a home server that he used to store a Time Machine backup of his Cisco laptop.  This backup contained, and, on information and belief, still contains Cisco Confidential Materials, including detailed information about Cisco's sales forecasts and opportunities, including customer names, commitments, and upsides. Mr. Williams did not return this backup to Cisco upon his termination.  Mr. Williams' retention of this backup was outside the scope of his employment at Cisco.

**D.     Poly**

188.203.     Paragraphs 1 through 187 are incorporated by reference as if fully stated herein.

189.204.     Poly acquired and used Cisco's trade secrets through the actions of its employee, Dr. Chung.  For example, Dr. Chung accessed Cisco Confidential Materials that he misappropriated at least on February 26, March 8, and March 24, 2019 while he was employed at Poly. On information and belief, Dr. Chung used these Cisco Confidential Materials within the course and scope of his employment at Poly.  The Cisco Confidential Materials accessed by Dr. Chung while he was employed at Poly contain Cisco's trade secrets.

1    190.205.        On September 9, 2019, Cisco notified Poly through its General Counsel that Dr.

2    Chung had misappropriated Cisco Confidential Materials.   Poly did not place Dr. Chung on

3    administrative leave at this time, and, on information and belief, took no action adverse to Dr. Chung.

4    Having not heard back from Poly, Cisco followed up on September 17, 2019, to reiterate its concerns

5    about Dr. Chung.   Poly's General Counsel stated that Dr. Chung denied taking any of Cisco

6    Confidential Materials.   On September 26, 2019, Poly wrote to Cisco and provided follow up

7    information which confirmed that Dr. Chung's representations to Poly were false.  Indeed, Dr. Chung

8    had, in fact, taken Cisco Confidential Materials to Poly, including at least the EA Document and

9    Webex Vision Document.  Despite his dishonesty, Poly still took no action adverse to Dr. Chung.  On

10   October 9, 2019, Cisco again contacted Poly about its concerns with Dr. Chung, and also provided

11   Poly with information confirming that Dr. Chung's explanation for the whereabouts of the First

12   Seagate Drive and Second Seagate Drive was not credible.  Only then did Poly place Dr. Chung on a

13   brief administrative leave.  Cisco and Poly then arranged for Dr. Chung's devices to be analyzed by a

14   third party.  Dr. Chung did not turn over the First Seagate Drive or the Second Seagate Drive for

15   analysis.  The forensic investigation revealed that Dr. Chung accessed Cisco Confidential Materials

16   after the start of his employment with Poly, that he emailed Cisco Confidential Materials to his Poly

17   email address, and that apparent data wiping procedures were performed on at least the Sandisk and

18   Samsung Drives after Cisco requested Dr. Chung to preserve all data.  The third party forensics lab

19   reported these results to Poly.  The whereabouts of the First Seagate Drive and Second Seagate Drive,

20   which contain Cisco Confidential Materials, remain unknown to Cisco, and, on information and belief,

21   to Poly.   Nevertheless, on the evening of November 13, Poly informed Cisco that it inexplicably

22   intended to return Dr. Chung to his position the very next day.

23   191.206.        On October 18, 2019, when the severity and gravity of Dr. Chung and Mr. He's

24   misappropriation became clear to Poly, Poly's General Counsel raised allegations (later proved to be

25   unsupported) that a former Poly employee who had recently joined Cisco exfiltrated confidential Poly

26   materials on a thumb drive.   On information and belief, Poly raised these allegations as a tactical

27   maneuver to compel Cisco to cease its investigations into Dr. Chung and Mr. He.   Cisco immediately

28   placed this employee on administrative leave and performed a thorough investigation.   Cisco's

1   investigation revealed that Poly's claims had no merit.  When Cisco revealed the results of its

2   investigation, Poly did not challenge the results.  Rather, Poly raised an additional allegation against

3   this same employee that Cisco investigated and found was not credible.

4          ~~192.~~207.        Poly knew or should have known that Dr. Chung still possessed, and intended

5   to use in his employment at Poly, Cisco Confidential Materials when it permitted him to return to work

6   on November 14, 2019.

7          ~~193.~~208.        Poly ratified Dr. Chung's misappropriation of Cisco's trade secrets by failing

8   to terminate his employment after discovering that he had, in fact, misappropriated Cisco Confidential

9   Materials.

10         ~~194.~~209.        Poly also ratified Dr. Chung's misappropriation of Cisco's trade secrets by

11  permitting him to return to work when it knew or should have known that Dr. Chung still possessed

12  Cisco Confidential Materials.

13         ~~195.~~210.        Poly also acquired and used Cisco's trade secrets through the actions of its

14  former employee, James He.  For example, Mr. He accessed Cisco Confidential Materials that he

15  misappropriated on June 27, July 1, and July 15, 2019 while he was employed at Poly.  On information

16  and belief, Mr. He used these Cisco Confidential Materials within the course and scope of his

17  employment at Poly.  The Cisco Confidential Materials accessed by Mr. He while he was employed

18  at Poly contain Cisco's trade secrets.

19         ~~196.~~211.        Poly also acquired through improper means, and on information and belief, used

20  Cisco's trade secrets through the actions of its officer, Mr. Puorro.  Mr. Puorro acted in concert with

21  Mr. Williams to acquire and use Cisco Confidential Materials at Poly.  On information and belief,

22  Poly's executives were aware of Mr. Puorro's conduct, and acquiesced to it.  Poly's executives,

23  including at least Second Poly Executive and Third Poly Executive knew or should have known that

24  Mr. Williams was revealing Cisco Confidential Materials to Mr. Puorro, at least because Mr. Williams

25  shared details relating to Project x, including that it was a Cisco project, to the Second Poly Executive

26  and Third Poly Executive. Furthermore, Mr. Puorro's inducement of Mr. Williams to disclose Cisco

27  trade secrets to him and others at Poly was within the course and scope of Mr. Puorro's employment

28  at Poly and was intended to benefit Poly to the detriment of Cisco.

## **COUNT I**

### **Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 by Dr. Chung**

197.212.        Paragraphs 1 through 196211 are incorporated by reference as if fully stated herein.

198.213.        Dr. Chung's misappropriation of trade secrets is actionable under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

199.214.        Cisco Confidential Materials contained trade secrets under 18 U.S.C. § 1839(3). For example, these trade secrets include Cisco technical information such as source code, schematics, design details and specifications, user feedback, design documentation, and features relating to Cisco's existing and future products, as well as Cisco business information such as marketing strategy, cost and pricing information, and payment information.

200.215.        Dr. Chung misappropriated Cisco's trade secrets by improper means (including, for example, by systematically transferring Cisco Confidential Materials out of Cisco immediately preceding his departure), by disclosure without authorization (including, for example, by uploading Cisco Confidential Materials to Poly's Sharepoint site), and by use without authorization (including, for example, to obtain a competitive advantage in his product development efforts).

201.216.        Dr. Chung has maintained and continues to maintain in his possession the wrongfully acquired Cisco documents and materials after the termination of his employment with Cisco.

202.217.        Dr. Chung used and continues to use Cisco trade secret contained in these wrongfully acquired Cisco documents by way of providing these documents to Poly and/or accessing these documents.

203.218.        Dr. Chung's possession after leaving Cisco, acquisition, disclosure, and/or use of Cisco trade secrets was and is without Cisco's express or implied consent.

204.219.        Cisco trade secrets were developed over time after expenditure of significant effort and resources.

1     205.220.        Cisco trade secrets are not publicly available, and are kept within the knowledge

2  and know-how of Cisco employees under strict confidentiality obligations, and only shared with

3  parties bound by contractual obligations of confidentiality.

4     206.221.        Cisco has taken reasonable measures to keep its trade secret information secret.

5     207.222.        Cisco communicates the importance of maintaining confidentiality to its

6  employees in various means and forms, including but not limited to the Proprietary Information and

7  Inventions Agreements and termination letters.

8     208.223.        On February 9, 2007, Dr. Chung executed the Chung PIIA in consideration for

9  his employment with Cisco.

10     209.224.        The Chung PIIA protects Cisco's proprietary information, which was defined

11 in the Chung PIIA as (i) information that was or will be developed, created, or discovered by or on

12 behalf of Cisco, or which became or will become known by, or was or is conveyed to Cisco, which

13 has commercial value in Cisco's business, or (ii) any other information that Cisco does not want

14 publicly disclosed.  The Chung PIIA further states that Cisco proprietary information includes but is

15 not limited to software programs and subroutines, source and object code, algorithms, trade secrets,

16 designs, technology, know-how, processes, data, ideas, techniques, inventions (whether patentable or

17 not), works of authorship, formula, business and product development plans, customer lists, terms of

18 compensation and performance levels of Cisco employees, and other information concerning Cisco's

19 actual or anticipated business, research or development, or which is received in confidence by or for

20 Cisco from any other source, or any document that is marked as "confidential."

21     210.225.        By signing the Chung PIIA, Dr. Chung agreed that he would "not remove any

22 Company Documents and Materials from the business premises of Cisco or deliver any Company

23 Documents and Materials to any person or entity outside of Cisco, except as [] required to do in

24 connection with performing the duties of [his] employment."  Dr. Chung also agreed that "immediately

25 upon the termination of [his] employment," he would "return all Company Documents and Materials,

26 apparatus, equipment and other physical property, or any reproductions of such property . . . ."

1   ~~211.~~226.      Dr. Chung took intentional and systematic steps during at least a three and a

2   half week period before the termination of his employment to transfer thousands of documents

3   containing Cisco Confidential Materials out of Cisco.

4   ~~212.~~227.      Upon termination of Dr. Chung's employment at Cisco on February 18, 2019,

5   Cisco delivered to Dr. Chung a termination letter, reminding Dr. Chung of his continuing obligations

6   to Cisco, including the duty to maintain confidentiality of Cisco confidential information, the duty of

7   non-solicitation within one year after the termination of Dr. Chung's employment, and the duty to

8   return any Cisco documents as soon as possible.

9   ~~213.~~228.      Dr. Chung did not return the Cisco Confidential Materials that he had

10   systematically transferred out of Cisco.

11   ~~214.~~229.      Cisco implements security measures such as electronic access points to restrict

12   access to Cisco's confidential and proprietary information.

13   ~~215.~~230.      Cisco trade secrets derive independent economic value, actual or potential, from

14   not being generally known to, and/or not being readily ascertainable through proper means by, the

15   public or other persons who can obtain economic value from the disclosure or use of the information.

16   ~~216.~~231.      Cisco's trade secrets at issue in this case are related to products that are placed

17   in or are intended to be placed in, interstate or foreign commerce due to the fact that Cisco sells its

18   products around the world.  Thus, the trade secrets are covered by the federal trade secrets act, 18

19   U.S.C. § 1836.

20   ~~217.~~232.      Defendant Dr. Chung's misappropriation of Cisco's trade secret information

21   was willful and malicious.

22   ~~218.~~233.      Under 18 U.S.C. § 1836(c), this Court has original federal jurisdiction over this

23   claim.

24   ~~219.~~234.      On information and belief, if Defendant Dr. Chung's conduct is not enjoined,

25   Defendant will continue to misappropriate, disclose, and use for his own benefit and to Cisco's

26   detriment Cisco's trade secret information.

27   ~~220.~~235.      Because Cisco's remedy at law is inadequate, Cisco seeks preliminary and

28   permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret

1  information and other legitimate business interests. Injunctive relief is necessary to eliminate the

2  commercial advantage that otherwise would be derived from Defendant Dr. Chung's continued

3  misappropriation of Cisco's trade secret information.

4  ## COUNT II

5  **Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 by Dr. Chung**

6  ~~221.~~236.        Paragraphs 1 through ~~220~~235 are incorporated by reference as if fully stated

7  herein.

8  ~~222.~~237.        Dr. Chung's misappropriation of trade secrets is independently actionable under

9  California's Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 et seq.

10  ~~223.~~238.        Under 28 U.S.C. § 1367, this Court has jurisdiction over this claim.

11  ~~224.~~239.        Defendant's misappropriation of Cisco's trade secret information was willful

12  and malicious.

13  ~~225.~~240.        On information and belief, if Dr. Chung is not enjoined, the Defendant will

14  continue to misappropriate, disclose, and use for his own benefit and the benefit of others and to

15  Cisco's detriment Cisco's trade secret information.

16  ~~226.~~241.        Because Cisco's remedy at law is inadequate, Cisco seeks preliminary and

17  permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret

18  information and other legitimate business interests.  Injunctive relief is necessary to eliminate the

19  commercial advantage that otherwise would be derived from Defendant's continued misappropriation

20  of Cisco's trade secret information.  Cisco is entitled to injunctive relief under Cal. Civ. Code §3426.2.

21  ## COUNT III

22  **Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 by Mr. He**

23
24  ~~227.~~242.        Paragraphs 1 through ~~226~~241 are incorporated by reference as if fully stated

25  herein.

26  ~~228.~~243.        Mr. He's misappropriation of trade secrets is actionable under the Defend Trade

27  Secrets Act, 18 U.S.C. § 1836.

28

1     ~~229.~~244.     Cisco Confidential Materials contained trade secrets under 18 U.S.C. § 1839(3).
2   For example, these trade secrets include Cisco technical information such as design and architectural
3   documents, hardware diagrams, schematics, source code stacks, and engineering specification relating
4   to existing and future Cisco products, as well as business information such as relating to marketing
5   plans, business opportunities, and revenue and cost information that is not disclosed in publicly
6   available financial reports.

7     ~~230.~~245.     Mr. He's misappropriated Cisco's trade secrets by improper means (including,
8   for example, by systematically transferring Cisco Confidential Materials out of Cisco immediately
9   preceding his departure), on information and belief by disclosure without authorization, and by use
10  without authorization (including, for example, to obtain a competitive advantage in his product
11  development efforts).

12    ~~231.~~246.     Mr. He maintained in his possession these wrongfully acquired Cisco
13  documents and materials after the termination of his employment with Cisco.

14    ~~232.~~247.     On information and belief, Mr. He has used Cisco trade secrets contained in
15  these wrongfully acquired Cisco documents.

16    ~~233.~~248.     Mr. He's possession after leaving Cisco, acquisition, disclosure, and/or use of
17  Cisco trade secrets was and is without Cisco's express or implied consent.

18    ~~234.~~249.     Cisco trade secrets were developed over time after expenditure of significant
19  effort and resources.

20    ~~235.~~250.     Cisco trade secrets are not publicly available, and are kept within the knowledge
21  and know-how of Cisco employees under strict confidentiality obligations, and only shared with
22  parties bound by contractual obligations of confidentiality.

23    ~~236.~~251.     Cisco has taken reasonable measures to keep its trade secret information secret.

24    ~~237.~~252.     Cisco communicates the importance of maintaining confidentiality to its
25  employees in various means and forms, including but not limited to the Proprietary Information and
26  Inventions Agreements and termination letters.

27    ~~238.~~253.     On March 8, 1999, Mr. He executed the He PIIA in consideration for his
28  employment with Cisco.

239.254.      The He PIIA protects Cisco's proprietary information, which was defined in the He PIIA as information that was developed, created, or discovered by or on behalf of Cisco, or which became or will become known by, or was or is conveyed to Cisco, which has commercial value in Cisco's business.  The He PIIA further states that Cisco proprietary information includes but is not limited to software programs and subroutines, source and object code, algorithms, trade secrets, designs, technology, know-how, processes, data, ideas, techniques, inventions (whether patentable or not), works of authorship, formula, business and product development plans, customer lists, terms of compensation and performance levels of Cisco employees, and other information concerning Cisco's actual or anticipated business, research or development, or which is received in confidence by or for Cisco from any other person.

240.255.      By signing the He PIIA, Mr. He agreed that he would "not remove any Company Documents and Materials from the business premises of [Cisco] or deliver any Company Documents and Materials to any person or entity outside [Cisco], except as [] required to do in connection with performing the duties of [his] employment."  Mr. He also agreed that "immediately upon the termination of [his] employment," he would "return all Company Documents and Materials, apparatus, equipment and other physical property, or any reproductions of such property . . . ."

241.256.      Mr. He took intentional and systematic steps at least during a six week period before the termination of his employment to transfer thousands of documents containing Cisco Confidential Materials out of Cisco.

242.257.      Cisco implements security measures such as electronic access points to restrict access to Cisco's confidential and proprietary information.

243.258.      Cisco trade secrets derive independent economic value, actual or potential, from not being generally known to, and/or not being readily ascertainable through proper means by, the public or other persons who can obtain economic value from the disclosure or use of the information.

244.259.      Cisco's trade secrets at issue in this case are related to products that are placed in or are intended to be placed in, interstate or foreign commerce due to the fact that Cisco sells its products around the world.  Thus, the trade secrets are covered by the federal trade secrets act, 18 U.S.C. § 1836.

245.260.    Defendant Mr. He's misappropriation of Cisco's trade secret information was willful and malicious, further entitling Cisco to recover exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and its attorneys' fees and costs under 18 U.S.C. § 1836(b)(3)(D).

246.261.    Under 18 U.S.C. § 1836(c), this Court has original federal jurisdiction over this claim.

247.262.    On information and belief, if Defendant Mr. He's conduct is not remedied and/or enjoined, Defendant will continue to misappropriate, disclose, and use for his own benefit and to Cisco's detriment Cisco's trade secret information.

248.263.    Because Cisco's remedy at law is inadequate, Cisco seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and other legitimate business interests. Injunctive relief is necessary to eliminate the commercial advantage that otherwise would be derived from Mr. He's continued misappropriation of Cisco's trade secret information.

## COUNT IV

**Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 by Mr. He**

249.264.    Paragraphs 1 through 248263 are incorporated by reference as if fully stated herein.

250.265.    Mr. He's misappropriation of trade secrets is independently actionable under California's Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 et seq.

251.266.    Under 28 U.S.C. § 1367, this Court has jurisdiction over this claim.

252.267.    Cisco is entitled to recover damages in the form of actual loss, unjust enrichment and/or reasonable royalty. Cal. Civ. Code § 3426.3(a),(b).

253.268.    Defendant's misappropriation of Cisco's trade secret information was willful and malicious, further entitling Cisco to recover exemplary damages under Cal. Civ. Code § 3426.3 and its attorneys' fees and costs under Cal. Civ. Code § 3426.4.

254.269.    On information and belief, if the Defendant's conduct is not remedied, and if the Defendant is not enjoined, the Defendant will continue to misappropriate, disclose, and use for their own benefit and to Cisco's detriment Cisco's trade secret information.

1   255.270.   Because Cisco's remedy at law is inadequate, Cisco seeks, in addition to

2   damages, preliminary and permanent injunctive relief to recover and protect its confidential,

3   proprietary, and trade secret information and other legitimate business interests. Injunctive relief is

4   necessary to eliminate the commercial advantage that otherwise would be derived from Defendant's

5   continued misappropriation of Cisco's trade secret information.  Cisco is entitled to injunctive relief

6   under Cal. Civ. Code §3426.2.

7   **COUNT V**[1]

8   **Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 by Mr. Williams**

9   256.271.   Paragraphs 1 through 255270 are incorporated by reference as if fully stated

10   herein.

11   257.272.   Mr. Williams' misappropriation of trade secrets is actionable under the Defend

12   Trade Secrets Act, 18 U.S.C. § 1836.

13   258.273.   Cisco Confidential Materials contained trade secrets under 18 U.S.C. § 1839(3).

14   For example, these trade secrets include Cisco's market and strategy data, partner margins, potential

15   limited restructurings, information concerning Cisco's emerging technologies, competitive focus,

16   sales opportunities and customer lists, product pipelines, and future plans for current products.  On

17   information and belief, the Cisco documents stored on Mr. Williams' server backup include Cisco's

18   trade secrets such as customer lists, pricing information and strategic business development plans.

19   259.274.   Mr. Williams misappropriated Cisco's trade secrets by acquisition by improper

20   means (including, for example, by retaining possession of Cisco Confidential Materials after the

21   termination of his employment), by disclosure without authorization (including, for example, by

22   disclosing Cisco Confidential Materials to Mr. Puorro, to other Poly executives, and to Consultant),

23   and by use without authorization (such as to obtain a competitive business advantage in sales and

24   marketing).

25   260.275.   Mr. Williams' possession after leaving Cisco, acquisition, disclosure, and/or

26   use of Cisco trade secrets was and is without Cisco's express or implied consent.

27

28   [1] Count V against Mr. Williams is stayed pending arbitration.  *See* Dkt. 97 at 20.

51

1   261.276.       Cisco trade secrets were developed over time after expenditure of significant

2   effort and resources.

3       262.277.       Cisco trade secrets are not publicly available, and are kept within the knowledge

4   and know-how of Cisco employees under strict confidentiality obligations, and only shared with

5   parties bound by contractual obligations of confidentiality.

6       263.278.       Cisco has taken reasonable measures to keep its trade secret information secret.

7       264.279.       Cisco communicates the importance of maintaining confidentiality to its

8   employees in various means and forms, including but not limited to the Proprietary Information and

9   Inventions Agreements and termination letters.

10      265.280.       On July 20, 1998, Mr. Williams executed the Williams PIIA in consideration

11  for his employment with Cisco.

12      266.281.       The Williams PIIA protects Cisco's proprietary information, which was defined

13  in the Williams PIIA as information that was developed, created, or discovered by or on behalf of

14  Cisco, or which became or will become known by, or was or is conveyed to Cisco, which has

15  commercial value in Cisco's business.  The Williams PIIA further states that Cisco proprietary

16  information includes but is not limited to software programs and subroutines, source and object code,

17  algorithms, trade secrets, designs, technology, know-how, processes, data, ideas, techniques,

18  inventions (whether patentable or not), works of authorship, formula, business and product

19  development plans, customer lists, terms of compensation and performance levels of Cisco employees,

20  and other information concerning Cisco's actual or anticipated business, research or development, or

21  which is received in confidence by or for Cisco from any other person.

22      267.282.       By signing the Williams PIIA, Mr. Williams agreed that he would "keep in

23  confidence and trust and will not use or disclose any Proprietary Information of anything relating to it

24  without the prior written consent of an officer of the company, except as may be necessary in the

25  ordinary course of perming my duties to the Company."  Mr. Williams also agreed that he would "not

26  remove any Company Documents and Materials from the business premises of [Cisco] or deliver any

27  Company Documents and Materials to any person or entity outside [Cisco], except as [] required to

28  do in connection with performing the duties of [his] employment."  Mr. Williams also agreed that

1   "immediately upon the termination of [his] employment," he would "return all Company Documents
2   and Materials, apparatus, equipment and other physical property, or any reproductions of such
3   property . . . ."

4   268.283.   Before leaving Cisco, Mr. Williams took intentional steps to transfer Cisco
5   Confidential Materials out of Cisco.

6   269.284.   Cisco implements security measures such as electronic access points to restrict
7   access to Cisco's confidential and proprietary information.

8   270.285.   Cisco trade secrets derive independent economic value, actual or potential, from
9   not being generally known to, and/or not being readily ascertainable through proper means by, the
10  public or other persons who can obtain economic value from the disclosure or use of the information.

11  271.286.   Cisco's trade secrets at issue in this case are related to products that are placed
12  in or are intended to be placed in, interstate or foreign commerce due to the fact that Cisco sells its
13  products around the world.  Thus, the trade secrets are covered by the federal trade secrets act, 18
14  U.S.C. § 1836.

15  272.287.   Defendant Mr. Williams' misappropriation of Cisco's trade secret information
16  was willful and malicious, further entitling Cisco to recover exemplary damages under 18 U.S.C. §
17  1836(b)(3)(C) and its attorneys' fees and costs under 18 U.S.C. § 1836(b)(3)(D).

18  273.288.   Under 18 U.S.C. § 1836(c), this Court has original federal jurisdiction over this
19  claim.

20  274.289.   On information and belief, if Defendant Mr. Williams' conduct is not remedied
21  and /or enjoined, Defendant will continue to misappropriate, disclose, and use for his own benefit and
22  to Cisco's detriment Cisco's trade secret information.

23  275.290.   Because Cisco's remedy at law is inadequate, Cisco seeks, in addition to
24  damages, preliminary and permanent injunctive relief to recover and protect its confidential,
25  proprietary, and trade secret information and other legitimate business interests. Injunctive relief is
26  necessary to eliminate the commercial advantage that otherwise would be derived from Mr. Williams'
27  continued misappropriation of Cisco's trade secret information.

28

1

## COUNT VI[2]

2

**Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 by Mr. Williams**

3      ~~276.~~291.        Paragraphs 1 through ~~275~~290 are incorporated by reference as if fully stated

4  herein.

5      ~~277.~~292.        Mr. Williams' misappropriation of trade secrets is independently actionable

6  under California's Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 *et seq.*

7      ~~278.~~293.        Under 28 U.S.C. § 1367, this Court has jurisdiction over this claim.

8      ~~279.~~294.        Cisco is entitled to recover damages in the form of actual loss, unjust

9  enrichment and/or reasonable royalty. Cal. Civ. Code § 3426.3(a),(b).

10      ~~280.~~295.        Defendant's misappropriation of Cisco's trade secret information was willful

11  and malicious, further entitling Cisco to recover exemplary damages under Cal. Civ. Code § 3426.3

12  and its attorneys' fees and costs under Cal. Civ. Code § 3426.4.

13      ~~281.~~296.        On information and belief, if the Defendant's conduct is not remedied, and if

14  the Defendant is not enjoined, the Defendant will continue to misappropriate, disclose, and use for

15  their own benefit and to Cisco's detriment Cisco's trade secret information.

16      ~~282.~~297.        Because Cisco's remedy at law is inadequate, Cisco seeks, in addition to

17  damages, preliminary and permanent injunctive relief to recover and protect its confidential,

18  proprietary, and trade secret information and other legitimate business interests. Injunctive relief is

19  necessary to eliminate the commercial advantage that otherwise would be derived from Defendant's

20  continued misappropriation of Cisco's trade secret information.  Cisco is entitled to injunctive relief

21  under Cal. Civ. Code §3426.2.

22

## COUNT VII

23

**Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 by Mr. Puorro**

24      ~~283.~~298.        Paragraphs 1 through ~~282~~297 are incorporated by reference as if fully stated

25  herein.

26

27

28  _____

[2] Count VI against Mr. Williams is stayed pending arbitration.  *See* Dkt. 97 at 20.

~~FIRST~~SECOND AMENDED COMPLAINT – ~~3~~4:19-cv-07562-PJH

1      284.299.     Mr. Puorro's misappropriation of trade secrets is actionable under the Defend

2 Trade Secrets Act, 18 U.S.C. § 1836.

3      285.300.     The materials and information that Mr. Puorro solicited from Mr. Williams

4 contained trade secrets under 18 U.S.C. § 1839(3).  For example, these trade secrets include Cisco's

5 market and strategy data, partner margins, potential limited restructurings, information concerning

6 Cisco's emerging technologies, competitive focus, sales opportunities and customer lists, product

7 pipelines, and future plans for current products.

8      286.301.     Mr. Puorro misappropriated Cisco's trade secrets by acquisition by improper

9 means (including, for example, by inducing Mr. Williams to reveal Cisco Confidential Materials), by

10 disclosure without authorization (including, for example, by revealing Cisco Confidential Materials to

11 others at Poly), and by use without authorization (such as to obtain a competitive business advantage

12 in sales, marketing, and product development efforts).

13      287.302.     As a former Cisco employee, Mr. Puorro knew or should have known that Mr.

14 Williams had a duty to maintain secrecy over the materials he induced Mr. Williams to reveal.

15      288.303.     Mr. Puorro's acquisition, disclosure, and/or use of Cisco trade secrets was and

16 is without Cisco's express or implied consent.

17      289.304.     Cisco trade secrets were developed over time after expenditure of significant

18 effort and resources.

19      290.305.     Cisco trade secrets are not publicly available, and are kept within the knowledge

20 and know-how of Cisco employees under strict confidentiality obligations, and only shared with

21 parties bound by contractual obligations of confidentiality.

22      291.306.     Cisco has taken reasonable measures to keep its trade secret information secret.

23      292.307.     Cisco communicates the importance of maintaining confidentiality to its

24 employees in various means and forms, including but not limited to the Proprietary Information and

25 Inventions Agreements and termination letters.

26      293.308.     Cisco implements security measures such as electronic access points to restrict

27 access to Cisco's confidential and proprietary information.

28

1    ~~294.~~309.        Cisco trade secrets derive independent economic value, actual or potential, from

2    not being generally known to, and/or not being readily ascertainable through proper means by, the

3    public or other persons who can obtain economic value from the disclosure or use of the information.

4        ~~295.~~310.        Cisco's trade secrets at issue in this case are related to products that are placed

5    in or are intended to be placed in, interstate or foreign commerce due to the fact that Cisco sells its

6    products around the world.  Thus, the trade secrets are covered by the federal trade secrets act, 18

7    U.S.C. § 1836.

8        ~~296.~~311.        Defendant Mr. Puorro's misappropriation of Cisco's trade secret information

9    was willful and malicious, further entitling Cisco to recover exemplary damages under 18 U.S.C. §

10   1836(b)(3)(C) and its attorneys' fees and costs under 18 U.S.C. § 1836(b)(3)(D).

11       ~~297.~~312.        Under 18 U.S.C. § 1836(c), this Court has original federal jurisdiction over this

12   claim.

13       ~~298.~~313.        On information and belief, if Defendant Mr. Puorro's conduct is not remedied

14   and /or enjoined, Defendant will continue to misappropriate, disclose, and use for his own benefit and

15   to Cisco's detriment Cisco's trade secret information.

16       ~~299.~~314.        Because Cisco's remedy at law is inadequate, Cisco seeks, in addition to

17   damages, preliminary and permanent injunctive relief to recover and protect its confidential,

18   proprietary, and trade secret information and other legitimate business interests.  Injunctive relief is

19   necessary to eliminate the commercial advantage that otherwise would be derived from Mr. Williams'

20   continued misappropriation of Cisco's trade secret information.

21                                         **<u>COUNT VIII</u>**

22   **Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 by Mr. Puorro**

23       ~~300.~~315.        Paragraphs 1 through ~~299~~314 are incorporated by reference as if fully stated

24   herein.

25       ~~301.~~316.        Mr. Puorro's misappropriation of trade secrets is independently actionable

26   under California's Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 *et seq.*

27       ~~302.~~317.        Under 28 U.S.C. § 1367, this Court has jurisdiction over this claim.

28

1    303.318.        Cisco is entitled to recover damages in the form of actual loss, unjust

2    enrichment and/or reasonable royalty. Cal. Civ. Code § 3426.3(a),(b).

3    304.319.        Defendant's misappropriation of Cisco's trade secret information was willful

4    and malicious, further entitling Cisco to recover exemplary damages under Cal. Civ. Code § 3426.3

5    and its attorneys' fees and costs under Cal. Civ. Code § 3426.4.

6    305.320.        On information and belief, if the Defendant's conduct is not remedied, and if

7    the Defendant is not enjoined, the Defendant will continue to misappropriate, disclose, and use for

8    their own benefit and to Cisco's detriment Cisco's trade secret information.

9    306.321.        Because Cisco's remedy at law is inadequate, Cisco seeks, in addition to

10   damages, preliminary and permanent injunctive relief to recover and protect its confidential,

11   proprietary, and trade secret information and other legitimate business interests. Injunctive relief is

12   necessary to eliminate the commercial advantage that otherwise would be derived from Defendant's

13   continued misappropriation of Cisco's trade secret information.  Cisco is entitled to injunctive relief

14   under Cal. Civ. Code §3426.2.

15                                    **COUNT IX**

16        **Intentional Interference with a Contractual Relationship by Mr. Puorro**

17   307.322.        Paragraphs 1 through 306321 are incorporated by reference as if fully stated

18   herein.

19   308.323.        The Williams PIIA was a written contract between Cisco and Mr. Williams

20   which prohibited Mr. Williams from using or disclosing any of Cisco's proprietary information,

21   including trade secrets, without the prior written consent of an officer of the Company.

22   309.324.        Mr. Puorro was aware of the Williams PIIA.  For example, Mr. Puorro himself

23   signed a Proprietary Information And Invention Agreement (The "Puorro PIIA") which similarly

24   prohibited the use and disclosure of Cisco's proprietary information, including trade secrets.  Mr.

25   Puorro was also reminded of his obligations under the PIIA as recently as February 2019.  As another

26   example, Cisco's practice of entering Proprietary Information and Inventions Agreements with its

27   employees is well known in the industry generally.  As another example, Cisco sent Dr. Chung and

28

1    Mr. He's PIIA agreements to Poly during the course of those investigations, and, on information and

2    belief, those letters were shared with Mr. Puorro.

3    ~~310.~~325.      Mr. Puorro engaged in conduct that prevented and/or hindered performance of

4    the Williams PIIA, for example, by inducing Mr. Williams to reveal Cisco's proprietary information

5    and trade secrets to Mr. Puorro and other Poly executives~~.~~, and by inducing Mr. Williams to breach

6    his duty of loyalty to Cisco.  As another example, Mr. Puorro induced Mr. Williams to advance Poly's

7    interests in a partnership with RoomReady, to the detriment of Cisco's interest in that Partnership,

8    while Mr. Williams was still a Cisco employee.

9    ~~311.~~326.      Mr. Puorro intended for Mr. Williams to reveal Cisco's proprietary information

10   and trade secrets or knew it was likely.  For example, Mr. Williams repeatedly conveyed his desire for

11   a job at Poly to Mr. Puorro, and Mr. Puorro offered his advocacy in exchange for Mr. Williams'

12   revealing Cisco Confidential Materials.  Moreover, Mr. Puorro continued this course of conduct after

13   Mr. Williams first revealed Cisco Confidential Materials, and therefore intended for Mr. Williams'

14   conduct to continue.

15   ~~312.~~327.      Cisco has been substantially harmed as a proximate result of Mr. Puorro's

16   conduct.  For example, Mr. Puorro's intentional interference with the Williams PIIA threatens to

17   damage the value of Cisco's trade secret technology and business processes, and has provided Poly

18   with proprietary information about Cisco's financial performance, customers, internal business

19   processes, and product development plans, which, on information and belief, Poly is using for its own

20   benefit and to the detriment of Cisco.

21   ~~313.~~328.      Mr. Puorro's actions were willful, intentional, and malicious.  Cisco is therefore

22   entitled to punitive and exemplary damages.

23                                **COUNT X**

24      **Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 by Poly**

25   ~~314.~~329.      Paragraphs 1 through ~~313~~328 are incorporated by reference as if fully stated

26   herein.

27   ~~315.~~330.      Poly's misappropriation of trade secrets is actionable under the Defend Trade

28   Secrets Act, 18 U.S.C. § 1836.

316.331.     The materials and information that Mr. Puorro solicited from Mr. Williams contained trade secrets under 18 U.S.C. § 1839(3).  For example, these trade secrets include Cisco's market and strategy data, partner margins, potential limited restructurings, information concerning Cisco's emerging technologies, competitive focus, sales opportunities and customer lists, product pipelines, and future plans for current products.  The materials used by Dr. Chung and Mr. He while employed at Poly also included trade secrets, including, for example, non-public design specifications for current and unreleased Cisco products.

317.332.     Poly is vicariously liable for the actions of its officer, Mr. Puorro during the course and scope of his employment at Poly.  Mr. Puorro misappropriated Cisco's trade secrets by acquisition by improper means (including, for example, by inducing Mr. Williams to reveal Cisco Confidential Materials), by disclosure without authorization (including, for example, by revealing Cisco Confidential Materials to others at Poly), and by use without authorization (such as to obtain a competitive business advantage in sales, marketing, and product development efforts).

318.333.     Additional Poly officers were aware of Mr. Puorro's inducement of Mr. Williams, and ratified his conduct on behalf of Poly.  For example, at least one other Poly officer was aware of Mr. Puorro's inducement of Mr. Williams to disclose Cisco Confidential Material to others at Poly.  That other Poly officer further ratified Mr. Puorro's conduct on behalf of Poly by requesting that Mr. Williams disclose Cisco Confidential Material to Poly and others at Poly.

319.334.     Poly is vicariously liable for the actions of Dr. Chung and Mr. He during the course and scope of their employment at Poly.  Dr. Chung misappropriated Cisco's trade secrets by improper means (including, for example, by systematically transferring Cisco Confidential Materials out of Cisco immediately preceding his departure), by disclosure without authorization (including, for example, by uploading Cisco Confidential Materials to Poly's Sharepoint site), and by use without authorization (including, for example, to obtain a competitive advantage in his product development efforts).  Dr. Chung further operated within the scope of his employment with Poly when he recruited Mr. He to join Poly.   Mr. He's misappropriated Cisco's trade secrets by improper means (including, for example, by systematically transferring Cisco Confidential Materials out of Cisco immediately preceding his departure), on information and belief by disclosure without authorization, and by use

1   without authorization (including, for example, to obtain a competitive advantage in his product

2   development efforts).

3      320.335.   Poly is further liable for Dr. Chung's acts of misappropriation because it ratified

4   Dr. Chung's actions and misappropriation of Cisco's trade secrets when it failed to disavow Dr.

5   Chung's conduct or terminate his employment after Poly had reason to know of Dr. Chung's

6   misappropriation.

7      321.336.   Poly is further liable for Mr. Williams' acts of misappropriation because it

8   ratified Mr. Williams' actions and misappropriation of Cisco's trade secrets when it hired him after

9   Poly had reason to know of Mr. Williams' misappropriation through the actions of its senior executives

10   including Mr. Puorro.

11      322.337.   Upon information and belief, the Poly Executive Officers' familiar with the

12   misconduct of Mr. Puorro and Mr. Williams were also aware of Poly's decisions with respect to Dr.

13   Chung, thus demonstrating an intentional and willful disregard for Cisco's trade secrets by Poly.

14      323.338.   Poly's acquisition, disclosure, and/or use of Cisco trade secrets was and is

15   without Cisco's express or implied consent.

16      324.339.   Cisco trade secrets were developed over time after expenditure of significant

17   effort and resources.

18      325.340.   Cisco trade secrets are not publicly available, and are kept within the knowledge

19   and know-how of Cisco employees under strict confidentiality obligations, and only shared with

20   parties bound by contractual obligations of confidentiality.

21      326.341.   Cisco has taken reasonable measures to keep its trade secret information secret.

22      327.342.   Cisco communicates the importance of maintaining confidentiality to its

23   employees in various means and forms, including but not limited to the Proprietary Information and

24   Inventions Agreements and termination letters.

25      328.343.   Cisco implements security measures such as electronic access points to restrict

26   access to Cisco's confidential and proprietary information.

27

28

329.344.        Cisco trade secrets derive independent economic value, actual or potential, from not being generally known to, and/or not being readily ascertainable through proper means by, the public or other persons who can obtain economic value from the disclosure or use of the information.

330.345.        Cisco's trade secrets at issue in this case are related to products that are placed in or are intended to be placed in, interstate or foreign commerce due to the fact that Cisco sells its products around the world.  Thus, the trade secrets are covered by the federal trade secrets act, 18 U.S.C. § 1836.

331.346.        Defendant Poly's misappropriation of Cisco's trade secret information was willful and malicious, further entitling Cisco to recover exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and its attorneys' fees and costs under 18 U.S.C. § 1836(b)(3)(D).

332.347.        Under 18 U.S.C. § 1836(c), this Court has original federal jurisdiction over this claim.

333.348.        On information and belief, if Defendant Poly's conduct is not remedied and/or enjoined, Defendant will continue to misappropriate, disclose, and use for its own benefit and to Cisco's detriment Cisco's trade secret information.

334.349.        Because Cisco's remedy at law is inadequate, Cisco seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and other legitimate business interests. Injunctive relief is necessary to eliminate the commercial advantage that otherwise would be derived from Poly's continued misappropriation of Cisco's trade secret information.

### COUNT XI

**Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 by Poly**

335.350.        Paragraphs 1 through 334349 are incorporated by reference as if fully stated herein.

336.351.        Poly's misappropriation of trade secrets is independently actionable under California's Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 *et seq.*

337.352.        Under 28 U.S.C. § 1367, this Court has jurisdiction over this claim.

1    338.353.    Cisco is entitled to recover damages in the form of actual loss, unjust

2    enrichment and/or reasonable royalty. Cal. Civ. Code § 3426.3(a),(b).

3    339.354.    Defendant's misappropriation of Cisco's trade secret information was willful

4    and malicious, further entitling Cisco to recover exemplary damages under Cal. Civ. Code § 3426.3

5    and its attorneys' fees and costs under Cal. Civ. Code § 3426.4.

6    340.355.    On information and belief, if the Defendant's conduct is not remedied, and if

7    the Defendant is not enjoined, the Defendant will continue to misappropriate, disclose, and use for its

8    own benefit and to Cisco's detriment Cisco's trade secret information.

9    341.356.    Because Cisco's remedy at law is inadequate, Cisco seeks, in addition to

10   damages, preliminary and permanent injunctive relief to recover and protect its confidential,

11   proprietary, and trade secret information and other legitimate business interests. Injunctive relief is

12   necessary to eliminate the commercial advantage that otherwise would be derived from Defendant's

13   continued misappropriation of Cisco's trade secret information.  Cisco is entitled to injunctive relief

14   under Cal. Civ. Code §3426.2.

15                                   **COUNT XII**

16          **Intentional Interference with a Contractual Relationship by Poly**

17   342.357.    Paragraphs 1 through 341356 are incorporated by reference as if fully stated

18   herein

19   343.358.    Poly is vicariously liable for the actions of its officer, Mr. Puorro, during the

20   course and scope of his employment at Poly.  Mr. Puorro was aware of the Williams PIIA, and, within

21   the course and scope of his employment at Poly, engaged in conduct that prevented or hindered

22   performance of that contract, and intended that result.  Mr. Puorro's actions proximately caused Cisco

23   substantial harm.

24   344.359.    Mr. Puorro's actions, which are attributable to Poly, were willful, intentional,

25   and malicious.  Cisco is therefore entitled to punitive and exemplary damages.

26                                **Prayer For Relief**

27          WHEREFORE, CISCO prays for judgment as follows:

28          A.    Impose preliminary and permanent injunction against Defendants;

B.     Award compensatory damages against Messrs. He, Williams, Puorro, and Poly according to the proof;

C.     Award punitive and exemplary damages to deter similar wrongdoings;

D.     Award prejudgment interest at the maximum legal rate as allowed by the law;

E.     Award reasonable attorney's fees;

F.     Award costs of suit herein incurred; and

G.     Such other and further relief as this Court deems just and proper.

## Demand For Jury Trial

Plaintiff Cisco hereby demands a trial by jury on all issues so triable.

Dated: ~~December 17, 2019~~June 12, 2020     By:     _–/s/ ~~John M. Desmarais~~ Carson Olsheski_

John M. Desmarais (SBN 320875)
DESMARAIS LLP
101 California Street
San Francisco, CA 94111
(415) 573-1900

Justin P.D. Wilcox (admitted pro hac vice)
jwilcox@desmaraisllp.com
Tamir Packin (SBN 317249)
tpackin@desmaraisllp.com
Steven M. Balcof (admitted pro hac vice)
sbalcof@desmaraisllp.com
Carson Olsheski (admitted pro hac vice ~~pending~~)
colsheski@desmaraisllp.com
David A. Frey (admitted pro hac vice)
dfrey@desmaraisllp.com
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
(212-) 351-3400

_Attorneys for Plaintiffs_

1

2

~~**CERTIFICATE OF SERVICE**~~

3

~~I hereby certify that, on this day, I caused to be served the foregoing FIRST AMENDED~~

4

~~COMPLAINT FOR TRADE SECRET MISAPPROPRIATION on counsel for defendants Wilson~~

5

~~Chung and Jedd Williams in this action via e-mail transmission to each of the electronic addresses~~

6

~~listed below. I further certify that counsel for defendant James He will be served via CM/ECF upon~~

7

~~filing.~~

8

~~Counsel for Defendant Wilson Chung:~~            ~~Daniel Muller~~
~~Ventura Hersey & Muller LLP~~

9

~~1506 Hamilton Avenue~~
~~San Jose, CA  95125~~

10

~~Tel:  408-512-3022~~
~~Email:  dmuller@venturahersey.com~~

11

~~Counsel for Defendant Jedd Williams~~          ~~Alison Plessman~~

12

~~Hueston Hennigan~~
~~523 West 6th Street, Suite 400~~

13

~~Los Angeles, CA  90014~~
~~Tel:  213-788-4340~~

14

~~Email:  aplessman@hueston.com~~

15

16

~~Dated:  December 17, 2019~~

17

~~/s/ John M. Desmarais~~

18

~~John M. Desmarais~~

19

20

21

22

23

24

25

26

27

28

---

64