UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CISCO SYSTEMS, INC., et al.,

            Plaintiffs,

    v.

WILSON CHUNG, et al.,

            Defendants.

Case No.  19-cv-07562-PJH

**ORDER RE MOTIONS TO DISMISS SECOND AMENDED COMPLAINT, MOTION TO STAY DISCOVERY OR, IN THE ALTERNATIVE FOR A PROTECTIVE ORDER LIMITING DISCOVERY, AND MOTION FOR ENTRY OF A PROTECTIVE ORDER**

Re: Dkt. Nos. 92, 93, 110, 114, 115, 118

Before the court are defendants Plantronics Inc.'s ("Plantronics" or "Poly") and Thomas Puorro's ("Puorro") combined motion to dismiss and strike (Dkt. 114) and motion to stay discovery or, in the alternative, for a protective order (Dkt. 92), defendant Wilson Chung Ph.D.'s ("Chung") motion to dismiss (Dkt. 115) and joinder to Plantronics' motion to stay (Dkt. 99), and defendant James He's ("He") motion to dismiss (Dkt. 118) and joinder to Plantronics' motion to stay (Dkt. 100) (collectively, "defendants").  Also before the court is plaintiff Cisco Systems, Inc.'s ("plaintiff") motion for entry of a protective order (Dkt. 93).[1]

Having read the parties' papers and carefully considered their argument and the relevant legal authority, and good cause appearing, the court hereby **GRANTS IN PART** and **DENIES IN PART** Plantronics' motion to dismiss, **DENIES** Plantronics' motion to strike, **DENIES** Chung's motion to dismiss, **DENIES** He's motion to dismiss, **DENIES** Plantronics' motion to stay, **GRANTS** Plantronics' alternative motion for a protective

---

[1] To simplify, the court will refer only to "Plantronics" when discussing both its and Puorro's combined briefing on the above motions.

order, and **DENIES** plaintiff's motion for entry of a protective order.

**BACKGROUND**

This order decides the second round of defendants' motion to dismiss briefing in a purported trade secrets misappropriation action.  In its May 26, 2020 order (the "May 26 order" or "prior order"), the court held that plaintiff's first amended complaint ("FAC") failed to adequately allege that (1) the information purportedly misappropriated by Chung and He maintained independent economic value, Dkt. 97 at 34-36; and (2) the FAC failed to allege an intentional interference with contract claim that arises out of a set of facts distinct from those relied upon to support its trade secrets misappropriation claims ("trade secrets claims"), id. at 44-45.  The court allowed plaintiff a single opportunity to amend to cure those deficiencies.  Id. at 46.  Taking up that opportunity, plaintiff filed its second amended complaint ("SAC") on June 12, 2020.  Dkt. 108.  With that amended pleading in hand, the court now primarily considers whether the SAC's amendments cured the FAC's shortcomings.

In its May 26 order, the court expressly limited plaintiff's SAC amendments to the two issues noted above.  Dkt. 97 at 46-47.  Accordingly, it need not recount this action's overarching factual background and will detail that background, as well as the SAC's amendments, as necessary in its analysis below.

**DISCUSSION**

**A.    Legal Standard**

**1.    Rule 12 (b)(6) Motion to Dismiss**

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Rule 8 requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), dismissal "is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).  While the court is to accept as true all the factual allegations in the

1    complaint, legally conclusory statements, not supported by actual factual allegations,

2    need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). The complaint

3    must proffer sufficient facts to state a claim for relief that is plausible on its face. Bell

4    Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 558-59 (2007).

5           **2.     Rule 12(f) Motion to Strike**

6           Federal Rule of Civil Procedure 12(f) provides that the court "may strike from a

7    pleading any insufficient defense or any redundant, immaterial, impertinent, or

8    scandalous matter." Fed. R. Civ. P. 12(f).  "The function of a [Rule] 12(f) motion to strike

9    is to avoid the expenditure of time and money that must arise from litigating spurious

10   issues by dispensing with those issues prior to trial."  Whittlestone, Inc. v. Handi-Craft

11   Co., 618 F.3d 970, 973 (9th Cir. 2010).

12          Motions to strike are not favored and "should not be granted unless it is clear that

13   the matter to be stricken could have no possible bearing on the subject matter of the

14   litigation." Colaprico v. Sun Microsystem, Inc., 758 F. Supp. 1335, 1339 (N.D. Cal. 1991).

15   When a court considers a motion to strike, it "must view the pleadings in light most

16   favorable to the pleading party."  Uniloc v. Apple, Inc., 2018 WL 1640267, at *1 (N.D. Cal.

17   Apr. 5, 2018).  A court must deny the motion to strike if there is any doubt whether the

18   allegations in the pleadings might be at issue in the action.  In re 2TheMart.com, Inc.,

19   Sec. Litig., 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000).  However, a motion to strike is

20   proper when a defense is insufficient as a matter of law.  Chiron Corp. v. Abbot Labs.,

21   156 F.R.D. 219, 220 (N.D. Cal. 1994). Ultimately, the decision "to grant a motion to strike

22   lies within the sound discretion of the district court." Rees v. PNC Bank, N.A., 308 F.R.D.

23   266, 271 (N.D. Cal. 2015).

24   **B.     Analysis**

25          **1.     Plaintiff Adequately Alleged the Independent Economic Value of Some**

26                  **of the Information Purportedly Misappropriated by Chung and He**

27          In its May 26 order, the court set forth the standard for alleging independent

28   economic value within the meaning of Title 18 U.S.C. § 1839(3)(A)-(B) and California

United States District Court
Northern District of California

1   Civil Code § 3426.1(d)(1)-(2), namely:

2       "'To have independent economic value, a trade secret must be
3       sufficiently valuable and secret to afford an actual or potential
        economic advantage over others.' . . . A plaintiff may show
4       independent economic value 'by circumstantial evidence of the
        resources invested in producing the information, the
5       precautions taken to protect its secrecy, and the willingness of
        others to pay for its access.'"  Dkt. 97 at 34 (citing Calendar
6       Research LLC v. StubHub, Inc., 2017 WL 10378336, at *3 (C.D.
        Cal. Aug. 16, 2017)).

7   The court added, however, that:

8       "Although 'the standard to show that trade secrets derive
        [independent] economic value is not a high standard' . . . courts
9       recognize that merely reciting this element in a pleading is
        insufficient to state a claim for trade secret misappropriation,"
10      Dkt. 97 at 34 (citing Acrisure of Ca. v. So. Cal. Commc'l Ins.
        Servs., Inc., 2019 WL 4137618, at *4 (C.D. Cal. Mar. 27,
11      2019)).

12          In that order, the court concluded that plaintiff failed to adequately allege that the

13   information purportedly misappropriated by Chung and He maintained independent

14   economic value.  Chiefly, the court concluded that the allegations proffered by plaintiff

15   only generally relate to the economic value of its collaboration platform as opposed to

16   that of "the categories of information purportedly misappropriated by Chung or He that

17   concern the handful of subject matter that plaintiff alleged with sufficient particularity," id.

18   at 35-36, and that Chung's and He's confidentiality obligations themselves "say nothing

19   about the economic value of the particular information at issue," id. at 36.  The court also

20   rejected plaintiff's assertion that Chung's and He's decision to "risk" their careers to

21   access the information they purportedly misappropriated establishes such value, id.

22          In its SAC, plaintiff attempts to remedy its FAC's shortcomings on this element by

23   adding allegations regarding the three circumstantial methods outlined by the court in

24   Calendar Research for showing independent economic value with respect to the

25   information purportedly misappropriated by Chung and He.  The court analyzes those

26   amendments as they relate to each defendant below.

27

28

United States District Court
Northern District of California

### a.   Some of the Information Purportedly Misappropriated by Chung Maintains Independent Economic Value

In its opening brief, Plantronics asserts that "the majority of the SAC consists of broad references to entire swaths of documents" and thus "prevent[] defendants from discerning any possible 'nexus' between an alleged trade secret and the categories of alleged independent economic value." Dkt. 114 at 14-15. On the other end of the spectrum, plaintiff asserts that "[i]n its May 26 Order, the Court explained that while Cisco's prior pleading described the economic value of information related to its collaboration products generally, it did not address the independent economic value of the Chung/He Trade Secrets. In view of that guidance, Cisco provided new allegations in the SAC that specifically set forth the independent economic value of each category of the Chung/He Trade Secrets to satisfy the <u>Calendar Research</u> standard." Dkt. 121 at 7.

Both parties overstate the import of the SAC's additions. As an initial matter, plaintiff mischaracterizes the court's May 26 order. As noted above, in it, the court held that the FAC's allegations of independent economic value of the information purportedly misappropriated by Chung "only generally relate to plaintiff's collaboration platform," but "they say nothing about the economic value of the categories of information purportedly misappropriated by Chung or He ***that concern the handful of subject matter*** that plaintiff alleged with sufficient particularity." Dkt. 97 at 35-36 (emphasis added).

Plaintiff's argument that the SAC "sets forth the independent economic value of each category of the Chung/He Trade Secrets," Dkt. 121 at 7, means nothing if such categories do not specifically concern the qualifying subject matters of the categories of information that allowed this court to determine in the first instance that plaintiff described the information purportedly misappropriated by Chung with sufficient particularity. Absent such qualification, the court has no plausible basis to impute the economic value of the categories of information in general to such categories of information as applied to the referenced subject matters in particular. Significantly, those categories may not even discuss the referenced subject matters and, even if they did, it is possible that, when

taken together an entire category might be valuable, but the information concerning a particular subject matter might not.  Failure to account for this possibility presents the same sort of logic problem (attributing the value of the whole to each constituent part) that the court rejected in its prior order.  Dkt. 97 at 36 ("While that subject matter may serve as constituent parts falling under the umbrella of plaintiff's 'collaboration platform,' that relationship does not compel a reasonable inference that any information about such particular subject matter is itself economically valuable.").

To be sure, there was no ambiguity about the meaning or import of the term "subject matter" when used by the court in its prior order.  Literally three pages before it concluded that the FAC's independent economic value allegations were insufficient, the court specifically enumerated each such subject matter (indeed, using plaintiff's own words).  Dkt. 97 at 32-33 ("As argued by plaintiff, such subject matter includes 'Cisco's contribution to 5G technology. . . . **These subject matters** qualifications again allow defendant a 'level of detail that is sufficient to ascertain at least the boundaries within which the secrets lie and the scope of appropriate discovery.") (emphasis added).

While plaintiff is correct that "[t]he Court has already determined that Cisco 'described the trade secret information purportedly misappropriated by Chung [and He] with sufficient particularity,'" it is plaintiff, not defendants, that "miss[es] the point," Dkt. 121 at 12, when construing the court's prior order.  Plaintiff must allege not only the purportedly misappropriated information with sufficient particularity but also that such information maintains independent economic value.  Stated differently, any allegations of the economic value of various categories of information—untethered to the enumerated subject matters that allowed this court to conclude that plaintiff satisfied the sufficient particularity requirement in the first instance—does not give rise to an actionable trade secret.

Here, while the parties spill a lot of ink arguing whether plaintiff adequately alleged the independent economic value of the information purportedly misappropriated by Chung and He, the court's determination of that issue is straightforward.  First, in its prior

order, the court concluded that plaintiff described the trade secrets information

purportedly misappropriated by Chung with sufficient particularity.  Dkt. 97 at 31-33.  To

support that conclusion, the court relied upon two sets of allegations: (1) the ***categories***

of information allegedly misappropriated; and (2) the ***subject matter*** of the information

allegedly misappropriated.  Id. at 32.  When viewed in light of that justification, then,

plaintiff adequately alleged that Chung misappropriated certain categories of

information—namely "design specifications, schematics, source code, product market

analyses, and vendor contract details," SAC ¶ 27 (FAC ¶ 26), as well as "user feedback

[and] design documentation," id. ¶ 214 (FAC ¶ 199)—that concerns the particular subject

matters enumerated by the court in its prior order, namely the following:

- Cisco's contribution to 5G technology.
- Pre-release video conferencing display prototypes.
- Debugging a user interface.
- Sound bar products.
- Plaintiff's communications product portfolio.
- Strategy and costs for a pre-release video conferencing display product.
- Plaintiff's marketing position in the collaboration space.
- Component specifications and competitive differentiators for plaintiff's current and unreleased hardware products (reflected in the so-called "EA document").

Dkt. 97 at 32-33.

Second, having identified the universe of trade secrets information purportedly

misappropriated by Chung that plaintiff described with sufficient particularity in its FAC,

the next question is whether the SAC adequately alleges that the categories of

information (e.g., design specifications) concerning each of the bulleted subject matters

(e.g., contributions to 5G technology) maintain independent economic value.

The court concludes that the SAC adequately alleges such value with respect to

some categories concerning some subject matters but not for those concerning others.

With respect to design specifications and schematics for its pre-release video

United States District Court
Northern District of California

United States District Court
Northern District of California

1  conferencing prototype, plaintiff alleges that the resources invested in this information

2  include a "careful orchestration" of the prototype's "component selection and layout,"

3  which "require[s] the coordinated efforts of a team of engineers for many months" and

4  allows plaintiff "to manufacture [its pre-release video conferencing products] for resale at

5  a scale at a competitive cost." SAC ¶ 99. Based on this alleged effort and resulting

6  manufacturing advantage, the court concludes that plaintiff adequately alleged

7  independent economic value with respect to this category of information concerning this

8  subject matter. Relatedly, because plaintiff's design details and specifications for its

9  sound bar products generally follow the process for the pre-release video conferencing

10  prototype and result in a similar manufacturing advantage, id., the court also concludes

11  that plaintiff adequately alleged that this category of information concerning this subject

12  matter maintains independent economic value.

13      Separately, with respect to the EA document, plaintiff alleges that this document

14  identifies "more than two dozen Cisco collaboration products by code name" and that

15  "[f]or each product, it identifies critical component selection choices made by Cisco's

16  design team in the course of product development." Id. Plaintiff further adds that this

17  document "reflects thousands of hours of engineers' labor in making these decisions." Id.

18  Based on this document's purported identification of plaintiff's various collaboration

19  products' component selection decisions and the engineering efforts that went into

20  making those decisions, the court concludes that plaintiff also adequately alleged that EA

21  document reflects information that maintains independent economic value.

22      Lastly, with respect to its emerging business opportunities in the collaboration

23  space, plaintiff alleges that the resources invested in this information include "market

24  research," "direct customer engagement," and developing "long-term relationships" with

25  customers and partners. Id. ¶ 134.[2] Plaintiff alleges that this information is "valuable to

26  

27  [2] It appears plaintiff mistakenly included this allegation of independent economic value
under those concerning the information purportedly misappropriated by He. To avoid

28  future motion practice related to this apparent mistake, the court will construe it as
intended to concern the information purportedly misappropriated by Chung.

8

Cisco because it identifies customers and targeted deals, allowing Cisco . . . to target previously identified commercial opportunities to maximize efficiencies." Id.  Based on this alleged effort and sales advantage, the court concludes that plaintiff adequately alleged independent economic value with respect to the above referenced categories of information concerning this subject matter.

In their briefing, Plantronics and Chung raise two remaining arguments in opposition to plaintiff's additional allegations of the independent economic value of the information purportedly misappropriated by Chung.  First, plaintiff failed to establish that third parties were willing to pay for access to its alleged trade secrets.  Dkt. 123 at 4. Second, plaintiff failed to show that the information purportedly misappropriated by Chung derives economic value from its secrecy, Dkt. 115 at 7-8; Dkt. 123 at 6.   These arguments do not alter the above conclusions.

First, based on the allegations describing the impact of the above information upon plaintiff's business, the court finds it plausible that third parties would be willing to pay for information detailing plaintiff's collaboration products' codenames, their underlying components and such components' placements, and the best marketing opportunities to target.  At minimum, it appears that such information would allow a competitor insight to an exemplar of how to design and economically manufacture like products and where or with whom to market them.

Second, plaintiff alleges at least four different ways that it attempts to maintain the secrecy of its information, including without limitation the specifications, schematics, EA document, and that information concerning the emerging business opportunities referenced above.  In particular, plaintiff alleges that such methods include (1) requiring Chung to agree to his Proprietary Information and Invention Agreement ("PIIA") as a condition of employment, (2) requiring  Chung to annually certify that "he would not use Cisco assets for non-company purposes," (3) monitoring Chung's (and seemingly all of its employees) network activity, and (4) restricting access to its offices and data systems. Id. ¶ 100.  As concluded by the court in its prior order, these sorts of precautions "support[]

the inference that information reviewed by Chung . . . in the course of [his] employment is valuable," but "say[] nothing about the economic value of the particular information at issue." Dkt. 97 at 36. That conclusion remains true: secrecy **itself** does not establish value. However, these precautions show that the subject information is not "generally known" by others. Incident to plaintiff's exclusive possession of that information, which plaintiff circumstantially showed the value of through investing in its development, plaintiff might enjoy a marginal economic advantage in manufacturing that others do not. That said, plaintiff failed to adequately allege the independent economic value of any category of information concerning the remaining subject matters—namely, its contributions to 5G technology, communications product portfolio, strategy and costs for the pre-release video conferencing display product, and component specification and competitive differentiators for its other unspecified products (outside of the EA document).

Instead, plaintiff alleges that "[t]he trade secrets misappropriated by Dr. Chung have independent economic value," SAC ¶ 98, because, principally, it has "invested significant resources in the creation of these particular trade secrets," id. ¶ 99. Plaintiff then alleges the resources invested in its general categories of information—namely, artwork prototypes, user experience design documentation, user interview feedback, and source code—without expressly conditioning such alleged investments with respect to any of the remaining subject matters. While plaintiff does allege that its "misappropriated source code" reflects engineers development efforts, including "testing and debugging," id., plaintiff neglects any explanation about how its source code **for debugging a user interface** itself maintains independent economic value.

In the alternative, plaintiff argues that it separately showed the independent economic value of the information purportedly misappropriated by Chung (1) "by describing the precautions taken to protect that information's secrecy," particularly Chung's PIIA and plaintiff's physical and electronic restrictions to access, Dkt. 121 at 8-9, and (2) "through evidence that others (i.e., Poly) were willing to pay for that information," id. at 9.

1   The court rejects both grounds.  Plaintiff's first alternative ground runs into another

2   logic problem: merely because the information purportedly misappropriated by Chung

3   might qualify as "proprietary" under contract does not establish that that information

4   satisfies the statutory definition of a "trade secret."  Plainly, a lot of information may be

5   proprietary (i.e., owned) but not economically valuable.  Additionally, security precautions

6   are common across companies.  Adopting plaintiff's rationale on this issue (i.e., if the

7   information is subject to a security measure, then it maintains independent economic

8   value) would result in overly inclusive findings of what qualifies as economically valuable.

9   Accordingly, plaintiff's first alternative ground fails to establish that the information

10  purportedly misappropriated by Chung, as a categorical matter, maintains independent

11  economic value.

12   To substantiate its second alternative ground, plaintiff cites to the court's prior

13  order's recognition that "employment comes with certain monetary benefits . . . which,

14  plainly, are economically valuable," Dkt. 97 at 37, and then reasons that because "Chung

15  was also hired by Poly . . . proceeded to use Cisco's trade secrets in the course of his

16  employment . . . and was paid by Poly for doing that work," the information he purportedly

17  misappropriated, too, must have maintained independent economic value, Dkt. 121 at 9;

18  Dkt. 119 at 8.

19   Plaintiff again mischaracterizes this court's prior order.  The court previously found

20  that it could infer that the information purportedly misappropriated by Williams maintained

21  independent economic value because, in part, plaintiff alleged a detailed several month

22  long series of communications between Williams and Puorro prior to Williams' offer to join

23  Plantronics that suggested a quid pro quo scheme between the two.  Dkt. 97 at 37.

24  Plaintiff failed to allege any such scheme with respect to Chung's employment.  Given

25  that distinction, the court may not infer that others, including Plantronics, were willing to

26  pay for all of the information purportedly misappropriated by Chung.[3]  Accordingly,

27

28  [3] Plaintiff also points to Chung's alleged "use" of the purportedly misappropriated
    information in his employment at Plantronics as a further basis to support its second

United States District Court
Northern District of California

1  plaintiff's second alternative ground fails to establish that the information purportedly

2  misappropriated by Chung, as a categorical matter, maintains independent economic

3  value.

4        In short, the court concludes that plaintiff adequately alleged that the design

5  specifications and schematics of its pre-release video conferencing prototype and sound

6  bar products, its EA document, and information concerning its emerging business

7  opportunities in the collaboration space maintain independent economic value.  However,

8  with respect to any category of information concerning the remaining subject matters, the

9  court concludes that plaintiff failed to allege their independent economic value.  Such

10  information may not serve as a basis for plaintiff's trade secrets claims.

### b.    Some of the Information Purportedly Misappropriated by He Maintains Independent Economic Value

13        To determine whether plaintiff adequately alleged the independent economic value

14  of the information purportedly misappropriated by He, the same framework applies.  In its

15  May 26 order, the court determined that plaintiff described that information with sufficient

16  particularity by alleging that He misappropriated "design and architectural documents,

17  hardware diagrams, schematics, source code stacks, and engineering specifications

18  relating to existing and future Cisco products, and non-public financial information" that

19  concerns the following:

20  •    An unreleased headset concept and like prototypes.

21  •    Vendor roadmaps for plaintiff's products.

22  •    An unreleased IP telephone project.

---

alternative ground of independent economic value.  However, in its SAC, plaintiff bases
such use upon Chung's "email[ing] and upload[ing] the EA document to his Plantronics
email and the Plantronics' internal Sharepoint, as well as Chung's "retain[ing] and
refus[ing] to return" the Second Seagate Drive, "which, on information and belief,"
contains the various categories of information noted above.  SAC ¶ 101.  Given that the
court already concluded that the EA document maintains independent economic value, it
need not consider this alternative ground.  With respect to the information contained on
the Second Seagate Drive, the court has either already concluded that such information
does maintain independent economic value or lacks a qualifying subject matter.

- Full engineering specifications for a next-generation conference room collaboration device. Dkt. 97 at 33-34.

The court concludes that the SAC adequately alleges independent economic value with respect to some categories concerning some subject matters purportedly misappropriated by He but not for those concerning others.  With respect to design documents and hardware diagrams for headset prototypes, plaintiff alleges that the resources invested in this information include a "careful orchestration" of the prototypes' "component selection and layout," which "require[s] the coordinated efforts of a team of engineers for many months" and allows plaintiff "to manufacture [its headset products] for resale at a scale at a competitive cost."  SAC ¶ 134.   Based on this alleged effort and resulting manufacturing advantage, the court concludes that plaintiff adequately alleged independent economic value with respect to this category of information concerning this subject matter.

In their briefing, He and Plantronics advance arguments on this issue similar to those previously raised with regard to Chung.  First, they argue that plaintiff failed to establish that third parties were willing to pay for access to its alleged trade secrets.  Dkt. 123 at 4.  Second, they argue that plaintiff failed to show that the information purportedly misappropriated by He is, in fact, secret or derives economic value from its secrecy, Dkt. 123 at 6; Dkt. 118 at 4-8.

These arguments fail for the same reasons described in Section B.1.a. above with respect to the specifications, EA document, and collaboration opportunities information purportedly misappropriated by Chung.  Separately, He relies upon circular logic when characterizing the headset prototype designs as public information.  Dkt. 118 at 5 ("This information is simple public knowledge as people in the industry already know this.").  And even if, as He contends, this information were founded upon "standard concepts" of physics and sound, id., the specific application of those concepts to the designs at issue may still be secret.  In any event, whether the headset designs purportedly misappropriated by He qualify as matters within the public knowledge is a question of fact

13

better suited for a summary judgment motion.  Accordingly, these residual challenges do not alter the above conclusion that plaintiff adequately alleged the independent economic value of its design documents and hardware diagrams for headset prototypes.

Separately, with respect to its vendor product roadmaps, plaintiff alleges that the resources invested in this information include its "buying power" and "extensive purchasing history with [its] vendors," and that it values this information "because it facilitates product development planning."  Id.  Stated differently, it appears plaintiff's theory of investment with respect to this information rests upon its role as a historically major purchaser in the electronic components market.  Plaintiff fails to offer any explanation about how such industry status itself qualifies as a viable theory of investment in its development of the subject information.[4]  Accordingly, the court finds this theory of investment implausible and concludes that plaintiff failed to allege the independent economic value of this information.

Plaintiff also failed to adequately allege the independent economic value of the categories of information concerning the remaining subject matters previously determined as described with sufficient particularity.  First, while plaintiff alleges that its full engineering specifications "reflect the materials that Cisco sends to its manufacturing partners to enable them to physically make the products without duplicating Cisco's iterative design process," id ¶ 134, plaintiff neglects any explanation about how its full engineering specifications *for a next-generation conference room collaboration device* itself maintains independent economic value.  Similar to its allegations about the independent economic value of its source code purportedly misappropriated by Chung, allegations of the value of this category of information not expressly tethered to a

---

[4] In any event, the court also questions whether plaintiff may maintain any trade secret right in the product development plans of the third-party vendors who manufacture those input components.  Based on plaintiff's description of that information, SAC ¶ 134 ("vendors . . . provide information *about their own product pipelines* before that information becomes publicly available) (emphasis added), it appears that that information, while shared with plaintiff for product development purposes, is actually owned by the vendors.

particular subject matter at issue is insufficient.

Second, with respect to design details and schematics for its unreleased IP telephone project, plaintiff summarily alleges that it "invests heavily" in this project, including in its work on IP telephone products that "do not become commercially available." Id. ¶ 134. Plaintiff adds that as with its "commercially available products, Cisco's unreleased products require thousands of hours of engineering time . . . [and] reflect negative know-how . . . Thus, design details and schematics for the unreleased IP telephone project are valuable at least because they embody know-how that is part of the corpus of engineering knowledge that Cisco uses to develop its cutting-edge collaboration product portfolio." Id. While plaintiff may dedicate significant engineering time to its "unreleased products" in general, plaintiff fails to allege that it dedicates such engineering resources to its unreleased IP telephone project in particular. Accordingly, the court concludes that plaintiff failed to allege the independent economic value of this information.

Separately, plaintiff advances the same two alternative grounds to show the independent economic value of the information purportedly misappropriated by He that it relied upon with respect to Chung. First, plaintiff takes precautions to protect the secrecy of the information purportedly misappropriated by He. Dkt. 121 at 11; Dkt. 120 at 9-10. Second, as shown by Plantronics' decision to hire He and his use of the information purportedly misappropriated by him while at Plantronics, others were willing to pay for access to such information. Dkt. 121 at 12; Dkt. 120 at 10.

The court already rejected each of these arguments. While plaintiff does allege that He used its trade secrets at Plantronics, plaintiff extrapolates that conduct from He's "accessing" the subject information. SAC ¶ 136 ("In particular, Mr. He used the trade secrets in the course and scope of his employment at Poly, for which he was paid a salary. For example, while employed and paid by Poly, Mr. He accessed at least the schematic for . . . "). Without more, such access, unspecified in scope, does not compel the inference that others would pay for the accessed information. Accordingly, these

1   grounds do not provide a basis to conclude that the information purportedly

2   misappropriated by He, as a categorical matter, maintain independent economic value.

3       In short, the court concludes that plaintiff adequately alleged that the design

4   documents and hardware diagrams for its headset prototypes maintain independent

5   economic value. However, with respect to any category of information concerning the

6   remaining subject matters, the court concludes that plaintiff failed to allege their

7   independent economic value. Again, such information may not serve as a basis for

8   plaintiff's trade secrets claims.

9       **2.   Plaintiff Adequately Alleged that It Suffered Harm as a Result of He's**

10      **Purported Misappropriation**

11      He separately argues that plaintiff failed to allege harm as a result of the

12   information that he allegedly misappropriated. Dkt. 118 at 8-9.

13      **a.   He Did Not Waive His New Argument**

14      As a threshold matter, He did not raise this argument in his initial motion to

15   dismiss. Given that, plaintiff contends that he may not do so now. The court disagrees.

16   In relevant part, Rule 12(g) states that the following:

> "Except as provided in Rule 12(h)(2) or (3), a party that makes
> a motion under this rule must not make another motion under
> this rule raising a defense or objection that was available to the
> party but omitted from its earlier motion." Fed. R. Civ. Pro.
> 12(g)(2).

20      As used in Rule 12, a "defense" includes the various challenges listed at Rule

21   12(b)(1)-(7), including, for example, failure to state a claim. Fed. R. Civ. Pro. 12(b) ("But

22   a party may assert the following defenses by motion . . ."). Rule 12 does not define,

23   albeit expressly or contextually, what qualifies as an "objection." Plaintiff failed to proffer

24   any authority for the proposition that He's new argument, which challenges the adequacy

25   of the factual allegations, is a "defense or objection" that is subject to waiver within the

26   meaning of Rule 12(g). Fed. R. Civ. Pro. 12(g)(2).

27      Plaintiff's reliance upon to Hernandez v. City of San Jose, 241 F. Supp. 3d 959

28   (N.D. Cal. 2017) does not remedy that shortcoming. In relevant part, that decision

1   involved a municipal defendant's attempt to raise an immunity defense under the

2   California Government Code for certain discretionary acts of its employees.  241 F. Supp.

3   3d at 984-85, aff'd in part, dismissed in part, 897 F.3d 1125 (9th Cir. 2018) ("Thus, if the

4   defense of § 820.2 immunity was available to the City Defendants in the first motion to

5   dismiss and the City Defendants failed to raise the defense in the first motion to dismiss,

6   then the City Defendants may not raise the defense in the instant second-round motion to

7   dismiss.").  Given that plaintiff failed to show that He waived his new argument by not

8   raising it in the first motion, the court will consider its merits.

9             **b.      He's New Argument Fails on the Merits**

10            "California courts have presumed irreparable harm when proprietary information is

11  misappropriated."  Albert's Organics, Inc. v. Holzman, 2020 WL 1332074, at *5 (N.D. Cal.

12  Mar. 23, 2020).

13            Here, the court concludes that plaintiff adequately alleged that it suffered harm as

14  a result of He's alleged conduct.  On May 30, 2019, He obtained the subject information

15  by copying "Confidential Materials, including architectural design documents relating to

16  Cisco's unreleased headset concepts to a LaCie external hard drive . . . ('LaCie Drive')."

17  SAC ¶¶ 109, 120.  In his opening brief, He acknowledges that the information he

18  "downloaded" qualifies as "proprietary" under his PIIA.  Dkt. 118 at 3.  He does not

19  expressly challenge the adequacy of the allegations that he misappropriated the subject

20  information.  Instead, He characterizes the SAC as alleging only mere possession.  Id. at

21  9.  He challenges the sufficiency of the misappropriation allegations as a subtle and

22  improper invocation of the debunked "inevitable disclosure doctrine."  Id.

23            The court disagrees.  He left plaintiff's employment on June 21, 2019.  Id. ¶ 121.

24  At that time, He "retained" the LaCie Drive, id. ¶ 121, and, on multiple occasions following

25  that date, accessed its contents.  Id. ¶¶ 124-26.  While made on information and belief,

26  plaintiff alleges that He accessed the subject information "for his own benefit, and for the

27  benefit of Poly, to Cisco's detriment."  Id. ¶ 127.  Contrary to He's characterization, these

28  allegations amount to more than mere possession.  Because He failed to challenge his

United States District Court
Northern District of California

17

1   alleged misappropriation on any other basis, the court concludes that plaintiff has

2   adequately alleged misappropriation and, thus, presumes harm.

3   He also argues that plaintiff proffered only conclusory allegations that it suffered

4   harm as a result of his conduct.  Dkt. 118 at 8.  That argument misses the point.  Absent

5   a challenge to the sufficiency of plaintiff's misappropriation allegations, the court may

6   presume harm when proprietary information is misappropriated.  In any event, the level of

7   detail necessary to satisfactorily allege harm is not demanding.  Mintel Learning Tech.,

8   Inc. v. Ambow Educ. Holding Ltd., 2012 WL 762126, at *3 (N.D. Cal. Mar. 8, 2012)

9   (allegations of "lost profit" and "unjust enrichment" resulting from alleged misappropriation

10  suffice); Top Agent Network, Inc. v. Zillow, Inc., 2015 WL 10435931, at *4 (N.D. Cal. Aug.

11  6, 2015) ("While later crossroads in this case will no doubt demand of [plaintiff] a more

12  particularized showing of damages, its present allegations that it 'suffered significant

13  harm, both financially and to its goodwill and reputation,' while [defendant] enjoyed a

14  surge in stock price and market value 'due in large part to the launch of its competing

15  product,' are not so vague that this claim should fail to advance.").

16  Here, plaintiff alleges that "if [the information misappropriated by He] were to

17  become public, competitors could exploit them to shorten their own development

18  timelines" and that knowledge of Cisco's designs would enable a competitor to "tailor its

19  own solutions to anticipate Cisco's product roadmap," which would deprive it of a "first-

20  mover advantage."  SAC ¶ 137.  These allegations are sufficiently detailed to support

21  plaintiff's assertion that He's alleged misappropriation has caused or will continue to

22  cause it "detriment."  Id. ¶¶ 127, 262, 269.  At this juncture in the litigation, plaintiff has

23  adequately shown harm on this separate ground.

24  **3.    Plaintiff Failed to Allege a Cognizable Basis for Its Intentional**

25  **Interference with Contract Claim**

26  California Civil Code § 3426.7(b) "preempts common law claims that are based on

27  the same nucleus of facts as the misappropriation of trade secrets claim for relief."  K.C.

28  Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc., 171 Cal. App. 4th 939, 958

United States District Court
Northern District of California

1   (2009).

2          In its prior order, the court concluded that "plaintiff failed to allege an intentional

3   interference with contract claim that arises out of a set of operative facts distinct from

4   those relied upon to support its trade secrets misappropriation claims." Dkt. 97 at 44.  To

5   support that conclusion, the court reasoned that plaintiff relied upon the same sort of

6   communications between Williams and Puorro to support both sets of claims. Id. at 44-

7   45.  In relevant part, the court expressly compared plaintiff's reliance upon Williams'

8   communication concerning customers available for poaching (proffered to support the

9   intentional interference with contract claim) with its citation to FAC paragraph 258 to

10  support its trade secrets claims.  Id. at 45 n.14.  Significantly, that allegation, now detailed

11  at SAC ¶ 273, provides that the categories of information purportedly misappropriated by

12  Williams "include Cisco's . . . sales opportunities and customer lists . . ." Dkt. 108-1 at 52

13  (comparing FAC ¶ 258 to SAC ¶ 273).  Earlier in its May 26 order, the court also

14  determined that plaintiff alleged the information purportedly misappropriated by Williams

15  with sufficient particularity because plaintiff qualified these categories of information to

16  subject matters concerning, in part, "plaintiff's collaboration business" and "certain

17  marketing opportunities," Dkt. 97 at 29-30.[5]

18         In its SAC, plaintiff added six paragraphs of allegations in its attempt to proffer a

19  set of facts in support of its intentional interference claim that is distinct from their trade

20  secrets claims counterparts.  Those allegations concern Williams' purported attempts to

21  solicit the business of a then-existing Cisco customer, ReadyRoom, during a meeting

22  with its chief executive officer, Aaron McCardle ("McCardle"), on September 3, 2019.

23  SAC ¶¶ 179-183, 325.  Plaintiff alleges that Williams informed Puorro that "he was

24  meeting with a Cisco partner named RoomReady (also known as 'Zeller Digital' or 'ZDI')

25  and said that he was '[l]ooking at them from the Cisco lens.  I could easily change that

26

27  _____

28  [5] In its briefing in opposition to Plantronics' first motion to dismiss, plaintiff characterized
    the information purportedly misappropriated by Williams as including "Cisco's future plans
    for particular collaboration products." Dkt. 51 at 13 (citing FAC ¶ 169).

United States District Court
Northern District of California

1   lens though.'" Id. ¶ 179. On information and belief, plaintiff then alleges that Williams and

2   Puorro "agreed" that Williams "would pursue the RoomReady opportunity on Poly's

3   behalf despite the fact that Mr. Williams was still employed by Cisco." Id.  Williams

4   allegedly put a then-consultant (presently Plantronics' Chief Revenue Officer) in contact

5   with McCardle and, on information and belief, those latter two then discussed partnership

6   opportunities.  Id. ¶ 182.  Plaintiff alleges that, through his participation in the above

7   events, Puorro "induc[ed] Mr. Williams to breach his duty of loyalty to Cisco."  Id. ¶ 325.

8          Here, the court again concludes that plaintiff failed to allege an intentional

9   interference with contract claim that arises out of a set of facts distinct from those relied

10  upon to support its trade secrets claims.  Throughout its additions, plaintiff generally

11  describes its intention toward RoomReady as an "opportunity," SAC ¶¶ 179,182-83, and

12  its relationship with RoomReady as a partnership, id. ¶¶ 179-83.  In one instance, though,

13  plaintiff cites Williams' description of RoomReady as a "[c]ollaboration" partner, id. ¶ 180,

14  which is the same adjective that plaintiff used to qualify the products forming the subject

15  matter of the "sales opportunities and customer lists" category of information that it also

16  alleges Williams misappropriated.  Dkt. 97 at 29 (citing Dkt. 51 at 13 ("Within those

17  categories of information, Cisco alleges with particularity the subject matter of specific

18  trade secrets that Mr. Puorro induced Mr. Williams to take. . . . Additionally, the FAC

19  alleges that Mr. Puorro induced Mr. Williams to misappropriate information about . . .

20  Cisco's future plans for particular **collaboration** products.")) (emphasis added).  When

21  analyzed along with plaintiff's other allegations (and its prior representations to this

22  court), the court concludes that the SAC's additions amount to nothing more than a

23  specific instance of Williams' alleged misappropriation of sales opportunities concerning

24  plaintiff's plans for its collaboration products.

25          Other circumstances surrounding the RoomReady incident support this

26  conclusion.  Significantly, that incident occurred on September 3, 2019, which is in the

27  middle of Williams' and Puorro's alleged several month scheme to misappropriate

28  plaintiff's trade secrets.  Additionally, the purported benefactor of Williams' alleged breach

United States District Court
Northern District of California

United States District Court
Northern District of California

1  of his PIIA and duty of loyalty are the same persons—Puorro and Plantronics, and,

2  however labeled, the subject of both the alleged misappropriation and the alleged

3  intentional interference concerns plaintiff's business opportunities with third parties.

4  Further, the unidentified "Consultant" that Williams put McCardle in contact with appears

5  to be the same person to whom Williams emailed certain "market and strategy data"

6  relating to plaintiff's "collaboration business" on June 11, 2019.  SAC ¶ 164.  When

7  reviewed collectively, these shared circumstances in the events underlying the trade

8  secrets claims and the intentional interference claim vitiates the plausibility that the

9  RoomReady incident qualifies as a distinct basis in support of the latter claim.

10      Plaintiff's counterarguments do not change the court's conclusion.  First, plaintiff

11  argues that the two sets of subject claims are distinct because it "has not alleged that

12  either Mr. Williams or Mr. Puorro used or in any way relied on Cisco's trade secrets in

13  their pursuit of RoomReady on Poly's behalf."  Dkt. 121 at 15.  That argument is

14  misplaced.  As shown above, sales opportunities, including those obtained through

15  partnerships, served as one of the sorts of trade secrets purportedly misappropriated by

16  Williams.  It was Williams' act of pursuing that opportunity on behalf of Plantronics that

17  qualified as the alleged misappropriation.

18      Second, plaintiff argues that the RoomReady incident could not qualify as a

19  misappropriation of its customer lists.  Plaintiff reasons that such lists "are eligible for

20  trade secret protection because they are **compilations** of information that are not in the

21  public domain and that reflect investments in customer development from which their

22  owners may gain a competitive advantage."  Id. (emphasis in the original).

23      This argument fails for two reasons.  First, plaintiff fails to proffer any authority

24  acknowledging that a trade secrets claim may not extend to the use of only a single

25  contact in a customer list.  Second, whatever the merits of that proposition, a "customer

26  list" concerning plaintiff's future plans for its collaboration products is not the only relevant

27  category of information that Williams purportedly misappropriated.  As detailed at length

28  above, plaintiff specifically included "sales opportunities" concerning that same subject

1   matter.  Given that, the RoomReady incident remains legally indistinct from the purported

2   misappropriation of the sales opportunities category of information concerning plaintiff's

3   plans for its collaboration products.

4          Lastly, any ex post attempt by plaintiff to recast Williams' alleged involvement in

5   helping Plantronics poach existing clients as a breach of his "duty of loyalty," Dkt. 121 at

6   14-16, is irrelevant here.  That theory, while perhaps accurate as a matter of law, does

7   not itself change the underlying factual basis of the intentional interference claim.  This

8   court's recent decisions are in-line with that conclusion.[6]

9          The court has already allowed plaintiff an opportunity to amend its pleadings to

10  allege a set of facts in support of its intentional interference claim that is distinct from that

11  relied upon to support its trade secrets claims.  Rather than identify a qualifying set of

12  facts, plaintiff merely provided a specific example of Williams' purported misappropriation

13  of some of the information at issue in the trade secrets claims.  Given that failure, it

14  appears plaintiff cannot save this claim by further amendment.  Therefore, the court

15  dismisses the intentional interference claim with prejudice.  As an incident to such

16  dismissal, the court denies as moot defendant's alternative request that the court strike

17  the allegations (SAC ¶¶ 7, 18, 179-83, 325) proffered in support of this claim.

18         **4.     The Court Denies Defendant's Motion to Strike the Remaining**

19                  **Allegations**

20         Plantronics argues that the court should strike various sets of allegations in the

21  SAC.  The court considers each remaining challenge in turn.

22  _____

23  [6] Five Star Gourmet Foods, Inc. v. Fresh Express, Inc., , 2020 WL 513287, at *14 (N.D. Cal. Jan. 31, 2020) ("For example, a claim alleging a violation of a duty of loyalty is not

24  displaced by CUTSA where the duty of loyalty would be violated by undertaking competitive acts, regardless of whether any proprietary information was implicated. . . .

25  However, 'where the allegation is that [a defendant] breached his duty of loyalty *by* disclosing trade secrets, the claim for breach of fiduciary duty is based on the same

26  operative facts and is therefore preempted by CUTSA.'") (emphasis in the original); Albert's Organics, Inc., 2020 WL 1332074, at *6 ("Plaintiff's sixth and seventh claims are

27  based on Akagaki and Laffer's fiduciary duty to Albert's. The alleged breach of their fiduciary duty **was broader than** disclosing trade secrets or confidential information and

28  included a duty not to compete against one's current employer (i.e., a duty of loyalty).") (emphasis added).

United States District Court
Northern District of California

1

### a.     The Court Declines to Strike SAC Paragraphs 99 and 134

Plantronics argues that the court should strike SAC paragraphs 99 and 134 on various grounds.  First, Plantronics argues that those paragraphs violate Rule 10(b). Dkt. 114 at 15 n.3; id. at 16 n.5.  In relevant part, that rule provides the following:

> "A party must state its claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances. . . . If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense." Fed. R. Civ. Pro. 10(b).

The court is well-aware that neither SAC paragraph 99 nor 134 is "limited to a single set of circumstances, but, rather, includes five separate alleged categories of independent economic value, each separated by bullet points with formless blocks of text, one of which is comprised of over 20 lines of text."  Dkt. 114 at 15 n.3; id. at 16 n.5. That said, the court has expended significant resources on both its prior order and the instant order and finds that striking those paragraphs, only to allow plaintiff the opportunity to refile a third-amended complaint, which might then generate further motion practice, is simply unwarranted. As alleged, these paragraphs are sufficiently clear to permit defendants to defend against plaintiff's claims.  In some ways, plaintiff's bullet-pointed pleading per category of information referenced throughout these paragraphs assisted the court in its determination of the underlying issues presented.  Accordingly, the court will exercise its discretion to deny defendant's motion to strike these paragraphs on Rule 10(b) grounds.  Rees v. PNC Bank, N.A., 308 F.R.D. at 271.

Second, Plantronics argues that the court should strike SAC paragraphs 99 and 134 because they "provide vague descriptions of a variety of alleged trade secrets in impermissibly broad categories that fail to meet the appropriated threshold." Dkt. 114 at 16.  The court analyzed at length the allegations of independent economic value in each of those paragraphs in Section B.1.a.-b. above.  As indicated in those subsections, some allegations sufficiently allege the independent economic value of certain categories of information concerning certain subject matters (decided in the court's prior order as described with sufficient particularity) while others do not.  At its conclusion of each

United States District Court
Northern District of California

United States District Court
Northern District of California

1   subsection, the court expressly warned plaintiff against advancing its trade secrets claims

2   under any theory premised upon any information concerning any subject matter for which

3   it failed to adequately allege the independent economic.

4       That said, while those allegations of independent economic value are insufficient

5   to support a cognizable trade secret contained within the remaining categories of

6   information, the court cannot conclude that they clearly have "no possible bearing on the

7   subject matter of the litigation." Colaprico, 758 F. Supp. 1335 at 1339.  Given that low

8   bar and that plaintiff may base its trade secrets claims on only the information discussed

9   at Section 1.a. above, the court will exercise its discretion to deny the motion to strike on

10  these grounds as well.

11      **b.      The Court Declines to Strike SAC Paragraphs 27-137, 212-70,**

12              **298-321, and 329-56**

13      Plantronics argues that the court should strike the trade secrets claims that are

14  based upon the alleged misappropriation by Chung and He, as well as such claims'

15  supporting allegations (SAC ¶¶ 27-137, 212-70, 298-321, and 329-56), because "under

16  Rule 10(b) those claims should have been pleaded as separate causes of actions." Dkt.

17  114 at 17.  As noted above, Rule 10(b) does require a plaintiff to break-out its claims as

18  separate counts "***if doing so*** would promote clarity."  Fed. R. Civ. Pro. 10(b).   While

19  specifying state and federal trade secrets claims against Plantronics premised on the

20  purported misappropriation of each co-defendant (Williams, Chung, and He) would

21  promote clarity, it would also make the operative pleading unnecessarily longer.  Given

22  that whatever net gains to clarity have already been diminished by the parties' extensive

23  motion practice,[7] the significant judicial resources expended to settle the pleadings in this

24

25  [7] In its May 26 order, the court explained that because the FAC "failed to adequately
    allege that the information purportedly misappropriated by Chung and He maintained
26  independent economic value," plaintiff failed to allege any trade secrets claim against
    Plantronics premised upon the purported misappropriation of information by Chung and
27  He.  Dkt. 97 at 41 n.12.  As decided above, plaintiff cured that failure with respect to
    certain of that information.  In its opening brief, Plantronics failed to alternatively argue
28  that it may not be held liable for such misappropriation.  Given that, plaintiff may also
    pursue its trade secrets claims against Plantronics upon such bases.

United States District Court
Northern District of California

1    action, and the need to prevent further expenditure on a potential third round of motion to

2    dismiss briefing, the court denies the motion to strike the above referenced paragraphs

3    on this separate ground.

4         **5.**      **Other Outstanding Items in This Litigation**

5         Shortly before this court issued its prior order, on May 20, 2020, Plantronics

6    moved to stay discovery and, in the alternative, for a protective order. Dkt. 92. Chung

7    and He joined in that motion. Dkt. 99; Dkt. 100. Plaintiff opposed that motion. Dkt. 102.

8    At core, that motion requests that (1) the court stay discovery pending its resolution of the

9    instant second round of motions to dismiss, Dkt. 92 at 8-11, and (2) in the event the court

10   denies that request, it enter a protective order limiting the scope of the discovery requests

11   previously served by plaintiff, id. at 11-15.

12        On May 21, 2020, plaintiff filed a similarly styled motion for entry of a protective

13   order. Dkt. 93. In it, plaintiff moves the court to require the parties to comply with

14   plaintiff's preferred 32-page protective order (Dkt. 93-2) concerning how they handle the

15   information subject to this litigation. According to plaintiff, its proposed protective order is

16   based upon this district's model protective order for litigation involving patents, highly

17   sensitive confidential information and/or trade secrets. Dkt. 93 at 2. Plaintiff previously

18   submitted a redline of its proposed protective order against the above referenced model

19   protective order of this district (Dkt. 81-3 at 33). Dkt. 93 at 5. Plantronics opposed this

20   motion, Dkt. 104, which Chung and He also joined, Dkt. 105; Dkt. 106.

21        At the parties' May 28, 2020 case management conference, the court stayed

22   discovery pending its resolution of the instant motions. Dkt. 98. At that conference, the

23   court directed defendants to file their own proposed protective order as part of their

24   opposition to plaintiff's motion for entry of a protective order and stated that if the parties

25   were unable to stipulate to a protective order, it would choose between the better of the

26   two proffered by defendants and plaintiff. Id. Par for the course, the parties did not

27   stipulate and, as directed, defendants filed their proposed protective order (Dkt. 104-2).

28   According to defendants, their proposed protective order is also based upon this district's

1   model protective order for litigation involving patents, highly sensitive confidential

2   information and/or trade secrets.  Defendants also submitted a redline of their proposed

3   protective order against this district's model protective order (Dkt. 104-4).  Dkt. 104 at 5.

4   The court notes its decision on each of these requests immediately below.

### a.      Discovery May Proceed Once Plaintiff Serves Its Disclosure

6   Here, because the instant order resolves the second round of motions to dismiss,

7   the court denies defendants' requested discovery stay as moot. [8]

8   With respect to the alternative requests for a protective order limiting the discovery

9   already served by plaintiff, the court agrees with defendants that, at this juncture, the

10   requested discovery is procedurally premature.  Plaintiff has not yet served its California

11   Code of Civil Procedure § 2019.210 trade secret disclosure ("CCP § 2019.210 trade

12   secret disclosure").  Accordingly, defendants need not respond to discovery until it has

13   been served with that CCP § 2019.210 trade secret disclosure.

### b.      The Court Adopts Defendants' Proposed Protective Order

15   In relevant part, Rule 26(c) provides that "[a] party . . . from whom discovery is

16   sought may move for a protective order in the court where the action is pending . . . The

17   court may, for good cause, issue an order to protect a party or person from annoyance,

18   embarrassment, oppression, or undue burden or expense, including . . . requiring that a

19   trade secret or other confidential research, development, or commercial information not

20   be revealed or be revealed only in a specified way."  Fed. R. Civ. Pro. 26(c)(1).  This

21   district's model protective orders "set forth presumptively reasonable conditions regarding

22   the treatment of highly confidential information."  In re Lithium Ion Batteries Antitrust

23   Litig., 2017 WL 930317, at *3 (N.D. Cal. Mar. 9, 2017) (Magistrate Judge Ryu).

24   Here, the court will adopt the protective order proffered by defendants.  As an

25   initial matter, that order makes only four sorts of changes to the model protective order,

---

[8] Plaintiff also filed an administrative motion for leave to file a supplemental brief in opposition to Plantronics' motion to stay discovery.  Dkt. 110.  Given that this order on the second round of motions to dismiss resolves the defendants' stay request, the court denies as moot plaintiff's administrative motion for leave.

United States District Court
Northern District of California

1    namely: (1) deleting the order's source code designation, (2) deleting the "designated

2    house counsel" procedures, (3) adding mock jurors to the list of persons who might

3    receive highly confidential information, provided certain protections and (4) permitting

4    disclosure of confidential information to experts without prior notice to the opposing party,

5    provided certain protections.  Dkt. 104-4 (redline).  Given this court's orders on the

6    motions to dismiss, those changes are reasonable under the circumstances.

7         The court cannot say the same about all of plaintiff's proposed changes.  For

8    example, plaintiff attempts to shift the burden of proving the legitimacy of a confidentiality

9    designation to the challenging party (as opposed to the designating party) following the

10   "first instance" that parties cannot a resolve a designation without court intervention.  Dkt.

11   93-2 at 10; Dkt. 81-3 at 42 (redline).  Absent a reason to think that defendants would

12   abuse this process, plaintiff's burden-shifting modification overreaches.  Given that, as

13   well as the breadth of plaintiff's other changes, the court finds that more closely adhering

14   to this district's model protective order better suits the needs of this litigation.

15        The court understands that, as part of its reply, plaintiff attaches what it describes

16   as a "compromise" protective order (Dkt. 109-2).  Dkt. 109 at 2.  The court declines

17   plaintiff's last-minute proffer of a third option.  Plaintiff could have offered this version in

18   initial support of its motion for entry of a protective order.  It did not, so defendant did not

19   have the opportunity to reply to this version.  Moreover, on June 4, 2020, ***after*** the parties

20   had the opportunity to review and potentially adjust their positions on the scope of

21   protections necessary in this litigation, the court allowed them an additional day to file

22   their opposition and reply on the subject motion to "negotiate entry of a stipulated

23   protective order."  Dkt. 103.  They failed to negotiate such entry.  Based on that failure,

24   the court infers that defendants disagree with plaintiff's eleventh-hour proposal.  In any

25   event, certain changes proffered by plaintiff in this version, including, for example, its re-

26   inclusion of provisions concerning source code, do not appear necessary under the

27   circumstances of this case.  As decided above, plaintiff failed to allege the independent

28   economic value of its source code for debugging user interface, which, based on

United States District Court
Northern District of California

1  plaintiff's additions in its SAC, appears to have been the only source code that it

2  described with sufficient particularity and alleged to maintain independent economic

3  value.  Accordingly, the court orders that the parties must, except as modified by the

4  court,[9] comply with the protective order proffered by defendants (Dkt. 104-3), which the

5  court files concurrently with this order.

6  **CONCLUSION**

7  For the above reasons, the court rules as follows:

8  - Plantronics's and Puorro's motion to dismiss is **GRANTED IN PART** and

9  **DENIED IN PART.**

10  - Chung's motion to dismiss is **DENIED**.

11  - He's motion to dismiss is **DENIED**.

12  - Plantronics' motion to stay discovery is **DENIED** and, in the alternative, for

13  a protective order is **GRANTED**.

14  - Plaintiff's motion for entry of a protective order is **DENIED**.

15  **IT IS SO ORDERED.**

16  Dated:  August 5, 2020

17  /s/ Phyllis J. Hamilton

18  PHYLLIS J. HAMILTON
   United States District Judge

19

20

21

22

23

24

25

26

27

28

---

[9] It appears defendants mistakenly failed to remove paragraph 8 "Prosecution Bar" from their proposed order.  Dkt. 104-3 at 13 (highlighting this section as "optional").  Given that, the court will strike that paragraph in its entirety.