1  RUSSELL HAYMAN (SBN 110643)
rhayman@mwe.com
2  JON DEAN (SBN 184972)
jdean@mwe.com
3  JASON D. STRABO (SBN 246426)
jstrabo@mwe.com
4  MICHELLE LOWERY (SBN 302882)
mslowery@mwe.com
5  TALA JAYADEVAN (SBN 288121)
tjayadevan@mwe.com
6  McDERMOTT WILL & EMERY LLP
2049 Century Park East, Suite 3200
7  Los Angeles, CA 90067-3206
(310) 277 4110
8

9  AMOL PARIKH (admitted *pro hac vice*)
amparikh@mwe.com
10  KATHARINE M. O'CONNOR (admitted *pro hac vice*)
koconnor@mwe.com
11  HAN CUI (admitted *pro hac vice*)
hcui@mwe.com
12  McDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
13  Chicago, IL 60606
(312) 372 2000
14

15  Attorneys for Defendants
PLANTRONICS, INC. AND THOMAS PUORRO

16                THE UNITED STATES DISTRICT COURT
17                NORTHERN DISTRICT OF CALIFORNIA
                              OAKLAND
18

| 19  CISCO SYSTEMS, INC., a California Corporation, CISCO TECHNOLOGY, INC., a California Corporation | CASE NO. 4:19-cv-07562-PJH |
|---|---|
| Plaintiffs, | **DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DOMINIC PERSECHINI** |
| v. | [Declaration of Michelle Lowery, filed concurrently herewith; [Proposed] Order lodged concurrently herewith] |
| WILSON CHUNG, JAMES HE, JEDD WILLIAMS, and THOMAS PUORRO, individuals, and PLANTRONICS, INC. dba POLY, a Delaware Corporation | Date: January 18, 2023 Time: 1:30 p.m. Judge: Hon. Phyllis J. Hamilton |
| Defendants. | |

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

1

## TABLE OF CONTENTS

2   SUMMARY OF OPINIONS ............................................................................................3

3      A.   Mr. Persechini purports to value the allegedly disclosed trade secret
            information regarding Project Sunkist and Project Polaris............................3
4      B.   Mr. Persechini admits there is no evidence of any actual loss to Cisco or
            unjust enrichment to Poly, so he purports to calculate reasonable royalty
5           damages...........................................................................................................4
       C.   Despite no evidence of use, Mr. Persechini calculates his reasonable royalties
6           by using Cisco's forecasted development costs................................................5

7   LEGAL STANDARD ....................................................................................................6

8   ARGUMENT .................................................................................................................8

9      I.    Mr. Persechini's entire reasonable royalty opinion does not fit the facts of the
             case..................................................................................................................8
10
       A.   The facts do not support the opinion that Poly would pay a reasonable
11          royalty. ...........................................................................................................8
       B.   Mr. Persechini's use of *all* of Cisco's forecasted development costs is
12          based on the unsupported assumption that Cisco's *entire* investment
            *could* be lost. ...............................................................................................11
13
       II.   Mr. Persechini's opinion is independently excludable as unreliable because he
14           uses *Cisco's forecasted* development costs to calculate his baseline royalties.
             .......................................................................................................................12
15
       A.   Mr. Persechini does not reliably apply principles and methods to
16          explain his use of Cisco's forecasted development costs for his
            baseline royalties............................................................................................13
17     B.   Mr. Persechini's blind reliance of Cisco's forecasted development
            costs without any independent testing is unreliable as a matter of law.
18          .......................................................................................................................14

19            1.   *Mr. Persechini did not adjust his forecasted development costs*
                   *for known error rates, nor confirm that Cisco's forecasts were*
20                 *reasonable.* ................................................................................14
              2.   *Mr. Persechini prorates his forecasted developments costs,*
21                 *despite evidence that the forecasts were not accurate as to*
                   *timing.* .........................................................................................15
22
       III.  Mr. Persechini fails to apportion damages to the alleged trade secrets. ..........17
23
       IV.   Mr. Persechini's purported adjustments to his baseline royalties are unreliable.
24           .......................................................................................................................20

25  CONCLUSION............................................................................................................24

26

27

28

- i -
DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ajaxo, Inc. v. E\*Trade Financial Corp.*,
  48 Cal. App. 5th 129 (Cal. Ct. App. 2020) ...................................................................9

*Bogosian v. Mercedes–Benz of No. America, Inc.*,
  104 F.3d 472, 479 (1st Cir. 1997) ...............................................................................8

*Carbo Ceramics, Inc. v. Keefe*,
  166 Fed. App'x 714 (5th Cir. 2006) ...........................................................................12

*Daubert v. Merrell Dow Pharms, Inc.*,
  509 U.S. 579 (1993) ............................................................................................. *passim*

*Dean v. Thermwood Corp.*,
  No. 10-CV-433-CVE-PJC, 2012 WL 90442 (N.D. Okla. Jan. 11, 2012).........................14, 15

*ePlus, Inc. v. Lawson Software, Inc.*,
  764 F. Supp. 2d 807 (E.D. Va. 2011) .........................................................................20

*General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).......................................7, 13, 16

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.
  1970) .............................................................................................................. *passim*

*In re Avaya Inc.*,
  No. 17-10089 (SMB), 2018 WL 1940381, at \*8 (Bankr. S.D.N.Y. Apr. 23, 2018),
  *aff'd* 602 B.R. 445 (S.D.N.Y. May 6, 2019)...........................................................17

*Kolcraft Enterprises, Inc. v. Chicco USA, Inc.*,
  No. 09 C 03339, 2018 WL 10772693 (N.D. Ill. July 16, 2018) ..........................11, 12

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999).........................................................................................6, 7, 20

*LivePerson v. [24]7AI*,
  No. 17-CV-01268-JST, 2018 WL 6257460 (N.D. Cal. Nov. 30, 2018)................................19

*Mettler-Toledo, Inc. v. Fairbanks Scales, Inc.*,
  No. 9:06-CV-97, 2008 WL 11348468 (E.D. Tex. Oct. 27, 2008) .........................20

*MSC Software Corp. v. Altair Eng'g, Inc.*,
  No. CV 07-12807, 2015 WL 13273227 (E.D. Mich. Nov. 9, 2015) ......................19

- ii -
DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

*Rand A Tech. Corp. v. Parametric Tech. Corp.*,
  No. 03-CV-11046-MEL, 2005 WL 6768210 (D. Mass. Oct. 19, 2005)...........................14, 15

*Redfoot v. B.F. Ascher & Co.*,
  No. C 05-2045 PJH, 2007 WL 1593239 (N.D. Cal. June 1, 2007) (J. Hamilton) ................7, 8

*Rovid v. Graco Children's Prods. Inc.*,
  No. 17-cv-01506-PJH, 2018 WL 5906075 (N.D. Cal. Nov. 9, 2018) (J. Hamilton).....6, 11, 16

*Sloan Valve Co. v. Zurn Indus., Inc.*,
  33 F. Supp. 3d 984 (N.D. Ill. 2014) ....................................................................................12

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
  188 F.3d 11 (1st Cir. 1999)..................................................................................................14

*Waymo LLC v. Uber Techs., Inc.*,
  No. C 17-00939 WHA, 2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) .............................17, 20

**Statutes**

18 U.S.C. § 1836(b)(3)(B)(ii) ...............................................................................................8

Cal. Civ. Code § 3426.3(b) ..................................................................................................8

**Other Authorities**

Federal Rule of Evidence 402 ...............................................................................................7

Federal Rule of Evidence 403 ...............................................................................................7

Federal Rule of Evidence 702 .................................................................................... *passim*

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 18, 2023, at 1:30 p.m. in the District Court for the Northern District of California, Oakland Division, Defendant Plantronics, Inc. ("Poly") will and hereby do move pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993), for an order excluding the testimony of Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc.'s (collectively, "Cisco") damages expert Domonic Persechini.

For the reasons stated in Poly's Memorandum of Points and Authorities, Poly requests that the Court exclude Mr. Persechini's expert testimony in its entirety.

## MEMORANDUM OF POINTS AND AUTHORITIES

Cisco seeks to have its damages expert, Dominic Persechini, offer purported expert opinion regarding arbitrary damages figures untethered to the facts of this case. Mr. Persechini's opinion falls far below the relevance and reliability requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and should be excluded in its entirety for the following four independent reasons.

*First*, Mr. Persechini's entire reasonable royalty opinion fails the relevance requirement of *Daubert* because it does not "fit" the facts of the case. Mr. Persechini has simply cloaked a wholly flawed and unreliable opinion on damages within a *Georgia-Pacific* hypothetical negotiation that is devoid of any connection to the actual facts of the case. Indeed, Mr. Persechini erroneously assumes, without explanation or analysis, that a party that never used a trade secret would pay a reasonable royalty for that trade secret. Given that he admits that Poly never used the alleged trade secrets at any point in time, the entire premise of his reasonable royalty opinion—that a willing licensee would pay for a license it knows it has not and will not use—is fundamentally flawed. Additionally, Mr. Persechini's use of *all* of Cisco's forecasted development costs as the starting point for his presumed baseline royalties is based on the unsupported assumption that Cisco's *entire* investment in Projects Sunkist and Polaris (the only categories of trade secrets at issue here) *could* be lost, despite that Mr. Persechini admits that none of the investment was actually lost, and both parties to the hypothetical

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE TESTIMONY OFDOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

negotiation would know that the none of the investment was actually lost.  The opinion does not meet the requirements of Rule 702 and *Daubert*.

**Second**, Mr. Persechini's opinion should be further excluded as unreliable because he uses *Cisco's forecasted* development costs to calculate his baseline royalties.  Indeed, Mr. Persechini fails to analyze and explain why *Cisco's* forecasted development costs is a reliable metric for *Poly's* development costs, which is his entire flawed starting point for the ultimate royalty he assumes Poly would pay in a hypothetical *Georgia-Pacific* negotiation.  Additionally, Mr. Persechini's blind reliance of Cisco's *forecasted* development costs without any independent testing is unreliable, particularly in light of the fact that Mr. Persechini's own analysis of Cisco's forecasted revenue shows that Cisco's forecasting is not accurate.

**Third**, Mr. Persechini admits that the allegedly disclosed trade secrets are only a part of Projects Sunkist and Polaris, yet he admittedly fails to properly apportion between the parts of the projects that relate to the alleged trade secrets and the non-trade secret components.  More specifically, Mr. Persechini uses the entirety of Cisco's alleged forecasted development costs for Projects Sunkist and Polaris without apportioning out the costs that are not attributable to the trade secrets in this case.  As a result of his failure to apportion, Mr. Persechini included costs in his reasonable royalty for information that is not even at issue in this case.  He also has no opinion as to a reasonable royalty for any specific document or any specific piece of information, which is not helpful for the jury in the event that the jury finds some documents are not misappropriated, or some information is not a trade secret.

**Fourth**, Mr. Persechini's purported adjustments to his baseline royalties based on the *Georgia-Pacific* factors are unreliable because he fails to explain how he arrived at his final reasonable royalty based on his analysis of the factors, he otherwise admits he has no factual support for and is not qualified to give certain opinions, and some of his opinions are self-contradictory.

Mr. Persechini's opinions do not comport with the requirements of Rule 702 or *Daubert* and are inadmissible and should be excluded.

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

## SUMMARY OF OPINIONS

Mr. Persechini is an economic consultant and damages expert.  (Ex. 1, Persechini Expert Report ¶ 4.)  Although he has worked in that capacity for over 17 and a half years, Mr. Persechini has only testified in **one** other trade secret case outside of this case and the related arbitration, and has **never** calculated a reasonable royalty in a trade secret case prior to this case.  (Ex. 2, Persechini Dep. at 6:15-19, 7:16-9:15, 10:12-25.)   Cisco's counsel retained Persechini to provide damages opinions resulting from the alleged misappropriation of Cisco's alleged trade secrets.  (Ex. 1, ¶ 1.)

A.   **Mr. Persechini purports to value the allegedly disclosed trade secret information regarding Project Sunkist and Project Polaris.**

The alleged trade secrets at issue in this case are information related to Project Sunkist and Project Polaris, all of which were allegedly disclosed in documents that Dr. Wilson Chung allegedly misappropriated.  (*Id.* ¶ 1, Ex. 2, Dep. at 38:19-38:24.)  Project Sunkist is Cisco's internal name for Cisco's 730 Headset, which launched commercially in the fall of 2019.  (Ex. 1, ¶ 20.)  Mr. Persechini claims two documents allegedly disclosed the Sunkist trade secrets.  (*Id.* ¶¶ 21-22.)   The first document is a two-page Excel spreadsheet that has no confidentiality markings on it titled Endpoints and Accessories.xlsx (the "EA Document").  (*Id.* ¶ 32, Figure 3.)  The only information in this Excel spreadsheet that Cisco is claiming is a trade secret is one row of information regarding Project Sunkist.  (*Id.*)  Mr. Persechini claims that this one row discloses eight pieces of information that constitute Projects Sunkist trade secrets: (1) the product model number; (2) that it would have a USB connection; (3) that it would have a 3.5 mm port; (4) that it would be dual Bluetooth; (5) that it would have stereo sound; (6) ███████████████████████████; (7) Qualcomm would supply the chipset; and (8) the chipset would be the QCC5120[1].  (*Id.* ¶ 31.)

The second document that allegedly disclosed Cisco's Sunkist trade secrets is not a Cisco document at all, but rather an email Dr. Chung wrote on June 4, 2019, to other Poly employees (the "June 4 Email").  (*Id.* ¶ 28.)  Mr. Persechini claims that the June 4 Email contains 11 pieces of information that constitute Project Sunkist trade secrets: (1) Cisco was working on a Bluetooth

---

[1] The QCC5120 was not even the chip that was eventually used in the 730 headset.  (*Id.* ¶ 31, n.75.)

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

headset; (2) the headset would have hybrid ANC; (3) when Cisco would announce Project Sunkist; (4) when Project Sunkist would likely be released; (5) what chipset Project Sunkist would use; (6) that Project Sunkist would be boomless; (7) that Cisco would develop on-ear and ███████ ███ ; (8) Project Sunkist would include an elongated headset cup to house the microphones; (9) aspects of Project Sunkist's microphone design; (10) Cisco was investing heavily in Project Sunkist; and (11) ███████████████████████ .  (*Id.*)

Project Polaris was Cisco's code name for Cisco's Webex Desk Pro product, which launched in November 2019.  (*Id.* ¶ 33.)  Mr. Persechini admits that he has "not reviewed any evidence in this matter indicating that Dr. Chung shared the Polaris Trade Secrets with Poly or that Poly incorporated the Polaris Trade Secrets into its products or otherwise utilized the Polaris Trade Secrets."  (*Id.* ¶ 47.)

**B.**    **Mr. Persechini admits there is no evidence of any actual loss to Cisco or unjust enrichment to Poly, so he purports to calculate reasonable royalty damages.**

Mr. Persechini admits that Cisco suffered no actual loss—no lost profit, no lost revenue, no lost sale, and no lost investment.  (Ex. 2, 45:13-45:20, 141:15-143:7, 149:12-153:5.)  Mr. Persechini also admits that Poly was not unjustly enriched.  (Ex. 1, ¶ 104.)  Instead, he purports to measure damages using reasonable royalties.  (*Id.* ¶ 106.)  In calculating the reasonable royalties, Mr. Persechini assumes that the parties to the hypothetical negotiation for the alleged Sunkist and Polaris trade secrets are Cisco and Poly.  (*Id.* ¶ 114.)  Hence, he offers damages opinions only as to Poly's alleged misappropriation and has no opinions as to the individual defendants' (Mr. Puorro and Dr. Chung) alleged misappropriation.  (Ex. 2, 38:6-38:9.)

Mr. Persechini further assumes that the date of the hypothetical negotiation will be either February 26, 2019, the date the EA Document was allegedly misappropriated, or June 4, 2019, the date of the June 4 Email, for the allegedly misappropriated Sunkist trade secrets, and February 26, 2019, for the allegedly misappropriated Polaris trade secrets.  (Ex. 1, ¶¶ 111-113.)  His sole basis for selecting February 26, 2019, as the date of the hypothetical negotiation for the allegedly misappropriated Polaris trade secrets is that Cisco's counsel told him to assume that the alleged Polaris trade secrets were misappropriated on that date.  (Ex. 2, 40:2-40:12.)

DM_US 191232228-28.074958.0018

Mr. Persechini applies the "Book of Wisdom" convention to his reasonable royalty analysis, where the parties consider facts and evidence "ex post" to the date of the hypothetical negotiation. (Ex. 1, ¶ 116.)

## C.   Despite no evidence of use, Mr. Persechini calculates his reasonable royalties by using Cisco's forecasted development costs.

Without providing any evidence of Poly ever using Cisco's alleged Sunkist and Polaris trade secrets, Mr. Persechini purports to use a cost approach to calculate the reasonable royalties that the parties would agree to at a hypothetical negotiation.  (*Id.* ¶¶ 120-121, 127-130; Ex. 2, 46:6-46:9.)  As the starting point of his calculation, Mr. Persechini used *all* of *Cisco's forecasted* development costs for Projects Sunkist and Polaris through the date of the alleged misappropriation,[2] on the assumption that Cisco's entire investment in these projects *could* be lost.  (Ex. 1, ¶¶ 141, 151.)  Mr. Persechini never analyzed Poly's development costs in his analysis.   (Ex. 2, 47:11-47:19.)   Nor did he independently test the accuracy of Cisco's forecasted development costs, despite knowing that Cisco's forecasting is not accurate as its forecasted revenue was not comparable to Cisco's actual revenue.  (*Id.* at 67:4-70:8, 80:12-80:22, 81:17-83:7.)  Nor did he check to see if Cisco's forecasted development costs were even a reasonable starting point as compared to the development costs of any similar products in the industry.  (*Id.* at 54:17-56:10, 89:2-89:15, 94:7-94:11.)

Importantly, Mr. Persechini also never apportioned any of Cisco's forecasted development costs between any of the alleged trade secret information as disclosed in the allegedly misappropriated Sunkist and Polaris documents on the one hand and the costs of development that are unattributable to the alleged trade secrets on the other.  (*Id.* at 104:16-104:25, 108:2-18, 108:19-110:6, 161:10-166:8.)  He simply uses all forecasted development costs through his assumed date of alleged misappropriation for Projects Sunkist and Polaris without any apportionment.   (*Id.*)  Accordingly, Mr. Persechini calculates that the baseline royalty for the alleged Sunkist trade secrets is ▮▮▮▮▮ assuming February 26, 2019 is the date of misappropriation, or ▮▮▮▮▮ assuming

---

[2] Mr. Persechini did not include capital asset expenses for Project Polaris. Project Sunkist does not have any capital asset expenses.  (Ex. 2, 116:22-117:10.)

- 5 -
DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

June 4, 2019 is the date of misappropriation.  (*Id.* ¶ 141.)  Mr. Persechini further calculates that the baseline royalty for the alleged Polaris trade secrets is ███████ assuming February 26, 2019 is the date of misappropriation.  (*Id.* ¶ 151.)

Mr. Persechini then purports to adjust his baseline royalties based on the *Georgia-Pacific* factors.  (*Id.* ¶ 309, Figure 43 (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).)  Of the 15 *Georgia-Pacific* factors, Mr. Persechini opines that Factor 4 would adjust the royalties upward, Factors 7, 10, and 13 would adjust the royalties downward, and all other factors (with the exception of Factor 15, which is a synthesis of the first 14 factors) would remain neutral.  (*Id.*)  From there, he concludes that the baseline royalties should be reduced by ████ for Project Sunkist and ████ for Project Polaris under Factor 13, which he did not calculate using Poly's cost of capital return on investment, but rather *Cisco's internal projections for its cost of capital*.  (Ex. 2, 233:23-234:3.)  He then further reduced his baseline royalties to the final reasonable royalty numbers based on Factors 4, 7, and 10 without any dollar-by-dollar or factor-by-factor allocation.  (*Id.* ¶¶ 312-314.)  He simply concludes that the final reasonable royalty for the alleged Sunkist trade secrets should be reduced to $1.25 million assuming a date of misappropriation of February 26, 2019, or $2.25 million assuming an alternative date of misappropriation of June 4, 2019, and the final reasonable royalty for the alleged Polaris trade secrets should be reduced to $4.5 million assuming a date of misappropriation of February 26, 2019.  (*Id.*)  For Project Sunkist, assuming June 4, 2019 is the date of misappropriation, that leaves ████████ in reasonable royalty reduction without any explanation.  (Ex. 2, 100:8-101:25.)

## LEGAL STANDARD

A witness who has been qualified as an expert by knowledge, skill, experience, training, or education may give an opinion on scientific, technical, or otherwise specialized topics if (1) the expert's scientific, technical, or other special knowledge will help the trier of fact understand the evidence or determine a fact in issue, (2) the testimony is based upon sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the witness has reliably applied the principles and methods to the facts of the case.  *Rovid v. Graco Children's Prods. Inc.*, No. 17-

cv-01506-PJH, 2018 WL 5906075, *3 (N.D. Cal. Nov. 9, 2018) (J. Hamilton) (citing Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)).  The proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the admissibility requirements are met. *See* Fed. R. Evid. 702, Advisory Committee Notes.

The trial court acts as a "gatekeeper" with regard to the admission of expert scientific testimony under Rule 702.  *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (trial court acts as "gatekeeper" to exclude expert testimony that is not both relevant and reliable).  "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

Thus, *Daubert* requires a two-part analysis—reliability and relevance. *Id.* at 592-93.  In determining whether an expert's opinion is reliable, the district court can consider "many factors," including whether a scientific theory or technique can be (and has been) tested; whether there is a known or potential error rate; and whether an expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.  *Daubert*, 509 U.S. at 593–95; *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.")).

Rule 702's second prong concerns relevancy, or "fit."  *See Daubert*, 509 U.S. at 591.  Expert opinion testimony is relevant if the knowledge underlying it has a "valid . . .  connection to the pertinent inquiry."  *Id.* at 591-92.  As Rule 702 requires, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Id.* at 591.  "[T]he standard for fit is higher than bare relevance."  *Redfoot v. B.F. Ascher & Co.*, No. C 05-2045 PJH, 2007 WL 1593239, at *4 (N.D. Cal. June 1, 2007) (J. Hamilton) (citing *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 745 (3d Cir.1994)).

1    Finally, even under *Daubert,* the district court must still weigh the balancing factors of

2    Federal Rule of Evidence 403; *see also* Fed. R. Evid. 402.  Specifically, Rule 403 permits the

3    exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of

4    unfair prejudice, confusion of the issues, or misleading the jury." *Redfoot*, 2007 WL 1593239, at *4

5    (citing *Daubert,* 509 U.S. at 595).

6                                        **ARGUMENT**

7    **I.     Mr. Persechini's entire reasonable royalty opinion does not fit the facts of the case.**

8         Mr. Persechini's entire opinion suffers from two independent and impermissible flaws.  ***First***,

9    his entire hypothetical negotiation erroneously assumes, without explanation or analysis, that Poly

10   would pay a "reasonable royalty" of millions of dollars for a trade secret that Poly never used.

11   ***Second***, Mr. Persechini's use of *all* of Cisco's forecasted development costs in his baseline royalties

12   calculation is based on the disproven supposition that the *entire* investment in Sunkist and Polaris

13   *could* be lost in theory, despite the fact that both parties would know that the none of the investment

14   was actually lost.  Mr. Persechini's opinion, therefore, is completely divorced from reality—it is not

15   tied to any facts and has no valid connection to the pertinent inquiry at hand regarding what a willing

16   licensee would pay and what a willing licensor would accept in a *Georgia-Pacific* hypothetical

17   negotiation.  His opinions as a whole should be excluded under Rule 702 and *Daubert* because they

18   are irrelevant.  *Bogosian v. Mercedes–Benz of No. America, Inc.,* 104 F.3d 472, 479 (1st Cir.

19   1997) (excluding as irrelevant expert testimony because in performing test the expert "did not, in any

20   way, attempt to replicate the known facts surrounding the injury-producing event").

21   **A.     The facts do not support the opinion that Poly would pay a reasonable royalty.**

22        The DTSA and CUTSA permit plaintiffs to seek payment of a reasonable royalty only in

23   certain cases.  Specifically, the DTSA permits imposition of a reasonably royalty only "for the

24   misappropriator's unauthorized *disclosure or use* of the trade secret." 18 U.S.C. § 1836(b)(3)(B)(ii)

25   (emphasis added).  The CUTSA limits the imposition of a reasonable royalty to cases where the

26   misappropriator has *used* the claimed trade secret. Cal. Civ. Code § 3426.3(b) ("If neither damages

27   nor unjust enrichment caused by misappropriation are provable, the court may order payment of a

28
- 8 -
DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

1   reasonable royalty for no longer than the period of time the *use* could have been prohibited.")

2   (emphasis added).   In other words, the DTSA and CUTSA do not allow a plaintiff to recover a

3   reasonable royalty from a defendant who never used or disclosed the claimed trade secret. *See, e.g.,*

4   *Ajaxo, Inc. v. E\*Trade Fin. Corp.*, 48 Cal. App. 5th 129, 160 (Cal. Ct. App. 2020) (a reasonable

5   royalty under the CUTSA is simply "a court-determined fee imposed upon a defendant for [its] use

6   of a misappropriated trade secret.").

7           In calculating his reasonable royalty, Mr. Persechini cites no facts indicating that the alleged

8   trade secrets were put to any use. (Ex. 2, 45:9-12 ("Q. You haven't seen any evidence that Poly has

9   incorporated any Cisco trade secret into [its] products ever; correct? A. That is correct."); *id.* at 42:4-

10  7 ("Q. You haven't seen any evidence that Poly ever used the Polaris trade secrets; correct?   A. I

11  would agree with that.").)   Instead, he lists in his report six "strategic actions" Poly *could* have taken

12  with the alleged Sunkist trade secret information, and seven "strategic actions" Poly *could* have taken

13  with the alleged Polaris trade secret information, but then admits, as detailed in the chart below, that

14  he has seen no evidence that Poly did any of these things.

| Mr. Persechini's Opinions | Mr. Persechini's Admissions |
| --- | --- |
| "I understand that early knowledge of the features, components, and launch plans of Project Sunkist *could* allow Poly to take the following actions against Cisco:<br>• Pre-announce its own competing product to Project Sunkist<br>• Accelerate its product development plans<br>• Change prices<br>• Change advertising strategy for headsets<br>• Interfere with Cisco's ability to source materials<br>• Take no action but shift or confirm its risk | • "Q. Have you seen any evidence that Poly pre-announced its own competing product to Project Sunkist based on its knowledge of purported Sunkist trade secrets? A. *I have not.*"<br>• "Q. Have you seen any evidence that Poly accelerated any of its product development plans based on its alleged knowledge of purported Sunkist trade secrets? A. *I haven't seen any evidence of acceleration.*"<br>• "Q. Have you seen evidence that Poly changed the prices of any of its products or services based on its alleged knowledge of reported Sunkist trade secrets? A. *I have not seen evidence of price change.*"<br>• "Q. Have you seen any evidence that Poly changed its advertising strategy for any headset product based on its knowledge of purported Sunkist trade secrets? A. *I don't recall seeing that on these.*"<br>• "Q. Have you seen any evidence that Poly interfered with Cisco's ability to source materials based on Poly's knowledge of purported Sunkist trade secrets? A. *I have not seen any evidence of the interference of source materials.*"<br>• "Q. Have you seen any evidence that Poly cancelled |

28                                          - 9 -
DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

| | |
|---|---|
| profile" (Persechini Report ¶ 132.) | development projects based on its knowledge of purported trade secrets?  A. ***I don't recall any evidence of cancellation***. … Q. Have you seen any evidence that Poly shifted its risk profile by lowering its risk in one specific product portfolio and increasing its risk in another product portfolio?  …  A. ***I haven't seen specific where I think Poly talks specifically risk***." (Persechini Dep. at 121:18-130:12.) |
| "I understand that early knowledge of the features and components of Project Polaris ***could*** allow Poly to take the following actions against Cisco:<br>• Pre-announce its own competing product to Project Polaris<br>• Accelerate its product development plans<br>• Reverse-engineer Project Polaris using Polaris hardware information as a reference<br>• Change prices<br>• Change advertising strategy for desktop products<br>• Interfere with Cisco's ability to source materials<br>• Take no action but shift or confirm its risk profile" (Persechini Report ¶ 133.) | • "Q. Have you seen any evidence that Poly preannounced [its] own competing products to Project Polaris based on its knowledge of purported Polaris trade secrets?  A. ***No, I have not***."<br>• "Q. Have you seen any evidence that Poly accelerated [its] project development plans based on its knowledge of the purported Polaris trade secrets?  A. ***No, I have not***."<br>• "Q. Have you seen any evidence that Poly reverse engineered Project Polaris using Polaris' hardware information as a reference based on Poly's alleged knowledge of purported Polaris trade secrets?  A. … ***No, I have not***."<br>• "Q. Have you seen any evidence that Poly changed the prices of any of its products or services based on its knowledge of purported Polaris trade secrets?  A. ***No, I have not***."<br>• "Q. Have you seen any evidence that Poly changed its advertising strategy for any desktop product based on its knowledge of purported Polaris trade secrets?  A. ***I have not***."<br>• "Q. Have you seen any evidence that Poly interfered with Cisco's ability to source materials based on its alleged knowledge of reported Polaris trade secrets?  A. ***I have not***."<br>• "Q. Have you seen any evidence that Poly shifted or confirmed its risk profile based on Poly's knowledge of purported trade secrets?  A. ***I have not and both parties understand that under the Book of Wisdom construct***." (Persechini Dep. at 133:23-140:10.) |

Furthermore, under the Book of Wisdom convention adopted by Mr. Persechini, he admits that both Cisco and Poly would know at the hypothetical negotiation that Poly did not in fact take any of the actions he claimed Poly *could* take.  (*Id.* at 132:15-20 ("Q. Under the Book of Wisdom approach, the parties would know that Poly did not, in fact, take any strategic actions against Cisco that Cisco alleges it could have taken; right?  A. That is correct.")  There is no economic basis for Poly to pay anything, let alone millions of dollars, for alleged trade secrets that it has never used in

- 10 -

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

1    the first place (and which via the Book of Wisdom both parties to the negotiation would know would

2    never be used).

3         **B.      Mr. Persechini's use of *all* of Cisco's forecasted development costs is based on**

4                   **the unsupported assumption that Cisco's *entire* investment *could* be lost.**

5         Mr. Persechini's use of *all* of Cisco's forecasted development costs is based on the disproven

6    supposition that the *entire* investment in Sunkist and Polaris *could* be lost in theory, despite the fact

7    that both parties would know that the none of the investment was actually lost.  "[B]eginning from a

8    fundamentally flawed premise . . . results in a fundamentally flawed conclusion."  *Kolcraft*

9    *Enterprises, Inc. v. Chicco USA, Inc.*, No. 09 C 03339, 2018 WL 10772693, at *4 (N.D. Ill. July 16,

10   2018) (citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011)).  Here, Mr.

11   Persechini's use of Sunkist and Polaris's forecasted "total development costs as the baseline royalty

12   as opposed to some smaller percentage of the development costs is premised on the idea that Cisco's

13   entire investment was at risk."  (Ex. 2, 143:22-144:4, 150:23-151:13.)  But Mr. Persechini admits, as

14   he must, that not only is there ***no evidence*** that Cisco lost any investment—let alone its entire

15   investment—Cisco went on to sell both Project Sunkist and Project Polaris products and continues

16   to do so to this day.  And, again, under the Book of Wisdom convention adopted by Mr. Persechini,

17   both Poly and Cisco would know at the hypothetical negotiation that Cisco did not lose any

18   investment.  More specifically, Mr. Persechini admitted the following in his deposition:

19   •    **Q.** But we know in fact Cisco's entire investment was not lost; is that correct?  **A.** ***That***

20        ***is correct***.

21        **Q.** And under your Book of Wisdom approach Poly and Cisco would know that Cisco's

22        entire investment would not be lost; right?  **A.** ***That is correct***.  (*Id.* at 152:21-153:5.)

23   •    **Q.** Are you aware of any evidence that Cisco's entire investment into Sunkist was

24        diminished because of Poly's alleged knowledge of purported Sunkist trade secrets?

25        **A.** ***No, I am not***.  (*Id.* at 142:21-143:2.)

26   •    **Q.** Are you aware of any evidence that Cisco's "entire investment into Project Polaris

27        was diminished because of Poly's alleged knowledge of purported Polaris trade

28

                              - 11 -
DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

secrets?" **A. *No, I'm not.*** (*Id.* at 150:7-12.)

- **Q.** You mentioned that the Project Polaris and project Sunkist were put entirely at risk. Did those projects actually come to fruition?  **A.** They did.  **Q.** So those investments weren't lost?  **A.** No.  My understanding is that Sunkist is […] Cisco is selling both the Webex Desk Pro and the 730 headset.  (*Id.* at 110:7-17.)

Because Cisco did not lose any investment, Mr. Persechini does not have any reliable basis or scientifically valid reason to use Cisco's entire forecasted development cost for Project Sunkist and Project Polaris as the starting point for his reasonable royalty analysis.  *Rovid*, 2018 WL 5906075, \*3 (expert testimony must be "based upon sufficient facts or data" and expert must have "reliably applied the principles and methods to the facts of the case"); *Daubert*, 509 U.S. at 592-93 (expert's reasoning underlying the testimony must be "scientifically valid" and properly "applied to the facts in issue.").  Mr. Persechini's reasonable royalty analysis based on this fundamentally flawed premise must be excluded.  *Kolcraft Enterprises*, 2018 WL 10772693, at \*3–4 ("[B]eginning from a fundamentally flawed premise . . . results in a fundamentally flawed conclusion.").

Because Mr. Persechini's entire opinions do not fit the facts of the case, the Court should exclude them in their entirety.

## II.     Mr. Persechini's opinion is independently excludable as unreliable because he uses *Cisco's forecasted* development costs to calculate his baseline royalties.

Mr. Persechini's baseline royalties for the alleged Sunkist and Polaris trade secrets, which are equal to Cisco's cumulative forecasted development costs[3] on the date of the hypothetical negotiation for the two projects respectively, is unreliable for two reasons.  ***First***, Mr. Persechini did not even consider Poly's potential development costs, which is of course the entire premise of the cost approach he purports to use.  ***Second***, Mr. Persechini simply assumed Cisco's forecasted development costs were accurate as to the amount and timing without any comparisons or analysis,

---

[3] Mr. Persechini's purported reasonable royalty opinions based on *all* of Cisco's forecasted development costs is nothing more than a back-door attempt to show a hypothetical unjust enrichment by Poly, without proof that Poly has gained anything (Ex. 1, ¶ 104.)

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

and despite the fact that Cisco admittedly did not accurately forecast its revenue. Because Mr. Persechini's baseline royalties are the starting point for his reasonable royalty analysis, his entire opinion that stems from his baseline royalties is unreliable and inadmissible. *See Carbo Ceramics, Inc. v. Keefe*, 166 Fed. App'x 714, 724-725 (5th Cir. 2006) (damages inadmissible where the starting point for the damages were speculative projections); *Sloan Valve Co. v. Zurn Indus., Inc.*, 33 F. Supp. 3d 984, 1000 (N.D. Ill. 2014) (reasonable royalty calculation based on arbitrary starting point is inadmissible).

A.      **Mr. Persechini does not reliably apply principles and methods to explain his use of Cisco's forecasted development costs for his baseline royalties.**

Mr. Persechini fails to analyze and explain why Cisco's forecasted development costs is a reliable metric for Poly's development costs. Mr. Persechini agrees as a matter of principle that "under the cost approach [] no prudent buyer would pay more for a discrete potential asset than the total cost to construct an intangible of equal desirability and utility[.]" (Ex. 2, 46:15-46:20.) But in arriving at his reasonable royalty opinions, Mr. Persechini did not analyze how much it would cost *Poly* to create or purchase the alleged trade secret information present in the alleged Sunkist and Polaris trade secret documents. (*Id.* at 47:11-47:19.) Instead, his analysis was "based on the cost to develop by Cisco." (*Id.*) He admits he did not do or consider any efficiency studies as part of his analysis. (*Id.* at 48:15-48:25.) He therefore has no idea whether Poly, a company with more than 70 years of experience in the headset market, could construct a headset more efficiently than Cisco, a company that has been developing headsets for just a few years. (*Id.*) Said differently, Mr. Persechini wants this Court to accept Cisco's forecasted development costs as the appropriate metric instead of Poly's costs, because he said so. His inability to bridge this analytical gap between the data he used (i.e., Cisco's forecasted development costs) and the opinion he proffered (i.e., those are the costs that a prudent buyer would pay in the hypothetical negotiation) is another reason why his baseline royalty is unreliable. *Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

1    data and the opinion proffered.").   Thus, Mr. Persechini has failed to reliably apply the principles of

2    the cost approach to the facts of the case.

3        **B.      Mr. Persechini's blind reliance of Cisco's forecasted development costs without**

4              **any independent testing is unreliable as a matter of law.**

5        Even assuming Cisco's development costs could be a substitute for Poly's development costs

6    (they are not), Mr. Persechini's use of Cisco's *forecasted* development costs is inappropriate, as he:

7    (1) made no adjustment for a known error rate but instead assumed without any confirmation that

8    Cisco's forecasted expenses were reasonable; and (2) assumed that the expenses were incurred at the

9    exact time projected by Cisco, both of which render his baseline royalty unreliable, and show that

10   Mr. Persechini has failed to reliably apply the principles of the cost approach to the facts of the case.

11              1.    *Mr. Persechini did not adjust his forecasted development costs for known*

12                   *error rates, nor confirm that Cisco's forecasts were reasonable.*

13       Mr. Persechini admits that it is possible that Cisco's actual development costs for Project

14   Sunkist and Project Polaris "were significantly less than the forecasted development cost," but he has

15   done nothing to adjust Cisco's forecasted development costs to address this known error rate.   (Ex.

16   2, 51:16-25, 52:12-19.)    In determining whether an expert's reasoning or methodology is

17   scientifically valid, the district court can consider whether there is a known or potential error rate.

18   *Daubert*, 509 U.S. at 593–95.   Instead, Mr. Persechini simply "assumed Cisco did a good job in [its]

19   forecast."   (Ex. 2, 91:18-22; *see also id.* at 81:10-16, 91:6-92:4, 93:7-22.)   Courts have excluded

20   expert opinions that blindly rely on client's data with no independent testing.   *SMS Sys. Maint. Servs.,*

21   *Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) ("[A]n expert must vouchsafe the

22   reliability of the data on which he relies and explain how the cumulation of that data was consistent

23   with standards of the expert's profession."); *Dean v. Thermwood Corp.*, No. 10-CV-433-CVE-PJC,

24   2012 WL 90442, at *9 (N.D. Okla. Jan. 11, 2012) (granting the defendant's motion to strike expert

25   where the expert "did nothing more than blindly accept his client's version of events"); *Rand A Tech.*

26   *Corp. v. Parametric Tech. Corp.*, No. 03-CV-11046-MEL, 2005 WL 6768210, at *1 (D. Mass. Oct.

27   19, 2005) ("An expert must do more than simply rely on a client's representations").

28                                          - 14 -

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

Mr. Persechini admits that he "did not compare the forecasted development expenses for Project Sunkist with the forecasted development expenses for any other headset products," so he has "no idea whether the forecasted development costs are comparable to the cost to develop other headsets in the industry." (Ex. 2, 54:17-55:17.)  Similarly, he admits he did not "compare the forecasted development expenses for Project Polaris with the forecasted development expenses with any other video conferencing product," not even "any other Cisco video conferencing product," so he has no opinion "as to whether the forecasted development expenses for Project Polaris were an appropriate amount for a video conferencing product in the video conferencing industry." (*Id.* at 55:18-56:10.)  Indeed, despite the fact that the majority of Cisco's forecasted development cost is the cost of employees who worked on Project Sunkist and Project Polaris ("Headcount Cost"), Mr. Persechini never asked Cisco to provide him a list of who was working on those two projects for any given period of time in order to determine whether Cisco had accurately forecasted the Headcount Cost. (*Id.* at 89:2-15, 94:7-11.) [4]  Without any adjustment to his Headcount Cost, or any of Cisco's forecasted development costs, Mr. Persechini's reasonable royalty opinion is unreliable and should be excluded.  *Rand A Tech.*, 2005 WL 6768210, at *1 (excluding expert testimony because expert accepted client's budget prediction "without any independent evaluation to confirm its reliability," and "[a]s a result, both [his] methods and the resulting conclusion as to damages lack basic indicia of reliability"); *Dean*, 2012 WL 90442, at *9 (granting the defendant's motion to strike expert where the expert "did nothing more than blindly accept his client's version of events").

2. *Mr. Persechini prorates his forecasted developments costs, despite evidence that the forecasts were not accurate as to timing.*

Mr. Persechini's use of prorated development costs is based on an unreliable methodology and not tied to the facts of the case.  For his baseline royalties for Sunkist and Polaris, Mr. Persechini assumes that Cisco accurately forecasted the timing of its forecasted development costs, and performs

---

[4]  Mr. Persechini argues that forecasted development costs are appropriate because Cisco does not track actual development cost.  (Ex. 2, 49:21-51:15.)  But even if that were true, Mr. Persechini has not adjusted the forecasted development costs based on the other metrics that were available to him, or confirmed that the numbers that Cisco has forecasted are in fact reasonable, beyond looking at Cisco's forecasted revenues, which also do not support Mr. Persechini's conclusions.

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

simple division and multiplication to determine the development costs that were expended as of his assumed dated of misappropriation.  (Ex. 2, 87:14-87:16.)  He claims that "Cisco's actual 730 headset revenue is comparable to the projected revenue for Project Sunkist" and that gives him "a degree of confidence that the forecasted development costs are probably in the same ballpark."  (*Id.* at 60:20-62:4.)  But as his own analysis shows, █████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

█████████████████████████████████  His purported explanation is therefore nothing more than speculation and *ipse dixit*, which is not allowed.  *Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Similarly, Mr. Persechini's own analysis shows that ██████████████████████████

███████████████████████████████ █ ██████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

---

[5] Mr. Persechini's arbitrary decision to prorate Cisco's entire forecasted development costs for Project Polaris to February 26, 2019 (Ex. 2, 40:2-40:12) is unreliable for the additional reason that he, again, assumes without basis that Poly misappropriated Cisco's alleged Polaris trade secrets on this date, based solely on a request from Cisco's counsel.  *See Rovid*, 2018 WL 5906075, *3 (expert testimony must be "based upon sufficient facts or data" and the expert must have "reliably applied the principles and methods to the facts of the case"); *Daubert*, 509 U.S. at 592-93.

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ███████████████████████████████████████████  Given the unreliability of Cisco's

forecast as shown by Mr. Persechini's own analysis of Cisco's forecasted revenue, Mr. Persechini's

use of Cisco's forecasted development costs with no independent testing renders his entire opinion

unreliable.  No reliable basis exists for Mr. Persechini's use of forecasted Cisco development costs

as a baseline royalty when the ███████████████████████████████████████████████

████

Mr. Persechini's attempt to use Cisco's forecasted development costs to try to show the value

to Poly cannot survive *Daubert* when he has done no analysis to show that Cisco's forecasted

development costs matched Poly's development costs, or that they are comparable to the

development costs in the industry, or that Poly gained any advantage from the development costs.

There is simply no economic basis to support Mr. Persechini's conclusion that this is what Poly

would be willing to pay at the hypothetical negotiation, and Mr. Persechini has failed to apply any

reliable methodology accurately to the facts of the case.

## III.      Mr. Persechini fails to apportion damages to the alleged trade secrets.

Even assuming Mr. Persechini's flawed baseline royalties pass *Daubert*, his reasonable

royalty opinions still fail under both the reliability and the relevance prongs of Rule 702 and *Daubert*

because he failed to perform any apportionment of Cisco's forecasted development costs to the

alleged trade secrets at issue in this case.  Damages experts must apportion damages actually

attributable to the allegedly misappropriated trade secrets.  *In re Avaya Inc.,* No. 17-10089 (SMB),

2018 WL 1940381, at *8 (Bankr. S.D.N.Y. Apr. 23, 2018), *aff'd* 602 B.R. 445 (S.D.N.Y. May 6,

2019) (holding that apportionment is required where a product includes both legitimately acquired

benefits and misappropriated trade secrets, and apportioning the value of a trade secret based on "the

cost or price of a component compared to the cost of the entire multi-component product" was

appropriate) (collecting cases); *Waymo LLC v. Uber Techs., Inc.*, No. C-17-00939-WHA, 2017 WL

5148390, at *4, *6 (N.D. Cal. Nov. 6, 2017) ("It was absurd for [damages expert] to simply attribute

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

1    [the] full sticker price to the value of a single asserted trade secret.").  Mr. Persechini has failed to

2    meet this most basic requirement of any trade secret reasonable royalty opinion.

3              Mr. Persechini's failure to apportion between the alleged trade secrets at issue in this case on

4    the one hand and the rest of Project Sunkist and Project Polaris not disclosed by the allegedly

5    misappropriated documents on the other hand renders his opinion unreliable.  Cisco alleges that the

6    EA Document contains eight pieces of information that constitutes Projects Sunkist trade secrets.[6]

7    (*See supra* at p. 3.)  Cisco also alleges that the June 4 Email contains 11 pieces of information that

8    constitutes Project Sunkist trade secrets.  (*See supra* at pp. 3-4.)[7]  Mr. Persechini admits that these

9    alleged trade secrets only comprise a portion of the total Project Sunkist and Project Polaris products.

10   (Ex. 2, 104:9-104:15.)  But he admits that he has not done any quantitative analysis to determine how

11   much of Project Sunkist and Project Polaris is trade secret versus what is not a trade secret.  (*Id.* at

12   104:16-104:25.)  Specifically, he admits that he:

13        • Did not provide any sort of feature count as to what is allegedly disclosed in the trade

14          secrets versus what has not been disclosed (*id.* at 108:2-18);

15        • Did not determine how much of the development cost was needed to develop the alleged

16          trade secrets as opposed to the non-disclosed portions of Project Sunkist and Project

17

18   [6] The QCC5120 was not even the chip that was used in the 730 headset. (Ex. 1, ¶ 31, n.75.) Cisco cannot possibly contend that false information constitutes its trade secret.  As such, assuming that

19   the Court agrees that at a minimum this alleged "fact" cannot be a Cisco trade secret, Mr. Persechini does not have a damages opinion to offer for the jury, as the only opinion he provided is the opinion

20   as to damages for every trade secret that Cisco has alleged to be a trade secret in Sunkist through the EA Document and the June 4 Email.  (Ex. 2, 27:11-30:22, 34:2-34:21.)

21   [7] Cisco's Second Amended Trade Secret Disclosure admits that "Dr. Chung's alleged misappropriation of the Project Sunkist information is expressly limited to that information in the EA

22   document," pursuant to the Court's explicit instructions that Cisco had failed to adequately plead that Dr. Chung had misappropriated any other information related to Project Sunkist. (Ex. 3, 2d Am.

23   Trade Secret Discl. at 5:5-5:6; Dkt. No. 97 at 46:13-46:17 ("Absent leave of court or consent of defendants, plaintiff may not otherwise amend its pleadings.  That prohibition extends to any attempt

24   by plaintiff to expand its allegations to information that falls outside the subject matter previously found to have satisfied the sufficient particularity pleading requirement."); Dkt. No. 168 at 32:10-

25   32:11 ("In the event plaintiff again attempts to expand the scope of its disclosure in violation of this court's prior orders, the court may issue sanctions.").)  As such, any information in Dr. Chung's June

26   4 Email that is not from the EA Document is an improper attempt by Cisco to expand the scope of its Second Amended Trade Secret Disclosure in direct violation of the Court's prior order, and as

27   such, Mr. Persechini's alleged reasonable royalty improperly accounts for alleged trade secret information that is not in this case.  (*Id.*)

28
DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

Polaris (*id.* at 108:19-110:6); and

- Did not do any damages calculation for Poly allegedly knowing any of the specific facts he listed for the EA Document and the June 4 Email that Cisco alleges are its Project Sunkist trade secrets, or the portion of the reasonable royalty that is attributable to any of those facts (*id.* at 161:10-166:8).

As a result of his failure to apportion, Mr. Persechini included costs in his reasonable royalty for information that is not even at issue in this case.[8]  For example, it is undisputed that no software code has been misappropriated in this case (Ex. 3)—a fact that Mr. Persechini did not even know when opining on Cisco's alleged damages.  (Ex. 2, 112:6-112:9.)  Yet, Mr. Persechini included in his reasonable royalty calculation the Headcount Cost for ███████████.  (Ex. 1, Schedules 1.3-1.5).  Similarly, it is undisputed that Cisco ████████████████████████████████ ██████████████████████████████████████ (Ex. 1, ¶ 72.)  Because Mr. Persechini failed to perform any apportionment, he does not even know whether his calculation included Cisco's forecasted development costs for ████████████████████████ ████████████████████████████████.  (Ex. 2, 75:18-78:8.)  The same goes for the rest of the expense line items that he included in his reasonable royalty calculation,[9] as he admits that he did not apportion between what relates to the alleged trade secret information and what does not.  (Ex. 2, 114:19-121:1.)  Because Mr. Persechini failed to perform any cost apportionment, his entire reasonable royalty opinion is unreliable.

Mr. Persechini's failure to apportion his reasonable royalty also renders his opinion unhelpful to the fact finder, and therefore fails the relevance prong of Rule 702 and *Daubert*.  Mr. Persechini

---

[8] Mr. Persechini's explanation for not doing any apportionment is because he, again, assumed without basis that the alleged misappropriation of the alleged trade secrets would put the entire project at risk. (*Id.* at 102:15-103:2.)  But as Mr. Persechini admits himself, Cisco's entire investment was not lost. (*See supra* § I.B.)  Because the parties would know Cisco's entire investment was not lost at the hypothetical negotiation, there is no sound economic basis for Mr. Persechini to fail to apportion Cisco's alleged development costs to the alleged trade secrets at issue.

[9] Those other costs include ████████████████████████ ████████████████████████████████████████████████ ████████████████████████ (Ex. 1, Schedules 1.3-1.5.)

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

1   admits that because he never attributed costs to the specific documents and the pieces of information

2   allegedly disclosed in those documents at issue in this case, if the court finds that certain documents

3   or specific information that Dr. Chung is alleged to have taken were not in fact trade secrets, or were

4   not in fact misappropriated, he has no opinion as to a reasonable royalty for any specific document

5   or any specific piece of information.  (Ex. 2, 27:11-30:22, 34:2-34:21.)  Mr. Persechini's opinion

6   therefore is not helpful for the fact finder and should be excluded on that basis alone.  *LivePerson v.*

7   *[24]7AI*, No. 17-CV-01268-JST, 2018 WL 6257460 (N.D. Cal. Nov. 30, 2018) (excluded damages

8   expert's opinion "because he does not apportion trade secret misappropriation damages among

9   particular alleged trade secrets, and offers no methodology for the jury to calculate trade secret

10  misappropriation damages on fewer than all of the 28 alleged trade secrets in the case"); *MSC*

11  *Software Corp. v. Altair Eng'g, Inc.*, No. CV 07-12807, 2015 WL 13273227, at *12 (E.D. Mich.

12  Nov. 9, 2015) (excluding damages expert's reasonable royalty opinion because his "lump sum

13  reasonable royalty analysis is based on his perception of an irrelevant hypothetical negotiation which

14  was not directed and confined to the three trade secrets that were misappropriated.").

15  **IV.      Mr. Persechini's purported adjustments to his baseline royalties are unreliable.**

16        Mr. Persechini's purposed adjustments to his baseline royalties based on the *Georgia-Pacific*

17  factors are nothing more than impermissible *ipse dixit*.  Courts have routinely excluded damages

18  expert opinions that fail to bridge the analytical gap between discussions of the *Georgia-Pacific*

19  factors and the final adjustments.  *See, e.g., Waymo*, 2017 WL 5148390, at *8 (excluding reasonable

20  royalty opinion because the damages expert "made no attempt whatsoever to bridge the analytical

21  gap" between his discussion of unquantified 'neutral' and 'increase' factors in a hypothetical

22  licensing negotiation and his decision to simply raise his [reasonable royalty] numbers by ten percent

23  across the board"); *Mettler-Toledo, Inc. v. Fairbanks Scales, Inc.*, No. 9:06-CV-97, 2008 WL

24  11348468, at *3 (E.D. Tex. Oct. 27, 2008) (excluding reasonable royalty opinion because the

25  damages expert "chose 1% for all *Georgia-Pacific* factors, regardless of how strongly a factor

26  favored adjustment"); *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 815 (E.D. Va. 2011)

27  (excluding reasonable royalty opinion because damages expert's failure to explain how the *Georgia-*

28

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

*Pacific* factors permitted adjustments "how it was that the application of any one or all of those [*Georgia-Pacific*] factors would permit an increase in the base royalty rate of approximately 100%" is "quintessential *ipse dixit*" and "precisely that kind of opinion that *Daubert, Kumho*, and *Joiner* require the district courts to exclude.").

Mr. Persechini's reasonable royalty opinions should be excluded because he fails to explain how he arrived at his final reasonable royalty based on his purported analysis of the *Georgia-Pacific* factors.  Of the 15 *Georgia-Pacific* factors, Mr. Persechini opines that Factor 4 would adjust the royalties upward, Factors 7, 10, and 13 would adjust the royalties downward, and all other factors (with the exception of Factor 15, which he opines is a synthesis of the first 14 factors) would remain neutral.  (Ex. 1, ¶ 309, Figure 43.)[10]  From there, he concludes that the baseline royalties should be reduced to the final reasonable royalties with no discernable methodology.  (*Id.* ¶¶ 312-314.)  Take his reduction to the alleged June 4, 2019 Sunkist baseline royalties for example, Mr. Persechini admits that he had reduced the baseline royalty from ███████████ to ███████████ based on Poly's expected return on investment of ███ based on his analysis of Factor 13 (which is itself problematic for the reasons explained below).  (Ex. 2, 99:15-99:22.)  He admits that he further reduced ███████████ to $2,250,000.00, which was the final reasonable royalty that he proffered.  (*Id.* at 99:23-100:7.)  Mr. Persechini admits that he has no dollar-by-dollar or factor-by-factor allocation, nor any formulas, to explain the ███████████ reduction to reach the final reasonable royalty.  (*Id.* at 100:8-101:25.)  Because Mr. Persechini completely failed to specify his methodology behind his so-called adjustments, his entire reasonable royalty opinions should be excluded.

At a minimum, Mr. Persechini should not be allowed to offer his opinions as to Factor 4, 7, 10, and 13, which would then render his entire *Georgia Pacific* analysis irrelevant.  For Factor 4 (the licensor's established policy regarding licensing), Mr. Persechini claims that this factor would have

---

[10] Factor 4 is licensor's established policy regarding licensing; Factor 7 is the duration of the Trade Secrets and the term of the license; Factor 10 is the nature of the Trade Secrets and their benefits to the user; and Factor 13 is apportionment of the realizable profit between that which should be credited to the Trade Secrets as distinguished from non-trade secreted elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.  (*Id.* ¶¶ 308-309, Figure 43.)

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

an upward impact on royalties because "Cisco goes to great lengths to protect the confidentiality of its projects and business operations," (Ex. 1, ¶ 309, Figure 43), but he fails to provide any citation for this opinion. (Ex. 2, 208:5-208:18.)  Indeed, Mr. Persechini admits that he is not even qualified to provide such an opinion because he is not an e-data, asset recovery, or Company security expert. (*Id.* at 208:19-209:2.)  He has not considered—because he does not even know—that, among others: (1) Cisco did not mark the EA Document with any confidentiality labeling let alone trade secret labeling (*id.* at 209:24-212:20); (2) Cisco simply classified Dr. Chung's MacBook Pro as lost after Dr. Chung refused to return it and took no action to recover the laptop for eight months (*id.* at 205:8-208:4); and (3) Cisco took no action to recover the alleged hard drive that Cisco claims Dr. Chung has used to download documents related to Project Polaris until it reached out to Poly more than six months after Dr. Chung left Cisco (*id.* at 213:13-214:21).  Mr. Persechini therefore has no opinion on the appropriate method to protect trade secret information, the steps that Cisco has not taken to protect its alleged trade secrets, and the efficiency of any of the steps Cisco has taken to protect its alleged trade secrets.  (*Id.* at 203:16-19, 209:3-12.)  Mr. Persechini's baseless opinion that *Georgia-Pacific* Factor 4 has an unquantifiable upward impact on his baseline royalty is therefore nothing more than *ipse dixit* from an unqualified expert that would only be prejudicial.

For Factor 7 (the duration of the Trade Secrets and the term of the license), Mr. Persechini's final reasonable royalty figures for Project Sunkist are directly at odds with his opinion regarding this factor, further highlighting the lack of methodology in his purported adjustments.  Mr. Persechini opines that the value of non-public competitive information for an unreleased product tends to be reduced as the product announcement or release draws nearer, as the recipient of the information has less time to react strategically to the information.  (Ex. 1, ¶ 191.)  But Mr. Persechini contradicts his own opinion by offering two alternative reasonable royalty amounts for Project Sunkist, where the reasonable royalty amount for the later date ($2.25 million assuming the date of misappropriation is June 4, 2019) is higher than the reasonable royalty amount for the earlier date ($1.25 million assuming the date of misappropriation is February 26, 2019).  (*Id.* at ¶¶ 312-313.)  If the value of non-public competitive information would decrease as the public announcement draws nearer, as Mr.

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

Persechini claims, one would expect Persechini's damages amount in his June calculation to be lower than the damages amount in his February calculation because Project Sunkist was allegedly publicly announced in November 2019.[11]   Mr. Persechini attempts to explain the inherent conflict in his opinion by opining that the June royalties are higher because Poly would have the benefit of further development in that project, and Cisco would have spent additional funds for that project by then. (Ex. 2, 190:10-191:25.)  Under that strained logic, if Poly had misappropriated Cisco's alleged trade secrets the day before they were announced, Poly would have to pay an even higher amount than $2.25 million in reasonable royalty, even though the information would become public the next day, and Poly would have no time to act on the alleged trade secrets.  (*Id.* at 194:17-195:18.)  Mr. Persechini's self-contradicting analysis of Factor 7 is yet another reason why his opinions are fundamentally flawed and unreliable.

For Factor 10 (the nature of the trade secrets and their benefits to the user), Mr. Persechini utterly fails to apportion costs attributable to the allegedly disclosed trade secrets for Projects Sunkist and Polaris, as detailed above in Section III.  Mr. Persechini somehow opines, however, that this factor is downward because the alleged trade secrets at issue in this case "comprise just a portion of the Polaris and Sunkist products."  (Ex. 1, ¶ 309, Figure 43.)  But other than this general statement, he admits that he has not done any analysis to apportion costs attributable to the allegedly disclosed trade secrets.  (Ex. 2, 227:6-227:11.)[12]   His sole basis for concluding this factor resulted in an unquantifiable amount of downward pressure is based on "his professional experience and judgement."  (*Id.* at 105:10-15.)[13]   Mr. Persechini's *ipse dixit* opinion with no methodology and no analysis whatsoever on apportionment is precisely the type of unreliable opinion that Rule 702 and

---

[11] Indeed, Mr. Persechini admits that he failed to even consider evidence showing Cisco had already released information about its alleged trade secrets prior to November 2019 through Cisco Live, which is Cisco's annual customer and partner conference that has more than 500,000 attendees, in June 2019 (Ex. 4), Cisco's annual sales event that took place in Las Vegas in August 2019 before 18,000 attendees (Ex. 2, 254:3-259:9), and in emails to customers in September 2019 (*id.* at 239:21-254:2).

[12] "Q. But you have no idea what portion of the products actually are the trade secrets; right?  A. I have not done a feature by feature account or something like that, as we have discussed."

[13] "Q. How did you determine how much G-P Factor 10 should reduce the reasonable royalty?  A. […] looking at G-P factors in their entirety and using my professional experience and judgment."

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

*Daubert* are meant to exclude.

For Factor 13 (apportionment of the realizable profit between which should be credited to the Trade Secrets as distinguished from non-trade secreted elements), which is the only factor for which Mr. Persechini provided any formulation, his methodology is unsound.  Mr. Persechini opines that Poly would expect a ███ return on investment on Project Sunkist and ███ return on investment on Project Polaris.  (Ex. 1, ¶¶ 297-305.)  But he arrived at these numbers not by looking at Poly's cost of capital return on investment, but rather *Cisco's internal projections for its cost of capital*.  (Ex. 2, 233:23-234:3.)  Mr. Persechini offers no explanation why Cisco's internal projections for its cost of capital is a good yardstick for Poly's cost of capital return on investment.  And, as explained above, Factor 13 alone does not explain the total amount of adjustment that Mr. Persechini made to his baseline royalties.  Furthermore, as detailed above in Section III, this factor should account for the trade secret elements of the product as compared to the non-trade secret elements.  But Mr. Persechini does not apportion, and instead performs his unrelated return on investment calculation in order to skip over the analysis he should have actually performed in connection with Factor 13.

Mr. Persechini's purported adjustments pay mere lip service to the *Georgia-Pacific* factors in order to proffer ultimate damages figures to the jury as if they are based on a scientific methodology and sound economics.  They plainly are not. Numbers have power and Cisco should not be permitted to present unfounded opinions to a jury as if they are based on sound expert methods.

## CONCLUSION

For the reasons detailed above, Mr. Persechini's opinions should be excluded in their entirety.


Dated: November 3, 2022                    Respectfully submitted,

                                           MCDERMOTT WILL & EMERY LLP

                                           By: */s/ Michelle Lowery*
                                           Michelle Lowery (SBN 302882)
                                           mslowery@mwe.com
                                           Russell Hayman (SBN 110643)
                                           rhayman@mwe.com

DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jon Dean (SBN 184972)
jdean@mwe.com
Jason D. Strabo (SB 246426)
jstrabo@mwe.com
Tala Jayadevan (SBN 288121)
tjayadevan@mwe.com
McDERMOTT WILL & EMERY LLP
2049 Century Park East, Suite 3200
Los Angeles, California 90067
(310) 277-4110

Amol Parikh (admitted *pro hac vice*)
amparikh@mwe.com
Katharine M. O'Connor (admitted *pro hac vice*)
koconnor@mwe.com
Han Cui (admitted *pro hac vice*)
hcui@mwe.com
McDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606
(312) 372 2000
*Attorneys for Defendants Plantronics, Inc. and Thomas Puorro*

- 25 -
DEFENDANT PLANTRONICS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE
THE TESTIMONY OF DOMINIC PERSECHINI
Case No.: 4:19-CV-07562-PJH

DM_US 191232228-28.074958.0018