1

2

3

4            UNITED STATES DISTRICT COURT

5          NORTHERN DISTRICT OF CALIFORNIA

6

7   CISCO SYSTEMS, INC., et al.,

8                Plaintiffs,                Case No. 19-cv-07562-PJH

9        v.                                 **ORDER RE MOTIONS FOR SUMMARY JUDGMENT**

10  WILSON CHUNG, et al.,                    Re: Dkt. Nos. 251, 261

11              Defendants.

12

13

14          The parties' motions for summary judgment came on for hearing before this court

15  on February 2, 2023.  Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc.

16  (collectively, "Cisco") were represented by Justin Wilcox, Carson Olsheski, Sumeet Dang,

17  and Julianne Thomsen.  Defendant Plantronics, Inc. (dba "Poly") was represented by Jon

18  Dean, Russell Hayman, Tala Jayadevan, and Michelle Lowery.  Defendant Wilson Chung

19  was represented by Daniel Muller.  Having read the papers filed by the parties and

20  carefully considered their arguments and the relevant legal authority, and good cause

21  appearing, the court hereby rules as follows.

22                          **BACKGROUND**

23          This is a trade secrets case.  Plaintiff Cisco is a California corporation that

24  designs, engineers, manufactures, and sells software, hardware, and other electronic

25  devices.  Second Amended Complaint ("SAC") ¶¶ 2, 11.  Defendant Poly is "in the IP

26  telephone, headset, video, and collaboration space" and is a market competitor to

27  plaintiff.  Id., ¶ 13.  Defendant Chung previously worked for Cisco, where his

28  responsibilities included developing plaintiff's collaboration products, including "IP

1   telephony solutions and audio headsets." Id., ¶ 27.  Incidental to his role, Chung had

2   access to Cisco's alleged trade secrets, including "design specifications, schematics,

3   source code, product market analyses, and vendor contract details." Id.

4       In February 2019, Chung left Cisco to begin work at Poly.  Cisco alleges that

5   Chung overlapped his two positions, starting at Poly on February 26, 2019, but not

6   ending his Cisco employment until February 28, 2019.  SAC, ¶ 62-63, 69-70.

7       Cisco alleges a series of instances between February 3, 2019 and at least March

8   8, 2019 in which Chung downloaded, copied, or emailed various Cisco documents and

9   files concerning certain technological and business subject matter.  SAC, ¶¶ 37-81.  It is

10  these documents that contain the trade secrets that are the subject of this litigation.

11      Cisco first became aware of potential trade secret misappropriation not by Chung

12  but by another employee who left Cisco for Poly – James He, who was originally named

13  as a defendant in this case, but who has since been voluntarily dismissed.  See Dkt. 187.

14  On August 2, 2019, Cisco alerted Poly to potential misappropriation by He.  SAC, ¶ 130.

15  On September 9, 2019, Cisco alerted Poly to potential misappropriation by Chung.  Id., ¶

16  87; Dkt. 261, Ex. 41.

17      Poly conducted an investigation into Chung's conduct, and determined that five

18  Cisco documents had been found on Chung's devices.  SAC, ¶ 87.  Cisco further alleges

19  that, after Chung received a document preservation notice, he deleted files in an attempt

20  to "conceal his misappropriation." Id., ¶ 91.

21      On October 10, 2019, Poly informed Cisco that it had placed Chung on

22  administrative leave.  SAC, ¶ 97.  Poly also retained a neutral third-party forensics firm to

23  conduct an investigation of Chung's devices. Id.  When Poly brought Chung back to

24  work, Cisco filed this suit. Id.

25      The scope of the complaint has been narrowed since its filing, and the following

26  claims remain: (1) violation of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C.

27  § 1836, against Chung, (2) violation of the California Uniform Trade Secrets Act

28  ("CUTSA"), Cal. Civ. Code § 3426, against Chung, (3) violation of the DTSA, against

1   Poly, and (4) violation of the CUTSA, against Poly.

2   Notably, Cisco seeks only injunctive relief as to Chung.  Dkt. 301 at 13.  As to

3   Poly, Cisco seeks both injunctive relief and damages.

4   At various times, the scope of this lawsuit included all of the following alleged trade

5   secrets:  Project Sunkist, Project Polaris, Project X, Project Liberator, Project Rialto,

6   Cisco's partner margins, Cisco's limited restructurings, Project Hopen, Project Havella,

7   Project Vecchio, Bookings data, and ASP forecasts trade secrets.  See Dkt. 261 at 25.

8   The scope has now been narrowed to include just two:  Project Sunkist and Project

9   Polaris.  See Dkt. 310 at 14.

10  Project Sunkist is a Bluetooth wireless headset with a voice microphone, ultimately

11  released as the Cisco 730 Headset.  See, e.g., Dkt. 310 at 14; Dkt. 261 at 13-14.

12  Project Polaris is a "videoconferencing desktop product," ultimately released as

13  the WebEx Desk Pro.  See, e.g., Dkt. 310 at 14; Dkt. 261 at 14.

14  Both defendants have moved for summary judgment as to all claims asserted

15  against them.  See Dkt. 251, 261.  Cisco has moved for partial summary judgment on

16  certain affirmative defenses.  See Dkt. 252.  Cisco has also filed two motions for

17  spoliation sanctions, seeking case-terminating sanctions or, in the alternative, an adverse

18  inference.  See Dkt. 230, 233.  Poly has also filed Daubert motions as to three of Cisco's

19  experts.  See Dkt. 248, 253, 258.  In connection with the aforementioned motions, the

20  parties have also filed many motions to seal – thirty-five (35), to be exact.  See Dkt. 228,

21  229, 231, 232, 239, 241, 249, 250, 254, 255, 259, 260, 262, 263, 266, 267, 269, 270,

22  271, 279, 280, 283, 284, 287, 295, 296, 302, 303, 304, 307, 308, 309, 311, 331, 334.[1]

23  **DISCUSSION**

24  A.   Legal standard for summary judgment

25  Summary judgment is proper where the pleadings, discovery, and affidavits show

26

27  _____

28  [1] The parties filed an additional twelve (12) sealing motions in connection with Cisco's later-filed Daubert motions.  See Dkt. 339, 341, 342, 345, 347, 348, 349, 351, 352, 365, 367, 372.  This brings the total number of sealing motions to forty-seven (47).

that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  "A 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact."  United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (citation omitted).

Courts recognize two ways for a moving defendant to show the absence of genuine dispute of material fact: (1) proffer evidence affirmatively negating any element of the challenged claim and (2) identify the absence of evidence necessary for plaintiff to substantiate such claim.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.").

"Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or by the depositions, answers to interrogatories, and admissions on file, come forth with specific facts to show that a genuine issue of material fact exists."  Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993) (per curiam).  "When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact."  Id.

The court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.  See Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014); Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  However, when a non-

4

1    moving party fails to produce evidence rebutting defendants' showing, then an order for

2    summary adjudication is proper.  Nissan Fire, 210 F.3d at 1103 ("If the nonmoving party

3    fails to produce enough evidence to create a genuine issue of material fact, the moving

4    party wins the motion for summary judgment.").

5    B.    Analysis

6         1.    Injunctive relief

7         As mentioned above, Cisco seeks injunctive relief as to both defendants, and both

8    defendants have moved for summary judgment.  The court will first address the injunctive

9    relief arguments as they apply to each defendant, and then will address the damages

10   arguments as they apply to Poly.

11        A plaintiff must demonstrate constitutional standing separately for each form of

12   relief requested.  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc., 528 U.S. 167,

13   185 (2000).  To have Article III standing to seek injunctive relief, a plaintiff must show

14   that: (1) he is under threat of suffering injury in fact that is concrete and particularized; (2)

15   the threat is actual and imminent, not conjectural or hypothetical; (3) the threat is fairly

16   traceable to the challenged action of the defendant; and (4) it is likely that a favorable

17   judicial decision will prevent or redress the injury.  See, e.g., Summers v. Earth Island

18   Institute, 555 U.S. 488, 493 (2009).

19        In other words, the "threatened injury must be certainly impending to constitute

20   injury in fact" and "allegations of possible future injury are not sufficient."  Clapper v.

21   Amnesty Int'l USA, 568 U.S. 398, 409 (2013).

22        As an initial matter, Cisco made clear at the hearing that it no longer seeks

23   injunctive relief as to the Sunkist-related information.  Dkt. 371 at 69:4-6.  Thus, the court

24   will evaluate only Cisco's standing to seek injunctive relief as to the Polaris-related

25   information.

26             a.    Standing to seek injunctive relief as to Chung

27        Cisco argues that it faces a threat of injury due to Chung's continued possession

28   of an external hard drive containing the Polaris-related information.  Dkt. 301 at 15-21.

1   Chung disputes that he is in possession of the hard drive, and argues that Cisco cannot

2   raise a triable issue of fact on the issue of whether he indeed possesses it.  Dkt. 251 at

3   14-15.  While the court finds that Cisco's position is based largely on speculation, it is

4   also true that the court on summary judgment is to view the evidence in the light most

5   favorable to the non-moving party, and to construe disputed evidence in the non-moving

6   party's favor.  Thus, for purposes of evaluating Chung's motion for summary judgment,

7   the court will assume that Cisco can indeed show that Chung is in possession of the hard

8   drive.  However, even with that assumption, Cisco must still show that there is a threat of

9   misappropriation that an injunction would prevent.

10          Cisco cites a California state court case holding that "threatened misappropriation

11   is established by the following essential facts: (1) trade secrets, (2) that remain in the

12   possession of a defendant, (3) who actually has misused or disclosed some of those

13   trade secrets in the past."  Dkt. 301 at 9 (citing Central Valley Gen. Hospital v. Smith, 162

14   Cal.App.4th 501, 527 (2008)).

15          In Poly's opposition to Cisco's sanctions motion, Poly cites Cisco's own damages

16   expert as acknowledging that he had "not reviewed any evidence in this matter indicating

17   that Chung shared the Polaris trade secrets with Poly or that Poly incorporated the

18   Polaris trade secrets into its products or otherwise utilized the Polaris trade secrets."  Dkt.

19   242 at 9 (citing Ex. 31 at ¶ 33).

20          In other words, Cisco has not presented any evidence that Polaris documents

21   were ever shared by Chung.  On those facts, Cisco cannot to establish that it is "under

22   threat of suffering injury in fact that is concrete and particularized," and that "the threat is

23   actual and imminent, not conjectural or hypothetical," as required to establish Article III

24   standing.

25          However, Cisco attempts to fill in any evidentiary gap by pointing to alleged

26   spoliation by Chung.

27   Evidentiary sanctions for alleged spoliation

28          As mentioned above, Cisco has filed two motions for spoliation sanctions – one

6

1   against Chung and Poly (Dkt. 230), and one against only Poly (Dkt. 233).[2]

2   In Cisco's first motion, it argues that Chung retained a Macbook laptop with Cisco

3   information on it, and that he deleted data on the Macbook and on 'cloud' accounts

4   (iCloud and Google Drive) before turning the laptop over to a third-party forensics firm.

5   See Dkt. 230.  Cisco highlights that Chung deleted 269 gigabytes of data, over three

6   hundred thousand files from his iCloud account, and at least one hundred files from his

7   Google Drive account.  Id. at 14-15.  Cisco further argues that Poly ratified Chung's

8   conduct by failing to investigate or respond to it.  Id. at 20-23.

9   Cisco's second sanctions motion relates to certain "audit logs" that were not

10  retained by Poly.  See Dkt. 233.  The audit logs show when files on Poly's "Sharepoint"

11  file-sharing system were accessed by Poly employees, and Cisco argues that Poly acted

12  improperly by failing to extend the automatic 90-day deletion schedule for the audit logs.

13  Id. at 9-12.

14  The legal standard for spoliation sanctions is provided by Federal Rule of Civil

15  Procedure 37(e), which states:

16  If electronically stored information that should have been preserved in the
    anticipation or conduct of litigation is lost because a party failed to take reasonable

17  steps to preserve it, and it cannot be restored or replaced through additional
    discovery, the court:

18  

19  (1) upon finding prejudice to another party from loss of the information, may
    order measures no greater than necessary to cure the prejudice; or

20  

21  (2) only upon finding that the party acted with the intent to deprive another
    party of the information's use in the litigation may:

22  (A) presume that the lost information was unfavorable to the party;

23  (B) instruct the jury that it may or must presume the information was

24  unfavorable to the party; or

25  (C) dismiss the action or enter a default judgment.

26  Cisco's argument focuses on the large number of files deleted by Chung, pointing

27  _____

28  [2] Poly has filed motions for leave to file sur-replies in connection with both sanctions
    motions.  See Dkt. 285, 286.  Poly's motions are DENIED.

United States District Court
Northern District of California

1 to the "269 gigabytes of data" that was deleted from the Macbook, or the "hundreds of

2 thousands" of documents that were removed from the iCloud account.  Dkt. 230 at 14-15.

3 But Cisco does not provide specifics on how much of this data actually encompassed

4 Cisco trade secret information, relying on the vague term "numerous."  This is the exact

5 passage in Cisco's brief:

> The same day that he received Cisco's October 11 letter, Dr. Chung began
> a mass deletion campaign to destroy evidence of his misappropriation,
> deleting: (1) 269 gigabytes of data from the MacBook; (2) hundreds of
> thousands of files from his iCloud account; and (3) numerous files and
> folders from his Google Drive account.  Dr. Chung's deletions included
> <u>numerous files specifically referencing Projects Sunkist and Polaris</u>. (See,
> e.g., id., ¶ 56 (identifying deletion of the EA Document and "Polaris ID Arrk
> Prototype 01.pptx" (Ex. BO) from the MacBook); ¶ 79 (identifying deletion of
> "CVTG_Polaris_ConceptCommit.pptx" and "Polaris-Block-Diagrams-04.pdf"
> from the iCloud account).)

12 Dkt. 310 at 16-17 (emphasis added).

13 　　　　The above excerpt identifies a total of four (4) Sunkist and Polaris files that were

14 included in Chung's deletions.

15 　　　　But even more important than the <u>amount</u> of deleted Cisco information is the

16 <u>significance</u> of any deleted information.  Cisco argues that Chung "irretrievably destroyed

17 critical metadata about his use of Cisco's trade secrets at Poly."  Dkt. 230 at 18.

18 Specifically, Cisco claims that the deleted data "would have shown the extent to which he

19 accessed and used the Cisco confidential files he misappropriated while employed at

20 Poly."  <u>Id.</u> at 19.

21 　　　　However, even if the metadata showing Chung's access was "irretrievably" deleted

22 from the Macbook laptop, any data showing Poly's use of any Sunkist or Polaris

23 information would still be on Poly's systems, which were not part of Chung's deletions.

24 Other than the Sharepoint audit logs, which will be discussed below, there is no

25 allegation that Poly's own data was ever spoliated.  In the court's view, Cisco does not

26 have a substantive rebuttal for Poly's argument that "[t]he allegedly spoliated metadata

27 could not show if Dr. Chung shared any document with others at Poly, or if anyone else

28 at Poly did anything with any document."  Dkt. 333 at 15.

1
2
3
4

Even in Cisco's telling, "Chung's mass-deletion of evidence of the Macbook destroyed evidence that would have shown the extent to which <u>he</u> used the trade secret information on that computer while at Poly" and "the extent to which <u>he</u> had accessed those files while at Poly."  Dkt. 310 at 26 (emphasis added).

5
6
7
8
9
10
11
12
13
14

Turning to the Sharepoint audit logs, those logs would show only the extent to which other Poly employees viewed the EA document.  Any evidence of actual use constituting an injury to Cisco – i.e., any utilization of that information for business advantage – would still be on Poly's systems, as there are no allegations that anything other than the audit logs were spoliated.  In other words, Cisco has had a full opportunity to discover unspoliated evidence from Poly's systems that would have shown if Poly used the alleged trade secrets, and after years of discovery, Cisco has failed to uncover any such evidence.  Further below in this order, in the context of Cisco's damages claims, the court will further discuss the evidentiary showing regarding Poly's alleged "use" of the trade secrets.

15
16
17
18
19

In short, because the deleted data would have shown only when Chung accessed the files, rather than showing any currently-ongoing threat of misappropriation, there is no actual, material prejudice to Cisco resulting from any alleged spoliation.  Thus, because Rule 37(e)(1) provides for sanctions only upon a finding of prejudice, the court concludes that sanctions are not warranted under Rule 37(e)(1).

20
21
22
23
24
25
26
27
28

Rule 37(e)(2) separately allows the court to order sanctions upon a finding that a party acted with the intent to deprive another party of the information's use in the litigation, and does not appear to expressly require a showing of prejudice.  However, even assuming that Chung acted with the intent to deprive Cisco of the information's use in the litigation, the court concludes, for the reasons explained above, that the information would have shown only the extent of Chung's access of the files, and that Cisco has not been deprived of the information regarding any ultimate use of the information by Poly or any ongoing threat of misappropriation, and thus, sanctions are not warranted.  For those reasons, Cisco's motions for evidentiary sanctions are DENIED.

United States District Court
Northern District of California

1   Turning back to the standing issue, Cisco appears to be relying on speculation that

2   Chung has not only shared Polaris trade secrets in the past but may also do so in the

3   future.  But again, even taking into account any possible spoliation, if Polaris documents

4   had indeed been shared, there would be evidence on Poly's systems – and there being

5   none in the record, Cisco cannot simply seek to fill in the blanks with speculation.

6   Cisco's theory strikes the court as similar to the theory of "inevitable disclosure"

7   that has been rejected by courts in this district, and which Cisco concedes is not good

8   law.  See Dkt. 301 at 23, fn. 13.  The "inevitable disclosure" doctrine is the idea that "a

9   plaintiff may prove a claim of threatened misappropriation of a trade secret by

10  demonstrating that a former employee's new employment will inevitably lead him to rely

11  on plaintiff's trade secret."  Bayer Corp. v. Roche Molecular Sys., Inc., 72 F.Supp.2d

12  1111, 1118 (N.D. Cal. 1999).  As Cisco concedes, the Bayer court held that "California

13  trade-secrets law does not recognize the theory of inevitable disclosure; indeed, such a

14  rule would run counter to the strong public policy in California favoring employee mobility.

15  A trade-secrets plaintiff must show an actual use or an actual threat."  Id. at 1120.

16  In the court's view, for the reasons stated above, Cisco has presented only

17  "allegations of possible future injury," rather than evidence of a "threatened injury" that is

18  "certainly impending to constitute injury in fact."  Clapper, 568 U.S. at 409.  Accordingly,

19  the court concludes that Cisco cannot establish standing to seek an injunction against

20  Chung.  Because injunctive relief is the only remedy sought against Chung, Chung's

21  motion for summary judgment is GRANTED as to all claims asserted against him.

b.      Standing to seek injunctive relief as to Poly

23  As with Chung, Cisco seeks injunctive relief against Poly as to only the Polaris-

24  related information, not the Sunkist-related information.  Dkt. 371 at 69:4-6.  And as with

25  Chung, Cisco must demonstrate standing to seek injunctive relief as to Poly, which

26  entails showing a threat of injury that is actual and imminent, and "certainly impending to

27  constitute injury in fact," while "allegations of possible future injury are not sufficient."

28  See, e.g., Summers, 555 U.S. at 493; Clapper, 568 U.S. at 409.

United States District Court
Northern District of California

1   Cisco's argument for standing as to Poly suffers from the same shortcomings as

2   its argument for standing as to Chung.  Specifically, even taking into account any alleged

3   spoliation, Cisco has not presented evidence of an actual or imminent threat that Poly will

4   misappropriate any Polaris-related trade secrets.  According to Cisco's own damages

5   expert, there is no evidence that Poly ever used Polaris documents or had them in its

6   possession at any time, let alone evidence that the Polaris documents remain in Poly's

7   possession as of now.  Dkt. 242 at 13 (citing Ex. 31 at ¶ 47).   In fact, Cisco's damages

8   expert set April 2020 as the end-date for any Polaris-related damages, as that is the date

9   when Cisco released their product containing the Polaris information.  See Dkt. 332 at 15

10   (citing Persechini damages report, ¶ 203).

11   Accordingly, the court has no basis for finding that Cisco has Article III standing to

12   seek an injunction as to Poly and the Polaris documents, and thus, the court GRANTS

13   Poly's motion for summary judgment as to the request for injunctive relief.

14   2.      Poly's motion for summary judgment re damages

15   Having concluded that Cisco does not have standing to seek injunctive relief as to

16   either defendant, the court will now analyze Cisco's claims against Poly for damages.

17   As an initial matter, the Ninth Circuit has made clear that federal and state trade

18   secret claims can be analyzed together "because the elements are substantially similar."

19   InteliClear, LLC v. ETC Global Holdings, Inc., 978 F.3d 653, 657 (9th Cir. 2020).  To

20   succeed on a claim under either the DTSA or the CUTSA, a plaintiff must show that (1) it

21   possessed a trade secret, (2) the defendant misappropriated the trade secret, and (3) the

22   plaintiff suffered damages as a result.  Alta Devices, Inc. v. LG Elecs., Inc., 343

23   F.Supp.3d 868, 877 (N.D. Cal. 2018) (citing 18 U.S.C. § 1839(5); Cal. Civ. Code §

24   3426.1(b)).  "Misappropriation" means either the "(1) [a]cquisition of a trade secret by

25   another person who knows or has reason to know that the trade secret was acquired by

26   improper means;" or the "(2) [d]isclosure or use of a trade secret of another without

27   express or implied consent."  Id.

28   Three types of damages are available to trade secret plaintiffs: (1) lost profits, (2)

11

1   unjust enrichment, and (3) reasonable royalties.  See 18 U.S.C. § 1836(b)(3)(B); Cal. Civ.

2   Code § 3426.3.  In this case, Cisco is not pursuing damages under a lost profits or unjust

3   enrichment theory, it is seeking only reasonable royalty damages.  See Dkt. 310 at 46.

4       Poly argues in its motion, and Cisco concedes in its opposition brief, that, to

5   receive reasonable royalty damages, federal trade secret law requires it to show either

6   "disclosure" or "use," i.e., "acquisition" is not sufficient.  See Dkt. 310 at 45 (citing 18

7   U.S.C. § 1836(b)(3)(B)(ii)).  Under California trade secret law, Cisco must show "use,"

8   neither "acquisition" nor "disclosure" are sufficient for reasonable royalty damages.  Id.

9   (citing Cal. Civ. Code § 3426.3(b)).  Thus, under either federal or state law, in order to

10  receive reasonable royalty damages, it is not enough to show that Poly simply "acquired"

11  the trade secrets.

12      As another threshold matter, the parties dispute the proper scope of the Sunkist-

13  related trade secret information.  Poly argues that Cisco limited its trade secret disclosure

14  to a single document, referred to as the "EA document" (for "endpoints and accessories").

15  Dkt. 261 at 27.  Cisco argues that the trade secret includes not only the EA document but

16  also an email that was sent from Chung to other Poly employees on June 4, 2019.  Dkt.

17  310 at 20.  Poly argues that the June 4 email must be treated as separate from the EA

18  document, especially given that some of the Sunkist-related information in the email is

19  directly contradicted by the information in the EA document.  Dkt. 261 at 30-31.  For

20  purposes of evaluating Poly's motion for summary judgment, the court will construe the

21  evidence in a light favorable to Cisco, the non-moving party, and will treat the June 4

22  email as part of the relevant trade secret.

23          a.   Disclosure

24      The key issue here is whether "disclosure" must be to a third party.  The trade

25  secret statutes do not specifically set forth such a requirement, but Poly cites multiple

26  courts in this district that have concluded that "disclosure" must indeed be to a third party.

27  See Palantir Techs. Inc. v. Abramowitz, 2022 WL 2952578 (N.D. Cal. July 26, 2022);

28  Netlist, Inc. v. SMART Storage Systems, Inc., 2014 WL 4380760 (N.D. Cal. Sept. 4,

United States District Court
Northern District of California

2014); MedioStream, Inc. v. Microsoft Corp., 869 F.Supp.2d 1095 (N.D. Cal. 2012).

The court finds the cases cited by Poly to be persuasive.  The alternative view would allow for an alleged misappropriator to be sued for disclosing a trade secret to himself.  Accordingly, because Cisco does not present evidence that Poly disclosed any trade secrets to a third party, the court concludes that Cisco cannot raise a triable issue as to whether Poly "disclosed" the trade secrets under the meaning of either the federal or state trade secret statutes.  Thus, in order to succeed on its damages claims, Cisco must show that Poly "used" the alleged trade secrets.

b.      Use

The key dispute here is what qualifies as "use" under the trade secret statutes. Poly cites the Ninth Circuit as holding that, to "use" a trade secret, a defendant "must have actually put the trade secret to some commercial use."  JustMed, Inc. v. Byce, 600 F.3d 1118, 1130 (9th Cir. 2010).  That court further held that "to sustain a trade secrets action under the 'use' prong of the statutory definition of 'misappropriation,' a plaintiff must necessarily demonstrate that the defendant received some sort of unfair trade advantage."  Id.

Poly argues that "use" is properly defined to include "employing the confidential information in manufacturing, production, research or development, marketing goods that embody the trade secret, or soliciting customers through the use of trade secret information."  BladeRoom Group Ltd. v. Facebook Inc., 2018 WL 514923, at *9 (N.D. Cal. Jan. 23, 2018) (citing PMC, Inc. v. Kadisha, 78 Cal.App.4th 1368, 1383 (2000)).  Poly summarizes its argument on use here:

> The undisputed evidence conclusively shows that Poly never used any of Cisco's claimed Sunkist or Polaris trade secrets.  Indeed, Cisco's experts concede that Poly did not incorporate any supposed Cisco trade secrets into any Poly products.  Remarkably, Cisco's product development expert, Mr. Ball, does not even mention, much less analyze, any Poly products in his report.  Nor does Mr. Ball make any attempt to argue that Poly acted on early knowledge of Sunkist or Polaris in any other way by, for example, pre-announcing a competing product, altering its own product development plans, or changing its marketing strategy.  Cisco's corporate representative and other witnesses also could not point to any evidence of Poly using

13

Cisco's alleged trade secrets.

Dkt. 261 at 33.

Cisco, in contrast, relies on cases holding that "nothing in the [C]UTSA requires that the defendant gain any advantage from the disclosure; it is sufficient to show 'use' by disclosure of a trade secret with actual or constructive knowledge that the secret was acquired under circumstances giving rise to a duty to maintain its secrecy." AT&T Comm. v. Pacific Bell, 1998 U.S. Dist. LEXIS 13459 at *7 (citing Religious Technology Center v. Netcom On-Line Communication Services, Inc., 923 F. Supp. 1231, 1257 (N.D. Cal. 1995)).  Cisco argues that Poly "used" the Sunkist information through its receipt of Sunkist information in the June 4 email, and the general impact it had on Poly's planning in the headset market.  Dkt. 310 at 27-28.

The cases cited by Cisco, AT&T and Religious Tech. Center, are district court cases that predate the Ninth Circuit opinion in JustMed.  Therefore, in the court's view, the "unfair trade advantage" rule of JustMed should be applied, rather than the contrary rule that was previously applied by the two district courts.

Cisco does cite a more recent case with an expansive definition of "use," Business Solutions LLC v. Gantara, 2020 WL 1279209 (C.D. Cal. Jan. 22, 2020).  While this case was decided after JustMed, it does not cite JustMed, instead citing a 2010 state appeals court case holding that "a person uses a trade secret when they directly employ the trade secret for any purpose."  See Business Solutions at *6 (citing Silvaco Data Sys. v. Intel Corp., 184 Cal.App.4th 210, 222 (2010)).

In addition to JustMed, Poly cites other cases from this district and others in the circuit that follow the JustMed view and require a plaintiff to show that a defendant received an "unfair trade advantage" from any misappropriation.  See, e.g., Payward, Inc. v. Runyon, 2021 WL 242903 (N.D. Cal. Jan. 25, 2021); Bartech Sys. Int'l, Inc. v. Mobile Simple Sales Solutions, Inc., 2016 WL 3002371 (D. Nev. May 24, 2016).

Overall, the JustMed case appears to be precedential, and Cisco has not provided the court with a basis to find otherwise.  Thus, the court will analyze whether Cisco has

presented evidence that Poly received an "unfair trade advantage" as a result of the

Sunkist information.

In its brief, Cisco endeavors to describe how Poly "used" the alleged trade secrets,

but its descriptions consist of vague generalities.  This is how Cisco describes the alleged

"use" by Poly:

> Poly accessed, analyzed, and proliferated the information to purposefully
> signal Cisco's emergence as a more significant competitor, thereby robbing
> Cisco of its exclusive right to control the dissemination of its Sunkist launch
> plans and prevent competitors from anticipating its market entry.
> …
> [T]he record indicates Poly gained an 'unfair trade advantage' through its
> exploitation of the Sunkist product development plan, which Cisco
> maintained a secret, to enhance its competitive intelligence efforts.

Dkt. 310 at 28.

Cisco is similarly vague in the introduction to the same brief, summarizing its "use"

argument as follows:

> Regarding use, Poly's employees used Cisco's trade secrets to do their
> jobs.  For example, Dr. Chung and the many Poly employees who
> disseminated or received the Project Sunkist trade secret information use
> that information to inform Poly's competitive strategies, and their comments
> and testimony indicate Poly valued that critical information that could not
> been acquired through public sources.

Dkt. 310 at 8.

A similar example of Cisco trying to describe the advantage gained by Poly:

> Poly received actual value from the Sunkist product development plan
> because that information signaled Cisco's emergence as a more significant
> competitor in the headset space.

Dkt. 310 at 39.

Reading these passages, the court cannot identify any unfair trade advantage that

Poly received.  Cisco also relies on speculation in describing any harm that it suffered:

> For example, disclosure of the Sunkist product development plans to
> competitors would allow those competitors to impair Cisco's ability to
> successfully launch the product – e.g. by interfering with Cisco supply
> chain, or by pre-announcing a competing product.

Dkt. 310 at 41.

If Poly had actually taken those actions – e.g., interfered with the supply chain,

15

1    pre-announced a competing product – that could constitute an unfair trade advantage,

2    but speculation about possible use is not the same as evidence of actual use.

3           Poly argues that the evidence of "use" in this case is similar to that in a case from

4    the Eastern District of California involving software for the health insurance business.

5    See Agency Solutions.com, LLC v. TriZetto Group, Inc., 819 F.Supp.2d 1001 (E.D. Cal.

6    2011).  The plaintiff claimed that the defendant had improperly used its trade secret,

7    which came in the form of a high-level document describing a software process, which

8    "reveals no source code but does specify software requirements, how it is accessed, and

9    describes the data elements" of the software process."  Id. at 1023.  The plaintiff argued

10   that the trade secret was given to defendant "not for the purpose of providing specific

11   information to be incorporated into [defendant's] programming, but for background

12   information on how they (plaintiff) carry out a function that can be assumed to be carried

13   out in similar, though not identical, ways by other companies in the business."  Id. at

14   1024.  The court concluded that the document, "even if it qualifies as a trade secret itself,

15   does not appear to have been used by [defendant]."  Id. (emphasis in original).  "At

16   maximum, [plaintiff] alleges that the [] document helped [defendant] to understand how a

17   sales automation application such as [plaintiff's] works," which "falls far short of alleging

18   that [defendant] actually used, much less embodied, the information in the [] document

19   into any program or description."  Id. (emphasis added).  This strikes the court as similar

20   to the supposed 'advantage' that Poly gained in this case – the general knowledge that

21   Cisco would be making more of an effort to compete in the headset market.  On that

22   point, the court finds the reasoning of Agency Solutions.com to be persuasive, and

23   similarly concludes that such general knowledge of business plans, without more, is not

24   enough to constitute "use" of a trade secret.

25          Here, as before, Cisco seeks to bridge any evidentiary gap by pointing to the

26   alleged evidentiary spoliation.  Specifically, Cisco argues that evidence of Poly's "use"

27   was spoliated by either the deletion of the files on Chung's Macbook or of the Sharepoint

28   audit logs.  However, as discussed in the context of Cisco's claims for injunctive relief,

United States District Court
Northern District of California

1   the allegedly-spoliated data would have shown only the extent to which certain files were

2   accessed by Chung or Sharepoint users.  Any evidence of actual "use" by Poly – i.e., the

3   type of use that would give rise to an unfair trade advantage – would have still been on

4   Poly's systems, and Cisco has had a full opportunity to take discovery regarding those

5   systems.  Cisco cannot point to alleged spoliation as a means of avoiding its burden to

6   raise a triable issue of fact as to Poly's "use."

7          Thus, the court concludes that Cisco has failed to raise a triable issue of fact as to

8   Poly's own use or disclosure of any trade secret information.  The court will now assess

9   whether Cisco has raised a triable issue of fact as to whether Poly is liable for any

10  alleged disclosure or use by another party; specifically, Cisco argues that Poly is liable for

11  the conduct of Chung via a ratification theory, and also argues that Poly is liable for the

12  conduct of Chung and He via a vicarious liability theory.

13              c.      Ratification

14         Ratification "is generally applied where an employer fails to investigate or respond

15  to charges that an employee committed an intentional tort."  C.R. v. Tenet Healthcare

16  Corp., 169 Cal.App.4th 1094, 1110 (2009).

17         Cisco acknowledges that Poly did indeed investigate Chung, but it now claims that

18  certain aspects of the investigation were deficient, and its overarching argument is that

19  "Poly's myopic approach limited its inquiry to responding only to specific concerns that

20  Cisco identified rather than taking Cisco's concerns and conducting a fulsome

21  investigation."  Dkt. 310 at 30.

22         There are two flaws in Cisco's argument.  First, the sequence of events

23  surrounding Poly's investigation directly contradicts Cisco's characterization.  According

24  to the undisputed evidence in the record, Cisco initially contacted Poly about potential

25  misappropriation by James He, and when Poly initiated an investigation into He, it

26  decided on its own to expand the scope of the investigation to include Chung.  See Dkt.

27  261, Ex. 34. 36.  If Poly had truly sought to limit its inquiry and avoid a fulsome

28  investigation, it would not have voluntarily expanded the scope of its investigation to

United States District Court
Northern District of California

United States District Court
Northern District of California

1   include Chung.  Second, even if Poly had confined its investigation to the parameters

2   defined by Cisco, it is not clear that Poly would have acted improperly by doing so.  Cisco

3   was in the best position to determine which of its trade secrets had allegedly been

4   misappropriated, so it seems reasonable for Poly to be responsive to Cisco's

5   characterization of the scope of the needed investigation.  To that end, when Cisco

6   eventually did alert Poly to potential misappropriation by Chung, Poly preserved Chung's

7   laptop and phone and sent them to a third-party forensics firm where searches were run

8   at Cisco's request.  See Dkt. 261 at 21-23.  The record further indicates that Cisco

9   thanked Poly for its cooperation and expressed appreciation for its efforts.  See, e.g., Dkt.

10  261, Ex. 77.  On these facts, the court cannot find that Cisco raised a triable issue as to

11  whether Poly "failed to investigate or respond" to the complaints of potential trade secret

12  misappropriation.

13         Accordingly, for the reasons set forth above, the court concludes that there is no

14  triable issue of fact as to whether Poly ratified Chung's conduct.

15                 d.     Vicarious liability

16         To succeed on this theory, Cisco needs to show that Chung or He were acting in

17  the scope of their employment when they misappropriated trade secrets.  See, e.g.,

18  Citcon USA v. RiverPay Inc., 2019 WL 917056, at *5-6 (N.D. Cal. Feb. 25, 2019); Duste

19  v. Chevron Prods. Co., 738 F.Supp.2d 1027, 1044 (N.D. Cal. 2010).

20         Starting with He, Cisco is not clear in specifying exactly what conduct of He's is

21  relevant to this claim against Poly.  Poly's opening motion suggests that Cisco had been

22  claiming that He's downloading of files was conduct for which Poly was vicariously liable,

23  but in Cisco's opposition, it appears to have narrowed its He-related claims to the single

24  act of He's receipt of Chung's June 4 email.  See Dkt. 310 at 33-34.  Cisco argues that

25  He improperly acquired trade secret information via that email, and that Poly is

26  vicariously liable for He's improper acquisition.  However, as mentioned above, to prove a

27  right to reasonable royalty damages, it is not enough for Cisco to show acquisition – it

28  must show disclosure or use.  Thus, any vicarious liability for acquisition is irrelevant, and

1   as a result, any vicarious liability allegations related to He are irrelevant.  Therefore, the

2   court's analysis of vicarious liability is limited to whether Poly is vicariously liable for any

3   disclosure or use by Chung.

4        As to Chung, Cisco argues that Chung's actions were intended to benefit Poly.

5   But this argument is belied by the sequence of events surrounding the investigation,

6   which was voluntarily widened by Poly to include not just He, but also Chung.  If Chung

7   was acting at Poly's behest, there would have been no reason for Poly to be proactive

8   about the investigation and widen its scope beyond just the single individual that Cisco

9   had identified.  Just as this sequence of events undermines Cisco's arguments regarding

10  ratification, so too it undermines Cisco's arguments regarding vicarious liability.  Simply

11  put, if Chung was acting for Poly's benefit, why would Poly voluntarily investigate him,

12  place a litigation hold on his data, and place him on administrative leave?

13       The main case cited by Cisco is <u>SolarCity Corp. v. Pure Solar Co.</u>, 2016 WL

14  11011989 (C.D. Cal. Dec. 27, 2016), but the court in that case found that, even after the

15  defendant-employer was notified of potential trade secret misappropriation, it continued

16  to use the misappropriated information.  As discussed above, Cisco has not presented

17  any evidence of Poly's use, let alone continued use after it was notified of potential

18  misappropriation.

19       Thus, the court concludes that Cisco has not raised a triable issue of fact as to

20  Poly's vicarious liability for the acts of Chung or He.

21       Because Cisco has not raised a triable issue of fact as to Poly's disclosure or use

22  of the alleged trade secrets – either for its own conduct, or under a ratification theory or a

23  vicarious liability theory – the court concludes that Poly's motion for summary judgment

24  must be GRANTED as to Cisco's claims for damages.

25            e.    "Knew or had reason to know"

26       Even if Cisco were able to raise a triable issue as to Poly's disclosure or use, it

27  must also show that any such disclosure/use was made when Poly knew or had reason

28  to know that the information was either (1) obtained by improper means, (2) subject to a

United States District Court
Northern District of California

1    duty to maintain its secrecy or limit its use.  See 18 U.S.C. § 1839(5)(B); Cal. Civ. Code §

2    3426(b)(2)(A).  "Improper means . . . includes theft, bribery, misrepresentation, breach or

3    inducement of a breach of a duty to maintain secrecy, or espionage through electronic or

4    other means."  18 U.S.C. § 1839(6); Cal. Civ. Code § 3426(a).

5         Poly argues that, at the time it received the June 4 email, it had no reason to know

6    that the Sunkist-related information was obtained by improper means or subject to a duty

7    to maintain its secrecy or limit its use.  Poly argues that, "on its face, the high-level

8    information in the email would not have appeared to be a trade secret, let alone

9    confidential, and Cisco can cite to no evidence that Poly had reason to know it contained

10   information that had been improperly acquired."  Dkt. 261 at 32

11        Rather than providing any specific reason why Poly would have known that the

12   June 4 email had secret information, Cisco instead relies on general principles of

13   employee confidentiality.  Cisco does not directly answer the question of how Poly would

14   have known that the specific information in the June 4 email was obtained by improper

15   means.  Cisco instead cites to general, boilerplate language about the obligation of

16   employees to not reveal their former employees' confidential information:

         No doubt exists that Poly was aware of Dr. Chung's confidentiality
17       obligations to his former employer Cisco. Poly knew that proprietary
         information agreements like the one Dr. Chung had with Cisco are common
18       in the industry. . . Additionally, Poly's code of business conduct provides:
         'Poly does employ former employees of competitors, we recognize and
19       respect the obligations of those associates not to use or disclose the
         confidential information of their former employers.'  In view of these facts,
20       Poly knew or should have known that Dr. Chung owed a duty to Cisco to
         maintain the secrecy of the Sunkist product development plan.
21
22   Dkt. 310 at 28.

23        In the court's reading, Cisco's conclusion does not follow from its premises.  Poly

24   was presumably aware that Dr. Chung was bound by certain Cisco confidentiality

25   provisions, but that is different from asking whether Poly would have known, from the

26   face of the June 4 email, that the information contained in that email was obtained by

27   improper means.  Cisco's general citations to confidentiality agreements and industry

28

practice do not provide any specific reason why Poly knew or should have known specifically that the June 4 email contained improperly-obtained information.

In fact, one of Cisco's arguments actually undermines its own point. It argues that Chung's role at Poly was to provide "competitive intelligence" about Cisco. Dkt. 310 at 25. Cisco provides multiple citations to exhibits where Chung spoke about Cisco products to Poly employees. See id. However, Cisco does not appear to be claiming that any of the information in those exhibits was a trade secret. In other words, it appears that it was common for Chung, in his role at Poly, to discuss Cisco products and provide insight from his experience at Cisco, without revealing trade secrets. Given those facts, the court is unable to find support for Cisco's argument that Chung's June 4 email would have stood out to its recipients at Poly as containing misappropriated information.

Moreover, the evidence shows that Cisco began announcing the Sunkist product during the same approximate timeframe as the June 4 email. Poly has submitted evidence that Cisco announced the product at a "Cisco Live" event between June 9-13, 2019. See Dkt. 261, Ex. 84. Cisco is non-committal about when the product became known to the public, stating only that the product was officially announced in November 2019, without acknowledging the evidence that it was unofficially announced earlier than that. Dkt. 310 at 37.

For instance, Poly provides an email thread including slides of the Sunkist product and a Cisco employee stating that "the new headsets were on display at our Annual Sales Event in Las Vegas." See Dkt. 261, Ex. 30 at 3. The email was sent in August 2019, but it is unclear when the Las Vegas event was (though the verb tense suggests it was before the email). In the same August 2019 email thread, a Cisco employee informs recipients outside Cisco of the impending Sunkist product release "around Dec/Jan timeframe" – in other words, Cisco employees were informing non-Cisco employees about an unreleased product, which undermines Cisco's argument that any discussion of an unreleased product should automatically cause the listener to "know or have reason to know" that they have received trade secret-protectable information.

21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Overall, the court need not – and in fact, cannot, given the conflicting evidence – definitively resolve when the Sunkist product became public, but even if the evidence is construed in Cisco's favor, it seems clear that, by the time Poly had notice of potential wrongdoing by Chung, Cisco was already in the process of informing the public about its new product.  The imminence of Cisco's public announcement provides a further basis for concluding that Cisco has not presented evidence that Poly knew or had reason to know that the Sunkist information was obtained by improper means or subject to a duty of secrecy.

Thus, because Cisco has not raised a triable issue of fact as to whether Poly knew or should have known that the information in the June 4 email was improperly acquired or subject to a duty of secrecy, that provides an independent basis for GRANTING Poly's motion for summary judgment

The court need not – and does not – reach Poly's two remaining arguments, that Cisco failed to take reasonable steps to protect its trade secrets, or that the alleged trade secrets have no independent economic value.

    f.  Proof of damages

For the same reasons that Cisco cannot establish a triable issue as to "use," it also cannot establish a triable issue as to the damages element of a trade secret claim.  In other words, the lack of an 'unfair trade advantage' means not only that Poly did not 'use' the trade secrets within the meaning of the statutes, it also means that Cisco did not suffer any harm as a result of Poly's conduct.  Thus, for the same reason that Cisco cannot demonstrate 'use,' it similarly cannot demonstrate damages.  This provides an alternate basis for granting Poly's summary judgment motion, though it involves the same analysis as for the "use" prong.

    3.  Other motions

In light of defendants' motions for summary judgment being granted as to all claims, Cisco's motion for partial summary judgment regarding affirmative defenses (Dkt. 251) is denied as moot.  Poly's <u>Daubert</u> motions (Dkt. 248, 253, 258) are similarly denied

1  as moot.  Cisco's later-filed <u>Daubert</u> motions (Dkt. 340, 343, 346, 350, 353) are also
2  denied as moot.

3       As mentioned above, the parties have filed a total of 47 sealing motions.  <u>See</u> Dkt.
4  228, 229, 231, 232, 239, 241, 249, 250, 254, 255, 259, 260, 262, 263, 266, 267, 269,
5  270, 271, 279, 280, 283, 284, 287, 295, 296, 302, 303, 304, 307, 308, 309, 311, 331,
6  334, 339, 341, 342, 345, 347, 348, 349, 351, 352, 365, 367, 372.  As discussed at the
7  hearing, none of the material in the parties' briefs meets the Ninth's Circuit's high
8  threshold for sealing records attached to dispositive motions, that "compelling reasons"
9  support secrecy.  <u>See</u> <u>Kamakana v. City and County of Honolulu</u>, 447 F.3d 1172, 1180
10  (9th Cir. 2006).  To the extent that any party seeks the sealing of any portion of the briefs,
11  that request is DENIED.  All parties are directed to file unredacted versions of its briefs on
12  the public docket, no later than **April 7, 2023**.

13       As to the sealing of the exhibits submitted by the parties, the motions to seal such
14  exhibits are DENIED without prejudice.  The court will allow the parties to file a renewed,
15  narrowed motion to seal, seeking only the sealing of exhibits, or portions thereof, that the
16  parties wish to have be part of the summary judgment record in light of this order, and
17  those exhibits, or portions thereof, which also meet the high standard for sealing, i.e.,
18  those exhibits for which the parties would seek to seal the courtroom if presented to a
19  jury.  Any renewed motion must be consistent with this district's Civil Local Rule 79-5,
20  which states that parties must "avoid wherever possible sealing entire documents (as
21  opposed to merely redacting the truly sensitive information in a document)."  Any
22  renewed motion to seal must be filed no later than **April 7, 2023**.

23                              **CONCLUSION**

24       For the foregoing reasons, Poly's motion for summary judgment (Dkt. 261) is
25  GRANTED, Chung's motion for summary judgment (Dkt. 251) is GRANTED, Cisco's
26  motions for evidentiary sanctions (Dkt. 230, 233) are DENIED, Cisco's motion for partial
27  summary judgment is denied (Dkt. 252) as moot, and all pending <u>Daubert</u> motions (Dkt.
28  248, 253, 258, 340, 343, 350, 353) are denied as moot.

The motions to seal are denied to the extent they seek sealing of any portion of any brief, and denied without prejudice to the extent they seek sealing of a narrowed set of exhibits.

**IT IS SO ORDERED.**

Dated:  March 22, 2023

_/s/ Phyllis J. Hamilton_
PHYLLIS J. HAMILTON
United States District Judge